```
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3   UNITED STATES OF AMERICA,      ) Docket No. 14 CR 447
                                    )
 4                     Plaintiff,)
                                    )
 5              vs.                 )
                                    )
 6   HAKEEM EL BEY,                 ) Chicago, Illinois
                                    ) September 11, 2015
 7                    Defendant.) 10:00 o'clock a.m.

 8              TRANSCRIPT OF PROCEEDINGS - STATUS
              BEFORE THE HONORABLE RICHARD A. POSNER
 9
     APPEARANCES:
10
     For the Plaintiff:        HON. ZACHARY T. FARDON
11                             United States Attorney
                               BY:  MR. CHRISTOPHER P. HOTALING
12                                  MS. KATHRYN E. MALIZIA
                               219 S. Dearborn St., Suite 500
13                             Chicago, Illinois  60604

14   For the Defendant:        MR. HAKEEM EL BEY, Pro Se

15   For the Defendant as      JENNER & BLOCK LLP
     Standby Counsel:          BY:  MR. GABRIEL A. FUENTES,
16                             353 North Clark Street
                               Chicago, Illinois  60654
17
     Also Present:             MS. SANDRA DeNICHOLAS, Probation
18
     Court Reporter:           MR. JOSEPH RICKHOFF
19                             Official Court Reporter
                               219 S. Dearborn St., Suite 1232
20                             Chicago, Illinois  60604
                               (312) 435-5562
21
                 * * * * * * * * * * * * * * * * *
22
                     PROCEEDINGS RECORDED BY
23                   MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED BY COMPUTER
24

25
```

```
 1              THE CLERK:  14 CR 447, USA vs. Hakeem El Bey.  For

 2    status.

 3              MS. MALIZIA:  Good morning, your Honor, Kathryn

 4    Malizia and Christopher Hotaling on behalf of the United

 5    States.

 6              THE COURT:  I'm sorry?

 7              MS. MALIZIA:  Good morning, your Honor, Kathryn

 8    Malizia and Christopher Hotaling on behalf of the United

 9    States.

10              MR. HOTALING:  Good morning, your Honor.

11              MS. DeNICHOLAS:  Good morning, your Honor.

12              MR. FUENTES:  Gabe Fuentes, standby counsel, present

13    for the defendant as standby counsel.

14              MS. DeNICHOLAS:  Good morning, your Honor, Sandra

15    DeNicholas from the Department of Probation.

16              THE COURT:  Okay.

17              So, Mr. El Bey, I regret having to issue a drag order

18    to bring you here, but you have to obey the Court's orders.  I

19    had ordered you to appear yesterday for the status conference.

20    Your no-show wasted my time, time of the law clerks, time of

21    the stenographer and courtroom deputy, marshals' time, the

22    time of the prosecutors, time of the standby counsel

23    Mr. Starsky (phonetic), who was substituting for Mr. Fuentes

24    yesterday.

25              You know that failure to obey a Court order can lead
```

1    to a separate punishment for contempt of court, longer

2    sentence on the original charges on the ground of disrespect

3    for the law and the likelihood, therefore, of future criminal

4    acts.

5              THE DEFENDANT:  Well, Judge, you said that the court

6    was on September 17th.  So, that's the date I was looking for,

7    September 17th.

8              THE COURT:  Yes, but I had set the sentencing -- this

9    status hearing for yesterday --

10             THE DEFENDANT:  I've never heard anything --

11             THE COURT:  -- and you were ordered --

12             THE DEFENDANT:  It's the first time I'm ever hearing

13   this.  I never heard anything about a status or --

14             THE COURT:  What, no one gave -- he was not provided

15   with the order?

16             THE DEFENDANT:  I haven't have any paperwork.  No one

17   sent me anything.

18             THE COURT:  Is that true?

19             THE DEFENDANT:  So, I don't know anything about

20   what's going on.  So, if I'm -- if I'm -- if I'm defending

21   Hakeem El Bey, then I need to know what's going on.  And no

22   one's telling me anything, so I don't know anything.

23             So, if you said the 17th, then I'm set for the 17th,

24   and not for the 9th or the 10th.  So, I don't see how I

25   violated anything if I didn't know.

```
 1              THE COURT:  Is that true?  Mr. El Bey didn't get
 2    the --
 3              MS. MALIZIA:  Your Honor, it's very possible the
 4    Court may have mailed him notice, but I can't say whether or
 5    not he would have received it in Kankakee.
 6              THE DEFENDANT:  I haven't received -- they hadn't
 7    sent anything to me in Kankakee and definitely not at my house
 8    because someone's at my house waiting for any mail to come.
 9              MR. HOTALING:  Judge, this is some of the
10    circumstances, the difficulties that arise when you have pro
11    se defendants.  He's obviously at Kankakee.
12              I'm assuming, Mr. El Bey, that you don't have --
13              THE DEFENDANT:  But I'm not pro se.  I'm sui juris.
14              MR. HOTALING:  Okay.  Whatever it is that you are --
15              THE DEFENDANT:  Okay.
16              MR. HOTALING:  -- I'm assuming -- the question really
17    wasn't about so much about that.  It's whether or not you have
18    Internet access such that you can consult the docket if you
19    wanted to.
20              THE DEFENDANT:  Well, I don't have Internet access
21    locked up.
22              MR. HOTALING:  And I think that's probably right,
23    Judge.
24              So, it certainly could have been if the Court
25    ordered -- if the Court mailed him a copy of the order to him
```

1   at Kankakee, it could -- and that was on Tuesday, it could

2   have been the case that he did not receive it prior to

3   Thursday's court appearance.  That's certainly a possibility.

4           THE COURT:  Okay.  Well, given the possibility, we

5   won't worry about you not showing up yesterday.

6           Now, I have to ask you, Mr. El Bey, whether you are

7   planning to show up at the sentencing hearing next Thursday.

8   You don't have to.  You are not required to appear at

9   sentencing.  But it's important for you that you come.

10          The reason for that is that at a sentencing hearing,

11  defendant has a right of what's called allocution.  And what

12  that means is that before the judge sentences him, he has a

13  right to give an explanation of his situation, his

14  perspective, his understanding of the case, anything that you

15  might think of which would tend to persuade the judge to give

16  a lighter sentence.

17          So, that's the advantage of being at the sentencing

18  hearing.

19          If you're not at the sentencing hearing, you forfeit

20  this right of allocution.  So, you really ought to be here.

21  Unlike today, when you were ordered to appear and the drag

22  order made that explicit, you don't have to come to the

23  sentencing hearing.  But I would advise you to because it will

24  give you a chance to give a full statement of your position.

25          Now, there's another consequence if you decide not to

1    appear at the sentencing hearing, which is that that would

2    require me to revoke your pro se or, as you call it, sui juris

3    status and direct Mr. Fuentes to represent you.  So, if you

4    want to remain pro se, that's another reason for attending the

5    sentencing hearing.

6         So, let me ask you -- I mean, you can take a few

7    minutes to decide if you want, or you can decide tomorrow for

8    that matter -- but do you want to be present at the sentencing

9    hearing next week?

10        THE DEFENDANT:  Yeah, I'm pretty sure I'm going to be

11   here.

12        THE COURT:  Okay.

13        THE DEFENDANT:  Yeah.

14        THE COURT:  That's fine.

15        I want to clarify something I said at the bond

16   revocation hearing.  I said that you were incapable of

17   representing yourself.  And what my exact words were from the

18   transcript, that, "You should have listened to me at the first

19   hearing when I said you needed a lawyer.  You're not a lawyer.

20   You're incapable of defending yourself.  You live in a dream

21   world."

22        And what worried me is that those words, you know, or

23   that statement I just quoted taken literally might seem to

24   imply that I shouldn't have allowed you to represent yourself.

25   But I didn't mean to say that.  I mean, I think you're

1     intelligent.  You're lucid, as far as I can tell.  You're

2     perfectly normal psychiatrically.

3          What I meant was that because you lack legal training

4     and because you're committed to views about the law that are

5     not valid in the American legal system, you would not be an

6     adequate substitute for a lawyer.  And I still think that's

7     true.

8          But you have a right to appear without a lawyer

9     because I don't believe you have a mental defect.  And, in

10    fact, just by coincidence, just a week ago the court of

11    appeals, in a case that I had no involvement in at all -- a

12    case called United States vs. Anzaldi -- the court dealt at

13    length with this distinction I've just mentioned between not

14    being really in a good position to defend yourself but, on the

15    other hand, having the right to defend yourself because you

16    are mentally normal.

17         So, what the court said was -- quoting an earlier

18    decision, said -- adherence to bizarre legal theories does not

19    imply mental instability or cognitive defect so great that the

20    district court is required to order a mental competency

21    examination.

22         Now, that earlier case from which this quotation was

23    taken in Anzaldi is a case called United States vs. James and

24    involved a member of the Moorish Science Temple.  And the

25    court held that the defendant's reliance on the legal theory

1   that members of the temple, like yourself, have articulated

2   did not require the district court to hold a competency

3   hearing.  Because one can be perfectly competent mentally --

4   as I believe you are -- but have ideas that are not recognized

5   as valid in the legal system.

6       Now, another point, I think it would be a benefit to

7   you if you -- if Mr. Fuentes has a chance to speak, to say

8   something at the sentencing hearing.  But that's your choice.

9       You'll be able to speak yourself.  That's the right

10  of allocution I mentioned.  But you can do that and also have

11  the benefit of any additional information, argument, and so

12  on, that Mr. Fuentes would present.  And if he says things

13  that you think are helpful, you can adopt them, obviously.  If

14  he says things that you disagree with, you can explain that,

15  tell me that at the hearing.

16      So, my question for you, is it okay with you for

17  Mr. Fuentes to make a statement at the sentencing hearing?

18       THE DEFENDANT:  No.

19       THE COURT:  No.  Okay.  Well, then he can't.

20      Now, my last point -- this will be a very brief

21  session -- I want to ask the prosecutors and the probation

22  officer whether either the government or the Probation --

23  either the prosecutors or the Probation Service wants to

24  update the sentencing recommendation that you made previously

25  in light of anything that's gone on since?

1    MS. DeNICHOLAS:  Your Honor, on February -- I'm

2 sorry.  On September 8th, I did file an updated Presentence

3 Report that included information respective to the violation

4 of bond.

5    THE COURT:  Do we have that?

6    MS. MALIZIA:  I will tender a copy to the Court and

7 to the defendant right now.

8    THE COURT:  So, we have that?

9    A LAW CLERK:  Yes.

10    MS. DeNICHOLAS:  And I did a revised recommendation

11 based on that new information.  So, I believe that the

12 prosecutor is going to give the defendant a copy -- hard

13 copy -- right now, just to be sure that he has that.

14    THE COURT:  So, has Mr. El Bey gotten your updated --

15    MS. MALIZIA:  Your Honor, we just handed him a copy.

16    THE COURT:  No, I meant from the Probation Service.

17    MS. MALIZIA:  Yes.

18    MS. DeNICHOLAS:  That is the report that they handed

19 him, is my report.  I did mail it inadvertently to the

20 Metropolitan Correctional Center.  So, since yesterday --

21    THE COURT:  Right.

22    MS. DeNICHOLAS:  -- in court I learned that he was at

23 Kankakee, I doubt that he would have received it by mail at

24 this point.  So, the prosecutor --

25    THE COURT:  Oh, so you are giving me --

1          MS. DeNICHOLAS:  -- brought an extra copy to give him

2   right now.

3          THE COURT:  Right now.

4          MS. DeNICHOLAS:  Yes.

5          MS. MALIZIA:  Yes, your Honor.

6          THE COURT:  But do the prosecutors intend to --

7          MS. MALIZIA:  Your Honor, we are --

8          THE COURT:  -- update their recommendation?

9          MS. MALIZIA:  Your Honor, we're in agreement with

10  Probation's recommendation.  We will be advocating for the

11  two-level obstruction enhancement at sentencing.  In light of

12  the fact that we are in agreement, we will advocate for that

13  orally, as well as the higher Guidelines range.  But we are

14  not planning to file anything at this time.

15          THE COURT:  That's fine.

16          MS. MALIZIA:  Your Honor, the government would also

17  move to unseal Probation's sentencing recommendation.

18  Traditionally, that is under seal unless the Court makes it

19  available to both parties.  The government would move to make

20  it available to Mr. El Bey and to the government at this time.

21          THE COURT:  So, that's okay with the Probation

22  Service?

23          MS. DeNICHOLAS:  Your Honor, we typically object to

24  releasing our recommendation, but that's merely just a policy

25  that we've always had.  In this case, I don't have any

1    objection to releasing the --

2            THE COURT:  So, that's fine.

3            MS. DeNICHOLAS:  -- original and revised

4    recommendation.  I think it might be a good idea.

5            THE COURT:  That's fine.  You can do that.

6            MS. MALIZIA:  Thank you, Judge.

7            MR. HOTALING:  But it is important that the Court

8    issue an order allowing both parties to have access to the --

9            THE COURT:  Okay.  I have to issue an order.

10           MR. HOTALING:  -- Probation Office recommendation.

11           THE COURT:  Okay.

12           MS. DeNICHOLAS:  I would include standby counsel, as

13   well, just --

14           MR. HOTALING:  Agreed.

15           THE COURT:  Providing it to standby --

16           MS. DeNICHOLAS:  Providing it to standby counsel.

17           THE COURT:  Right.

18           MR. HOTALING:  We would agree with that.

19           THE COURT:  Is there any other order that I should

20   issue?

21           MS. MALIZIA:  I don't believe so, your Honor.

22           THE COURT:  Is there anything, Mr. El Bey, that you'd

23   like to bring up?

24           THE DEFENDANT:  Well, I'm just -- I just wanted to

25   know -- I know you said the 17th and I know you said so when I

1    denied -- I denied it because it was for the 17th and not the

2    9th.  But, you know, I'm getting it now and so -- okay.  And

3    the fact that -- again, I have to ask you, Judge, I still

4    haven't seen the warrant.

5            THE COURT:  I'm sorry, you haven't, what?

6            THE DEFENDANT:  I still haven't seen the warrant.

7            THE COURT:  Oh, the warrant.

8            THE DEFENDANT:  Yes, sir.  I've asked for the

9    warrant.

10           THE COURT:  The bench warrant.

11           THE DEFENDANT:  And by law, legally you have to show

12   me the warrant if you issue one.  And I think it's two weeks

13   that went by, I still haven't received -- I haven't -- is it

14   filed on the case or -- I mean, I haven't seen anything.

15           I'm just saying if you came and got me, if you kidnap

16   me and brought me to this dead man court and you haven't shown

17   me the warrant, I'm just saying that's a violation.  I just

18   need to know if you have the warrant.  That's all I ask for.

19   Nothing else.

20           THE COURT:  Well, at the last conference, our last

21   little meeting --

22           THE DEFENDANT:  You told me "No."

23           THE COURT:  -- before I issued the bench warrant, I

24   said -- I'm just rereading the transcript.  I had said if you

25   wanted to see the warrant, sure, you can see the warrant,

1    right?

2            THE DEFENDANT:  No.  You told me "No" last time I was

3    in court.  Two weeks ago you told me, no, I couldn't see it.

4    I asked you could I see the warrant.  That's all I ever asked

5    you for.

6            THE COURT:  Well, actually -- well, I said both.

7            So, is there any objection to showing --

8            MS. MALIZIA:  Your Honor, we have no objection.  We

9    would note, again, that Mr. El Bey -- I'm not really sure what

10   the purpose of showing him the warrant would serve, given that

11   you are present here and telling him that you issued that

12   warrant.  I'm not sure if he's questioning that reality.  But

13   we can obtain a copy of -- a physical copy of -- the warrant

14   for him if that's your Honor's wish.

15           THE COURT:  Yeah, I'd prefer that.  It's, obviously,

16   important to him.

17           THE DEFENDANT:  I'd like to see it in writing with

18   your -- with your -- signature on it.

19           THE COURT:  Yeah.

20           THE DEFENDANT:  Not a stamp, but a signature.

21           MR. HOTALING:  Okay.  Now, wait.

22           MS. MALIZIA:  This is -- your Honor, this is where

23   I --

24           MR. HOTALING:  He's asking for stuff that's just --

25           THE DEFENDANT:  I'm only talking to the Judge.  I

```
 1   don't know why they always talk for you and they don't know
 2   what you know.
 3            Mr. Posner -- Judge Posner -- if I may, your Honor,
 4   is it okay if I ask you can I get a copy of your warrant?
 5   That's all I wanted to see.
 6            MS. MALIZIA:  We have one on hand.
 7      (Document tendered to the defendant.)
 8            MR. HOTALING:  He's getting a copy.
 9            THE COURT:  Is that it?
10            MR. HOTALING:  Uh-huh.
11            THE COURT:  Okay.
12            MS. MALIZIA:  Your Honor, while Mr. El Bey is
13   reviewing the warrant, it may be beneficial before we adjourn
14   today to maybe give him an overview of what the sentencing
15   hearing will entail just in terms of what will be covered.
16            THE COURT:  Okay.  I think that's a good idea.  Yes.
17      (Brief pause.)
18            THE DEFENDANT:  But it's not -- it's not -- signed
19   by -- it's not signed by you, Judge.
20      (Brief pause.)
21            MS. MALIZIA:  I think maybe Mr. El Bey's source of
22   confusion is that --
23            THE DEFENDANT:  I'm not confused.  I just asked to
24   see the warrant.  That's all I asked.  There's no confusion.
25   If you can show it to me, I don't have a problem with it.
```

1   There's no confusion.

2           MR. HOTALING:  So, there shouldn't be a problem

3   because he has it.  So, we should be all taken care of.

4           THE DEFENDANT:  But it has to be a wet ink signature,

5   and it doesn't have a affidavit, Judge.  You know by law --

6   you're a judge.  We just talking.  By law, it says when a

7   judge issue a warrant, it has to be with an affidavit with a

8   wet ink signature and this is not --

9           THE COURT REPORTER:  I'm sorry?

10          THE DEFENDANT:  It has to be an affidavit or his oath

11  with a wet ink signature on it or also a wet ink signature

12  with the warrant.  This is not a wet ink signature.  This is

13  typed.  So, this is -- this is -- still is not right.  The

14  Judge has to sign it.  It has to have his hand -- his

15  autograph on it.  So, this is not sufficient enough.

16          But do you mind if I keep this copy, Judge?

17          THE COURT:  That's up to the marshal.  I don't know

18  whether --

19          THE DEFENDANT:  Do you all -- do you mind if I keep

20  it with the rest of my documents?

21          THE MARSHAL:  If you don't mind, your Honor, I don't

22  mind.

23          THE COURT:  In other words, do you have other copies?

24  It's not your only copy.

25          THE MARSHAL:  It's on file.

```
 1            MS. MALIZIA:  It's on -- yes.

 2            THE MARSHAL:  We don't have an objection --

 3            THE COURT:  That's fine, yes.

 4            THE MARSHAL: -- your Honor, if you don't.

 5            THE COURT:  You can keep them.

 6            THE DEFENDANT:  Okay.  Thank you.

 7            MS. MALIZIA:  Your Honor, I have here a copy of the

 8     probation officer's revised sentencing recommendation, which

 9     I'm going to tender to Mr. El Bey right now so he has a copy

10     of the sentencing recommendation at this time.

11        (Document tendered.)

12            MS. MALIZIA:  This is pursuant --

13            THE COURT:  Is this the original one?

14            MS. MALIZIA:  This is pursuant -- do we have the

15     original, as well?

16            MS. DeNICHOLAS:  Your Honor, I know that you don't

17     have it.  The clerk does not have that.  I included the

18     original, all of the justification, in the revised.  So, there

19     is nothing additional that would be in that recommendation

20     that is not in this revised recommendation.

21            I can provide a copy, but it is the same information

22     with the additional information in the revised rec.  There is

23     nothing that was eliminated in the revised recommendation.

24     So, he has everything that the Probation Office has filed with

25     the Court.
```

```
 1          THE COURT:  So, including the Justice Department's

 2   sentencing recommendation?

 3          MS. MALIZIA:  Your Honor, Mr. El Bey has received, I

 4   believe, at this point multiple copies of our sentencing

 5   memorandum.  We gave it to him in person, and he was also

 6   served with it personally when -- before his first sentencing

 7   date, when somebody from the Probation Department actually

 8   went to his home and handed it to him.  So, he is well aware

 9   of our position.

10          THE DEFENDANT:  Nobody came to my house and handed

11   anything to me.

12          MS. MALIZIA:  Your Honor, we are happy to document

13   this in any way that will satisfy Mr. El Bey, but I guarantee

14   you somebody came to his house and handed him those papers.

15          THE DEFENDANT:  Someone came to my house and told me

16   to be sure to appear on the court date.  That's what they did.

17   They didn't have any paperwork.  And, first of all, he had

18   nothing to do with the case, so he shouldn't have been there.

19          If the probation officer who was handling the case

20   should come, then if they want to hand it to me, then hand it

21   to me; but, not through nobody else.  But he never brought

22   anything.  He only told me to be sure to be there on that

23   court date.

24          MS. MALIZIA:  Your Honor, we handed it to him.

25          THE DEFENDANT:  He knocked on my door.  That's all he
```

1    did.

2              THE COURT:  Wait.  One at a time.

3              MS. MALIZIA:  Your Honor, we handed it to him.  He

4    has a copy.

5              THE DEFENDANT:  Well, Judge, I'm telling you I

6    didn't -- he didn't hand me anything.  When he came to my

7    house, I didn't even open my door.  I opened my front door.

8    My screen was locked.  He said, I'm just here because the

9    Probation Officer told me to come see you because you live

10   closer -- you live closer -- to me than her.

11             And, so, he told me, he said, will this be -- I'm

12   here to be sure that you'll be on court on the 22nd.  That's

13   all he told me.  Then I shut my door.

14             I have no reason to lie about it.  I'm not a liar.  I

15   stick to what I do because I don't look over my shoulder

16   because I don't do anything wrong.  So, when I tell you -- I

17   say what I mean and I mean what I do.  So --

18             THE COURT:  Of course, the 22nd was set as the date

19   of the --

20             THE DEFENDANT:  Yes.  He came -- he came -- one week

21   before then.

22             THE COURT:  Wait a second.

23             The 22nd was fixed as the day.  Remember, there was

24   an initial sentencing hearing scheduled, which you appeared,

25   and you said that the Post Office had held up your mail.  As a

1   result, you hadn't had a chance to read the Presentence Report

2   or the government's sentencing memorandum.  So, the government

3   said, fine, we'll postpone the sentencing hearing to the 22nd.

4           THE DEFENDANT:  Yes.

5           THE COURT:  So, you were clearly told at the hearing

6   that there would be a sentencing hearing on July 22nd.

7           THE DEFENDANT:  Yeah, I understand that.

8           THE COURT:  And you did not show up on July 22nd.

9           THE DEFENDANT:  Because you wasn't talking to me.  We

10  go over this -- Judge --

11          THE COURT:  You were told it would be July 22nd.

12          THE DEFENDANT:  But he did.  He came two days early.

13          THE COURT:  It doesn't matter when he came.

14          THE DEFENDANT:  It was on the paper.

15          THE COURT:  You were told --

16          THE DEFENDANT:  He told you who he was.

17          THE COURT:  You were told at the first and the

18  aborted sentencing hearing that the sentencing hearing would

19  be rescheduled for the 22nd.  But you didn't show up on the

20  22nd.

21          THE DEFENDANT:  I thought it came, El Bey did show

22  up.

23          THE COURT REPORTER:  I'm sorry?

24          THE COURT:  Excuse me?

25          THE DEFENDANT:  He did show up.  He filed hisself on

```
 1    the case --

 2            THE COURT:  Nobody showed up on the 22nd.

 3            THE DEFENDANT:  But if you talking about Hakeem

 4    surname El Bey, no, I didn't show up because you wasn't

 5    talking to me.  That's not me.  So, the one you're talking

 6    about on the paper, he showed up.  But you --

 7            THE COURT:  This argument is not going to fly --

 8            THE DEFENDANT:  Okay.  Well, that's fine, Judge.

 9            THE COURT:  -- that there's two El Beys, the upper

10    case and the lower case.

11            THE DEFENDANT:  Okay.

12            THE COURT:  That -- it's not going anywhere.

13            THE DEFENDANT:  Okay.  Well, I understand.

14            THE COURT:  As far as the warrant is concerned, if

15    you wish to challenge the legality of the warrant, if you're

16    planning to appeal and you want to ask the court of appeals --

17    where I would have absolutely no connection with any appeal,

18    obviously --

19            THE DEFENDANT:  Well, you with the Seventh Circuit.

20    I don't know.

21            THE COURT:  No, no.  I'm not -- if a court of appeals

22    judge is handling a case in the district court, he isn't

23    allowed to have anything to do with an appeal from his

24    decision.  So, that's clear.

25            So, if you decide to appeal -- if you're not happy
```

1    with the sentence, decide to appeal -- and you want to

2    challenge the legality of the warrant and say that somehow it

3    invalidates the sentence or the conviction or everything,

4    then, of course, you're free to do that.  I'm not going to get

5    involved in the warrant at this stage because I want to

6    complete the case with the sentencing hearing.

7              THE DEFENDANT:  Okay.

8              THE COURT:  Is there anything else that requires

9    discussion at this time?

10             MS. MALIZIA:  May --

11             MS. DeNICHOLAS:  I do have one issue.

12             THE COURT:  Sure.

13             MS. DeNICHOLAS:  I am not available next Thursday.

14   I'm going to be on leave.  But I have arranged for a colleague

15   of mine -- which we typically do when we're on leave -- to be

16   fully apprised of the case.  She's read all of the reports and

17   can answer questions.  And we typically don't advise the

18   judges ahead of time if we're going to be on leave, but I do

19   know that this is kind of a unique case.  So, I thought I

20   would mention that to your Honor just for information.

21             THE COURT:  Sure.  That's fine.  That's fine.

22             MS. DeNICHOLAS:  Thank you.

23             MS. MALIZIA:  Your Honor, again, as we discussed,

24   maybe it would be helpful to Mr. El Bey if we talked --

25             THE COURT:  Yes.  I'm sorry.  Yes.

1       So, Mr. El Bey, Ms. Malizia wants to explain the

2   procedure at the sentencing hearing.  That will help you to

3   prepare your own response.

4       THE DEFENDANT:  Okay.

5       MS. MALIZIA:  So, Mr. El Bey, the first thing the

6   Court will do is address the Sentencing Guidelines.  These are

7   discussed in the filings by Probation.  They're discussed in

8   our sentencing recommendation, as well.

9       There's also -- I mean, there's a book that I imagine

10  would probably be available to you at Kankakee that sort of

11  explains how we arrive at our sentencing recommendation and

12  the recommendation that the Judge will make based on the

13  nature of the offense, your criminal history -- you actually

14  have none -- and other factors, such as the fact that you

15  refused to show up for your second sentencing hearing.

16      All of these come into play in calculating what is

17  called the recommended Sentencing Guidelines range.

18      Now, the Judge will explain that it's just an

19  advisory range and he can decide to go above that range or

20  below that range, but it's helpful in guiding the Court.  It's

21  helpful in guiding you in sort of the kind of sentence you may

22  be looking at.

23      Once the Judge has made a finding about which

24  Guidelines apply based on your offense and your background,

25  the parties can argue something called the 3553(a) factors.

1   That's a statutory term.  It's a technical term.  It just

2   means that we talk about your background, your history, the

3   offense in this case, the proceedings in this case, other

4   factors such as the need to deter people like you from

5   committing crimes like this again, factors in mitigation, such

6   as the fact that you've been mostly cooperative with the Court

7   with the exception of recent events.  All of these are factors

8   that the Court can consider in setting your sentence.

9           We will speak.  You'll speak.  Mr. Fuentes can speak,

10  if you give him the opportunity.  Once that's done, you can

11  also make a statement on your own behalf, talking about your

12  offense, talking about yourself, talking about what you think

13  you deserve to receive as punishment in this case.

14          The Court will also address something called

15  supervised release conditions.  These are the conditions that

16  will apply if you receive a term of what's called supervised

17  release after a term of imprisonment.  These are -- and,

18  again, Probation can speak to this better than I can, but

19  these are restrictions on your ability to in some cases

20  travel, in some cases to assume new lines of credit.

21          You'll be required to report to the probation officer

22  on a regular basis so they can keep track of if you're paying

23  restitution, for example.  You were found guilty of defrauding

24  the IRS of $600,000, and I imagine that restitution will be

25  ordered in this case.  So, they'll be monitoring that.

1         The Court will also address forfeiture.  As you're

2  aware, the government has moved to forfeit your home and a car

3  that you purchased with the proceeds of your fraud.  A

4  preliminary order of forfeiture that you've been served with

5  has been entered against you.

6         If the Court -- at the end of the sentencing, the

7  Court, I imagine, will very likely enter -- make that order

8  final as to you, allowing the government to seize those assets

9  as restitution -- to satisfy the restitution in this case.

10         That's a basic overview of what's going to happen

11  next week.

12         THE DEFENDANT:  Okay.

13         THE COURT:  Let me amplify that just a little bit.

14         So, Congress will fix a maximum sentence for each of

15  the different -- for all crimes.  And if you remember the

16  first hearing we had where Ms. Malizia explained that the

17  maximum sentence if you're convicted on all eight counts, as

18  you were, of 160 years, that's the statutory max.  Obviously,

19  I'm not going to impose a sentence remotely like that.  But

20  that's the congressional limit.

21         These Sentencing Guidelines that she mentioned,

22  there's a United States Sentencing Commission which tries

23  to -- because as in this case, because the range -- often

24  there's no minimum statutory sentence and the maximum

25  statutory sentence may be very long.  So, rather than let

1     the -- rather than the judge just wallowing in this enormous

2     range trying to pick out a sentence, the Sentencing Commission

3     lays out Guidelines and its conception of what a more sensible

4     range than the statutory range would be.

5          But as Ms. Malizia pointed out, not only is the judge

6     not bound -- required -- to impose sentence within that range,

7     he has to actually consider other factors before deciding

8     whether to stay within the range.  Those are the factors that

9     are in a section of the federal code called 18 U.S.C. 3553(a).

10    And I'll go over them with you at sentencing.

11         As I emphasized and as Ms. Malizia mentioned, you'll

12    have a chance to make your own statement and you will have to

13    accept what I say.

14         This reference to supervised release, this is an

15    unfortunate feature of federal law, which is that in the olden

16    days, there was something called parole.  There is still a

17    little residual parole, but rarely applicable in federal

18    cases.  And parole, after a person has served a portion of a

19    prison sentence, the probation -- the Parole Commission might

20    decide, well, this person has been well behaved and looks

21    unlikely to commit further crime, so we'll recommend that he

22    be allowed out early.  That's what we used to have.  We don't

23    have that anymore.

24         Now, for most crimes, including this fraud, now --

25    so, the current system that replaced parole is that at

1    sentencing, the judge is supposed to decide -- now, sometimes

2    there's some mandatory supervised release conditions, but

3    usually it's discretionary -- often discretionary.  So, the

4    judge decides what kind of restriction should I place on the

5    defendant when he's released from prison.  So, for example, if

6    the defendant had a drug problem, the judge might say when you

7    complete your sentence, you're going to have to take a drug

8    test every month or something like that, not associate with

9    certain people, and so on.

10          So, the government will be recommending some

11   conditions of supervised release; but, unless any of them are

12   mandatory, it's up to me whether I impose any or what I impose

13   or what.

14          So, I don't know, that's all I can think of.

15          MS. MALIZIA:  Mr. El Bey, do you have any questions?

16          THE DEFENDANT:  No.

17          THE COURT:  Okay.

18          MS. MALIZIA:  All right, your Honor.  I think that's

19   it.

20          MR. HOTALING:  Thank you, Judge.

21          THE COURT:  That's it.

22          Okay.  Well, I'll see you all next week.

23          MS. MALIZIA:  Thank you, Judge.

24          MR. FUENTES:  Judge, if I may?

25          THE COURT:  Mr. Fuentes, yes.

1          MR. FUENTES:  Obviously, with the defendant declining

2     the Court's suggestion that I say anything at the sentencing,

3     I will not say anything at the sentencing.

4          I suppose as an officer of the Court, I see this as a

5     little bit of a unique case where you have -- the Court has --

6     the resources of standby counsel who sat here through the

7     proceedings, prepared every examination, cross-examination,

8     closing argument, only not to give them.  And, Judge, this has

9     not been easy being standby counsel.

10          THE COURT:  I know.

11          MR. FUENTES:  I've asked for relief, I think, four

12     times from the appointment.

13          THE COURT:  Right.  I know.  I understand.

14          MR. FUENTES:  I'm not asking for that now.

15          THE COURT:  I'm sorry about that.

16          MR. FUENTES:  Please don't apologize.  We said yes --

17     I said yes -- because I want to be of service to the Court.

18          So, I think at this point having gone this far --

19     and, actually, I would be here through the sentencing -- my

20     thought, Judge -- and it's just a suggestion or an offer -- is

21     that if the Court wished to at this time relieve me of the

22     standby counsel appointment and appoint me as, in effect, an

23     amicus, I would be willing to speak to the Court at the

24     sentencing.  We'd be willing to do that if it's something the

25     Court wishes to do.

1          And that's all I had to say, Judge.  If the Court's

2    going to do that, I think it should happen today with the

3    sentencing next week so that I may prepare.

4          THE COURT:  So, Mr. El Bey, an amicus curiae means

5    friend of the court.  And sometimes the court will appoint a

6    lawyer -- he's not the lawyer for a party to the case, but

7    he's someone that the court thinks can help the court make up

8    its mind about some ruling.  And it's very common.  We have

9    amicus curiae briefs in the court of appeals.  And the Supreme

10   Court, because it has such a light caseload, will often allow

11   like a hundred amicus curiae briefs to be submitted.

12         So, unless the government objects, I'd be happy to

13   let Mr. Fuentes be an amicus curiae.  And, you know, Mr. El

14   Bey, unless you think he'll say something harmful to you --

15   again, he won't be your lawyer; it won't change your status as

16   a pro se or sui juris -- it might be helpful.  It's certainly

17   not going to be harmful to you.  But I don't want to permit it

18   if you're going to feel that it's inappropriate.

19         THE DEFENDANT:  No, no, I don't have a problem with

20   that.  He know I don't have a problem with that.

21         MS. MALIZIA:  I guess, your Honor, our concern would

22   be if Mr. Fuentes were taking an advocacy position on Mr. El

23   Bey's behalf, I guess we could contemplate if Mr. Fuentes

24   feels strongly about maybe the proceedings as a whole or maybe

25   the integrity of these proceedings, that would call for an

1   amicus appointment.  But if he's going to be advocating for

2   Mr. El Bey, I guess I just am confused how that's any

3   different than him serving as his standby counsel.

4           MR. FUENTES:  If I may, Judge?

5           THE COURT:  Yes, sure.

6           MR. FUENTES:  I think it's different from standby

7   counsel in the sense that standby counsel has, in effect, been

8   muzzled on one level and, on another level, we have a case

9   where the defendant -- and the Court may say by the

10  defendant's choice -- the defendant is maintaining a legal

11  position that the Court has declined to entertain, to put it

12  politely.

13          And the result of that has been that, in effect, the

14  defendant has been voiceless.  And, so, the proceedings have

15  been extraordinarily one-sided.  And I say that not as a

16  criticism of any of the actors.  But they've been

17  extraordinarily one-sided.

18          Now we're approaching the sentencing where an amicus

19  appointment offers the Court with the opportunity to hear, so

20  to speak, another side of the story.  So, I think probably

21  what I would have to say probably could be characterized as

22  what a defense counsel might argue from a Guidelines and a

23  federal law sentencing perspective if the defense counsel were

24  in the case.  That's what I'm suggesting may be a benefit to

25  the Court, if the Court wants it.

1        So, I think Ms. Malizia is correct.  I would be

2   advocating positions that probably would not be in agreement

3   with a 57-month sentence; probably would not be in agreement

4   with 28-month sentence; probably would argue far less than

5   that.  So, I want to be transparent about that, Judge.

6        I think there's a certain uniqueness to this case.

7   Many defendants -- some defendants have these Moorish beliefs,

8   come in, perhaps go to trial, perhaps get sentenced, and don't

9   get the benefit of a friend of the court on some of these

10  issues.  And maybe there's an issue for the Court there.

11       But this is a case where you have somebody who's been

12  here and heard it all.

13            THE COURT:  I'm sorry, who's what?

14            MR. FUENTES:  Who's been here and who's heard it all

15  and has reviewed documents, some of which, I think, are

16  relevant to the sentencing.

17       And, so, I don't think it's an abuse of the Court's

18  discretion to appoint me as amicus if the Court wishes to do

19  so.

20       But very clearly, it would be a voice that's

21  different from the government voice that the Court's been

22  hearing and different from Mr. El Bey's voice, which I assume

23  will be heard, as well.

24            THE COURT:  Of course.

25            MR. FUENTES:  And, so, that's how I think that would

1    play out, Judge.  I'm just trying to be responsive to the

2    government and transparent.

3         THE COURT:  Well, since Mr. El Bey doesn't object, I

4    think that's fine.  Of course, the government will have a

5    chance to say whatever it wants.

6         MS. MALIZIA:  Your Honor, just to put it on the

7    record, we do object to this appointment.  We understand

8    Mr. Fuentes' concerns; but, traditionally an amicus is

9    appointed when a third-party has an interest in the

10   proceedings but doesn't actually have standing.  That's

11   certainly not the case here.

12        Mr. Fuentes has just stated on the record that he

13   would be advocating on Mr. El Bey's behalf.  He would be

14   taking an advocacy position on behalf of defendant, not a

15   third party, not even on the Court or in the interest of

16   protecting this tribunal in some way.  And that's our concern.

17        THE COURT:  But it's not correct that amicus --

18   amicus curiae is only -- is only representing his own interest

19   because we've often appointed an amicus curiae to assist in a

20   case involving a pro se.  Amicus curiae like Mr. Fuentes, not

21   someone who has some -- his own client might somehow be

22   affected by the court's order, but just as a way of providing

23   some additional information to the court when it's dealing

24   with a pro se.

25        So, I don't think there's any problem with this.

1          I'm just going to ask my law clerks whether I've left

2    something out, made some terrible error or something.  Then

3    we'll have finished.

4      (Brief pause.)

5          THE COURT:  Okay.  Well, unless there's anything

6    further, we'll adjourn and see everybody back next week.

7          MS. MALIZIA:  Thank you, Judge.

8                *    *    *    *    *

9

10   I certify that the foregoing is a correct transcript from the
record of proceedings in the above-entitled matter.

11

12
   /s/ Joseph Rickhoff               February 25, 2016
13   Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25