```
 1                 IN THE UNITED STATES DISTRICT COURT
                     NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3   UNITED STATES OF AMERICA,        ) Docket No. 14 CR 447
                                      )
 4                        Plaintiff,)
                                      )
 5              vs.                    )
                                      )
 6   HAKEEM EL BEY,                   ) Chicago, Illinois
                                      ) September 17, 2015
 7                        Defendant.) 10:15 o'clock a.m.

 8              TRANSCRIPT OF PROCEEDINGS - SENTENCING
                BEFORE THE HONORABLE RICHARD A. POSNER
 9

     APPEARANCES:
10

     For the Plaintiff:        HON. ZACHARY T. FARDON
11                             United States Attorney
                               BY:  MR. CHRISTOPHER P. HOTALING
12                                  MS. KATHRYN E. MALIZIA
                               219 S. Dearborn St., Suite 500
13                             Chicago, Illinois  60604

14   For the Defendant:        MR. HAKEEM EL BEY, Pro Se

15   For the Defendant as      JENNER & BLOCK LLP
     Amicus Curiae:            BY:  MR. GABRIEL A. FUENTES,
16                             353 North Clark Street
                               Chicago, Illinois  60654
17
     Also Present:             MS. SHEILA LAVIN, Probation
18
     Court Reporter:           MR. JOSEPH RICKHOFF
19                             Official Court Reporter
                               219 S. Dearborn St., Suite 1232
20                             Chicago, Illinois  60604
                               (312) 435-5562
21
                 * * * * * * * * * * * * * * * * *
22
                     PROCEEDINGS RECORDED BY
23                   MECHANICAL STENOGRAPHY
                 TRANSCRIPT PRODUCED BY COMPUTER
24

25
```

1           THE CLERK:  14 CR 447, United States vs. Hakeem El

2    Bey.

3           MS. MALIZIA:  Good morning, your Honor, Kathryn

4    Malizia and Christopher Hotaling on behalf of the United

5    States.

6           MR. HOTALING:  Good morning, your Honor.

7           THE DEFENDANT:  Good morning, your Honor, Hakeem Bey.

8           MR. FUENTES:  Good morning, Judge.  For the record,

9    Gabriel A. Fuentes as a friend to the court.

10          THE COURT:  Is there a probation officer?

11          MS. LAVIN:  Good morning, your Honor, Sheila Lavin

12   from U.S. Probation appearing for Sandra DeNicholas.

13          THE COURT:  I'm sorry?

14          MS. LAVIN:  Sheila Lavin appearing --

15          THE COURT:  Landon, did you say?

16          MS. LAVIN:  I'm from the U.S. Probation Office, and

17   appearing for Sandra DeNicholas.

18          THE COURT:  I was just trying to catch your name.

19          MS. LAVIN:  Oh, I'm sorry.  Lavin, L-a-v-i-n.

20          THE COURT:  Oh, Lavin.

21          MS. LAVIN:  Yes.

22          THE COURT:  Thanks.

23          MS. LAVIN:  Sorry.

24          THE COURT:  Well, please be seated.

25          So, we are here for the sentencing hearing of Mr. El

1    Bey.

2              I apologize for being late.  The traffic from Hyde

3    Park was unspeakable.  So, a 20-minute drive took an hour.

4              So, Mr. El Bey, you have received the Presentence

5    Report and the supplemental report prepared by Probation?  You

6    have received those?

7              THE DEFENDANT:  Yes, I did.  She gave it to me last

8    Thursday.

9              THE COURT:  Okay.  That's fine.

10             So, let me ask -- neither side has filed any

11   objections to the Presentence Report -- are there any

12   objections to the facts in the report or in the supplemental

13   report?

14             MS. MALIZIA:  We have none, your Honor.

15             MR. HOTALING:  Judge, I think Mr. El Bey was going to

16   comment.

17             THE COURT:  I'm sorry.

18             THE DEFENDANT:  Okay, Judge.  I have -- I do have

19   objections to the -- not the fact of the case, but the law

20   issues of the case.

21             THE COURT:  Okay.  Well, that will be for later.

22             THE DEFENDANT:  Okay.

23             THE COURT:  This is just facts.

24             THE DEFENDANT:  Okay.

25             THE COURT:  So, I will accept the facts.

1          Now, the Presentence Report lists a Guidelines range.

2    And this is just suggested.  This is not mandatory.  In fact,

3    I'm not allowed to accept the Guidelines range.  I have to

4    make a fuller assessment.  But the range in the Presentence

5    Report is 57 to 71 months.  And the question is whether

6    there's objections to that range.

7          MS. MALIZIA:  Your Honor, the government agrees that

8    that is the correct advisory Guidelines range.

9          THE COURT:  So --

10         MR. MALIZIA:  Your Honor, if we could get Mr. El

11   Bey's --

12         THE COURT:  Excuse me?

13         MS. MALIZIA:  If we could get Mr. El Bey's

14   objections, or lack thereof, on the record.

15         THE DEFENDANT:  Yes.  Well --

16         THE COURT:  To the Guidelines range?

17         THE DEFENDANT:  To the Guidelines, yes.

18         Okay, Judge.  I've never committed a crime in my

19   life.  I never been in any kind of trouble.  I actually really

20   thought that was -- I worked for the government for 30 years.

21   I thought that was sort of steep for a man who never did

22   anything in his life.  And I didn't think I did anything

23   wrong.

24         So, I think that's sort of steep for a man, to take

25   me away from my family, my kids that long.

1          THE COURT:  Yes, but the Guidelines range is just

2    basically arithmetical computation.

3          THE DEFENDANT:  Uh-huh.

4          THE COURT:  I'm not bound by it.

5          THE DEFENDANT:  Okay.

6          THE COURT:  The factors you've considered -- the fact

7    you don't have a criminal record and family -- so, those are

8    factors which I will be taking into account.

9          There's also a Guideline range of one to three years

10   for what's called supervised release.  So, after you complete

11   any prison sentence -- prison term -- that I impose, we're

12   supposed to -- the judge is supposed to -- consider placing

13   certain restrictions.  Not imprisonment, but, you know,

14   certain rules.  And I'll get to that.

15         There's a special assessment of $800?  Is that

16   mandatory?

17         MS. MALIZIA:  Yes, your Honor.

18         MR. HOTALING:  It's $100 per count--

19         MS. MALIZIA:  Per count.

20         MR. HOTALING:  -- of conviction, Judge.

21         THE COURT:  Excuse me?

22         MR. HOTALING:  It's $100 per count of conviction

23   under the statute.

24         THE COURT:  And there are eight counts.  So, a

25   hundred dollars.

1          There's also a fine range in the Guidelines of ten

2   thousand to a hundred thousand dollars.  I'm not going to

3   impose a fine.

4          There is restitution and forfeiture that is

5   mandatory.  The fine is optional.

6          Speaking of, though, forfeiture and restitution, I

7   want to ask the government, as I understand it, you're going

8   to apply the forfeiture to restitution rather than have two

9   separate $600,000 charges; is that correct?

10         MR. MALIZIA:  Yes.  Your Honor, to the extent that

11  restitution can be satisfied through forfeiture, the

12  forfeiting of the defendant's assets will be applied towards

13  that restitution.

14         THE COURT:  Pardon?

15         MS. MALIZIA:  It will be applied towards

16  restitution --

17         THE COURT:  Right.

18         MS. MALIZIA:  -- pursuant to the --

19         THE COURT:  So, it's not a double count.

20         MS. MALIZIA:  Correct, your Honor.

21         THE COURT:  Now, for the rest of our hearing, I'm

22  going to hear first from the government about the sentence

23  they consider appropriate; then from Mr. El Bey; then from

24  Mr. Fuentes.

25      (Brief pause.)

1          THE COURT:  I should have mentioned -- my law clerk

2    reminded me -- that this Guidelines range, the 57 to 71

3    months, which, as I say, is not binding, but it's calculated

4    from a table in which one calculates an Offense Level, which

5    is based on the nature of the crime and other factors and also

6    your criminal history, which you don't have a criminal

7    history.  So, from that Offense Level and Criminal History

8    Category, this Guidelines range is generated.

9          Okay.  So, as I said --

10          MS. MALIZIA:  Your Honor, I hate to interrupt, but

11   before we proceed, are you formally adopting the PSR and the

12   Guidelines range in the PSR?

13          THE COURT:  Yes.

14          MS. MALIZIA:  Thank you.

15          THE COURT:  So, I want to hear the government -- the

16   government will have a sentencing recommendation; Mr. El Bey,

17   also; and, Mr. Fuentes; and, I will give the government a

18   chance to respond.

19          After that, Mr. El Bey will have his opportunity for

20   what's called allocution, in which you can tell me anything

21   you think germane to the sentencing.

22          I want to mention for anyone not previous, Mr.

23   Fuentes was appointed as what's called standby counsel, which

24   means he was and is a resource for Mr. El Bey.  Mr. El Bey is

25   representing himself, as is his constitutional right.  But

1    Mr. Fuentes is present and he wanted to make a statement, and

2    Mr. El Bey said that was okay.  So, we'll hear from him.

3              So, begin with the government's sentencing

4    recommendation and want you to include, you know, any

5    supervised release conditions.

6              MS. MALIZIA:  Your Honor, the government is seeking a

7    Guidelines range sentence in this case.  We believe that this

8    case comes down to something very simple -- lies.  This is a

9    crime that even a five-year-old could grasp.  The defendant

10   said things that weren't true to get things that he was not

11   entitled to.  In this case, that was tax refunds.

12             As your Honor's aware, he filed a total of seven

13   false returns, six of which were charged in the indictment.

14   And virtually every line of these returns was a false

15   statement.  He created a sham trust with the IRS and, on these

16   returns, he lied about the date that trust was founded; the

17   trust's income; fiduciary fees paid by the trust; exemptions

18   that applied to the trust; and, of course, most importantly,

19   tax withheld from the trust by the IRS.

20             He did this to mislead the IRS into believing that he

21   was owed a $300,000 tax refund per return.  So, an attempted

22   total fraud of $2.1 million.

23             The evidence at trial showed beyond any doubt the

24   defendant knew this information was false when he submitted

25   these returns and that his conduct was illegal.

1    The IRS even told the defendant in writing in three

2  separate letters that they believed he had made false

3  statements on these returns and that his conduct was illegal.

4  And one of the most telling things about the defendant's state

5  of mind was his reaction to these letters.

6    What did he do at the very start of this fraud when

7  the IRS told him his conduct was illegal?  Did he say, "I'm

8  sorry, I've made a mistake?  I never intended to break the

9  law"?  No.  He refined his approach, your Honor.  Whereas he

10  filed three returns at once raising red flags with the IRS, he

11  decided to file one return at a time to skate under their

12  radar.

13    And each time he successfully got a check from the

14  IRS, he spent that check.  On a home, on cars, on his

15  household expenses.  And when that money ran out, he did it,

16  again.  The defendant's crime was deliberate; it was

17  systematic; and, it would have continued for as long as the

18  IRS remained in the dark about his conduct.

19    Your Honor, I wish I could say more about the

20  defendant's history and characteristics.  Unfortunately, our

21  picture of the defendant is incomplete because he's refused to

22  cooperate with the Probation Department's investigation.

23    We know he's a middle-aged man; that he has at least

24  five children; they're all adult aged.  We know that he grew

25  up in a loving, supportive and stable household; that he was a

1    Postal employee from 1984 through 2012; and, that apart from

2    the occasional traffic violation, he had never before been

3    convicted of a criminal offense until this case.

4         In a lot of ways, he's typical of what we call white

5    collar criminals.  He obeys the law as long as he thinks it

6    suits his needs, but he's willing to break it if he thinks he

7    can get away with it.  And when he's caught, he's willing to

8    engage in absurd rationalizations to try to explain his

9    transparently illegal behavior.

10        Even after the IRS found him liable for $600,000 in

11   this case, even after IRS investigators told him he could go

12   to prison for what he had done, he tried to satisfy the IRS's

13   $600,000 lien with a bogus check.  This total lack of respect

14   for the law has infected these proceedings from start to

15   finish.

16        As the Court is aware, the defendant is a member of

17   the sovereign citizen movement.  This is a group that rejects

18   the legitimacy of the United States government and its laws.

19   And at nearly every hearing and throughout his trial, the

20   defendant has repeatedly violated this Court's orders not to

21   interject irrelevant sovereign citizen mantras into these

22   proceedings.

23        He most recently became a fugitive after refusing to

24   appear for his sentencing hearing, and a warrant had to be

25   issued for his arrest.  That is why he's here today in

1    custody, your Honor.

2         The defendant's actions could be somewhat

3    understandable, perhaps even sympathetic, if he had had a

4    valid basis to object to these proceedings or the application

5    of the law in this case.  But the fact is, the sole purpose of

6    these outbursts, of these ramblings was to distract the Court

7    from the only real issue in this case; and, that is:  The

8    defendant's decision to systematically defraud the IRS of

9    hundreds of thousands of dollars.

10        That is why the need to promote deterrence in this

11   case, both specific and general, is absolutely critical, your

12   Honor.  The defendant clearly believes he is above the law.

13   Warnings and admonishments from the IRS, from criminal

14   investigators, and from this Court have failed to persuade him

15   otherwise.  Even his recent arrest seems to have had very

16   little effect on his state of mind.

17        A substantial prison term within the Guidelines range

18   is required to communicate to the defendant that his actions

19   have consequences beyond mere warnings, and to deter him from

20   committing similar crimes in the future.

21        The need for general deterrence here is no less

22   imperative.  The defendant's contempt for the law extends to

23   the entire sovereign citizen movement.  This is a movement

24   that consists of garden-variety fraudsters who attempt to

25   obscure the criminal nature of their conduct by derailing the

1   judicial process.  A substantial sentence in the Guidelines

2   range is necessary to deter others, both those who have

3   already joined the sovereign citizen movement and those who

4   may be tempted to join because of the prospect of easy money.

5   The only way to make the law real to this type of criminal is

6   to show them that their crimes have real consequences.

7           It's for these reasons and for all the reasons stated

8   in the government's sentencing memo, we're asking for a

9   sentence in the Guidelines range, which is sufficient, but not

10  greater than necessary, to satisfy the goals of 3553(a).

11          THE COURT:  Okay.  Thank you, Ms. Malizia.

12          So, Mr. El Bey, do you have a sentencing

13  recommendation, including any objections to forfeiture or

14  restitution?

15          As I mentioned, you will have an opportunity shortly

16  to say anything you want.  So, Ms. Malizia has suggested that

17  she proposes a sentence in this Guideline range, 57 to 71

18  months.  So, approximately five years to six years, roughly.

19          THE DEFENDANT:  Yes, I object to that, your Honor.

20          First of all, I'd like to say that Ms. Malizia made

21  untrue statements.  I'm not with any movement.  No sovereign

22  movement.  Anything I do, I stand on it as a individual, as a

23  man on my own.  I'm not with any sovereign movement.  I

24  don't -- anything that I do, I'll be responsible for whatever

25  I do.  Okay?

1        Now, if you asking me if I stated that I am a
2   sovereign individual, yes, I am a sovereign man; but, I'm not
3   with any individual group.  I don't do anything with anyone
4   but myself.  So, I wanted to make that perfectly clear.

5        And, yes, Judge, if it's on me, I would say I don't
6   deserve anything.  But if I have to go by Guideline, if I have
7   to, I don't see more than 18 to 24 months, Judge, because I
8   don't think that I really did anything to -- I haven't harmed
9   anyone, Judge.  I haven't -- I don't see a witness here
10  claiming that I hurt them, I took anything from them.

11       But only thing I can do is -- I'm standing before you
12  right now.  So, you know, my future is in your hands.  That's
13  all I can tell you.

14            THE COURT:  Okay.

15            THE DEFENDANT:  Thank you.

16            THE COURT:  Thank you, Mr. El Bey.

17            THE DEFENDANT:  All right.

18            THE COURT:  So, Mr. Fuentes?

19            MR. FUENTES:  Thank you, your Honor.

20       I just wanted to make one clarifying point to start
21  out; which is:  I have been standby counsel through the trial
22  proceedings since about early November of 2014.  And as I
23  interpreted the Court's order very recently, at my suggestion,
24  that I'm technically not standby counsel anymore, I'm an
25  amicus, Judge.

1          THE COURT:  Okay.  That's correct.

2          MR. FUENTES:  I'm as a friend of the court.

3          THE COURT:  I had forgotten that.  That's fine.

4          MR. FUENTES:  I want to thank the Court for the

5    opportunity to be heard as an amicus.

6          It's customary in these district court sentencings

7    for one or more of the counsel to thank the probation officer

8    and the Probation Department for its work in the case.  And I

9    will say that I think here that thanks is particularly well

10   deserved on the part not only of our officer who is here

11   today, but also Ms. DeNicholas, who prepared the report.

12         It was a very thoughtful analysis.  It was a

13   recommendation for a below-Guideline sentence initially of 24

14   months and, then, increased to 28 after the failure to appear

15   for the July sentencing date.  It was a recommendation that

16   was grounded in the probation officer's conclusions about

17   3553(a) and what need there is to impose a sentence -- the

18   fact that there is a need to impose a sentence that's

19   sufficient, but not greater than necessary, to comply with the

20   purposes of federal sentencing.

21         So, the question, I think, for the Court is, how much

22   is sufficient?  How much is sufficient, but not greater than

23   necessary, for this to be a just punishment, for it to be a

24   deterrent to criminal conduct, to protect the public?  I think

25   those are the three factors that are primarily in play here.

1          And, as the Court is aware, the insight of the

2   Probation Department, which is really an arm of the Court, can

3   be very helpful at sentencing.

4          So, according to the recommendation -- Ms. DeNicholas

5   was drawing on nine years of experience as a probation

6   officer.  She indicated she had seen -- the word she used was

7   -- many --

8          THE COURT:  I'm sorry, what?

9          MR. FUENTES:  Many.  She said she had seen many of

10   these tax-type cases involving persons who were -- either

11   described themselves or others described them as Moorish or

12   sovereign citizens.  And she made some comments about the

13   defendant's motives in this case.  She indicated that it

14   seemed to her more likely that he was acting out of his

15   various belief systems as opposed to a malicious intent to

16   harm the government's fist.

17          And she pointed out some mitigating factors.  He has

18   a lengthy history of solid employment with the Postal Service.

19   He lived the first 50 years of his life lawfully.  His

20   criminal record is virtually nil.  There are some traffic

21   offenses in there.  Many of us have traffic offenses.  I won't

22   say that I have any.  Certainly not pending.  But in any case,

23   Judge, there are many mitigating factors in that respect.

24          So, if you look at those factors and you begin to

25   think of how much is needed for the deterrent effect -- and I

1    begin with that because, as I'll mention in a few moments, as

2    friend to the court, I made an attempt -- I had really a short

3    time to do it, but I didn't want to ask for a delay in the

4    sentencing.  We have a defendant in custody.  I looked at what

5    some other district courts are doing and have done in the case

6    and what some of their rationales have been.  And it was

7    evident to me that the deterrent factor was certainly very

8    much at the forefront of these district courts' views.

9            So, in terms of specific deterrence, I wouldn't make

10   a prediction about whether Mr. El Bey would re-offend or not,

11   based on what he has espoused as his belief system here; but,

12   I would say that I had difficulty understanding or seeing a

13   basis to conclude that 57 months or anywhere between 57 and 71

14   was providing a significantly greater level of specific

15   deterrence than 24 or 28 months.

16           I think if he's going to re-offend, you could give

17   him ten years, your Honor, and he might re-offend.  I'm not

18   seeing a difference.  I'm not seeing added bang for the buck

19   on specific deterrence.  I'm not seeing that 24 or 28 is not

20   enough in that instance, Judge.

21           On the question of general deterrence, it's -- that's

22   been a particularly important consideration in some of the

23   cases that I looked at.  And, so, obviously, first of all, the

24   probation officer's analysis, before I move to those other

25   cases -- I think the Court read the recommendation.

1      So, the Court saw that her analysis on the 24 months,
2   28 months was based, in part, on some statistical data.  50
3   defendants convicted of tax-related offenses in the Seventh
4   Circuit; 26 received custodial sentences.  So, that's 24, I
5   guess, receiving probation or less than custody.  And of the
6   custodial sentences, the mean was 23 months; the median was 24
7   months.  And she would describe that as tax-related offenses.
8   So, we don't have a greater transparency into the specific
9   offense conduct of those 50 cases.
10      We know from some statistical data that the
11   Sentencing Commission puts out, Judge, we know that in fraud
12   cases for fiscal 2014, nationwide 7400 sentencings, 28.3 of
13   which were below Guidelines, not sponsored by the government.
14   We know that.  And we know also from the Sentencing
15   Commission's June, 2015, quarterly data report that about 27
16   percent of the 6,000-some 2B1.1 sentencings -- this is the
17   nationwide data -- were below Guidelines.  About 27 percent.
18      So, we know courts are doing that.  I think those
19   statistics provide some support for the probation officer's
20   conclusion.  But, again, what I really thought might be more
21   helpful to the Court was to look at some of these specific
22   cases if we could find them in a short period of time.  And we
23   were blessed that at the last time we were together, Judge,
24   you mentioned a case.  You mentioned the Anzaldi case, which
25   had just been decided by the Seventh Circuit.

1        So, I pulled the sentencing memoranda in that case.
2    I looked at the judgments.  And I, actually, also obtained the
3    transcripts of Judge Leinenweber's sentencing in those cases.
4    So, I learned a little bit about the case.

5        There were three defendants -- Latin, DeSalvo and
6    Anzaldi.  Anzaldi got 63 months.  That was the low end of what
7    Judge Leinenweber determined was the applicable range, 63 to
8    78.  DeSalvo got 30 months.  And that was below the low end of
9    his applicable range, which was 51 to 63.  And Latin received
10   18 months, also below his 51-to-63 range.

11       So, if we look at the case, we understand that the
12   range is, in part, a function of the numbers and the scope of
13   the fraud.  So, that was a case where the amount -- the
14   intended loss amount was something like $8 million.  There was
15   about 1.2 million that the IRS actually paid out.  And when
16   you look at Anzaldi, I thought her situation was particularly
17   interesting and helpful here.

18       Anzaldi filled out returns for 11 other people in
19   that case.  She used one of the people's credit cards to pay a
20   bill.  She committed multiple mortgage frauds.  And this is
21   all from the government's sentencing memo in that case.  She
22   filed frivolous lawsuits against prosecutors, against judges
23   in that case.  She wrote a threatening letter to the U.S.
24   Attorney.

25       And, so, all of this led Judge Leinenweber to

1    conclude, first of all, she wasn't really repentant at all;

2    and, second of all, that she was an instigator.  And I think

3    if you look at the record in that case, Anzaldi was a pretty

4    bad actor when you look at all that conduct.  And, so, she got

5    a Guideline sentence.  And, by the way, these defendants all

6    went to trial and were convicted at trial.

7            So, what about the others?  Latin got 18 months,

8    significantly below his Guideline.  He had some mitigating

9    family circumstances.  There was a special needs child, and

10   there was an argument at his sentencing about whether that

11   mattered or not.  Judge Leinenweber gave him the 18.  He

12   wasn't as big a player as Anzaldi was.

13           And, then, DeSalvo was someone who helped Anzaldi

14   file for these other people.  He got 30 months.  And, again,

15   his low end was 51.

16           So, when you look at these three defendants, it's

17   hard to say that Mr. El Bey is more like Anzaldi than the

18   other two, who Leinenweber gave below-Guideline sentences to.

19           Another case that I looked at, Judge, was U.S. vs.

20   Hodges.  U.S. vs. Hodges is 13 CR 678.  It happens to be a

21   Judge Leinenweber case.  Again, there were three defendants.

22   And these involved lower intended loss amounts and a lower

23   loss -- actual loss -- to the IRS.  So, the Guidelines ranges

24   were different.

25           The Guideline ranges were 27 to 33 for each of these

1    three defendants.  And Judge Leinenweber gave each of them six

2    months, which was a little under a fourth of the Guidelines

3    low-end range.  And there are comments in those transcripts

4    which I have available to the Court.  In fact, all of the

5    materials I'm drawing from I have with me and would be happy

6    to provide them to the Court if it would like.

7             Judge Leinenweber's comments indicated, in part, that

8    he thought the intended loss figure in those cases may have

9    overstated the real risk to the IRS.  And the question he

10   raised was, you know, I think there was a $5 million claim and

11   would the IRS really have paid that out.  That's a factor in

12   this case because, as you remember, Mr. El Bey actually

13   established through witness Ponzo in the case that Ponzo

14   didn't know why the IRS had done this, why they had paid the

15   two $600,000 checks.  So, no explanation was offered.

16            There was another witness who described a unit within

17   the IRS that's set up to prevent these returns from being paid

18   out on, and that sent the defendant a letter -- or several

19   letters at one point -- that caught it.  But then he continued

20   to engage in the conduct.  But nobody could really explain why

21   the money got paid out.

22            So, I think, you know, there is at play in this case

23   the notion that while the intended loss is very high -- 1.2

24   million -- you know, I don't know that it makes a difference

25   in the Guidelines because I think the range is 400,000 to 1.2

1    and there's an actual loss of 600.  But in any case, there's a

2    little bit of that in this case.

3            And there's also a notion that the Guidelines'

4    emphasis on intended loss is an emphasis that some courts have

5    looked at and have questioned a little bit.  The case cite I

6    can give to the Court for that is United States vs. Adelson,

7    which is a Southern District of New York case, 441 F.Supp.2d

8    506, in which the Court comments that it just didn't seem to

9    make a lot of sense to that district judge that there was as

10   much emphasis in the calculation under 2B1.1 on intended loss.

11           So, what I'm trying to do, Judge, is give the Court a

12   little bit of a flavor for why some district courts have, I

13   think, been willing to go below Guidelines on some of these

14   sentences.

15           Now, that said, Judge, there's another case that I

16   want to call to the Court's attention -- oh, I had one more

17   point on Hodges.

18           There's some indication in Hodges that one or more of

19   the defendants, Denise Hodges, had been sort of encouraged or

20   recruited to do this kind of behavior.  And there's some

21   flavor of that here, as well.  I'm not sure it ever came out

22   at trial, Judge, but there is a memorandum of interview in the

23   case where the defendant submitted to an interview and,

24   according to the agents who conducted the interview -- and the

25   government, I think, would stipulate that if the agents were

1    to testify, they would testify consistent with the

2    memorandum -- at one point the defendant said that he learned

3    about this from some person in the south suburbs named Winston

4    Shrout (phonetic) and that he paid Shrout some money and

5    Shrout gave him the instructions on how to do this.

6           I point that out not as an attempt to diminish

7    culpability, but as a point that illustrates some similarity

8    between his case and Hodges and, I think, some dissimilarity

9    between his case and Sharon Anzaldi, who is the person who is

10   telling other people to do this and causing other people to do

11   this.

12          So, finally, I want to mention another case that I'm

13   imagining the Court's erstwhile and learned clerks have

14   already discovered, United States vs. Clarke, with an "e" at

15   the end.  This case was decided in the Seventh Circuit on

16   September 8th of this year.  And while the appellate opinion

17   did not address the sentencing issues, I went back to PACER

18   and I pulled what the sentencing issues were.  And I found

19   that the defendant in Clarke submitted, I think, in the range

20   of four or five returns that had income amounts claimed in the

21   range of $900,000; that the refunds claimed were in the range

22   of $300,000.  And in that case, three refunds were paid.  So,

23   the defendant -- there was an actual loss of 900,000.

24          And that defendant received from Judge Rudy Lozano, a

25   low-end sentence.  But it was a Guideline sentence.  So, some

1    courts are giving Guideline sentences, Judge.  And that

2    sentence was, again, 41 months.  His range was 41 to 51.

3          So, to sum up, Judge, I think the Court certainly has

4    the discretion, if it wishes, to issue a below-Guideline

5    sentence if the Court believes that incarceration or some

6    level of it is necessary as a societal response to what's

7    happened here as a measure of deterring further conduct by

8    others and by this defendant.  The question is how much.

9          And, Judge, without basing this on anything

10   empirical, but in looking at the Probation data, the

11   Sentencing Commission data and what some judges -- like Judge

12   Leinenweber -- have done, I will tell you my own view is that

13   I was having a difficult time seeing how 57 months

14   accomplishes much more or any more than 24 or 28 months would

15   do, Judge.

16         And, so, my suggestion to the Court as amicus is that

17   a 24- to 28-month sentence would fulfill the purposes of

18   3553(a), and that more than that is not necessary.  But that's

19   a discretionary decision for the Court to make based on all

20   the information.

21         So, at this point, I wanted to stop talking and ask

22   the Court if it had any questions for me.

23         THE COURT:  No.  It was an excellent statement.

24         MR. FUENTES:  Thank you, Judge.

25         THE COURT:  Thank you, Mr. Fuentes.

1      Ms. Malizia, do you have anything you want to respond

2  to?

3      MS. MALIZIA:  Not at this time, your Honor.

4      THE COURT:  Well, Mr. El Bey, this is your

5  opportunity for your allocution, and you can tell us anything

6  that you'd like to that would be relevant to sentencing.

7      THE DEFENDANT:  Okay.  I just wrote a little letter.

8      But, first of all, I want to thank this young man

9  right here for at least putting a good word in for me.  I

10 appreciate it.

11     MR. FUENTES:  Thank you.  For the record, I'm old,

12 but I appreciate your comment.

13    (Laughter.)

14     THE DEFENDANT:  One more thing I wanted to say before

15 I start reading my allocution, Judge, is if I knew that this

16 was a violation, I would have never done it.  I don't do

17 anything illegal.  I don't break any laws knowingly.  Okay.  I

18 just wanted to get that out.  I thought it was very important

19 for you to know that.

20     Okay.  Here's my allo- -- this is what I wrote.  This

21 is how I felt in my heart.

22     Your Honor, accused in this criminal case coming as

23 he does from a colorable jurisdiction over his person and

24 property does object to being sentenced by this Court at this

25 time because the conviction in this case has been based upon

1  facts of the case while the law issues are still in dispute.

2  Namely, the Court's colorable jurisdiction in this criminal

3  charge which lacks the essence of a substantial claim claimed

4  by a damaged party.  Put the Court on notice that if it does

5  pronounce sentence at this time over the objection of the

6  accused, the accused will formulate his objection before a

7  higher court in the nature of a writ of error.

8          And I just have five little quick questions, Judge,

9  if you don't mind my asking real quick.

10         The first one is, where is the alleged maritime

11 contract?

12         The second is, who or what is being addressed as to

13 defendant and is the defendant a trans-meaning utility or a

14 trust or a cooperative and who is it owned by?

15         And, three, is this a constitutional entity; and, if

16 so, is it organized under Article III or Article V?

17         And the fourth is, where is or who or what is the

18 injured plaintiff?

19         And the fifth one is, what jurisdiction or authority

20 does this Court or this officer have here to address

21 fraudulent claims to my intention?

22         And, so, on that note, Judge, that's just how I felt

23 in my heart and I just wanted to get that out.  My hands is in

24 your hands now.  My future is with you.

25         THE COURT:  Okay.  Well, thank you very much, Mr. El

1    Bey.

2           So, now I proceed to the sentencing analysis.  And,

3    as I said, I'm not bound by the Guidelines range or the

4    recommendation of the government.

5           I have to consider a number of statutory factors in

6    Title 18 of the Federal Code, Section 3553(a).  They're

7    somewhat numerous, these factors.  They don't all apply.  But

8    they have to do with the characteristics of the defendant; age

9    and criminal record, or lack thereof; and, the deterrent

10   considerations emphasized by Ms. Malizia, also by Mr. Fuentes;

11   the gravity of the offense; the necessity to maintain respect

12   for the law.

13          So, regarding the history and characteristics of

14   Mr. El Bey, no criminal history except for the driving

15   violation.  I'm not going to worry about those.

16          Mr. El Bey is a member of the Moorish Science Temple,

17   and he adheres to beliefs that the temple promotes.  He was

18   emphatic in rejecting the jurisdiction of my court.

19          I very much enjoyed -- right before the trial

20   started, Mr. El Bey held up a little American flag on a

21   plywood base, and he asked me whether this was the flag of the

22   United States.  I said it was.  He asked me to look behind him

23   at the flag in the courtroom and to observe that it had this

24   gold trimming.  And he said that that was not the flag of the

25   United States; that was an admiralty flag; and, it meant that

1  my court was an admiralty court and I could only sentence -- I

2  could only try him for a violation of admiralty law.

3         I thought that was ingenious.  I rejected it.

4         But he has a body of beliefs that he's entitled to,

5  of course.  Anybody can believe whatever he wants.  But some

6  of these beliefs that he urged are simply not recognized by

7  the law of the United States, and that's what I have to

8  enforce.  But I think he's sincere in those beliefs.

9         The offense is serious in the sense that, you know,

10 $600,000 is a large amount of money.  I'm very critical of the

11 negligence of the Internal Revenue Service in allowing this

12 fraud to be perpetrated.  The Service seems not to take the

13 most elementary precautions.

14        After they sent Mr. El Bey repeated frivolous return

15 notifications, nevertheless on his fourth submission, they

16 sent him $300,000 and, then, on the fifth -- I don't

17 understand.  They don't seem -- you'd think that once the

18 Service has filed -- has sent the taxpayer a notification he's

19 filed a frivolous return, they would make a note of this in

20 their computer records of this taxpayer so that the next time

21 he tried that, they would identify it.  I don't understand.

22        And I do think it's unfortunate when an agency or any

23 other potential victim of crime actually kind of invites the

24 crime by its failure to take any elementary self-protective

25 precautions.

1          Now, with regard to considerations of general and

2     specific deterrence and respect for the law, and so on -- so,

3     we distinguish between general deterrence, which is deterrence

4     of other people, and specific deterrence, which is deterring a

5     defendant from future crimes.  And I don't really think

6     there's a substantial probability that after completion of his

7     sentence Mr. El Bey will try to repeat the conduct that's

8     gotten him in trouble here.  I don't think that's significant.

9          I do think general deterrence concerns are important

10    because there is a sovereign citizen movement and it does

11    promote criminal activity, and it's important that people in

12    that movement who are thinking of committing similar crimes

13    understand that there is punishment; and, on that basis, I

14    feel I have to impose a prison sentence.

15          However, I agree with Mr. Fuentes.  I think the

16    Guideline sentence is excessive, given your age, given your

17    clean criminal record, given the fact that I don't think --

18    Ms. Malizia portrays you as sort of a calculating criminal.  I

19    don't think so.  I think this belief system you have exercised

20    significant influence on you.  It's unfortunate.  But I don't

21    think you're an evil person.

22          So, I'm impressed by the Probation Service's

23    analysis.  They're neutral.  They're not defendants'

24    representatives or anything like that.  And the sentence that

25    they recommend is 28 months.  It's based, in part, on the

1    fact, Mr. El Bey, that you became a fugitive, which you know

2    is disfavored.  So, I'm going to sentence you to 28 months.

3            Now, technically, the 28 months is on each of the

4    eight counts for which you are convicted, but these 28 months

5    on each count will serve -- are to be served concurrently,

6    which means that the total sentence is 28 months.  You get

7    credit for the time you've been in jail.  It hasn't been very

8    much.

9            There's also -- even for sentences of this length,

10   there is good-time credit, isn't there?

11           MS. MALIZIA:  There can be, your Honor.

12           THE COURT:  So, if, as I'm sure you will, you know,

13   behave well in prison, you will receive some months off.

14           So, I am required to consider conditions of

15   supervised release.  They are not onerous.

16           So, this will be for a period of three years after

17   you are released.  So, you will be -- you will have a

18   probation officer assigned to you.  So, these conditions are

19   as follows -- of course, you'll get this in writing.

20           So, first, you're not to commit a federal, state or

21   local crime.  You're not to use or possess an illegal drug.

22   If a probation officer wants a DNA sample -- I don't know why,

23   but if the probation officer wants such a sample for your

24   genes -- then you may be required to cooperate with him.

25           You do have an obligation to pay restitution.  I

1    mean, there's the forfeiture, and the value the government

2    obtains from its forfeiture will be applied against

3    restitution.

4            I had issued a preliminary forfeiture order.  Now I'm

5    making it permanent.

6            So, the probation officer will assess your ability to

7    pay.  And, obviously, we're not going to make you pay what you

8    can't pay.  We don't have the debtors' prisons or anything.

9    You'll be required to notify the court and notify me if you

10   have some material -- some important change in your economic

11   circumstances that affect your ability to pay restitution.

12           If your health permits, you will be required to try

13   to obtain lawful employment.  It may be difficult at your age.

14   You may have some health problems.

15           If you want to leave the Northern District of

16   Illinois for more than a week, you need to get your probation

17   officer's permission.

18           Now, the problem I've noticed in other cases, nobody

19   actually knows the borders of a federal district.  Right?  So,

20   your probation officer will give you a map showing you the

21   boundaries of the Northern District.

22           If you change your residence, if you change your

23   employer, workplace, you'll be required to notify the

24   probation officer within 72 hours.  And, similarly, if you're

25   arrested or questioned by a police officer, other law

1    enforcement officer, you have to notify your probation officer

2    within 72 hours.

3           You have to provide the officer with access to

4    financial information that's relevant to your compliance with

5    any of these conditions.  You have to pay all required

6    federal, state and local taxes.

7           Again, this will be an area where your personal views

8    are in conflict with legal requirements.  I have to enforce

9    legal requirements.

10          You will have to give your probation officer a copy

11   of any tax return or other communications you have with the

12   Internal Revenue Service within a week.  And you are not to

13   provide any false information to the Internal Revenue Service

14   or any other government agency.  And, again, falsity as

15   defined in the law that binds us, although you are entitled to

16   personal views which disagree with that.

17          So, as I said, you're a middle-aged person.  You're

18   not violent.  I don't think you will commit crimes after

19   you're released from prison.  I think you may have been misled

20   by other people.

21          For all these reasons, for the reasons Mr. Fuentes

22   gave -- which I thought were very persuasive, as I said -- I

23   think this 28-month sentence and conditions of supervised

24   release and with the final order of forfeiture, I think, are

25   adequate.

```
 1              MS. MALIZIA:  Your Honor?

 2              THE COURT:  Yes.

 3              MS. MALIZIA:  If I may interrupt, I think the

 4   probation officer would like to address the Court about some

 5   of the conditions that were recommended but your Honor has

 6   chosen not to impose.

 7              THE COURT:  Okay.

 8              MS. LAVIN:  Your Honor, we would recommend that the

 9   defendant refrain from possessing a firearm or destructive

10   device or other dangerous weapon as noted on No. 8.  And,

11   then, also No. 15 and 16 in the report, to report to the

12   probation officer as directed and permit the probation officer

13   to visit the defendant at his home, work or community --

14              THE COURT:  I'm sorry, I didn't hear you.  Police

15   officer, did you say?

16              MR. HOTALING:  Probation officer.

17              MS. LAVIN:  The probation officer.

18              THE COURT:  Probation officer.

19              MS. LAVIN:  To permit the probation officer to visit

20   the defendant at his home or work or community location,

21   wherever, you know -- the probation officer will work it out

22   with the defendant where the appropriate places are to meet

23   with.

24              So, it's Nos. 8, 15 and 16 we would like recommended.

25              THE COURT:  I will not impose those conditions.
```

```
 1              MS. MALIZIA:  Your Honor, I think as a convicted
 2    felon under Illinois law, the defendant is actually prohibited
 3    from possessing a firearm.  I don't believe --
 4              THE COURT:  Well, if he's prohibited --
 5              MS. MALIZIA:  -- the defendant owns a firearm --
 6              THE COURT:  -- he's prohibited.
 7              MS. MALIZIA:  -- but it --
 8              MR. HOTALING:  We need to give him notice.
 9              MS. MALIZIA:  We need to give him notice that he
10    cannot possess a firearm upon his release from custody.
11              THE DEFENDANT:  I don't own a firearm, your Honor, so
12    you don't got to worry about that.
13              MS. MALIZIA:  Should not be a problem then.
14              THE COURT:  Ms. Malizia pointed out, which is
15    something -- which is good to know, which is that if you
16    change your mind, you're not permitted to have a gun.
17              MS. MALIZIA:  Your Honor, the government would
18    recommend that the defendant be prohibited from incurring new
19    credit charges or opening additional lines of credit without
20    the approval of the probation officer, in order to help with
21    his compliance in making restitution in this case.  This is a
22    discretionary condition, but we think it applies here.
23              THE COURT:  So, you want Mr. El Bey to notify the
24    probation officer if he wants to obtain a line of credit?
25              MS. MALIZIA:  That's correct, your Honor.
```

```
 1              THE COURT:  Okay.  I think that's reasonable.
 2              MS. MALIZIA:  And, your Honor, in this post-Thompson
 3   world we're in, I believe the Court has to make a record of
 4   its reasons for imposing these conditions, which can include
 5   that they allow the probation officer to monitor the
 6   defendant; they provide for the effective enforcement of these
 7   conditions; they protect the public; they facilitate his
 8   reintroduction into society; and, they help him engage in
 9   responsible fiscal behavior to comply with any restitution
10   obligations.
11              I just ask that if we could put on the record that
12   those are the reasons these conditions are being imposed.
13              THE COURT:  That's my decision -- Thompson.
14              MR. HOTALING:  We certainly --
15              MS. MALIZIA:  And we respect it.  We want to make it
16   part of the record.
17              THE COURT:  Well, I'll say a little about that.
18              MR. HOTALING:  We certainly wouldn't want to have a
19   reversal on a Thompson ground.
20         (Laughter.)
21              THE COURT:  I don't like supervised conditions.  I
22   wish we still had parole.
23              But anyway, I think it's -- some of these things are
24   pretty obvious.  Clearly, it would be very bad -- it would be
25   bad for society, bad for Mr. El Bey -- if after being released
```

1     from prison he were to commit a crime, obviously.

2              And nobody should use or possess an illegal drug.

3     And I don't think it's a danger, but this is actually a

4     required condition of supervised release.  Since it's

5     required, I don't think I have to give an explanation.

6              I don't get the DNA -- what's the DNA sample about?

7              MS. MALIZIA:  It's required under statute, your

8     Honor, for a convicted criminal.

9              THE COURT:  Is there a reason for it?

10             MS. MALIZIA:  I believe it's for identification if --

11    in the event that he re-offends, if there's a question about

12    his identity.  It is a statutory requirement, though, for all

13    federal convicted criminals.

14             THE COURT:  If it's a statutory requirement, I don't

15    have to give a reason.

16             I mean, clearly the question -- payment of

17    restitution, that's a sentencing question and depends on the

18    probation officer's assessment of Mr. El Bey's financial

19    circumstances.  And, of course, he should notify the court and

20    notify me if there's been some change in your economic

21    conditions that affect your ability.  That's self-evident.

22             And it's self-evident why you should try to seek

23    lawful employment.  The government is eager to recover as much

24    of this money as possible.  And if you're employed, of course

25    that will facilitate your payment.  I don't think you're

 1   likely to be able to pay $600,000, but you have to make an

 2   effort to pay as much as you are able to pay.

 3          I do not actually understand why there are these

 4   geographical limitations, why you should have to notify --

 5   I'll ask the probation officer.

 6          What is the theory behind saying he shouldn't leave

 7   the Northern District?  It's not as if the Northern District

 8   of Illinois were some natural socially significant area.  It's

 9   a totally arbitrary collection of city and some suburbs.

10          MS. LAVIN:  It's the district.  So, we're the

11   Northern District of Illinois.  So, that's why they're

12   required to just notify the probation officer.  It's not that

13   they cannot leave it.

14          THE COURT:  No, I understand.

15          MS. LAVIN:  It's just a notification as a courtesy to

16   let the probation officer -- so they can supervise their case

17   load appropriately.  If everyone has just kind of gone

18   wherever, it makes it impossible to supervise.  So, it's more

19   of a supervision issue to --

20          THE COURT:  Okay.  Well, that makes sense then.

21          Just so that they know where you are.  But they're

22   not going to lock you in the Northern District.

23          MS. LAVIN:  No.  Yeah, it's just so they can

24   supervise.

25          THE COURT:  And I guess similarly, the seventh

1   condition about notifying probation officer within 72 hours of

2   any change in residence, employer, workplace, the same

3   thing -- just to keep track.

4          And notify a probation officer should you be arrested

5   or questioned by a law enforcement officer.  Again, the sort

6   of thing probation wants to keep track of.

7          And that's really to your -- to help you, to make

8   sure you keep out of trouble.  So, they're on your side.

9          And, similarly, providing your probation officer with

10  access to financial information relevant to your ability to

11  comply with all the conditions.  Not just the money

12  conditions, but anything else.

13         And payment of required taxes, I think, is

14  self-evident and, similarly, giving the probation officer a

15  copy of a tax return or other communication with the Internal

16  Revenue Service and agreeing not to provide false information,

17  which, of course, would be a separate crime.

18         I think the only other thing I have to -- well, there

19  are a couple of other things I have to say.

20         Now, I don't know if this is something for the

21  probation officer.  Mr. El Bey is not a violent person, and I

22  would strongly recommend that he be assigned to a minimum

23  security prison, as close as possible to his home.

24         MS. LAVIN:  Right.  On the judgment and commitment

25  order, if you could just make that recommendation that he

1    be -- what you said, be -- placed somewhere close to home and

2    in a minimum or medium security --

3         THE COURT:  So, this should be on the sentencing

4    order?

5         MS. LAVIN:  Yes.

6         MS. MALIZIA:  Yes, Judge, as should, by the way, the

7    order of forfeiture.  That should also be --

8         THE COURT:  Excuse me?

9         MS. MALIZIA:  The final order of forfeiture should

10   also be part of the judgment and commitment order.

11       (Brief pause.)

12        THE COURT:  I will read the order of restitution,

13   forfeiture, special assessment just to be on the safe side.

14   But let me ask -- but before I do that, are there any other

15   issues that anyone wants to discuss?

16        MS. MALIZIA:  At this point, no other issues from the

17   government, your Honor.  Although the defendant does need to

18   be notified of his right to appeal before we adjourn.

19        THE COURT:  No, no, I am not going to forget that.

20        So, I will read the portion -- there will be a

21   printed sentencing order.  But I will just read the order of

22   restitution, forfeiture and the special assessment I

23   mentioned, the $800.

24        So, I entered a preliminary order of forfeiture on

25   August 18th.  This is now final.  And this forfeiture asks for

1 forfeiting property worth $600,000. Now, of course you don't

2 have that property. So, the forfeiture will only be a partial

3 satisfaction of the $600,000 judgment.

4          So, the defendant is ordered to forfeit to the United

5 States the house located at 439 South Hoxie Avenue in Calumet

6 City, Illinois, and one Quicksilver 2010 Buick LaCrosse

7 four-door sedan.

8          Now, you are ordered also to make restitution of

9 $600,000. Of course anything that's forfeited goes toward

10 that 600,000, but it won't reach -- it won't get all the way.

11 So, you will still have a restitution obligation.

12          You won't have to pay any interest on that 600,000.

13 And, as I've said already, you will have to provide the

14 probation officer with access to any financial information

15 that's needed to determine how much of the restitution you can

16 pay.

17          And the probation officer will devise a schedule on

18 which you will contribute to the restitution obligation,

19 something to be realistic in light of your present and likely

20 future resources. You will be asked to pay or ordered -- I'm

21 ordering you to pay -- the contributions you make toward

22 restitution will be at least ten percent of your monthly

23 income. The Probation Service will make any additional

24 recommendation to me about that.

25          And I mentioned earlier this mysterious special

 1   assessment of a hundred dollars per count, $800.  That's on

 2   top of the 600,000.

 3          And, then, as I say, I'm not imposing a fine.

 4          Now, the last issue -- and all this, including my

 5   suggestion about a minimum security prison near your home,

 6   that will all be in a written order.  The oral -- what I

 7   say -- if not entirely coherent, is the actual sentence, takes

 8   precedence over the written sentence.

 9          Now, about appeal.  You have a right to appeal.  Now,

10   in order to appeal, if you want to appeal, you have to file a

11   notice of appeal with the Clerk of the district court.

12          And is there a form for those, if you know?  An

13   appeal --

14          MS. MALIZIA:  I think -- your Honor, there are --

15   it's not a form per se, but there are models that the

16   defendant can use.  The standard is very low.  It should be

17   filed in the district court.

18          THE COURT:  Right.

19          And will Mr. El Bey have access to these forms?  He's

20   not a lawyer, so --

21          MS. MALIZIA:  Your Honor, I can tell you that I know

22   that incarcerated defendants who have represented themselves

23   have successfully filed a notice of appeal after their

24   conviction.  I cannot tell you specifically what is available

25   in Mr. El Bey's facility, but he does have access to those

1    resources.

2          THE COURT:  I will ask the probation officer, does --

3    is any provision made for giving a prisoner something for a

4    non-lawyer?  I don't know how a non-lawyer would figure out

5    what a notice of appeal is.

6          MS. LAVIN:  Not that I'm aware of.  I don't -- I

7    don't -- have any knowledge of what he has access to while he

8    is in custody.

9          MS. MALIZIA:  Your Honor, for example, Mr. El Bey to

10   successfully file yet another affidavit of the truth since he

11   was arrested -- I believe that appeared on the docket last

12   week -- it is the same process that he would have used to file

13   that affidavit; but, he would say in his notice of appeal that

14   he is appealing his sentence or conviction, or whatever he

15   objects to; and, that appeal would have to be filed, again, in

16   the district court within 14 days.  He needs to state the

17   basis for why he's objecting to his conviction or sentence.

18   But, again, because the defendant is pro se, the standard is

19   relatively low as long as it is within that 14-day period.

20         THE COURT:  Okay.

21         So, Mr. El Bey, if you decide you want to appeal,

22   then file a notice and -- I mean, give it to, you know,

23   someone in the jail -- file -- to an officer -- file a notice

24   within 14 days.  And all you have to say in the notice is that

25   you want to appeal from your conviction and sentence.  We can

1    appoint -- you can appeal just from the sentence or just from

2    the conviction or both.  That's fine.  And there's a filing

3    fee.  If you can't afford it, that will be waived.

4         Does the -- I should know.  I have seen notices of

5    appeal.  Should the notice of appeal -- does it have to

6    suggest a ground or can it just say that the defendant is

7    seeking reversal of his conviction or his sentence?

8         MS. MALIZIA:  Your Honor, it can be very broad.  It

9    can be brief.  It can be broad.  And it can just say that he

10   believes he has a basis for appeal because either the

11   conviction or the sentence were incorrectly decided.  It can

12   be -- it's my understanding, especially in a pro se case like

13   this one, that it can be that broad at the outset.  He will,

14   of course, have to elaborate on his reasons for making this

15   claim in a brief.  But the original notice can be very broad.

16        THE COURT:  Is that understandable?

17        THE DEFENDANT:  Yes, sir, Judge.

18        THE COURT:  Okay.

19        Is there anything else?  Are we finished?

20        MS. MALIZIA:  Nothing from the government, your

21   Honor.

22      (Brief pause.)

23        MR. HOTALING:  We would agree to the waiver of that

24   provision.

25        THE COURT:  I'm waiving the cost of incarceration.

```
 1            THE DEFENDANT:  I do want to say something.

 2            THE COURT:  Yes.

 3            THE DEFENDANT:  Even though I'm being sentenced, I

 4   have enjoyed my time being with you, believe it or not,

 5   because you have taught me some things.

 6            THE COURT:  Well, thank you.

 7            THE DEFENDANT:  I just wanted to say that to you.  I

 8   thought that was important.

 9            THE COURT:  Well, I have enjoyed my time with you,

10   also.

11            THE DEFENDANT:  I appreciate it.

12            THE COURT:  So, I guess that's it.

13            And, Mr. Fuentes, certainly thank you for your

14   efforts on behalf of Mr. El Bey.

15            MR. FUENTES:  Thank you, Judge.

16            A formality, if I may.  I'd like to request if the

17   Court could please enter an order that clearly discharges me

18   not only from my responsibilities earlier as standby counsel,

19   but for the friend of the court role, so that my status is

20   clear on the record.  If the Court would be so kind as to do

21   that, we'd appreciate it.

22            THE COURT:  Okay.

23            MR. FUENTES:  And thank you, once again, for the

24   opportunity to be before you, Judge.

25            THE COURT:  Well, thank you very much.  I know it was
```

```
 1    frustrating for you and it's been protracted.  And we

 2    really -- the Court greatly appreciates your taking the time.

 3               MR. FUENTES:  Thank you.

 4               THE COURT:  And certainly thank the prosecutors for

 5    their efforts, which were very impressive.

 6               And thank the Probation Service.

 7               MR. HOTALING:  We've enjoyed it, as well, Judge.

 8               MS. MALIZIA:  Thank you, Judge.

 9               THE COURT:  So, we are adjourned.

10                          *    *    *    *    *

11

12    I certify that the foregoing is a correct transcript from the
      record of proceedings in the above-entitled matter.
13

14
      /s/ Joseph Rickhoff                    March 7, 2016
15    Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```