1

1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
2                             EASTERN DIVISION

3   UNITED STATES OF AMERICA,          )
                                       )
4                    Plaintiff,        )
                                       )   No. 14 CR 447
5             vs.                      )   Chicago, Illinois
                                       )   February 12, 2015
6   HAKEEM EL BEY,                     )   10:10 a.m.
                                       )
7                    Defendant.        )

8
                        TRANSCRIPT OF PROCEEDINGS
9            BEFORE THE HONORABLE RICHARD A. POSNER

10  For the Plaintiff:          U.S. ATTORNEY'S OFFICE
                                219 South Dearborn Street
11                              Chicago, Illinois 60604
                                BY:  MR. CHRISTOPHER HOTALING
12                                   MS. KATHRYN E. MALIZIA

13  The Defendant:              MR. HAKEEM EL BEY
                                439 Hoxie Avenue
14                              Calumet City, Illinois 60409

15
    Defense Standby Counsel:    JENNER & BLOCK
16                              353 North Clark Street
                                Chicago, Illinois 60654
17                              BY:  MR. GABRIEL A. FUENTES

18  Official Court Reporter:    MAELLEN E. PITTMAN, FCRR, RDR
                                219 South Dearborn Street
19                              Room 2342
                                Chicago, Illinois 60604
20                              (312) 435-5576

21

22

23

24

25

1      (Proceedings heard in open court:)

2           THE COURT:  So we have the pretrial conference in the

3  El Bey prosecution.

4           The chair is so low, I feel like an elf.

5           So where is Mr. El Bey?

6           MS. MALIZIA:  Good morning, your Honor.

7           Kathryn Malizia and Christopher Hotaling on behalf of

8  the United States.

9           THE DEFENDANT:  Good morning, Judge.

10          MR. FUENTES:  Good morning, Judge.

11          THE COURT:  All right.  So I have a few remarks to make.

12          So first some comments to Mr. El Bey.  I have made these

13  points before, but I want to repeat some of them.

14          You know you're facing a formidable legal talent on the

15  part of these two government lawyers, and with the whole United

16  States Department of Justice behind them, and you would be better

17  off with a lawyer.

18          You do have advisors, but the advisors are not lawyers.

19  And that means that they are not permitted to sit at the

20  defendant's table, at counsel's table during the trial.

21          Now, Mr. Fuentes, if you want him to sit at counsel's

22  table, Mr. Fuentes, your standby counsel, can do that.

23          Also you can ask Mr. Fuentes to be your lawyer.  Because

24  if he isn't your lawyer, if he is just your standby counsel, he

25  can't examine witnesses, cross examine, because he is just there

1  for you to consult.  He is not your lawyer who takes the active

2  role in the trial that the government has brought.

3        Let me just ask Mr. Fuentes:  Would you in fact be

4  available during the week of the trial?  Because I think you had

5  some concern about a possible conflict.

6        MR. FUENTES:  I will, Judge.  Just this week the judge

7  in San Francisco postponed the trial in March.

8        THE COURT:  Okay.  Great.  Okay.  That's good.

9        So I would strongly urge you to retain Mr. Fuentes as

10 your lawyer, then he can examine, cross-examine, and it will be a

11 big help to you.

12       Now, a complication is that because you're not a lawyer

13 you may, you know, do things, say things in the trial that are

14 improper.  And I don't mean it would be deliberate on your part,

15 deliberate misconduct, but since you're not a lawyer it would be

16 easy for you to cross certain lines and make arguments that are

17 not permissible.

18       And if by doing that you show that you really can't

19 behave as required when someone is representing himself in a

20 trial, then I would have to order Mr. Fuentes to represent you.

21 I do have that power.  I don't want to exercise it, because, you

22 know, you are an intelligent person, and I think you are capable

23 of representing yourself, but you have to be careful that you

24 don't, as I say, cross lines, which we'll try to explain.

25       So let me describe some procedural steps in the trial.

1  You are probably familiar with that.  Obviously the government
2  lawyers are.
3         So assuming you are still representing yourself,
4  Mr. El Bey, you and the prosecutor, you'll be able to give an
5  opening statement to the jury.  The prosecutor goes first; then
6  the defendant.
7         And that opening statement is not evidence, right?
8  Because when you give an opening statement, you're not taking an
9  oath to tell the truth, the whole truth, and all that.  You are
10  just telling the jury, you know, what's coming:  what to expect,
11  what kind of evidence you hope to show.  But you can't actually
12  argue the facts, because there are no facts until witnesses who
13  are sworn to tell the truth begin to testify.
14         So I'll be telling the jury that what's said in opening
15  argument and closing argument at the end of the trial is not
16  evidence, it's argument, and a jury can't consider that.
17         Okay.  So that's the opening.
18         Then after the opening statements the prosecution
19  presents its case.  There will be witnesses.  And you,
20  Mr. El Bey, you'll have an opportunity to cross examine the
21  witnesses.
22         And then after the government is all through with all
23  its witnesses, documents, what have you, then you, the defense,
24  has its turn to present evidence.
25         Now, you don't have to present evidence.  The government

1  has to prove guilt beyond a reasonable doubt.  If you feel they

2  haven't carried that burden, you may decide you don't want to put

3  up -- put on a defense case.  But you have the right -- and you

4  can't be forced to testify -- but you may decide, you have

5  witnesses or documents or other evidence, so you would like to

6  present a defense rather than just rely on a belief that the

7  government has not carried its burden of proof beyond a

8  reasonable doubt.

9        And you can not only have witnesses to testify, you can

10 present documents as exhibits, they are called, documents that

11 the jury would use as evidence.  But I, as the judge, I have to

12 approve any document offered as evidence, whether by you or by

13 the government, to make sure it's admissible and proper.  And you

14 can always object to their exhibits; they can object to your

15 exhibits.

16       And then after all the evidence is in, then there are

17 closing arguments.  And again, it's not in evidence.  It's an

18 opportunity for each side to explain to the jury what you think

19 the evidence has shown.

20       And that's the procedure.

21       Now, have you -- you have received the indictment, have

22 you not?

23       THE DEFENDANT:  Yeah, I have the indictment.

24       THE COURT:  Do you have a copy?

25       THE DEFENDANT:  I have a copy.  I don't have it with me.

1   I have a copy though.

2          THE COURT:  Because one thing -- I think there is

3   confusion here; I want to make this clear.  Because you've

4   mentioned admiralty and you've mentioned Uniform Commercial Code.

5          What you're charged with is violating -- well, violating

6   the federal criminal code, which forbids fraudulent behavior with

7   regard to taxes.

8          So the government is arguing the tax refund you received

9   and then later sought in subsequent years, they say that you

10  weren't entitled to that and it was fraud.  So that's their

11  charge.

12         And so the other, you know, Uniform Commercial Code and

13  admiralty law, and so on, which you have mentioned in your

14  affidavits of truth, they are just not germane.

15         And similarly, you contend that you're not a U.S.

16  citizen; that you are a sovereign citizen and a member of the

17  Cherokee Nation, and so on.

18         But you have to understand that the government can

19  prosecute and a jury can find you guilty, you can be sentenced,

20  for any crime committed within the United States.

21         You don't have to be an American citizen.  You can be a

22  citizen of anywhere or nowhere, and you are still subject to the

23  jurisdiction of the American courts.

24         So that's -- and I emphasize these facts because when

25  you present your defense, you have to keep within the fundamental

1  rules of American criminal procedure.  And you're just not

2  permitted to put before the jury arguments that just have no

3  possible standing under American law.

4          So, I mean, for example, you've mentioned immunity from

5  liability under the Foreign Sovereign Immunities Act.  But that

6  applies to foreign countries; that would be a situation in which

7  the government was trying to prosecute a foreign nation.

8          And in any event, you did submit an affidavit

9  acknowledging that you are an American citizen.

10         And similarly --

11         THE DEFENDANT:  Excuse me?  You are saying I submitted

12 an affidavit to say that I was an American citizen?

13         THE COURT:  I'm sorry?

14         THE DEFENDANT:  You said I submitted a document stating

15 that I was an American citizen?

16         THE COURT:  Yes.

17         THE DEFENDANT:  I never did that.  I filed an affidavit

18 to show you that I'm not an American citizen.

19         THE COURT:  Do you have that affidavit?  Does the

20 government have it?

21         MR. HOTALING:  We do not have a copy of it here, Judge.

22         THE COURT:  Pardon?

23         MR. HOTALING:  We do not have a copy of the numerous

24 filings that Mr. El Bey has submitted; we did not bring copies

25 up.

1          THE COURT:  Do we have it?

2          LAW CLERK:  We don't have it here, but one of us can go

3  get a copy and come back.

4          THE COURT:  I think that would be a good idea, yeah.

5          THE DEFENDANT:  I would like to see that.

6          THE COURT:  But anyway, I don't want to make too much of

7  this because citizenship, as I say, is not relevant.

8          THE DEFENDANT:  Okay.

9          THE COURT:  If you are in the United States, commit a

10  crime in the United States, you are subject to American criminal

11  law.

12          Similarly, you mention common law and you mention, of

13  course, admiralty.  You mention rules of civil procedure.

14          This is a criminal case.  Rules of civil procedure are

15  not applicable.

16          You have made arguments about that the U.S. government

17  is insolvent and -- I think you said somewhere the Internal

18  Revenue Service has been dismantled.

19          Unfortunately, no, it's up and running.

20          And also you argue that you're exempt from paying

21  federal taxes, either as a sovereign citizen or as an American

22  Indian, but -- you called it American Indian Moor.

23          But you're not charged with failing to pay taxes, right?

24  You are charged with asking the government for a refund on taxes

25  that you hadn't paid; that you hadn't paid taxes, but you asked

1  for a refund anyway.

2          And so even if you didn't have to pay any taxes, the

3  government is arguing that you can't ask for a refund because

4  that just doesn't give you your money back, it gives you new

5  money.

6          THE DEFENDANT:  So you're confusing me again.  I don't

7  understand.  You keep saying money.  So you are saying there is

8  money in the United States?

9          THE COURT:  Excuse me?

10         THE DEFENDANT:  Are you saying that the government gave

11  me money?  Because you keep saying money.  You're saying I asked

12  for money.

13         THE COURT:  I'm not deciding the case.

14         THE DEFENDANT:  Well, that's what you said.  You said

15  they gave me money.  I'm trying to understand, are you saying

16  that the government gave me money?  Are you saying there is money

17  in the United States?

18         THE COURT:  No.  If I did -- if I did --

19         THE DEFENDANT:  Because you are confusing me now because

20  I'm not understanding you.

21         THE COURT:  If I said that I didn't mean to say that.

22         THE DEFENDANT:  Okay.  I just want to clarify

23  everything.

24         THE COURT:  The government is charging you --

25         THE DEFENDANT:  Yes.

1    THE COURT:  -- with having gotten money from them, the
2  600,000.  Now, they have to prove that.  Okay?
3    THE DEFENDANT:  Okay.
4    THE COURT:  So I'm not taking a position --
5    THE DEFENDANT:  Oh, I thought you said that the
6  government gave me money.  I'm trying to say where the money is.
7  I say I have no money in the United States.  I want to put it on
8  the record and make sure that you said that, and that you did,
9  because now you're confusing me.
10    THE COURT:  Okay.  If I said that I retract it.
11    THE DEFENDANT:  Okay.
12    THE COURT:  But I'm saying the government is charging
13  you with having received this money.
14    Now, if you didn't receive the money, fine.
15    THE DEFENDANT:  Oh, okay.
16    THE COURT:  But if you received it, or if you -- well,
17  they are charging two things:
18    They say you received $600,000 to which you were not
19  entitled.  They also say that you, four times after that, you
20  tried to get 300,000 a year.  That's an attempt.  That's criminal
21  also if you did it.
22    But it's up to the jury to decide whether you got any
23  money, whether you were trying to get money that you weren't
24  entitled to.  That's the core of the case.
25    All I'm saying is that a lot of the points that you've

1 made in your affidavits of truth, they are talking about
2 admiralty law or you're not a United States citizen or you're a
3 foreign sovereign.  They are just not relevant.
4           THE DEFENDANT:  Okay.  Because -- I'm sorry, Judge.  I
5 don't mean to cut you off.  But you are confusing me again.
6           THE COURT:  Excuse me?
7           THE DEFENDANT:  You stated that I keep mentioning UCC.
8           THE COURT:  Yes.
9           THE DEFENDANT:  Are you operating under the UCC or are
10 not?  So you don't operate under the UCC 1- -- you know, 1-103?
11 Are you telling me you don't operate under the UCC 103(a)?
12           THE COURT:  Not in this case.
13           THE DEFENDANT:  I want this to be on record.  Are you
14 saying to me that you don't use the UCC and you are operating
15 under UCC 1-103?
16           THE COURT:  In this case -- in this case the Uniform
17 Commercial Code is irrelevant.
18           THE DEFENDANT:  Oh, so it's --
19           THE COURT:  It's irrelevant to this case.
20           THE DEFENDANT:  I'm trying to understand.  You're saying
21 you can pick and choose on one case to use the UCC?
22           THE COURT:  No.  The government has --
23           THE DEFENDANT:  But you said in this case, though.
24           THE COURT:  Look.  The government is only charging you
25 with violating the federal criminal code.  It's not charging

1  anything to do with the Uniform Commercial Code.  The Uniform

2  Commercial Code is just irrelevant.

3          THE DEFENDANT:  Everything operates under the UCC, sir.

4          THE COURT:  No, it doesn't.  I don't operate under the

5  Uniform Commercial Code.

6          The Uniform Commercial Code covers certain commercial

7  transactions.  And the government doesn't have to bring the

8  Uniform Commercial Code into a case like this because -- now, if

9  you want to argue that --

10          THE DEFENDANT:  No, no.  I'm just getting confused.  I'm

11  not trying to argue with you.  I just wanted to clarify because

12  you was confusing me.

13          At first you said money, then you said you didn't say

14  that, and then you say the UCC is not of any worth of this case.

15          But everything is operating under the UCC.  Anytime you

16  do any kind of commercial transaction -- any kind of transaction

17  is commercial.

18          So I just want to clarify, are you saying to me that

19  this Court is not going to operate under the UCC as we go to

20  trial or as we continue?

21          THE COURT:  That's correct.  The Uniform Commercial

22  Code -- I mean, you're right of course, the Uniform Commercial

23  Code, which actually is not part of federal -- the Uniform

24  Commercial Code governs a lot of commercial transactions, but it

25  doesn't govern an alleged fraud against the Internal Revenue

1  Service.

2        And that's governed by federal criminal law, not by the

3  UCC.

4        The UCC is essentially -- the UCC was a kind of model

5  law that was drafted by professors and has been adopted as state

6  law in all the states.

7        THE DEFENDANT:  Actually, by lawyers.

8        THE COURT:  But it's not part of federal law.  It

9  doesn't have anything to do with this case.  Just as admiralty

10 has nothing to do with this case because there is no activity on

11 the high seas that's involved in the case.

12       So that's the essential point.  I understand that this

13 is just about a federal criminal fraud, and not about these other

14 bodies of law.

15       Okay.  Yeah.  So I'm looking at -- Mr. El Bey, I'm

16 looking at the affidavit of truth that you filed on

17 October 10th --

18       THE DEFENDANT:  Is that the Statute-At-Large 15?

19       THE COURT:  -- and that you signed.

20       And in it you say, on the second page:  As an American

21 citizen, I hold the inherent right of the Eleventh Amendment.

22       So you're saying that you're an American citizen.

23       THE DEFENDANT:  No, I didn't.  Actually that's Title 15,

24 the Statute-At-Large, June 27, 1868.

25       So what I'm saying, I put that on a file just to notify

1  you and allow you to understand that this was brought out before

2  the Fourteenth Amendment, the day before.

3         So if we are going to get technical, you know, I'm just

4  saying, because you have all my documents stating to them, who

5  and what I am.  And that's not going to change.

6         THE COURT:  But here you're appealing to the Eleventh

7  Amendment, and you say:  I hold the inherent right of the

8  Eleventh Amendment, and you say:  As an American citizen I hold

9  the inherent right.

10         So you're asserting that because you're an American

11 citizen you have an Eleventh Amendment right.

12         THE DEFENDANT:  Well, okay.  Again --

13         THE COURT:  So that's --

14         THE DEFENDANT:  -- that's why we are here.  We are here

15 on presumptions.  You know, okay, if we are going to do that.

16         But, now, before we continue, can I just speak a little

17 bit, Judge?  Can I say to you, something to the Court?  I think

18 this is very important.

19         This is on the record, correct?

20         THE COURT:  Yes.

21         THE DEFENDANT:  Okay.  Judge, I'm filing this for the

22 record, and this is very important to me.  I am a beneficiary of

23 the trust, and I am appointing you, Judge Posner, as my trustee.

24         Okay.  I, Hakeem El Bey, direct you, Judge Posner, on

25 case number 14 CR 0447, that I am accused of, and I want you to

1  discharge and eliminate the record.

2          I, Hakeem El Bey, suffered damages as a result of my

3  kidnapping and property stolen.

4          So I want to be compensated from the trust $122,500

5  times three in redemption from the proceeds of the Court.

6          And I want that -- I want that -- that's on the record.

7          THE COURT:  Okay.

8          THE DEFENDANT:  And after saying that, I'm going to let

9  my document precede me and I'm going to reserve my rights.

10          THE COURT:  Okay.  So let me move on to some other

11  things.

12          MR. HOTALING:  Judge, just for the record, I think we

13  need to make sure that we are clear.  Obviously we object to any

14  sort of idea that the Court be named as a trustee, because the

15  trust -- that should be self-evident.  We know it's self-evident.

16          THE COURT:  Yeah, I'm not eligible to be a trustee.

17          MR. HOTALING:  But because this case involves

18  allegations of trust and money moving through particular trusts,

19  the idea that Mr. El Bey is going to naming the Court as a

20  trustee, we would obviously object to that and ask that your

21  Honor not even remotely consider it.

22          And again, we are just making sure that the record is

23  clear on that point.

24          THE COURT:  See, I'm just not allowed to be a trustee.

25  It's just not within my --

1          THE DEFENDANT:  I'm going to let my documents precede

2    me.  So I'm fine.  I'm sorry for interrupting.

3          THE COURT:  No, no.  There is no problem.

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  So let me move on and say something to the

6    government.

7          You have a bunch of motions to preclude certain evidence

8    at the trial, but that strikes me as premature.  Right?  If

9    Mr. El Bey wanted to introduce particular evidence at the trial,

10   which he is certainly entitled to do, then you can object on the

11   ground that it's inadmissible as evidence.

12         But I don't know why -- it seems premature for me to be

13   ruling on it now.

14         MS. MALIZIA:  Your Honor, based on Mr. El Bey's

15   statements before this Court, even in advance of trial I think

16   there is as real fear that he will try to introduce evidence

17   before the jury that frankly is inadmissible and is categorically

18   inadmissible.

19         And we have attempted to define these categories broadly

20   because in similar cases involving sovereign citizens this

21   evidence has been precluded in advance of trial, precisely

22   because the jury should not be hearing that evidence.

23         And your Honor has admonished the defendant about

24   certain categories of evidence here today.

25         THE COURT:  But you can, of course, object at the trial.

1          MS. MALIZIA:  We can, your Honor.

2          THE COURT:  What would be the type of evidence you would

3    most likely -- you would most like me to or think it most

4    important for me to rule on in advance of the trial?

5          MS. MALIZIA:  Well, your Honor has addressed today

6    evidence concerning the UCC and other categories of law that are

7    just as your Honor has stated, simply irrelevant.  If the -- and

8    it sounds like the defendant may disagree with you on that point.

9          A ruling on the motion in limine in advance of trial may

10   preclude unnecessary delay, sidebars, basically wasting the

11   jury's time, and potentially avoiding mistrial if the defendant

12   does introduce evidence that is irrelevant and prejudicial.

13         MR. HOTALING:  And, Judge, by way of example, if

14   Mr. El Bey -- for example, if a revenue agent or an IRS special

15   agent were on the stand, and if Mr. El Bey were to ask questions

16   regarding his understanding of the UCC or his understanding of --

17   Mr. El Bey's theory of the dissolution of the United States back

18   in the 1800s, introduction of that type of evidence or that type

19   of questioning during the course of cross-examination, as your

20   Honor has said today, is totally irrelevant.

21         And then to allow even the question to be posed is then

22   exposing the jury to that type of totally irrelevant information.

23         So that's the reason we are asking for a pretrial ruling

24   to inform Mr. El Bey not to even go down that road because it's

25   not germane, it's not relevant to this particular case.

1    So your Honor has seen the filings.  Your Honor has
2  heard Mr. El Bey in court.  Your Honor has a sense of where he
3  might be wanting to go in terms of what his defense of this case
4  is.
5    And our view of where that might be going, as your Honor
6  has said before, it's irrelevant and it's not germane to what
7  this case is about, as your Honor has said, the filing of tax
8  returns and the receiving of moneys from the United States
9  Treasury.
10    THE COURT:  Well, I thought I just made it plain to
11  Mr. El Bey that this -- a lot of the material in his affidavits
12  of truth about rules of civil procedure and Uniform Commercial
13  Code, and the like, being exempt because he doesn't consider
14  himself an American citizen; that that's all immaterial.  That is
15  just not admissible.  I thought I made it clear.
16    MR. HOTALING:  Your Honor, at the time we filed the
17  motion we didn't have the benefit of that.  So I think your
18  ruling --
19    THE COURT:  See, the problem is -- I mean, suppose in
20  your hypothetical example of cross-examination Mr. El Bey were to
21  refer to one of these irrelevant statutes.
22    Well, I'd be saying the same thing to the jury, right?
23  What difference would the order make?
24    MR. HOTALING:  What the order is, Judge, it's
25  affirmatively telling the defendant that you are not allowed to

1   ask these questions.

2          THE COURT:  No, I understand.  But suppose he disobeys

3   the order.  Then what do I do?

4          MR. HOTALING:  Then that's something we are going to

5   have to deal with.

6          THE COURT:  No.  You have to be more precise.

7          MR. HOTALING:  What are we going to do?  You are going

8   to have to then -- there are two things you are going to have to

9   do:

10         You are going to have to be, I guess, more concrete with

11  Mr. El Bey that that line of questioning is improper.  And then

12  you are going to have provide a corrective instruction to the

13  jury saying that the question you just heard is irrelevant to

14  this case.

15         THE COURT:  That would be true whether or not I had

16  entered an order in advance of the trial.

17         MS. MALIZIA:  Your Honor, he would also be in violation

18  of a pretrial ruling by -- he would also be in violation of a

19  pretrial ruling by this Court.

20         THE COURT:  Yeah.  And therefore what, contempt of

21  Court, or what?

22         MS. MALIZIA:  Your Honor, I mean, these cases, they are

23  sometimes unpredictable.  This is anticipating some of that

24  unpredictability.

25         THE DEFENDANT:  Excuse me, your Honor.  Can I ask one

1  more question, please, if you don't mind?

2          I also, would I be allowed to have a jury of my peers to

3  have a fair trial?

4          THE COURT:  Yeah, of course.

5          THE DEFENDANT:  Okay.  And that's all I ask.

6          And then also to -- because none of my discovery has

7  been answered with signed signatures, sworn affidavits.  So, you

8  know, I'm going to always challenge jurisdiction.

9          And so until it's on the record, filed and put on the

10 record, then I don't really see how we can proceed.

11         THE COURT:  Do you have a comment about that?

12         MS. MALIZIA:  Your Honor, the government was contacted

13 by your chambers a little over a week ago and asked to reply to

14 Mr. El Bey's request for hard copies of the discovery.

15         We provided that discovery to Mr. El Bey last Friday,

16 February 6, for pick-up at the U.S. Attorney's Office.

17         Mr. El Bey did not come pick up that discovery.  We have

18 it here with us today.

19         He has asked us to put on the record the fact that we

20 are tendering hard copies of the discovery to him.  Everything in

21 that box has been previously provided Mr. El Bey in electronic

22 form as well.

23         THE COURT:  Well, he is certainly entitled to have it on

24 paper.

25         MR. HOTALING:  For the record, to make sure we are

1  providing Mr. El Bey --

2        THE DEFENDANT:  They are going to send it to me like I

3  sent it to them:  through the mail, certified.  I want to see it

4  on the record, certified, and I want what they want.

5        MS. MALIZIA:  It's on the record.

6        THE DEFENDANT:  Because let me say this, because it's

7  very important, because I got it from your clerk.  It says the

8  last filing date for the pretrial hearing was 1-26-15.

9        Now, I am just saying, if you said the last filing was

10 1-26, then they can't file anything to me.  And if they do, first

11 of all, Judge, let me say this:  We are in an important matter.

12 I'd like to receive information, just like I give to it them, in

13 writing with a written wet-ink signature on the record.

14       So you can give me anything in a box and say you gave it

15 to me.  I don't know.  You don't know.  Did you get a box, Judge?

16       THE COURT:  No, I don't know --

17       THE DEFENDANT:  That's what I'm saying.  Don't you think

18 that's important?

19       How can we have a fair trial if you're not getting it,

20 and they said they can give me anything.  I'm not coming and

21 picking up anything that they didn't come to my house and get it

22 at my house.  I spent my money, so you working for the

23 government, you represent money, I had to spend money.  So you

24 hired them to do their job.  Let them to their job.

25       THE COURT:  Now, did you file electronically --

1    THE DEFENDANT:  No.

2    THE COURT:  -- by January 26th?

3    THE DEFENDANT:  No, she didn't.  There is nothing on the
4 file.  I've got a copy of the file.  There is nothing on the
5 file.

6    MS. MALIZIA:  Your Honor, we tendered the vast, vast
7 majority of the discovery in this case to Mr. El Bey in September
8 of last year.

9    Last week was the first we heard that Mr. El Bey was, as
10 I believe he put it, computer illiterate and he requested hard
11 copies of that discovery, which we have provided.

12    THE COURT:  Which is a reasonable request.

13    MS. MALIZIA:  It is a reasonable request and we have
14 complied with it.

15    THE DEFENDANT:  Judge, this is our fourth court date.  I
16 have talked to you about discovery is not being answered.

17    She can't sit here and say that she didn't know.  You
18 can't either, Judge, because I have talked to you every time we
19 have been here about them not answering my discovery.

20    So now, for her to say this, and for you to sit here and
21 try to extend the time for them on the filing is not fair, Judge.
22 And so, you know, that's not -- I want the record to know that,
23 because every time I come before your Honor I thought I have
24 always been a gentleman, I have never disrespected you, never
25 will.

1    And all I'm asking you is to give me the same respect as

2 you give them.  And like he was saying, like we were saying, what

3 they going to object to, I can object to a lot of things that

4 they said.  And I want the same right to that for it to be a fair

5 trial.  That's all I am asking you for.

6    THE COURT:  But you do want to have a hard copy.

7    THE DEFENDANT:  I do.  I need a hard copy.

8    THE COURT:  That's fine.

9    THE DEFENDANT:  No, no.  It's too late now, Judge.  I

10 haven't just -- this haven't been answered.  I have come before

11 you three other times, and asked you in the affidavits about the

12 discoveries.

13    And they know -- and they aren't going to answer.  I

14 know they are not.

15    So what I am saying to you is, Judge, look, all I'm

16 saying is treat me fairly, the way you treat them.  I'm not

17 asking nothing personal or nothing special.  All my affidavits

18 that I sent to you and them state the same thing:  that they are

19 not answering discoveries.

20    And you sent me a letter on this pretrial right here.  I

21 have this right here.  This is what you said.

22    You said:  Many entries before the Honorable Richard A.

23 Posner as to Hakeem El Bey.

24    You said:  Status conference held on 1-8-15.  The final

25 pretrial conference originally set for 2-9-15 has been reset to

1  2-12-15 at 10:00 a.m.

2         You said:  Courtroom to be posted at a later date.

3         Final -- again -- final pretrial filings will still be
4  due on the date 1-26-15.  Now, that's from your office.

5         All I'm saying is I hit my time limits.  They haven't
6  asked you for any special treatment or extended time because I
7  haven't received anything.  So I'm asking you to treat me the way
8  you treat them.  They got to follow the law too.

9         THE COURT:  But what precisely do you want?  You don't
10 want to take the box with you.  Do you want them to have it
11 delivered to your house?

12        THE DEFENDANT:  What am I going to take it for?  You set
13 a timetable for it to be sent and delivered, and it wasn't
14 delivered and sent.

15        What she did afterwards, she sent me a broke -- I filed
16 it on the case, Judge, the same day she sent it to me and I ran
17 down here and filed it on the case.  So you know, it's on the
18 record, stamped with a notary.

19        So what I'm saying to you is this:  She know what she
20 did.

21        She sent this broke -- and she called my father and
22 said:  Now, look, maybe I could send you another on a disk.

23        I said:  No, I don't want another disk.  I said:  I want
24 a hard copy with a wet-ink signature.

25        She said:  What is a wet-ink signature?

1       I don't got nothing else to talk to you about it then.
2  You don't know what a wet-ink signature is?  If we are going to
3  play games, I'm going to play games too.

4       Now, all I'm saying to you is, your Honor, on the
5  record, is that I want the same treatment that you give them, if
6  they don't get it on the time limit, then it can't be admitted.

7       So I'm going to object to anything that you allow for
8  them to put on the record.  If she didn't give it to me on a hard
9  copy, put it on the record, it can't go on the record.

10      You said:  The final pretrial date is 1-26.  I made my
11 appointment dates and they can too.

12      MS. MALIZIA:  Your Honor --

13      THE COURT:  Let me hear the government a moment.

14      MS. MALIZIA:  -- it should probably go without saying,
15 neither the rules of evidence or the rules of criminal procedure
16 require that materials tendered in discovery be put on the
17 record.  In fact, there are a lot of reasons why they are not.

18      It's the government's position that we were in
19 compliance with our Rule 16 obligations in September of last
20 year, and we have continued to comply with our obligations under
21 Rule 16 since that time.

22      MR. HOTALING:  Including providing a hard copy.

23      Judge, I think there is some, perhaps some confusion by
24 the words -- the use of the word "discoveries."

25      I understand, and I have seen some of the material that

1  Mr. El Bey has submitted, usually as part of his affidavits of

2  truth, requiring and requesting that the government sign some

3  sort of acknowledgement under the UCC or any other sort of

4  non-germane bodies of law.

5     And the government is not going to engage in answering

6  those types of quote-unquote "discoveries."

7     Now, what we're talking about right now in terms of

8  discovery, as Miss Malizia just said, is Rule 16 discovery, the

9  discovery that is at the core of this criminal case, including

10 the material and the exhibits and the documents that the

11 government could be relying on, will be relying on to prove this

12 case beyond a reasonable doubt.

13    That is the material, that is the Rule 16 discovery,

14 separate and apart from whatever discoveries Mr. El Bey might be

15 referring to.  That's the material that we have here.  That's the

16 material that he has requested a hard copy of.

17    If Mr. El Bey wants it, it's here for him to take.  It's

18 in a box.  We are here as government attorneys, stating on the

19 record that the material that is in that box constitutes the

20 Rule 16 discovery material.

21    THE COURT:  Shouldn't he have been given the hard copies

22 at the same time that you, in January, when you gave him the

23 disks?

24    MS. MALIZIA:  Your Honor, we actually gave him the disks

25 in September of last year.  We have supplemented that with

1  additional discovery materials.

2       Again, it's the government's policy -- because, as

3  Mr. El Bey has noted, we don't have infinite funds, we do have

4  some -- we try to provide discovery electronically whenever

5  possible, unless a defendant requests otherwise.

6       And the first we learned of that request was last week

7  from your chambers.

8       THE DEFENDANT:  Okay.  Judge, now, I'm sorry.  Let me

9  get this out.

10       First of all, I wasn't asking for discovery on UCC.  I

11  was asking for discovery on the wet-ink signature.  Whoever my

12  accuser is, let him sign it and show that it's real.  First of

13  all, they have to put it on the docket.  If it's such evidence,

14  they can put it on the docket.

15       What I'm saying is I want to know who my accuser is.

16       THE COURT:  He is standing right here.

17       MR. HOTALING:  We are right here.

18       THE DEFENDANT:  Injured party.  Injured party.  I want

19  to know who is the party that was injured.  It can't be a

20  corporation.  It can't be these attorneys here representing them.

21  So I want to know:  Who did I injure?  Because it's going to come

22  down to you, I understand.

23       MR. HOTALING:  United States Treasury.

24       THE DEFENDANT:  Is the government into them?  Can you

25  speak for yourself?

1    MR. HOTALING:  Excuse me?

2    THE COURT:  The federal government.

3    THE DEFENDANT:  What I'm saying, Judge, is -- and you

4  know this -- that what I'm saying to you is this, Judge:  They

5  had every opportunity to come and present what they had.  I

6  presented what I have.

7    And so on discovery, you talking about Rule 16 and all

8  that.  Okay.  That's fine.  What I'm saying to you is this:  I'm

9  challenging jurisdiction.  I put it on the file.  It hasn't been

10  answered.  I'm going to always challenge jurisdiction.  And so

11  you know.

12    Okay.  We're going to go from there.

13    And what I have on the record is already on the record

14  again.  And this time I'm going to let my documents precede me,

15  and I'm going to reserve my rights, and rest the case now.

16    THE COURT:  Okay.  That's fine.  I will deal with that

17  in due course.  I have to move on too.

18    Now, this is something I want to ask the government

19  about.  Well, no, I want to ask both of you.

20    So the government has introduced a motion.  They want to

21  be able to -- they want to be allowed to introduce evidence that

22  you bought a home and eight new cars shortly after you received

23  the refund check.  And the reason they want to do that is they

24  want to use that as evidence that you did get that money, the

25  refund check.

1        So I want to ask you whether you have or whether you
2   want to file an objection to the government's introducing that
3   evidence about the home and the eight cars.
4        THE DEFENDANT:  Okay.  Now, I'm going to say this:  I'm
5   getting confused again.
6        THE COURT:  I'm sorry?
7        THE DEFENDANT:  I'm getting confused again, Judge.
8        Because they are saying Rule 16 and the Federal Rules of
9   Civil Procedure and Rule 16, it says civil, not criminal.  So
10  they have to be coming civil, and they can't be coming criminal.
11       So I want to know, he said he is using Rule 16, Federal
12  Rules of Civil Procedure --
13       MR. HOTALING:  Federal Rule of Criminal Procedure.  I
14  said criminal procedure.
15       THE DEFENDANT:  Okay.  So now they saying civil, not
16  criminal.
17       So all I'm saying is --
18       THE COURT:  Okay.
19       MS. MALIZIA:  I believe we have consistently cited the
20  criminal rules, but perhaps your Honor has something else you'd
21  like to add.
22       THE COURT:  Mr. El Bey.
23       Let me ask you this now:  It seems to me in order to use
24  that evidence, don't you have to show that Mr. El Bey didn't have
25  alternative assets or income that would enable him to buy the

1  eight cars and the home without any money -- any refund?

2          MR. HOTALING:  I don't think that there is a requirement

3  under the law that we have -- we would be able to show that.

4          Obviously, what our argument is is that it's

5  circumstantially based in terms of the timing after receipt of

6  the money, and that it's a direct --

7          THE COURT:  That seems to me thin, if the person has

8  ample other assets.

9          MS. MALIZIA:  Your Honor, we are prepared to prove at

10  trial that the defendant does not in fact have the ample

11  alternative assets.

12          THE COURT:  I think that's important.

13          MS. MALIZIA:  We intend to introduce evidence in the

14  form of bank records and other bank documents that show that he

15  does not have this kind of wealth, absent the fraudulently

16  obtained refunds.

17          THE COURT:  Now, another thing that the government wants

18  you to do, Mr. El Bey, they want to be permitted to introduce

19  certain business records with a certification by the records

20  custodian that it's what it appears to be, rather than having the

21  custodian testify live.

22          And do you object to that procedure for any reason?

23          THE DEFENDANT:  I'm sorry?

24          THE COURT:  They want to be able to introduce business

25  records with just a certification, a stamp of some sort, I guess.

1           THE DEFENDANT:  I reject.

2           THE COURT:  You don't want?

3           THE DEFENDANT:  No, I don't.

4           THE COURT:  Do you have a position about that, about the

5    live custodian versus the certification?

6           MS. MALIZIA:  Your Honor, we are prepared to call live

7    custodians if necessary.  It's our position that the category of

8    documents that we are asking to move in, absent that testimony,

9    are self-certifying and in some cases are admissible on their

10   face with a 902(11) certification, but we are prepared to call

11   those custodians to lay foundations.

12          THE COURT:  I would prefer the live custodian.

13          MS. MALIZIA:  Certainly.

14          THE COURT:  Okay.  Now, I want to discuss next voir

15   dire.

16          So, Mr. El Bey, voir dire refers to the questions that I

17   ask prospective jurors.  So there will be a bunch of people that

18   have been selected as potential jurors, and I have to ask them

19   questions.

20          And you submitted several questions.  But your

21   questions, again, they are about -- they are about -- let's see.

22          Do I have Mr. El Bey's voir dire questions?

23          LAW CLERK:  The parties' proposed voir dire, there is a

24   tab in the government's.

25          THE COURT:  Okay.  Thanks.  Okay.

1          So your questions are:  Do the jury know what the

2    Uniform Commercial Code is, and, if not, make sure they have?

3          Do the jury know what Uniform Commercial Code

4    Section 1-308 is?

5          Do the jury know what Federal Rule of Civil Procedure

6    12(b)(6) means?

7          That's failure to state a claim.

8          And the last is not really a question, more of an

9    instruction.  You want to make sure -- this is an earlier point

10   you made -- that the whole docket record is admitted in the trial

11   and given to the jury.

12         But again, the questions about Uniform Commercial Code

13   and rules of procedure, they are not relevant to the case.  So I

14   can't ask those.

15         So you may want to consider other questions you'd like

16   to ask.

17         THE DEFENDANT:  So now would the docket be permitted to

18   the trial, at trial?  The whole docket?

19         THE COURT:  Well, you described the docket record.  So

20   that would be just what, all the evidence in the case?

21         THE DEFENDANT:  What's put on record, no.

22         MR. HOTALING:  He might be asking whether or not the

23   whole ECF listing of docket entries to be --

24         THE DEFENDANT:  Yeah.  That is the docket.

25         MR. HOTALING:  Obviously, it's probably premature to

1   even have these discussions, because we haven't impaneled a jury

2   and we haven't gotten through the evidence admission portion of

3   the case.

4          So as a preview --

5          THE COURT:  But you wouldn't object to the docket list?

6          MR. HOTALING:  We probably would, Judge.

7          THE COURT:  What exactly is it establishing?

8          MR. HOTALING:  Well, Judge, as your Honor knows, what

9   the docket is is it will have the name of the parties, it will

10  have the name of the case, it will have docket entry number 1,

11  indictment, which the jury will get a copy of as part of their

12  deliberation; 2, the bail, the entry of the bail form; or minute

13  entries that are entered by the Court setting particular status

14  dates.

15         MS. MALIZIA:  Including finding the defendant competent

16  to waive his right to counsel.  I mean, things that could

17  potentially prejudice the defendant as well.

18         MR. HOTALING:  There is a 402, 401 relevance issue as to

19  why that was in any way germane to any issue, material issue that

20  is joined at the trial.

21         THE COURT:  Okay.  You are saying the docket record is

22  just a list of --

23         MR. HOTALING:  Docket entries.

24         THE COURT:  -- everything that went on?

25         THE DEFENDANT:  Everything that is filed.

1          MR. HOTALING:  So, for example, you have in front of you

2     everything, the government's consolidated motions in limine on

3     docket number 33, as it's reflected at the top.

4          He would want to have just a hard copy print that would

5     reflect -- well, maybe he is actually asking for all the

6     documents that are in the docket as well, as opposed to a docket

7     list.  I don't know.

8          I am not sure why we would want to have our motions in

9     limine describing our theory of the case, because that's most of

10    what the docket --

11         THE COURT:  Well, can you give Mr. El Bey the docket

12    list and let him indicate items he'd like to see?  Or is the list

13    confidential?

14         MR. HOTALING:  It's publicly available.

15         MS. MALIZIA:  It is publicly available.

16         THE COURT:  It's publicly available.

17         MS. MALIZIA:  I don't believe it's evidence.  And I'm

18    not sure why it would be presented to the jury or voir dired.

19         THE COURT:  Well, wouldn't it be good for Mr. El Bey to

20    have the list in case he noticed something should be evidence?

21         MS. MALIZIA:  He does.  He is on ECF.

22         THE COURT:  Do you have the list?

23         THE DEFENDANT:  I think it only fair that the docket be

24    permitted in the trial and so they can see what I see.  I mean,

25    if we are going to have a fair trial, Judge -- you know, you're

1    not giving me anything.  You are giving them everything they want

2    and I'm not getting anything.

3              THE COURT:  That's not true.

4              THE DEFENDANT:  So I'm looking up at everybody, I

5    haven't got a chance.  I am asking for this.

6              THE COURT:  I don't think so.

7              THE DEFENDANT:  I think it's very important to me and to

8    my case that the docket be permitted at the trial.

9              THE COURT:  By "docket," you mean this list?

10             THE DEFENDANT:  Yeah, the list, everything filed on the

11   case.

12             THE COURT:  But you mean not just the list, but every

13   document to which the list refers.

14             THE DEFENDANT:  That's on the case, yes.

15             THE COURT:  Okay.  But some of those will not actually

16   be relevant to the trial.

17             THE DEFENDANT:  Okay.  Well, they don't have to be

18   relevant but I want it to be admitted for my --

19             THE COURT:  But if it's not evidence it can't be given

20   to the jury.

21             THE DEFENDANT:  Well, what are you saying, they can't be

22   evidence on there?

23             THE COURT:  Well, I haven't seen this document.

24             THE DEFENDANT:  Well, you got them all.

25             THE COURT:  Pardon?

1          MR. HOTALING:  We can use as an example whether or not

2     the Court thinks it would be proper for the jury to see this

3     particular document, which is government's consolidated motions

4     in limine, docket number 33 on the publicly filed docket list.

5          It would be the government's position that that would be

6     something that Mr. El Bey might want to have before the jury, and

7     we would argue --

8          THE DEFENDANT:  Let me make that -- I don't need anyone

9     speaking for me.  So don't speak for me.

10          MS. MALIZIA:  Fair enough.

11          THE DEFENDANT:  So what I'm saying, Judge, is what we

12     really don't want is --

13          THE COURT:  No.  Make sure Mr. El Bey has the copy.

14          MR. HOTALING:  Absolutely.

15          THE COURT:  If there is anything in it that you think

16     should be given to the jury, you file a motion saying X, Y, Z,

17     whatever number, ought to be given to the jury.

18          Because I'm sure you won't want everything on that list

19     given to the jury.

20          THE DEFENDANT:  Well, if it's on the docket what are we

21     hiding?

22          THE COURT:  It's not a question of hiding.

23          THE DEFENDANT:  If it's on the docket, what are we

24     hiding?

25          THE COURT:  It's not a question of hiding.  You don't

1  want to give the jury things that are irrelevant because that's
2  just going to confuse them.
3          THE DEFENDANT:  Like you confusing me now.
4          So you talking about the jury, what about me?  I'm
5  standing before you.  I'm saying I don't understand.
6          THE COURT:  I don't want to --
7          THE DEFENDANT:  I don't understand.
8          THE COURT:  And then you'll decide -- you'll decide if
9  there are any items on it that you think the jury would like to
10 see and that would be relevant.
11         But if it's stuff that isn't relevant, then if we give
12 it to the jury we'll just confuse them.  Right?  It's not in your
13 interest to just flood the jury with irrelevant stuff, right?
14         THE DEFENDANT:  I'm not trying to do that.
15         THE COURT:  And I'm sure it's true that this docket
16 contains a lot of the stuff which is related just to our pretrial
17 procedures and not to the jury's determination of guilty or
18 innocence.
19         MS. MALIZIA:  Your Honor, perhaps you would like to set
20 a date by which the parties would file their witness lists and
21 perhaps preliminary exhibit lists, so that we are all on the same
22 page in terms of what the parties intend to present at trial.
23         Obviously those lists can change, but maybe that would
24 shortcut some of these issues.
25         THE DEFENDANT:  That would be fine with me, Judge.

1          THE COURT:  You would each file an exhibit list and give

2     the other party, is that the idea?

3          MS. MALIZIA:  Yes, your Honor.

4          MR. HOTALING:  And we could put it, again, on the formal

5     docket so that the Court would have access to it as well.

6          THE COURT:  Okay.  Let me move on to the government's

7     voir dire questions.

8          Now, I find these -- I find these questions troublesome.

9     You've got 20 questions.  A lot of them ask kind of embarrassing

10    personal stuff, right:  Have you ever been arrested?

11         MR. HOTALING:  Judge, those are --

12         THE COURT:  You can't ask a person in public.  They are

13    dragged in here, draftees, you are going to ask someone in front

14    of the whole crowd whether he or she has been arrested?

15         MR. HOTALING:  Absolutely.

16         THE COURT:  Absolutely?

17         MR. HOTALING:  Judge, these are questions that are asked

18    in this courthouse every single day.

19         THE COURT:  In public?

20         MR. HOTALING:  Absolutely.  Yes.

21         THE COURT:  I don't understand that.

22         MR. HOTALING:  Judge, the whole purpose, at least from

23    our perspective, is to get a sense of the exposure that potential

24    jurors have had to the criminal justice system.

25         THE COURT:  Now I'm asking about, look, when they fill

1  out their form they have to -- they are asked whether they have

2  been arrested, right?  That's part of the jury form.

3          MR. HOTALING:  I don't know the answer to that, Judge.

4  I don't have access to the jury form down on the second floor.

5          THE COURT:  My law clerks tell me that when you sign in

6  as a juror you are asked -- isn't that right? -- you are asked

7  whether you are arrested?

8          MR. HOTALING:  We don't get those, Judge.  The parties

9  don't get those questionnaires that are filled out.

10          Unless the Court is going to be anticipating actually

11  preparing a jury questionnaire that each one of the jurors will

12  then fill out and then provide it to the parties, and that might

13  obviate some of these questions.

14          But in terms of what might be asked down on the second

15  floor jury room, that is not material that normally, absent them

16  separately filling out a questionnaire that comes to us, and we

17  wouldn't see that.  So I don't know if they have answered yes to

18  that.

19          THE COURT:  I don't get that.  Why do you want to

20  embarrass jurors by asking them highly personal questions in

21  front of a bunch of strangers?  How do you get jurors by doing

22  things like that?

23          MR. HOTALING:  Well, first of all, these are questions

24  that go to our ability to --

25          THE COURT:  Look.  Being arrested doesn't mean you're a

1   criminal, right?  Maybe it was a mistake.

2          So arrest reports are generally confidential, and people

3   don't like to be asked whether they have been arrested.

4          MR. HOTALING:  Judge, obviously, if there is someone,

5   and if there are questions that your Honor thinks are personal,

6   there is a standard procedure that's used, is:  I'm going to ask

7   a series of questions, and if anyone wants to, to address these

8   questions with me at sidebar.  So that you don't have to answer

9   them in front of the entire room.

10         So we'll come over, we can sit at sidebar, we can

11  discuss what the issues are, explore them if necessary, so that

12  we get a sense of who these people are and whether or not they

13  are going to be good jurors for purposes of evaluating this case,

14  as part of the peremptory process.

15         THE COURT:  Now, when you say that you're not given the

16  juror sign-in form when they are asked this question, is it

17  forbidden to you or you just have never asked for it?

18         MR. HOTALING:  Judge, to be perfectly honest, I don't

19  know the procedures down there because that's outside the venue

20  of the parties.

21         So what happens -- there is two ways that I have

22  normally seen it happen:

23         Number one, the jurors will come up and they will be

24  asked to fill out a questionnaire that the Court has provided.

25  So Judge Posner Jury Questionnaire:  A series of questions that

1   might be a page, page and a half.

2          That would then be copied by the Court and then provided

3   to the parties so that we can evaluate and have some of these

4   questions pre-answered.

5          Oftentimes all we get when we walk in the room on a

6   particular day is just a list of names, and saying these are the

7   names of your potential jurors, it would list the name, it would

8   list the age and the occupation, and where the person lives, and

9   that's all we will have.

10          So we come into it blind, really.  And that's I think

11   the whole point of the voir dire process.

12          THE COURT:  Now I get the list presumably.

13          MR. HOTALING:  But in terms of whatever information they

14   provide --

15          THE COURT:  But I don't have to ask -- what I can do --

16   I don't want to embarrass these people.  What I can do is if I

17   have the list and on the list there is someone who in the

18   jury filled out his jury form and said he has been arrested, I'll

19   ask that person to come up.  I don't want to ask in public.

20          MR. HOTALING:  Fair enough.

21          THE COURT:  I'm just looking quickly at your other

22   questions.

23          Okay.  You have a question:  Have you ever served on a

24   jury, and so on.  And then you have the last of this is:  Were

25   you selected as the foreperson on the jury?

1          Why are you asking that?  What's that material to?

2          MR. HOTALING:  There is value in having a sense of kind

3   of what leadership role a particular person played in a previous

4   jury deliberation setting that has value to our analysis of

5   whether or not that person would be someone we would want to keep

6   on the jury or exercise a peremptory challenge.

7          THE COURT:  Okay.  I don't agree.

8          Now, I have a shortened list of -- I have a shortened

9   list of voir dire I thought I would run over and just ask both

10  sides.  Here is my -- Maria, where is your list?

11     (Pause.)

12         THE COURT:  Well, I'm sorry, but where is the

13  government's list with the 20 questions?

14     (Pause.)

15         THE COURT:  Okay.  You have two questions:  What

16  programs do you watch on television?

17         Why do you want to ask that?

18         MR. HOTALING:  There is lot of good information that can

19  be gleaned from that particular question, Judge, in terms of

20  whether or not that person might be a suitable juror.

21         THE COURT:  What magazines or other publications do you

22  subscribe to?

23         MR. HOTALING:  The same with the television program

24  question.

25         THE COURT:  Why aren't you asking them what movies they

1  watch, what books they read?

2          MR. HOTALING:  We can ask those if you'd like, Judge.

3          THE COURT:  I'm not suggesting that.  You could spend a

4  week, you know, peeling these people's brains back.

5          Why do you pick on television?  Why don't you ask them

6  what they look at on their cellphones?  Where do you stop with

7  all this?  Why do you pick on television rather than all the

8  other ways in which people get information?

9          MR. HOTALING:  Well, a lot of times many people will

10 say:  I get it online.

11         Where do you get your news?  I get my news from online.

12         THE COURT:  You're not asking where they got their news.

13         MR. HOTALING:  What programs do you watch on television?

14         THE COURT:  That's not the -- that's not the answer

15 then, right?

16         MR. HOTALING:  That's correct.

17         THE COURT:  Television is not the Internet.

18         MR. HOTALING:  I think a lot of times there can be

19 information.  If --- are they people who like watching CSI.

20         THE COURT:  You're not asking them that question.

21         MR. HOTALING:  But that goes to that question, Judge.

22         THE COURT:  No, it doesn't.

23         MR. HOTALING:  What programs do you watch on television?

24 And if the answer was:  I really like the CSI types of programs,

25 or I like Law and Order types of programs.

```
 1            THE COURT:  What if a person says:  I don't watch
 2   television?
 3            MR. HOTALING:  Then that's the answer.  And then we move
 4   on.
 5            THE COURT:  Why are you so fixated on television?  Most
 6   Americans no longer get news from television.
 7            MR. HOTALING:  But also the --
 8            THE COURT:  They get it on the Internet, right?
 9            MR. HOTALING:  Okay, Judge.
10            THE COURT:  You don't ask about the Internet.
11            MR. HOTALING:  No.  Judge, the question, as I indicated
12   just a moment ago, in terms of the television -- and I think
13   really from our perspective, I actually get a lot out of it.  If
14   someone says:  I watch CSI, and I watch all the CSI lines of
15   programs.
16            THE COURT:  Look, I don't watch television, for example.
17            MR. HOTALING:  Okay.
18            THE COURT:  A lot of people don't watch television.
19            MR. HOTALING:  Fair enough.
20            THE COURT:  Why have you limited your question to
21   television?
22            MS. MALIZIA:  It's not.
23            THE COURT:  Because this was written 20 years ago, or
24   what?
25            MR. HOTALING:  No, it wasn't.
```

1          Well, Judge, we're happy to expand it to --

2          THE COURT:  And what magazines or other publications?

3  Did it occur to you there are actually some people who read

4  books?  Can you imagine that?

5          MR. HOTALING:  I do, yes.  I do.

6          THE COURT:  What if they are reading, you know, Memoirs

7  of the Marquis de Sade, or something?

8          MR. HOTALING:  I think that the "other publications" is

9  a little bit broad and can cover books, Judge.  So if they want

10 to say, Judge, I love history novels, I love reading biographies,

11 then I think that that's covered by that question.

12         THE COURT:  No.  Actually it isn't covered by it.  It

13 talks about subscriptions.  That's not books.

14         MR. HOTALING:  What matters are other publications.

15         THE COURT:  You don't subscribe to books.

16         MR. HOTALING:  Publications.

17         THE COURT:  You don't subscribe to books.

18         MR. HOTALING:  Judge, it doesn't say subscriptions.  It

19 says:  What magazines or other publications do you subscribe to?

20         So publications --

21         THE COURT:  "Do you subscribe to."  You don't subscribe

22 to a book.  Don't you understand that?

23         MR. HOTALING:  I do, Judge.  I do.

24         MS. MALIZIA:  Your Honor, at the end of the day it is

25 obviously up to you what questions you adopt from our proposed

voir dire.  And if you think these are irrelevant or care to
expand on them, we obviously defer to your judgment.

THE COURT:  Well, I'll just read you the 10 questions --
I had my law clerk shorten yours:

Have you ever been arrested or charged for any other
offense other than a minor traffic offense?

Have you ever been convicted of a criminal offense other
than a minor traffic offense?

Have you or someone you are close with ever worked in
law enforcement as a prosecutor or criminal defense attorney?

Have you or someone you know had any experiences with
police, prosecutors, or criminal defendants that would make it
difficult for you to be impartial in deciding this case?

This case involves the IRS.  Have you or someone you
know had any experience with the IRS that might make it difficult
for you to be impartial in deciding this case?

Do you belong to any groups or organizations that
advocate the non-payment of taxes?

Do you believe it is unlawful or otherwise illegitimate
for the federal government to collect income tax?

Do you have any views about the federal government that
may affect your ability to be impartial in deciding this case?

Have you ever served on a jury before?  If so, what was
the nature of the case?  Did the jury deliberate and reach a
verdict?

1    At varying times during the case the Court will instruct
2 you about the applicable law.  Would you be able to apply that
3 law and reach a verdict even if you disagreed with that law?
4    And finally:  Are there any other reasons why you might
5 find it difficult to be impartial in deciding this case?
6    Is that adequate?  If you want to suggest others, you
7 may.
8    And similarly, Mr. El Bey, you can object or you can
9 suggest additional questions.
10    THE DEFENDANT:  Yes, Judge.  Are you going to allow us
11 to submit some of the questions we think should be --
12    THE COURT:  As I say, admiralty stuff is irrelevant.
13 But if you want to -- if you want to suggest additional questions
14 and if the government does similarly -- I guess I should give
15 them copies, right, of the 10 questions?
16    THE DEFENDANT:  Yes.
17    LAW CLERK:  There are four copies there to distribute.
18    MR. HOTALING:  Judge, if I might consider potentially, I
19 think it's our proposed number 18:  Do you have any religious,
20 philosophical, moral, or other beliefs that would make it
21 difficult for you to sit in judgment on another person?
22    There are instances that have arisen where someone says:
23 Because of my -- I can't do this job of sitting in judgment on
24 somebody else because it's against my personal beliefs.
25    Obviously, that would be problematic and might be the

1    basis of a motion to strike.

2          So we would ask if your Honor would consider adding that

3    to your list.

4          THE COURT:  I think that might well be good.

5          Why don't I give each of you have a copy of the -- yeah,

6    I think that's a good idea.

7          One to Mr. El Bey and -- okay.  Let's see.  Where am I?

8          THE DEFENDANT:  So, Judge, are you setting a certain

9    date for us to submit the list?

10         THE COURT:  That's a good idea.

11         MR. HOTALING:  And I think I missed Mr. El Bey's

12   request.  The list is what again?  I'm sorry.

13         THE DEFENDANT:  If he is setting a date for us to submit

14   the list.

15         MR. HOTALING:  Submit the additional voir dire

16   questions?

17         THE DEFENDANT:  Yes.

18         THE COURT:  When is the trial?

19         THE DEFENDANT:  March 2nd.

20         MR. HOTALING:  Two weeks from Monday.

21         THE COURT:  How about if I give a week from today.  So

22   the 19th, is that?

23         MR. HOTALING:  Thank you, Judge.

24         MS. MALIZIA:  Your Honor, could we also request that we

25   -- at least the parties -- exchange preliminary exhibit and

1  witness lists by that time?

2  The government has filed its preliminary witness list.

3  Obviously the defendant does not have to put on any

4  case.  But if he -- if Mr. El Bey has a list of anticipated

5  witnesses, and I'm sure if he has any intention of putting in

6  exhibits it might be helpful, for reasons of efficiency and to

7  avoid delay at trial, if he would present us with a preliminary

8  list of those witnesses and those potential exhibits.

9  THE COURT:  Of witnesses and exhibits?

10  THE DEFENDANT:  Your Honor, how can she ask that?  I

11  haven't gotten anything.

12  So what I'm saying is it's not fair, she asking me to

13  give her everything.  She didn't give me.

14  MS. MALIZIA:  We made our request.

15  THE COURT:  But are you planning to give Mr. El Bey --

16  MS. MALIZIA:  Your Honor, we had planned to tender a

17  preliminary exhibit list and provide copies of our exhibits to

18  the Court and to Mr. El Bey.

19  THE COURT:  And a list of witnesses.

20  MS. MALIZIA:  We had filed a list of witnesses with the

21  Court, reserving our right to supplement that, if necessary.

22  But I didn't receive that though.

23  MR. HOTALING:  It's on the docket.

24  THE COURT:  Is it customary for a criminal defendant to

25  submit that kind of material ahead of trial?

1          MS. MALIZIA:  It's customary for the parties to

2    exchange.  And again, to avoid delay at trial.

3          Mr. El Bey has the right not to present any case.  It is

4    our burden.  But traditionally, yes, to avoid delay at trial so

5    the parties know or can anticipate what's coming, yes, we

6    typically exchange exhibits and witness lists.

7          MR. HOTALING:  Some judges do in fact require that

8    witness lists --

9          THE COURT:  I'm sorry?

10          MR. HOTALING:  Some judges within the building actually

11    do require that, as we have done at the end of January, that

12    witness lists, preliminary witness lists be filed with the Court

13    a week in advance of trial.

14          Not all judges, some judges.

15          Again, it's a different practice in different

16    courtrooms.

17          MS. MALIZIA:  Although I believe your minute order

18    addressed that specific topic.

19          THE COURT:  Do you have a view on that, Mr. El Bey?

20          THE DEFENDANT:  Yes.  I would rather wait until the

21    trial come up.  I don't want to submit anything to them because

22    they haven't submitted anything to me.  I want it to be an even

23    playing field.

24          So I'm -- what I'm just saying, Judge, I am not asking

25    for any favors, I'm following all laws.  But, you know, it's --

1  the playing field is not even right now.

2         THE COURT:  They will send you --

3         THE DEFENDANT:  It's not balanced.

4         THE COURT:  They will send you a list of --

5         THE DEFENDANT:  They haven't sent me anything, Judge.

6         THE COURT:  I know they haven't, because they are

7  suggesting this be done.

8         MS. MALIZIA:  Your Honor, the exhibits were publicly

9  filed.  Mr. El Bey does have the filing.

10        THE COURT:  I'm sorry?  I didn't hear the beginning of

11 what you said.

12        MS. MALIZIA:  The government's witness list has been

13 publicly filed.  Mr. El Bey does have access to ECF, as

14 demonstrated earlier today when he held up and read your minute

15 order.

16        We have -- and that is publicly available, and has

17 certainly been made available to Mr. El Bey.

18        MR. HOTALING:  It's docket number 35, Judge, just so

19 that the record is clear.  We have provided and filed on

20 January 26, 2015, the government's proposed witness list.

21        We can obviously give Mr. El Bey a copy of it right now.

22        THE DEFENDANT:  Yes.  I would like a copy of it.

23        THE COURT:  So I think it would be a good idea,

24 Mr. El Bey, for you to reciprocate with your own list.  I'm not

25 going to make it a requirement.  I will just suggest it.

1          THE DEFENDANT:  Okay.  And that's fair, Judge.

2          MS. MALIZIA:  Your Honor, if I just may?

3          THE DEFENDANT:  Yes.

4          MS. MALIZIA:  If Mr. El Bey does not comply with your

5    request, if the government could be given consideration at trial

6    if Mr. El Bey does decide to put on an affirmative case or

7    attempts to put in documents that we have never seen before, if

8    we could have time to review those documents and assess those

9    witnesses.

10         THE COURT:  Okay.  The last thing I'd like to do, I'd

11   like to go over the proposed instructions.

12         Do you have a copy?  Do we have a copy of the

13   instructions?  I left mine --

14         MR. HOTALING:  Judge, if I might, before we turn to the

15   jury instructions, just touching back again in terms of the jury

16   selection process.

17         THE COURT:  Right.

18         MR. HOTALING:  How do you envision conducting the jury

19   selection process?  Do you have a particular favored method for

20   the actual voir dire process, when you want to entertain cause

21   strikes?  When should we be doing the peremptories?  Issues such

22   as that.

23         THE COURT:  Well, what I have done in the past is I'll

24   put the questions to the jury, and after I have gotten up

25   to -- so do you want to have, what? -- do you want to have -- we

1  still use those -- what little I know -- we are still using

2  12-person criminal juries?

3          MR. HOTALING:  With one alternate.

4          THE COURT:  Pardon?

5          MR. HOTALING:  We will need an alternate as well, Judge.

6          THE COURT:  Do you want to have two alternates?

7          MR. HOTALING:  We can have two alternates.  Either we

8  can have one, but we could certainly have two.  It would be a

9  good idea.

10          THE COURT:  I'm more comfortable with two even though it

11  will be --

12          MR. HOTALING:  -- a short trial.

13          THE COURT:  14 people.

14          When I get up to 14, then I'll ask the parties -- of

15  course privately -- if they want to -- if there is anybody they

16  want to strike for cause.

17          And after that, they each -- how many peremptories, 5?

18  Is that what people --

19          MR. HOTALING:  It's 10 for the defense.

20          THE COURT:  All right.

21          MR. HOTALING:  It's 10 for the defense.  I think it's 6

22  for the government.

23          THE COURT:  Just 4 for the government?

24          MS. MALIZIA:  6.

25          THE COURT:  10 and 6.

1          MR. HOTALING:  And then 1 additional for alternates.  So

2    it's basically 11 and 7.

3          THE COURT:  The alternates are struck separately?

4          MR. HOTALING:  There is a separate additional peremptory

5    offered for the alternates.

6          So, Judge, just make sure I'm understanding.  Is it your

7    intention to put 14 people, the first 14 names in the box, ask

8    them the 10 or 11 questions that you have put together, have each

9    of those groups, and that particular first 14 --

10          THE COURT:  Yes.  That was my idea.  But if you have

11    something better, I'm certainly open to it.

12          MS. MALIZIA:  I think that that process works great.  We

13    do 14 in a section, have to do it in a kind of seriatim process,

14    14 in the box.  We can certainly come up after the conclusion of

15    the questioning as to all 14, we can do a sidebar to talk about

16    cause strikes.

17          Then the question is would you prefer us to do

18    peremptories at the conclusion of each set of 14?  Or do you want

19    us to do peremptories after all the voir dire has been

20    questioned?

21          THE COURT:  I'd rather you do it after each.

22          MR. HOTALING:  Each panel.

23          THE COURT:  And the peremptories, the peremptories have

24    to be in writing.

25          And the reason for that is what happens is that if both

1  sides use a peremptory challenge against the same person, and I

2  don't want one to back out after seeing what the others have.

3          MR. HOTALING:  So no back-strikes.

4          THE COURT:  Exactly.  Right.

5          MR. HOTALING:  Perfect.

6          THE COURT:  Okay.  Let me look at the instructions.

7          MR. HOTALING:  Judge, I'm sorry.  Do you envision about

8  how big of a voir dire panel you intend to bring up to the

9  courtroom?

10          THE COURT:  Sounds like there is -- I don't know if

11  there is --

12          MR. HOTALING:  It's usually 40 or 50.

13          THE COURT:  I'll be guided by you because I have never

14  had the experience.  I mean, I have just done civil trials.

15          THE CLERK:  40 or 50.

16          MR. HOTALING:  I think it's 40 or 50 that we usually

17  bring up.

18          Judge, my experience has been that the voir dire process

19  can take at least through the morning, and sometimes into the

20  afternoon.

21          THE COURT:  I would be more comfortable with the 50.

22          MS. MALIZIA:  And I think your Honor does have to notify

23  the folks downstairs as to size of the panel.

24          THE COURT:  Right.  Okay.

25          So with regard to the instructions, I do not approve of

1 the instructions that I have been given.  Because I think

2 instructions should be extremely simple, very simple, and no, you

3 know, legal gibberish, because the jurors are not lawyers.

4       And so I want to make sure -- I'm going through the

5 instructions before -- and I just want to identify some now.

6       For example, there is a -- and this is bracketed so

7 maybe you have some doubts about it yourself -- but this is

8 instruction 4, Page 5, you say:

9       In addition, you may recall that I took judicial notice

10 of certain facts that may be considered by the parties as common

11 knowledge.  You may accept those facts as proved, but you're not

12 required to do so.

13       I don't understand that.

14       I mean, what if you said:  Well, you take judicial

15 notice of the fact that the Internal Revenue Service is an agency

16 of the federal government.

17       Now, you say:  You may accept those facts as proved, but

18 you're not required to do so.

19       I don't understand that.

20       You can't tell the jury:  You don't have to think the

21 IRS is an agency of the federal government, you can think it's a

22 part of the Mafia, right?

23       MR. HOTALING:  Judge, I wish we could speak to the

24 clarity of the language.  Obviously, as your Honor well knows,

25 this is all language that was adopted by the Seventh Circuit

1  panel.

2          THE COURT:  Right.

3          MR. HOTALING:  So I certainly understand and appreciate

4  your comments regarding the clarity of the language.

5  Unfortunately, we don't have any say-so in that one.

6          And also, for purposes of judicial notice, my

7  expectation is that this will not be an issue -- again, that's

8  why it's bracketed.

9          But I wish -- if your Honor has suggestions that would

10  clarify it, we will certainly entertain those.

11         But again, everything in there is standard.

12         THE COURT:  To take judicial notice means to say this is

13  true, you know, like what time the sun rises on January 1st, or

14  something.

15         I can't tell the jury:  You don't have to believe that.

16  You can have your own ideas of when the sun rises and falls.

17  Right?

18         I would just say, then, look, some of the things are not

19  disputable.  I don't know what they would be in a case like this,

20  but some things.

21         MS. MALIZIA:  Your Honor, we can find you case law if

22  this comes up --

23         THE COURT:  Pardon?

24         MS. MALIZIA:  We can find you the case law on this if it

25  comes up, if we ask the Court to give this instruction which, as

1  Mr. Hotaling said, I don't anticipate happening, but that hedging

2  language at the end that you are not required to do so I believe

3  has roots in judicial precedent.

4          THE COURT:  Look, there is so much nonsense in judicial

5  opinions, I don't repeat stuff.

6          MR. HOTALING:  Your brethren upstairs might take a

7  different view.  We just have to follow the law.

8          MS. MALIZIA:  There is law I believe that says you

9  cannot instruct a jury to take something as fact even on your

10 judicial authority.

11         THE COURT:  You're kidding.

12         MS. MALIZIA:  I am not kidding.  That's why the

13 instruction says this.

14         THE COURT:  Okay.  That's -- well, I suppose, yeah, you

15 have people -- all right.  Well, we won't --

16         MS. MALIZIA:  I think it also only applies in criminal

17 trials.

18         THE COURT:  I will certainly look at what you show me.

19         Okay.  Here is another one you may have heard.  The

20 terms direct evidence and circumstantial evidence.  Direct

21 evidence is directly proved.  Circumstantial evidence is evidence

22 that indirectly proves a fact.

23         What does that mean?

24         MR. HOTALING:  Judge, there is the example that we could

25 put in, that again is offered by the Seventh Circuit in terms of

1  an example of circumstantial evidence:  If a person comes into a

2  building with a wet umbrella, you can certainly circumstantially

3  establish that it's raining outside.

4        THE COURT:  No, no, that's fine.  That's a good example.

5  That's what I'd like to see and they'd understand.

6        MR. HOTALING:  There is that set example that's

7  contained within the jury instruction manual.

8        THE COURT:  It's in the instructions?

9        MR. HOTALING:  No, it's in the manual, the pattern

10 instruction book.  We can certainly insert that.

11       THE COURT:  No, I think that's good.  Actually, these

12 instructions aren't that bad.

13       MR. HOTALING:  A credit to the committee that recently

14 revised them.  I don't know if your Honor sits on that committee

15 or not.

16       THE COURT:  No.

17       MR. HOTALING:  I think it's chaired by Judge Bauer.

18       THE COURT:  Part of your job as jurors is to decide how

19 believable each fact is.  Okay.  Some factors you may consider

20 include the intelligence of the witness.

21       I mean, you're not going to have their IQ scores.

22       MR. HOTALING:  Sometimes you can determine the

23 intelligence just based on the way that a witness answers a

24 particular question.

25       MS. MALIZIA:  And also as part of the background

1    questions, the witness will include their level of education and
2    training.
3              THE COURT:  Well, that's different from intelligence.
4              MS. MALIZIA:  That's absolutely true, your Honor.  But
5    we assume that, as Mr. Hotaling just said, you can infer certain
6    things by the way a person speaks and comports themselves.
7              THE COURT:  Okay.  The other thing, the witness's
8    demeanor.  Now, what is demeanor?
9              MR. HOTALING:  The way they answer questions.  Are they
10   combative?  Are they looking around when they are answering
11   questions?  Are they paying attention?
12             Those are just a couple of examples.
13             You know, they kind of slouch down in the chair when
14   they are sitting up in the box.
15             THE COURT:  But look, this has been so discredited.
16   This is -- there is a whole literature -- of course, lawyers and
17   judges are not familiar with it -- about demeanor, which says you
18   cannot infer the truthfulness of some testimony from the way the
19   witness behaves.
20             Nervous people may be telling the truth.  Confident
21   people -- there are plenty of confident liars with beautiful
22   demeanor, right, and he is lying.  You just can't tell.
23             MR. HOTALING:  I think it's just one factor of many.
24             THE COURT:  It's not a factor, it's totally
25   illegitimate.  There is literature on this.

1          MR. HOTALING:  And, Judge, I think we are at a

2   disadvantage.  We are not as familiar with the literature.

3          THE COURT:  I know.  I don't understand it.

4          You have this huge apparatus of criminal law

5   enforcement, and the people involved in criminal law enforcement

6   don't realize there are lots of sociologists and psychologists,

7   criminologists, what have you, who actually study this stuff.

8          So there have been these studies of mock juries, really

9   hilarious, they have -- and of course, the private lawyers use

10  mock juries a lot, they think you can get a lot from having a

11  mock trial with a jury that's sort of matched, you know, in terms

12  of age and race and all sorts of things with what the likely jury

13  that you are going to have in your trial.

14         And they do things like they try the identical case to

15  two of these mock juries.  And one of them, they have

16  instructions to the jury, the other they don't have any

17  instructions.

18         And it turns out that the verdicts are identical.

19  Because the -- because the actual significance of instructions in

20  a trial is that it shapes and limits the closing argument of the

21  lawyers.  And that's what the jurors pay attention to, not the

22  instructions.

23         Because the judges drone out these instructions with a

24  lot of language in it that jurors don't understand, and they just

25  tune out.

1        So I don't understand why our judges and lawyers
2  continue to talk about demeanor.
3        MR. HOTALING:  Judge, obviously understanding that
4  that's the pattern, if your Honor feels that it's not
5  appropriate --
6        THE COURT:  Yeah, I'm not going to ask them about
7  demeanor.
8        MR. HOTALING:  We will strike that portion of the --
9        THE COURT:  Yeah.
10       MR. HOTALING:  We will strike out where it says the
11 witness's demeanor.
12       THE COURT:  I would appreciate that.
13       MS. MALIZIA:  Does the defendant have any objection to
14 that?
15       THE DEFENDANT:  No.
16       THE COURT:  I mean, on the whole the instructions are
17 fine.  I don't want to --
18       THE DEFENDANT:  Your Honor, can I say something?
19       THE COURT:  That's an indication.
20       THE DEFENDANT:  Your Honor --
21       THE COURT:  Let me, let me interrupt for a second.
22       Do you have any objection to jurors taking notes?
23       MS. MALIZIA:  Your Honor, we prefer it.
24       THE COURT:  Do you have any objection to jurors asking
25 questions?

1          MR. HOTALING:  That's a different subject.

2          I know that there has been some literature and some

3     model studies that have been done in terms of jurors asking

4     questions.

5          We, as a general matter, I think we would object to

6     that.  If your Honor is inclined to entertain it, we would ask

7     the questions come first to your Honor so that you can evaluate

8     whether or not they are appropriate questions and don't intrude

9     on any sort of impermissible or unconstitutional areas.

10         THE COURT:  See, in the civil trials I have conducted as

11    a volunteer in the district court I allowed the jurors to ask

12    questions.  I ask them just, you know, ask them out loud.  I

13    don't require that they be submitted to me.

14         But I do explain, you know, I may have to rephrase your

15    question.

16         I found it works fine.  They don't ask many questions.

17    When they do ask questions, they are good questions.

18         Although the reason I do it is not so much that I think

19    their questions will affect the trial, but I want them to feel

20    that they are participants rather than bumps on a log.

21         But I have never conducted a criminal trial before, so I

22    don't have any real feeling or whether it's appropriate.  I have

23    a feeling it's maybe not appropriate.

24         MR. HOTALING:  We would tend to agree with your Honor.

25         THE COURT:  And, Mr. El Bey, you wanted to say

1  something, I think?

2        THE DEFENDANT:  Yes.  Some of these questions we are

3  discussing are very racial questions.

4        THE COURT:  I'm sorry?

5        THE DEFENDANT:  Some of them are very racial questions.

6        It's almost as if they are raising themselves above some

7  of these people.  They are belittling these people.

8        Some of these questions are irrelevant.  I just

9  think --

10        THE COURT:  I'm not going allow the jury to ask

11  questions.

12        THE DEFENDANT:  Not the jury.  I mean, they are asking

13  the jury.  Some of the questions that they are going to ask the

14  jury that they have on this paper here, I just think some of them

15  are very -- they are racial questions.

16        THE COURT:  You mean the voir dire questions, asking the

17  jurors about?

18        THE DEFENDANT:  Yeah, asking the jurors we are supposed

19  to select.  Some of the questions they have to ask.

20        THE COURT:  I don't think they are racial.  Why do you

21  say that, "racial"?

22        THE DEFENDANT:  Belittling some people.  This is just my

23  opinion.  I just think that some of this stuff is not necessary,

24  you know, almost as if they are putting themselves a class above

25  these people.  And I think that's not right.

1          So, you know, I'm just sitting here listening.  That's
2  just my opinion.
3          But I just think some of these questions are totally
4  irrelevant to ask some of these people that you want to be a
5  juror on the trial.
6          THE COURT:  Okay.  So getting toward the end, I hope,
7  you have a summary of the counts in the indictment.  And I'm a
8  little bothered by some of this language.
9          MR. HOTALING:  Judge, is there a particular page so we
10 can follow along?
11         THE COURT:  Yeah.  21.
12         MR. HOTALING:  Okay.
13         THE COURT:  So looking at number 3, the scheme to
14 defraud involved a materially false or fraud pretense or promise.
15         So the words that strike me:  materially, pretense,
16 representation.  Because, I mean, it's really -- it's really
17 illogical because you say they have to find the scheme to defraud
18 involved, et cetera.  But it wouldn't be a scheme to defraud if
19 it doesn't involve those things, right?
20         MS. MALIZIA:  I'm sorry?
21         THE COURT:  How can you have a scheme to defraud that
22 didn't involve a materially false pretense of some sort?
23         MR. HOTALING:  I think we have to have the reference to
24 material under the materiality issue, because I think it's the
25 Nadir decision that the Supreme Court says:  Whatever the false

1    statement --

2         THE COURT:  What is materiality?  Suppose a juror was

3    puzzled by the word "materiality"?

4         MR. HOTALING:  It's defined in instruction number 23,

5    which is on Page 25, Judge.

6         THE COURT:  Well, but shouldn't it be defined right up

7    when it first appears?

8         MR. HOTALING:  Judge, obviously what we do in crafting,

9    I don't think we can -- obviously, the intent of this particular

10   instruction is just very simply to say:  These are the elements

11   of the offense.  These are the elements of the offense that the

12   government has to prove.  It has to meet each one of those

13   elements in order to find the defendant guilty, and if we miss

14   out on any one of them then it has to be not guilty.

15        And then we follow up by providing definitions of each

16   of the different terms that are in this instruction.

17        THE COURT:  Okay.  So why shouldn't I say to them that,

18   you know, I'm just going to go over the indictment, the charges?

19   And there is some legal, you know, technicalities here, terms,

20   but I will define them for you, okay, so you understand what

21   "materially false" means, and so on.

22        MR. HOTALING:  Do you want to actually do the definition

23   as you are going through each one of the respective elements?

24        THE COURT:  No.  I can tell them I'm just summarizing

25   the indictment, but I will -- in a little while I will explain

1 some of these terms that may have --

2        MR. HOTALING:  Oh, sure.  We have no problem with:  I'm

3 going to run through this, and I'm going to provide some follow

4 up as we go along.

5        Absolutely.  We are fine with that.

6        THE COURT:  We will make a stab at preserving the

7 language.

8        I will say:  In considering whether the

9 government -- wait a second.  Shouldn't be:  "has proven," it

10 should be "has proved."  "Proven" is the adjective.

11        That's unimportant.  Some intellectual snobbery.

12        MR. HOTALING:  And, Judge, you are right.  And I think

13 down later we actually correct that.  You might have caught us on

14 a typo.  We apologize.

15        THE COURT:  Now, on Page 27 it says:  Mail fraud statute

16 can be violated whether or not there is any loss or damage to the

17 victim.

18        That's fine.  Then you say:  The government need not

19 prove that the scheme to defraud actually succeeded.

20        But isn't that the same point?  It doesn't succeed --

21 well, it doesn't succeed if there is no gain to the defendant,

22 right?  Then it's a failure.  So --

23        MR. HOTALING:  It's tough to speak categorically on

24 that, Judge, because I guess there could be some situations where

25 it might.  But I see -- I get your point.

1      THE COURT:  See, there is a tendency of course in legal
2  discourse to multiply synonyms.
3      So looking at Page 29, about the false claim, number 2,
4  it says:  The claim was false, fictitious, or fraudulent.
5      Aren't those synonyms?
6      MR. HOTALING:  They are, Judge.  They are just terms
7  that match up with that which was contained in the indictment.
8      THE COURT:  Match up with what?
9      MR. HOTALING:  The indictment.
10      So a lot of times the language in the instructions
11  pattern what's contained in the indictment.
12      But yes, they are largely synonyms.
13      THE COURT:  Here it says "has proved," which is the
14  correct grammatical form.
15      MR. HOTALING:  We caught it on that one, Judge.
16      THE COURT:  Now, I take it you're not particularly
17  concerned with the jurors doing Internet research on their own?
18      MS. MALIZIA:  We are.
19      THE COURT:  Because some of the judges sometimes make
20  very, I think, rather heavy-handed comments to the jury about how
21  they must not do that.
22      MR. HOTALING:  Are you referring to the admonishment at
23  the conclusion of the day?
24      THE COURT:  In your instructions you do say they are not
25  to do that.  But it's just -- you know, you just say it.  So I

1  take it you don't want me to frighten them.

2      MR. HOTALING:  And what my question was is, I mean, if

3  this is going to be a trial that's going for, let's say, three

4  days, and at the conclusion of day one or day two it's common for

5  judges to say:  Please do not go out and do any sort of

6  independent research with respect to the issues that you have

7  heard about during trial today.  Please don't go to the Internet

8  and do any sort your own research on tax laws or anything like

9  that.

10      You are only supposed to consider that which you have

11  heard within the four corners of this room.

12      THE COURT:  I don't mind saying that, but I have to give

13  a reason, right?  And the only reason I can think of is that

14  although the Internet is a tremendous trove of knowledge, it's

15  not, it's not vetted for accuracy.

16      There is a lot of -- Google, there -- Google gives you

17  access to 15 billion pages.  Well, they are not all correct,

18  right?  And you don't -- and you, the jurors, do not have the

19  time, the resources, and so on, to be able to determine the

20  accuracy, and so on.

21      MR. HOTALING:  And similarly, obviously, we would want

22  to have the jury to consider, in terms of making a decision in

23  this case, that which your Honor has decided is evidence.  So we

24  want to limit the deliberations only to the evidence that has

25  come in.

1          THE COURT:  That's a good point.  Yeah, because there

2  might be accurate material that was relevant, but it wasn't

3  evidence.

4          MR. HOTALING:  It's not been admitted.

5          THE COURT:  The other side hasn't had any --

6          MR. HOTALING:  No cross-examination, you have the serial

7  process, whatever the case may be.

8          MS. MALIZIA:  And the same logic would apply, your

9  Honor.  We anticipate that there may be some press coverage of

10  this case, given your Honor's sitting on it.

11          THE COURT:  They want to see me blow it.

12          MS. MALIZIA:  If you want them to not do any research on

13  the case itself --

14          MR. HOTALING:  Let's face it, Judge, you are a

15  high-profile individual who's coming down from the Seventh

16  Circuit.  It's newsworthy.

17          THE COURT:  Okay.  Well, is there anything further?  Is

18  there something?  Do I have --

19          MS. MALIZIA:  We have a few, just a few issues, your

20  Honor.

21          THE COURT:  Okay.

22          MS. MALIZIA:  Does your Honor have a preference on

23  naming conventions for exhibits?  Some judges have a preference

24  in terms of limiting the parties to just numbers rather than

25  descriptive terms for exhibits, such as 1-A, 1-B, versus

1  Government's Exhibit Photo 1 or Photo 2.

2  THE COURT:  I would think descriptive would be more.

3  So are you going to give -- what I have done in civil

4  cases, I don't know if it works, I have given -- I have told the

5  lawyers to give each of the jurors a binder with all the exhibits

6  in it.

7  MR. HOTALING:  We were not planning on doing that,

8  Judge.

9  THE COURT:  Do you want to hand copies to the jury?

10  MR. HOTALING:  Actually what we intended to do, Judge --

11  and I think that was one of the questions we were going to get to

12  -- because what we normally will do is we will set up and we will

13  wire that particular courtroom with electronic equipment.

14  We have a program called Sanction, which is a trial --

15  it's kind of a trial assistance software.  We will have actually

16  loaded all of our exhibits -- assuming your Honor admits them --

17  into a computer program which can then be thrown up onto a large

18  screen, a large projection screen.  And we can actually

19  manipulate, we can blow out and highlight and do all sorts of

20  things with particular components of the documents.

21  THE COURT:  That's actually --

22  MR. HOTALING:  So that's what we intend to do.  As

23  opposed to doing binders and having their head down.  So that was

24  our intention.

25  And going to that point, do you know yet which courtroom

1  you will be using for purposes of the trial?

2          THE COURT:  I don't think so, but we can certainly get a

3  courtroom that has all that.

4          MR. HOTALING:  We have in-house people in the U.S.

5  Attorney's Office who will wire the courtroom.

6          THE COURT:  There are courtrooms that have that.

7          MR. HOTALING:  Yes.  Down on the 12th floor.

8          THE COURT:  I'll get one of those, I'm sure.

9          MR. HOTALING:  Whichever one, if we know ahead of time,

10  so we can take the appropriate steps to have it wired.

11          Now, Judge, if it is one of the wired ones -- I don't

12  know how in tune you are with the technology --

13          THE COURT:  Not very.

14          MR. HOTALING:  Those ones actually do require you to do

15  the publishing, as opposed in some of the other courtrooms --

16          THE COURT:  I press a button?

17          MR. HOTALING:  I don't know.  I have never been involved

18  in dealing with that.

19          In the other ones we actually have a panel we can do --

20  where we want to publish, we say:  Judge, can we publish to the

21  jury?  We actually have a "publish" button.

22          THE COURT:  That I would prefer.  So I will try to get

23  that.

24          MR. HOTALING:  So it would need to be in any courtroom

25  above -- not the 12th floor.  I don't know if they are wired yet

1  for 14.

2          MS. MALIZIA:  There are a few.

3          MR. HOTALING:  I would say 23, 21, 19, those are going

4  to be ones, like a courtroom like this where we will be able to

5  come in and do the wiring and handle the publishing.

6          THE COURT:  Okay.  Great.

7          Mr. El Bey, do you have anything further that you'd like

8  to say?

9          THE DEFENDANT:  Reserve my rights, sir.

10          THE COURT:  Tuesday, March 3rd -- so we are starting the

11  2nd, right?

12          MR. HOTALING:  Monday, yes.

13          THE COURT:  Okay.  Well Tuesday, March 3rd, I

14  have -- I'm sitting in the Court of Appeals in the morning.

15          So we could either skip Tuesday on the theory that we

16  pick the jury Monday and start the trial Wednesday, or we could

17  start Tuesday afternoon.

18          MR. HOTALING:  And, Judge, depending on how long it

19  goes, it is certainly possible we could even get openings done

20  that Monday.

21          If we get a jury picked by 2:00 or 2:30 in the

22  afternoon, but openings are not going to be that particularly

23  long in this case.  I expect that we can certainly get that done,

24  and potentially even start with the first witness.

25          So I would like to go as far as we can on Monday and

1  perhaps pick up on Tuesday afternoon.

2          THE COURT:  Yeah.  Tuesday afternoon is fine.

3          MR. HOTALING:  And what do you expect to be your trial

4  day?  Starting when and going until when?

5          THE COURT:  Well, the jurors like to go home early,

6  right?  A lot of them live in the suburbs, and so on.

7          So, you know, maybe like from 9:00 to 4:30.  Something

8  like that.

9          MR. HOTALING:  And you anticipate doing a morning and an

10 afternoon break to do the stretching of the legs?

11         THE COURT:  Yeah, you have to give the jury that.

12         THE DEFENDANT:  Your Honor, can I propose we start

13 Wednesday?  Can I propose we start the trial on Wednesday?

14         THE COURT:  You would prefer to start --

15         THE DEFENDANT:  Yes.

16         THE COURT:  To start the whole trial?

17         THE DEFENDANT:  I mean, I don't mean to rush you.  If

18 you are going to pick the jury Monday, we can start the trial

19 Wednesday.

20         THE COURT:  Well, let me --

21         MS. MALIZIA:  Your Honor, perhaps this would be a good

22 time to raise the subject of whether or not you are going to put

23 time limits on opening and closing statements.

24         THE COURT:  Yes.  Yeah.  I will have time limits, yeah.

25         THE DEFENDANT:  Okay.  So we can do the opening

1  statement, start everything on Wednesday with the trial?

2          THE COURT:  You prefer to start everything on Wednesday?

3          THE DEFENDANT:  Yes, sir.  That would be better for me.

4          THE COURT:  Do you have feelings about it?

5          MR. HOTALING:  Judge, again, one of the things we are

6  always cognizant of is the --

7          THE COURT:  The weekend.

8          MR. HOTALING:  Well, no, it's also just the lives of the

9  jurors, as your Honor said before.

10         THE COURT:  Is what?

11         MR. HOTALING:  The lives of the jurors.  And if we are

12 done with jury selection at 1:30 or 2:00 o'clock, and then

13 saying:  Well, you are done for the day.  When we have got a

14 whole afternoon available to us to actually move forward with the

15 trial, I just think that that's inefficient.

16         THE COURT:  Oh, no.  Of course.

17         MR. HOTALING:  I think Mr. El Bey's position is that we

18 are envisioning that we do the jury instructions and then cut it

19 off and not proceed for the rest of the day, and not do openings

20 until Wednesday.

21         THE DEFENDANT:  I would like to do the opening -- I

22 would like to do the opening and everything on Wednesday to

23 prepare myself.

24         THE COURT:  You want the jury picked Monday?

25         THE DEFENDANT:  Jury picked Monday, and start Wednesday.

1  I'd like to prepare myself.

2          THE COURT:  Yes.  But the concern is that the jury

3  doesn't really want to come in for just a morning and go back

4  home and then -- they want the trial to --

5          MR. HOTALING:  Get done.

6          THE COURT:  -- to wind up as soon as possible.  They

7  don't want to lose -- they don't want to have half days.

8          THE DEFENDANT:  Yes.  I have sick individuals in my

9  family that I am really obligated to.  That's why I need to clear

10  their schedule.  And Wednesday would be a better day for me to

11  give -- to get myself prepared for trial and get everything I

12  need.

13          I think that's not an unfair request.

14          THE COURT:  Well, does the government object to starting

15  Wednesday?

16          MR. HOTALING:  Just starting completely on Wednesday?

17          MS. MALIZIA:  Just pick the jury on Wednesday as well?

18          THE COURT:  Yeah.  Exactly.

19          MR. HOTALING:  This was the first we are hearing about

20  it.  This is news to us.

21          THE COURT:  It's not perfect because the weekend is

22  looming.

23          MR. HOTALING:  And that's my concern, Judge.

24          THE COURT:  That bothers me.

25          MR. HOTALING:  I guess as -- if the two options are

1  starting everything Wednesday, including jury selection, versus

2  just picking the jury on Monday and then having them come back on

3  Wednesday, I guess my preference would be the first.

4           So that we can get the jury picked and start -- you

5  know, we'll have everything picked, everything done, then they

6  come in Wednesday morning with opening statements and start

7  marching through.  That would be my preference because I think we

8  will get done before the weekend under that scenario.

9           THE COURT:  Okay.  Well, I will think about it.  I will

10 try to make a final decision.

11          MS. MALIZIA:  Your Honor, if we could ask -- I don't

12 want to rush you at all --

13          THE COURT:  You can rush me.

14          MS. MALIZIA:  We have some witnesses we will be actually

15 bringing in from out of town, and for the sake of also planning

16 around their schedules, if you could let us know as soon as

17 possible when the trial will be starting.

18          THE COURT:  I think my preference would be start on

19 Monday, use the whole day, and bring them back Tuesday afternoon.

20          I don't want them to take the whole day off Tuesday,

21 because they are going to forget a lot of stuff.

22          MR. HOTALING:  The government agrees with that.

23          THE DEFENDANT:  Again, your Honor, I'm just

24 requesting -- because I have other issues with my family that I

25 need to attend to, and so that's why I'm asking.  Other than

1  that, I wouldn't make the request.

2          THE COURT:  No, I understand that.  But the March 2nd

3  date has been set for a while.

4          THE DEFENDANT:  No, I don't have a problem with that.

5  We can choose the trial -- I mean, the jury.

6          But I wanted to start the trial on that Wednesday,

7  because I have other obligations I need to attend to.

8          THE COURT:  Yeah, but see, the problem is I don't want

9  Tuesday to be a dead day for the jurors.  Because they are going

10 to forget a lot that they learned on Monday.

11         THE DEFENDANT:  They are not going to -- we are just

12 going to pick them?

13         THE COURT:  To pick them I have to explain the case to

14 them, and so on.

15         THE DEFENDANT:  Well, aren't you going to give them

16 copies to read, and everything?

17         THE COURT:  Pardon?

18         THE DEFENDANT:  Don't they have copies to read on the

19 case, and everything?

20         THE COURT:  Copies to read, no.  I just explain the case

21 to them.

22         THE DEFENDANT:  Okay.  Okay.

23         THE COURT:  So I will have to leave now.  So thank you

24 very much for your patience.

25         MS. MALIZIA:  Your Honor, perhaps you could issue your

1  rulings on the motions in limine before trial, or we could meet

2  in the interim to get your rulings.  Again, for the record.

3          I think you have addressed some of them in court today

4  just by admonishing the defendant in certain ways.

5          THE COURT:  Yes.

6          THE DEFENDANT:  I thought you said we were going to

7  resubmit -- we have a week to resubmit what we want to be

8  admitted, and the Court asked you that.

9          MR. HOTALING:  That's not what we said, in a week.

10         THE DEFENDANT:  He said a week from today.

11         MR. HOTALING:  Perhaps we could clarify exactly, Judge,

12 exactly what is going to be required with respect to a week from

13 today to --

14         THE COURT:  I thought that was voir dire questions.

15         MR. HOTALING:  That was my understanding as well.

16         THE COURT:  Correct.

17         THE DEFENDANT:  Yeah.  To submit what we want to be

18 admitted for the jury, right.

19         THE COURT:  Back with a --

20         MR. HOTALING:  Questioning of the jury.

21         THE DEFENDANT:  Yes.

22         MR. HOTALING:  I'm sorry.  I misunderstood.  My

23 apologies.

24         THE COURT:  All set.

25         THE DEFENDANT:  Okay.  Thank you, Judge.

1        MR. HOTALING:  So we will see you -- unless we hear

2  anything back from you, we will see you Monday, March 3rd, at

3  what time?

4        March 2nd, I'm sorry.  March 2nd.  At what time do you

5  envision starting?  9:30?

6        THE COURT:  I think 9:00 o'clock.

7        MR. HOTALING:  9:00 o'clock.

8        THE COURT:  Yeah, Mr. Fuentes?

9        MR. FUENTES:  Two points briefly I want to put on the

10  record.

11        The first is a matter I discussed with the government

12  and Mr. El Bey, and that is Mr. Hotaling happens to be married to

13  a person who is a partner at Jenner & Block.

14        THE COURT:  I'm sorry?

15        MR. FUENTES:  Mr. Hotaling happens to be married to a

16  person who is a partner at Jenner & Block.  I am a partner at

17  Jenner & Block.

18        I don't view that as a conflict in any way.  I want to

19  be sure to let the Court know about that.

20        Secondly, earlier today the Court mentioned the prospect

21  of possibly contemplating ordering me as standby counsel during

22  the trial to perhaps step in and become trial counsel.  And I

23  just want to note that I believe Mr. El Bey would want to reserve

24  his right to object to that, were that to occur.

25        THE COURT:  Of course.

81

1          Mr. FUENTES:  That was all I had, Judge.  Thank you.

2          THE COURT:  Thank you.

3      (Proceedings concluded at 12:00 p.m.)

4

5                    C E R T I F I C A T E

6          I, Maellen E. Pittman, do hereby certify that the

7  foregoing is a complete, true, and accurate transcript of the

8  proceedings had in the above-entitled case before the Honorable

9  RICHARD A. POSNER, one of the judges of said Court, at Chicago,

10 Illinois, on February 12, 2015.

11

12                    */s/ Maellen E. Pittman, FCRR, RDR*

13                    Official Court Reporter

14                    United States District Court

15                    Northern District of Illinois

16                    Eastern Division

17

18

19

20

21

22

23

24

25