1

1              IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3   UNITED STATES OF AMERICA,          )
                                       )
4                     Plaintiff,       )
                                       )  No. 14 CR 447
5              vs.                     )  Chicago, Illinois
                                       )  March 2, 2015
6   HAKEEM EL BEY,                     )  9:00 a.m.
                                       )
7                     Defendant.       )

8
                           VOLUME 1
9                 TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE RICHARD A. POSNER
10                       AND A JURY

11  For the Plaintiff:        U.S. ATTORNEY'S OFFICE
                              219 South Dearborn Street
12                            Chicago, Illinois 60604
                              BY:  MR. CHRISTOPHER HOTALING
13                                 MS. KATHRYN E. MALIZIA

14  The Defendant:            MR. HAKEEM EL BEY
                              439 Hoxie Avenue
15                            Calumet City, Illinois 60409

16
    Defense Standby Counsel:  JENNER & BLOCK
17                            353 North Clark Street
                              Chicago, Illinois 60654
18                            BY:  MR. GABRIEL A. FUENTES

19  Official Court Reporter:  MAELLEN E. PITTMAN, FCRR, RDR
                              219 South Dearborn Street
20                            Room 2342
                              Chicago, Illinois 60604
21                            (312) 435-5576

22

23

24

25

1      (Proceedings heard in open court:)

2          THE COURT:  Good morning, ladies and gentlemen.

3          THE CLERK:  14 CR 447, U.S.A. versus Hakeem El Bey, for

4  trial.

5          MS. MALIZIA:  Good morning, your Honor.

6          Kathryn Malizia and Christopher Hotaling for the United

7  States.

8          MR. HOTALING:  Good morning, your Honor.

9          THE COURT:  Okay.  Let's --

10          MR. FUENTES:  For the record, Mr. El Bey is present and

11  Gabe Fuentes, standby counsel is present.

12          THE COURT:  Now, Mr. El Bey, your advisor, he can't be

13  at the table.  He has to sit in the audience section.

14          THE DEFENDANT:  He can't be with me today?

15          THE COURT:  So before we bring the jury in, there are

16  some matters to discuss.  And of course, Mr. El Bey, you received

17  my order, you got my order?

18          THE DEFENDANT:  I couldn't open it.

19          THE COURT:  Excuse me?

20          THE DEFENDANT:  I couldn't open it.

21          THE COURT:  I'm sorry?

22          THE DEFENDANT:  You sent it by minute, and when I tried

23  to open it on the computer I couldn't open it.

24          THE COURT:  Well, it also was put in your mailbox.

25          THE DEFENDANT:  Yes.  It was put in by the marshal?

1            THE COURT:  I had the marshals put it in your mailbox.

2            THE COURT:  Do you want a paper copy of it?

3            THE DEFENDANT:  I'd like to.  I haven't seen it.

4            THE COURT:  Do we have a paper copy?

5            MR. HOTALING:  I unfortunately --

6            THE COURT:  All right.  I will read it to you.  We have

7   the copy.

8            THE DEFENDANT:  Judge -- Judge, I would need to read it

9   for myself to get a thorough understanding.

10           THE COURT:  Okay.  Well, so you can give it to Mr. El

11  Bey.

12           Mr. El Bey, so you have it?

13           MR. EUFPLT:  Okay.  May I speak, your Honor?

14           THE COURT:  Excuse me?

15           THE DEFENDANT:  May I speak on your order?

16           THE COURT:  Yes.

17           THE DEFENDANT:  I don't have a problem with it except,

18  you know, I have Old Glory with me and you have an admiralty flag

19  behind you.

20           THE COURT:  Okay.  You'll have to speak more slowly.  I

21  don't understand.

22           THE DEFENDANT:  I'm saying I have Old Glory with me.

23  You have an admiralty, military flag behind you which you

24  actually -- not me -- I mean --

25           THE COURT:  Oh, come on --

1           THE DEFENDANT:  -- which is an old French flag.
2    Admiralty --
3           THE COURT:  Forget it.  You obey this order and don't
4    you talk back to me.  And forget your little stupid flag too.
5           THE DEFENDANT:  Stupid?
6           THE COURT:  Yeah, look, I don't want trouble from you.
7           THE DEFENDANT:  I'm not talking about creating any
8    problem.  I just have to be honest and sticking to the law, sir.
9           THE COURT:  Forget it.  And you obey this order and
10   anything else I say.
11          THE DEFENDANT:  Yes, sir.
12          THE COURT:  Now, I'm expecting from the government a
13   binder of exhibits.
14          MR. HOTALING:  Yes, your Honor.  We have that.
15          MS. MALIZIA:  Yes, your Honor, we have that with us.
16          MR. HOTALING:  And, your Honor, if the record could
17   reflect that we have provided an identical copy of that exhibit
18   binder.
19          THE COURT:  To Mr. El Bey?
20          MR. HOTALING:  Which we also provided to defense
21   counsel.  We have also provided a copy to the court reporter and
22   we will provide a copy to the clerk, as well as Mr. Fuentes, as
23   standby counsel.
24          THE COURT:  What are all these government exhibits?  You
25   are going to give the jury, what is it, a thousand exhibits or

1    something?

2              MR. HOTALING:  We're not -- no, we're not going to give

3    binders to the members of the jury.  Like we talked about during

4    the pretrial conference, your Honor, our intention is to use the

5    electronic equipment that is here in the courtroom and publish

6    the relevant portions of these exhibits to the members of the

7    jury to prove up the elements of the offense.

8              THE COURT:  How many exhibits do you have?

9              MR. HOTALING:  Judge, there is an exhibit list I believe

10   it's in front of us.  It is right in the front, Judge.

11             MS. MALIZIA:  It should be right in the front.

12             MR. HOTALING:  Right in the front, Judge.

13             THE COURT:  Well, how many are there?

14             MS. MALIZIA:  Probably 20, 40 and 50.

15             THE COURT:  50?

16             MR. HOTALING:  40 or 50, Judge.

17             THE COURT:  Why do you need 40 or 50 exhibits?  You want

18   the jury to consider 40 or 50 exhibits?

19             MR. HOTALING:  Yes, Judge.  In order to prove our case.

20   We have actually streamlined it down, Judge, and removed some

21   that we had originally proposed as part of the exhibit list that

22   we tendered some weeks ago.  So we have whittled it down.

23             Now, many of the exhibits that are in your binder are

24   entire stacks of bank records.  We don't intend to be showing the

25   jury every single page of those exhibits.  They are admitted

1  because that's what we are required to do.

2      We will only be highlighting certain pages of some of

3  those larger exhibits, like particular months of bank statements

4  versus all of them.

5      THE COURT:  When they deliberate they are going to be

6  taking that thing back?

7      MR. HOTALING:  They are going to be taking back the

8  original exhibits, yes, Judge, which will be contained within a

9  banker's box.

10     THE COURT:  Well, this stuff, they will get the 50

11 exhibits.

12     MR. HOTALING:  They will get one box.  They will get one

13 box that will contain all the original exhibits.  One copy of all

14 the original exhibits.

15     THE COURT:  Okay.

16     Now, Mr. El Bey, as you know, as I'm sure you know, so

17 the government is going to present its case first.  Then it will

18 be your turn.

19     And at the close of the government's case, if you plan

20 to introduce any documents you will have to present those

21 documents to the government, right?

22     So the government is giving you all its documents.  When

23 it's your turn, you will have -- if you have documents you want

24 to present, you'll give a copy to the government.  If you have

25 any trouble making copies or anything like that, we can take care

7

1  of that.

2          Now --

3          THE DEFENDANT:  Can I ask a question, Judge?  Are we

4  doing everything in one day?

5          THE COURT:  Excuse me?

6          THE DEFENDANT:  Are we doing everything in one day?

7          THE COURT:  Doing everything in one day?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  No.  No.  Whenever the government finishes

10  the presentation of its case then it's the turn of the defense,

11  and then you will, if you have documents that you want to

12  exhibit, you'll have to show them to the government.

13          THE DEFENDANT:  Okay.  Because what we said at the last

14  hearing, you said we was going to do a jury selection and then

15  just make an introduction, and then you said Tuesday we will

16  start fresh.

17          So I had all my documents, I didn't bring them with me.

18  I was prepared for tomorrow.

19          THE COURT:  That's fine.  You won't need them today.

20          THE DEFENDANT:  Okay.  But just make sure I have copies

21  for them for tomorrow.

22          THE COURT:  Or Wednesday.

23          MR. HOTALING:  That would be appreciated.  That would be

24  great.

25          THE DEFENDANT:  That's no problem.

1        THE COURT:  Now, Mr. El Bey, since you're not a lawyer
2   what I'm going to do is before every phase of the trial, I'm
3   going to explain to you as best I can what this phase is about
4   and what your role in it will be, okay?
5        So we're going to start off with a jury selection, and I
6   want to talk to you about that.  And then the next phase will be
7   opening arguments to the jury after the jury is selected.  And
8   then after there will be the government's case.  And then there
9   will be your case, and then there will be closing arguments.
10       So I will try to explain.
11       Now, when the jury is present I will explain this at the
12  side -- where is the sidebar?  Is that the sidebar?
13       Right here?  And there is the white noise machine, do we
14  have?
15       So the point is that when I talk to you or to a
16  prospective juror, anyway, over there, that will be completely
17  confidential.  The jury will be sitting there, will not hear
18  anything, okay?
19       Now, there is no jury here so we don't have to use the
20  sidebar.  But when the jury is present and I want to explain to
21  you the next phase of the case, I will take you over there.
22       Okay.  So here is the jury selection process:
23       Now, as I'm sure you know, in a federal criminal trial
24  there are 12 jurors.  But there is an extra wrinkle because in
25  addition to picking the 12 jurors, we pick two alternate jurors

1  in case one or two of the 12 drop out, get ill, or something,
2  then the alternates step in.

3          So it's important to understand.

4          Now, there are the -- the jury panel or the prospective
5  jurors are going to be a large number, and they are going to be
6  brought up and 14 of them will be seated in the jury box.  We
7  will start with those 14.  And I will be asking each of the
8  jurors questions.

9          And after I've asked these jurors questions, the
10  lawyers, both the prosecutors and you, Mr. El Bey, you will have
11  a chance to raise objections to particular jurors and we will do
12  that at the sidebar in private so that prospective jurors don't
13  overhear it.

14          And there are two types of objections which you can
15  make.

16          Now, one type is an objection for cause, which just
17  means if there is some reason that you can articulate or the
18  government can articulate why you don't think that person is
19  suitable to be a juror in this case -- maybe you think this
20  person has made up his mind or is not a fair-minded person or has
21  been involved in activities that make him very unsuitable.

22          So make an objection, and I rule on that.  Maybe I say
23  that person will not be selected for the jury.

24          But in addition to that, each side can challenge jurors,
25  exclude jurors without giving any reason at all.  But there is a

1  finite number of those challenges you can make.

2         The government can challenge without giving any reason,

3  can exclude six prospective jurors.  You, Mr. El Bey, as a

4  defendant, you can exclude ten.

5         Now, you have to be very careful because once you've

6  used up the six on the government's side or used up the ten,

7  that's it for challenges to jurors where you don't have to give

8  any reason.  So you want to, you know, keep a count so you don't

9  run out prematurely.

10        Now, some of the questions I ask may be a little

11  embarrassing to a particular juror, and the juror may want to

12  answer the question in private, in a sense, not in front of the

13  rest of the jurors.

14        In that event, I will bring the juror over to the

15  sidebar and you, Mr. El Bey, and the government lawyers will be

16  permitted to hear what the juror has to say.  But the audience,

17  the other jurors, will not be permitted to hear.

18        So that's the process.

19        So probably the way it will work, that we'll have to

20  start with 14, and probably some of them will be excluded either

21  for cause or because you or the government has just said "I don't

22  want that person" and then maybe we will end up with,

23  like -- say, we end up with eight jurors, then we are still be

24  four short of regular jurors, we are going to have our

25  alternates, so we will bring some more of the prospective jurors

1  into the jury box and we will go on from there.

2          It shouldn't take too long I hope.

3          The -- just to complicate things a little, I'm sorry

4  about this, but the alternates are treated separately.

5          That is, each of you, each side gets one challenge to an

6  alternate for which you don't have to give any reason.  If you

7  have a reason, that's fine.  But if you have no reason, you are

8  uncomfortable with a particular alternate prospect, you can

9  strike one of those prospective people.

10          So the way the alternates work, you deal with the

11 alternates, they will be with the jury, they will listen to the

12 case, and they will be prepared to jump in if one of the regular

13 jurors disappears.

14          But otherwise, if all 12 remain, then the alternates are

15 excused.

16          Now, if either side, either of you, not -- you don't

17 like the questions, something like that, that's fine.  But don't

18 make your objection -- don't speak out loud, so to speak.  If you

19 want to make an objection, you ask for a sidebar and we will

20 discuss it.

21          MR. HOTALING:  Judge, I might have missed that.  Is that

22 in connection with a question that you intend to be asking to

23 members of the potential jury?

24          THE COURT:  Yes.

25          MR. HOTALING:  Are we -- we had talked during the

1  pretrial conference about that list of -- I think 10 or 11

2  questions.  Are we still going with that list?

3          THE COURT:  Let's see.  Yeah, we have the same 11.

4          MR. HOTALING:  Great.

5          THE COURT:  Plus background questions.

6          So some of the questions are addressed to an individual

7  juror and to each individual juror, and others are, you know,

8  sort of yes-and-no questions.

9          MS. MALIZIA:  Your Honor, I think we had moved to

10  include an additional instruction.

11          THE COURT:  Pardon?

12          MS. MALIZIA:  I believe we moved to include an

13  additional instruction that your Honor had agreed to at the

14  pretrial conference.  Sorry.  An additional question, not

15  instruction.

16          THE COURT:  Wait.  I'm sorry.  I'm not following you.

17          MS. MALIZIA:  During our discussion of voir dire at the

18  pretrial conference, we discussed including a question about the

19  jurors' moral or political leanings that might cause them to find

20  it difficult --

21          THE COURT:  Right.  I do have that.  The question is:

22  Do you have any religious, philosophical, moral or other beliefs

23  that would make it difficult for you to sit in judgment on

24  another person?

25          MS. MALIZIA:  Thank you, your Honor.

1           MR. HOTALING:  Thank you, Judge.

2           LAW CLERK:  Judge, can I give the party the list?  This

3    is the list we are going to give the jurors.

4           THE COURT:  You have copies?

5           LAW CLERK:  Yes.

6           THE COURT:  That would --

7           MR. HOTALING:  Yes.

8           THE COURT:  Yes.

9           MR. HOTALING:  That would be great.  Thank you, Judge.

10          THE COURT:  Well, are there any questions?  Otherwise --

11   incidentally, I don't want any legal jargon.  Okay.  So I'm not

12   using the term voir dire.  It's just a piece of old French

13   nonsense.

14          MR. HOTALING:  Couldn't agree more, Judge.

15          THE COURT:  So I want you to understand the jurors are

16   not lawyers, Mr. El Bey is not a lawyer, and so everything should

17   be very simple and straightforward.

18          And I'm going to -- I want to have frequent breaks.

19   Jurors are going to get tired.  So probably take a ten-minute

20   break every hour or so.  And we will break for lunch at noon and

21   maybe take an hour.  And today I will have to end at 3:00

22   o'clock.  And tomorrow we will start at 1:30 and go to 5:00.

23          And then Wednesday and Thursday and Friday, if necessary

24   next Monday, we will have a regular, you know, 9:30 to 5:00 or

25   9:30 to 4:30.

1    Okay.  So why don't we bring in the jury?

2    MS. MALIZIA:  Your Honor, if we could address just one

3    issue before you bring in the jurors?

4    THE COURT:  Pardon?

5    MS. MALIZIA:  If we could address one issue?

6    THE COURT:  Sure.

7    MS. MALIZIA:  I assume you have some opening remarks

8    that you re expecting to make to the jury for this case and what

9    they will be doing for the next three days.  Were you also

10   planning to advise them of the defendant's right to proceed pro

11   se?

12   THE COURT:  Yes, of course.

13   MS. MALIZIA:  Thank you, your Honor.

14   THE COURT:  Excuse me.

15   THE DEFENDANT:  I'm going to object to that.  I'm sui

16   juris.  It's not pro se.  So there is a difference.  I'm in my

17   own accord, so I want that to be noted.

18   THE COURT:  No.  I'm not going to use the term pro se

19   because that's a legal -- I'm just going to say --

20   THE DEFENDANT:  That's what it means.

21   THE COURT:  -- you have a right to represent yourself

22   rather than have a lawyer, and that's fine.

23   THE DEFENDANT:  Yes.

24   THE COURT:  And I will explain Mr. Fuentes is what's

25   called a standby counsel.  He is not your lawyer.  He is not

1  going to address the jury or anything like that, but he is a

2  resource for you.  If you have a question you can ask

3  Mr. Fuentes.

4          THE DEFENDANT:  And one more question, your Honor?

5          THE COURT:  Yes.

6          THE DEFENDANT:  Since we are on what we don't want to

7  do, so I don't have to object to them calling me a tax protester

8  because that's not what I am.  Until it is proven that I am, I

9  don't want to be disrespected or put in the jury's mind that I'm

10 a tax protester.

11         So I'm going to make sure they don't say that before we

12 get started choosing a jury.  Until it's proven, don't call me

13 what I'm not.  I want to make sure that we get it on the record

14 that they don't call me a tax protester, or however they want to

15 call me a tax protester, what I'm not.

16         If I'm proven guilty of that, then you can do that.  But

17 until then, I -- I'm going to object to being that.  Just to put

18 the idea in the head.

19         MS. MALIZIA:  Your Honor, the government has no

20 intention of characterizing the defendant as a tax protester.

21         THE DEFENDANT:  That's the only thing.  I'm not asking

22 for a whole lot.

23         THE COURT:  Okay.  Then I think we are ready to bring

24 the jury in.

25         MR. HOTALING:  Judge, one procedural question before the

1  jury comes in.

2         THE COURT:  Sure.

3         MR. HOTALING:  Are you going to ask the parties to

4  introduce ourselves to the jury?

5         THE COURT:  Oh, no.  I'm going to do that.

6         MR. HOTALING:  Perfect.  Thank you.

7         THE COURT:  Maybe I should ask you how to pronounce it

8  now.  So you pronounce your name Hotaling?  Is that correct?

9         MR. HOTALING:  That's correct.

10        THE COURT:  And, Miss Malizia, is that how you pronounce

11 it?

12        MS. MALIZIA:  Yes.

13        THE COURT:  And you have another person there?

14        MR. HOTALING:  This is Special Agent Darren Bodner of

15 the IRS.

16        THE COURT:  So should I introduce him or -- because the

17 jury may be curious about anyone sitting at counsel table.

18        MR. HOTALING:  And if you feel more comfortable, we are

19 happy to do our self-introductions if you'd like to do that that

20 way.  Whatever you prefer.

21        THE COURT:  Special Agent --

22        MR. HOTALING:  Darren, D-A-R-R-E-N, last name Bodner,

23 B-O-D-N-E-R.

24        THE COURT:  Bodner.

25        Okay.  So I will introduce all four -- all five, because

1  including Mr. Fuentes.

2        THE DEFENDANT:  Okay.  Your Honor, I just want to ask

3  one thing.  I'm just saying this is just not a level playing

4  field.  You have boxes, you've got levels, and you are allowing

5  them to have someone.

6        I have an advisor and I can't have my advisor, but you

7  are allowing them to have someone at their table.  I don't think

8  that's fair.  We need to remove these boxes in the playing field

9  and level them so it can be an even playing field, because right

10  now I'm at a disadvantage.  You allow them to have.  I want to

11  have my advisor.

12        THE COURT:  Wait a second.

13        So why is Mr. Bodner sitting at your table?

14        MR. HOTALING:  Judge, because he is the case agent.  As

15  we are the lawyers for the government, Mr. Bodner represents the

16  United States Treasury in the sense of the -- as part of the

17  government agency and the case agent on this case.

18        It's customary for a case agent, one case agent to sit

19  at the government table essentially as the client for whom we are

20  representing him.

21        THE DEFENDANT:  I thought he'd only sit there when he is

22  called, Judge.  Again, we have got these levels and we have got

23  these bars, and it's an uneven playing field.  And all I'm asking

24  is a fair chance.  And you've got these levels and these bars

25  here, and then you are allowing them to do what they want to do.

1    I'm not -- I can't have my advisor.  I'd like to talk to
2 my advisor also.
3    THE COURT:  Okay.  So, Mr. Bodner, you'll sit in the
4 general section.
5    THE AGENT:  Yes, sir.
6    THE DEFENDANT:  And one more thing, Judge.  I'm sorry.
7    THE COURT:  Go ahead.
8    THE DEFENDANT:  I'm just trying to make sure things are
9 right.
10    So what I'm asking is who am I coming against, the
11 Department of Justice, or who is representing the Department of
12 Justice?  I mean, I don't think we need two attorneys to come at
13 me.
14    THE COURT:  No.  Mr. Hotaling --
15    THE DEFENDANT:  Just little old me.
16    THE COURT:  They are Justice Department lawyers, and the
17 Justice Department prosecutes cases on behalf of the federal
18 government.
19    So the client is the federal government, the Treasury,
20 whatever, the Internal Revenue Service is part of the Treasury.
21 So that's the client.
22    THE DEFENDANT:  Okay.
23    THE COURT:  And you're the client on the other side
24 representing yourself.  So it's not completely symmetrical.
25    THE DEFENDANT:  This is my client as a sovereign.  This

1 is my client as a sovereign.  And we are a team, just like they

2 are a team, I'm a team with my advisor as a sovereign man of the

3 land, so that's why I wanted to know why I can't have mine.

4          THE COURT:  Okay.  So since Mr. Bodner has now been sent

5 to the audience section, the only people at the government's

6 table are the two lawyers representing the government.

7          THE DEFENDANT:  Okay.

8          THE COURT:  And you don't have a lawyer representing

9 yourself.  So you are the only person at your table.

10          THE DEFENDANT:  I object to that.  I'm not a person.

11 I'm a man.  So I'd really appreciate if you all didn't call me a

12 person.  I'm a man.  Not a person, not a corporation, I'm not a

13 fiction.  So I want the record to show that.

14          I object to you calling me a person.

15          My name is Hakeem El Bey, or you can call me a man.  But

16 I do not -- I'm not the defendant.

17          But anyway, what I'm saying to you is this -- we are on

18 the same page, I know you understand me so all I'm saying, just

19 don't call me a person.

20          THE COURT:  Okay.  That's fine.

21          THE DEFENDANT:  Because I'm not a fiction and I'm not a

22 corporation.

23          The scales are still unbalanced, Judge.  That's all I'm

24 saying.  It's still unbalanced.  You've got someone behind me

25 that I don't want him in my -- he keeps whispering in my ear.  He

1  is bothering me.  He is still sitting there, and they are going
2  to think he is being represented by me.
3        They have -- we have got the levels and we have got
4  boxes and --
5        THE COURT:  I will explain to the jury Mr. Fuentes's
6  role, so don't worry.
7        I just want the prospective jurors to understand who is
8  here.
9        THE DEFENDANT:  Okay.  This is what is I'm saying to
10  you, Judge.  Miss Malizia, Kathryn Malizia, brought the case and
11  now she is being advised -- he is whispering in her ear.
12        And what I'm saying is he is advising her -- again, I'm
13  going to say this, this ship here is not an even playing field.
14  The Court is not even.  You've got levels and you've got boxes.
15  Until we remove those boxes and levels, it's not an even playing
16  field.
17        Or unless you are going to let me have my advisor also
18  to whisper in my ear.
19        THE COURT:  Okay.  But remember when you say not a level
20  playing field --
21        THE DEFENDANT:  Yes, sir.
22        THE COURT:  -- one difference:  I'm sure you understand
23  the government has to prove its case beyond a reasonable doubt,
24  and they have to put in evidence and have witnesses, and so on.
25        You don't have any burden of proof.  You can put in

1  evidence or not.  But they still have to prove their case.  So

2  it's --

3          THE DEFENDANT:  It's still uneven.  It's two against one

4  and the playing field --

5          THE COURT:  But you have an advantage because you don't

6  have a burden of proof.  You just have to resist their efforts to

7  prove.

8          THE DEFENDANT:  You're saying I don't have a burden of

9  proof.  You're saying it's jurisdiction.  It's not on record.

10 What I'm saying you haven't put anything on record.

11         THE COURT:  There is jurisdiction.  It's not a problem

12 with jury.

13         THE DEFENDANT:  According to Hagen and Levine, it has to

14 be on record to proceed.  And so I will put these in my files.

15         THE COURT:  What has to be on record?

16         THE DEFENDANT:  Proof of jurisdiction.  It has to be on

17 record.  And you are saying you have jurisdiction.  It's the law

18 states that a court can't dictate that it has jurisdiction.

19         THE COURT:  No.  Look at my order.

20         THE DEFENDANT:  You haven't did anything that you are

21 supposed to do.

22         THE COURT:  Mr. El Bey, my order said you cannot

23 question jurisdiction.  Look, if you don't like my rulings, which

24 is fine, if you lose the case, you can appeal, right?

25         THE DEFENDANT:  Yes, sir.

1          THE COURT:  And the Court of Appeals may agree with you,

2     say I'm all wrong, and then you get a new trial or they say

3     you're acquitted.  So you have that protection.

4          But I have to make my rulings and I have to adhere to

5     them.

6          THE DEFENDANT:  And no disrespect, Judge, but what I'm

7     just saying, these are Supreme Court decisions and that's all I'm

8     saying.  These are Supreme Court decisions and you know on a

9     federal case they have to abide by the law.  Everything is the

10    law.  This is in church.  We have to follow the law.  What I'm

11    saying to you is we're not following law.

12         THE COURT:  I disagree with you.  I think I'm following

13    the law.  As I say, if you disagree with me --

14         THE DEFENDANT:  Yes, sir.

15         THE COURT:  -- then you --

16         THE DEFENDANT:  Well, you the judge.

17         THE COURT:  If you lose the case --

18         THE DEFENDANT:  Yes, sir.

19         THE COURT:  -- and you decide to appeal, you will be

20    making the arguments to a completely new set of judges.  I won't

21    have anything to do with it.

22         THE DEFENDANT:  You an appellate judge.  You have

23    something to do with it.

24         THE COURT:  I am not --

25         THE DEFENDANT:  You an appellate judge.  You have

1    something to do with it.

2              THE COURT:  No, no, no.

3              THE DEFENDANT:  Yes, you do.  We on the same page.  I

4    understand.

5              THE COURT:  Wait a second.  When I sit as a district

6    judge, as in this case, and if the case is appealed, I am not

7    allowed to have anything to do with the appeal.  I'm not -- they

8    don't allow me --

9              THE DEFENDANT:  You got buddies, you got buddies.

10             THE COURT:  I have done this before.  I have been doing

11   trials for 33 years, and I have been reversed several times.

12             THE DEFENDANT:  Yes, you have.  And let me say, you good

13   at what you do because I studied you.  You very good.  I must

14   admit.  I even looked at your record.  You good at what you do

15   but I'm pretty decent too.

16             THE COURT:  You are.  Well, we will see how everything

17   comes out eventually.

18             THE DEFENDANT:  You good at what you do.  I got to

19   admit.  Especially with that Eleventh Amendment, you talked to me

20   about it last time.  I liked it.  I didn't comment on it, but I

21   appreciate what you did because you opened my eyes and you are

22   real good.

23             THE COURT:  Thank you.

24             THE DEFENDANT:  Excuse me.  Your Honor, would I have

25   time to run to the washroom real quick?

1        THE COURT:  I think so.  Sure.

2     (Pause.)

3        MS. MALIZIA:  Your Honor, the government's preliminary

4  witness list did not contain the names of the custodians we

5  intend to call at trial.  I have a list of those names here,

6  however, if we want to question the jury about whether or not

7  they know any of those individuals?

8        MR. HOTALING:  Wait until he gets back in.

9        MS. MALIZIA:  I didn't realize he was out.

10        MR. HOTALING:  We will wait until he comes back in.

11        THE COURT:  Okay.

12     (Defendant in.)

13        MS. MALIZIA:  Now that the defendant has returned to the

14  courtroom, the government has a complete list of witnesses they

15  intend to call at trial, including the names of the custodian

16  witnesses which were not included on the government's original

17  exhibit list tendered to the Court.

18        THE COURT:  So this is more than the six?

19        MR. HOTALING:  It is those six individuals.  However,

20  the government's original exhibit list did not include the names

21  of those individuals, just the fact that we would be calling

22  custodians from certain organizations.

23        THE COURT:  Well, I'm not sure.  I have this list:

24  Kristy Morgan, Denise Shanks, and so on.

25        MS. MALIZIA:  Those are all potential IRS witnesses.

1        THE COURT:  Right.  You have other witnesses.

2        MS. MALIZIA:  These are in addition to the six custodian

3    witnesses that were also identified on the government's list but

4    not named.

5        THE COURT:  What are you doing now?

6        MS. MALIZIA:  We now have the names of those six

7    witnesses.

8        THE DEFENDANT:  Judge, can I ask a question?  How are we

9    going to admit discoveries now and they never, you know what I'm

10   saying?  You have boxes and you have levels.  The playing

11   field in this court is not even.

12       So I don't have a chance the way you are operating the

13   court, because it's not fair.  The discovery was supposed to be

14   January the 26th.  Now here we are March, and now she is

15   admitting discovery.  Someone she didn't have the name.

16       Okay.  You don't have the name, then you can't use them.

17   And what I'm saying is nothing that I submitted has been

18   answered.

19       THE COURT:  Look.  You can object.  The only purpose of

20   this is to make sure that the -- that the prospective jurors

21   don't know these people, aren't friends of these people.  This

22   has nothing to do with whether they will be permitted to testify,

23   right?

24       THE DEFENDANT:  Okay.  But if --

25       THE COURT:  If the government calls them to testify, you

1  can object if you want.

2          THE DEFENDANT:  Okay.

3          THE COURT:  But it's important that the jurors know the

4  names of potential witnesses, but -- not actual, but potential

5  witnesses -- so if they know these people.

6          THE DEFENDANT:  But, Judge, didn't you give a date to

7  have all this in?  And what I'm saying is is now you are

8  exceeding the date, and that's what I'm saying, it's not a level

9  playing field.  We still got boxes, we still got levels.  And I

10 have to mention that because it's not an even playing field.

11         THE COURT:  Okay.  I have noted your --

12         THE DEFENDANT:  You know what I'm saying.  So all I'm

13 saying is you are giving them everything that they want, and

14 everything that I have asked them --

15         THE COURT:  This is not for their benefit.

16         THE DEFENDANT:  It's not for mine either.

17         THE COURT:  Look, you are not understanding.  These are

18 potential witnesses.  It's important to find out whether the

19 jurors know any of these people.  And that has nothing to do with

20 whether these people will be permitted to testify.  If the

21 government calls them as witnesses, you can object.

22         THE DEFENDANT:  Okay.  I got it.

23         THE COURT:  Get it?

24         THE DEFENDANT:  Yes, sir.

25

1     (Prospective jurors enter courtroom.)

2          THE CLERK:  I'm going to call 14 names.  As I call your

3  name, please come and sit in the jury box here, starting with the

4  front row.

5          THE COURT:  Start with the front row.

6          THE CLERK:  Michael Hibicke, H-i-b-i-c-k-e.

7          Barry Aufmann, A-u-f-m-a-n-n.

8          Steve Jones, J-o-n-e-s.

9          Elba Muir, M-u-i-r.

10         Treon Smith, S-m-i-t-h.

11         Timothy Kelly, K-e-l-l-y.

12         Shannon Fox, F-o-x.

13         Joan Portale, P-o-r-t-a-l-e.

14         Theresa Shea, S-h-e-a.

15         Abbie Morrison, M-o-r-r-i-s-o-n.

16         Margaret Doyle, D-o-y-l-e.

17         Christine Seisser, S-e-i-s-s-e-r.

18         Edith Jerele, J-e-r-e-l-e.

19         Roger Vilmur, V-i-l-m-u-r.

20         Would all the prospective jurors please stand and raise

21  your right hand, including the ones in the back as well.

22     (Prospective jurors sworn.)

23         THE COURT:  Okay.  Well, ladies and gentlemen, I'm Judge

24  Posner.  And what we have to do first in this case is select a

25  jury from among -- from the pool which you represent.

1            And just for convenience, I have asked the 14 of you to

2   be put into the jury box.  So we are going to be picking a jury

3   of 12 plus two alternates.  I'll explain that.  And we start with

4   the group of 14, and probably some will not be selected for the

5   jury, and then we will bring in others.

6            So what I want to tell you, something about the case,

7   and introduce the parties.  And then I'll explain the jury

8   selection process, and we will move along and we will try to move

9   everything forward and with a minimum of jargon and delays and so

10  on.

11           So we are very grateful to have you.  We know we are

12  taking you out of your ordinary day-to-day activities, and asking

13  you to exercise actually governmental power as a jury, deciding

14  guilt and innocence in a federal criminal case.

15           This is a case in which the defendant is accused by the

16  federal government of defrauding the Internal Revenue Service.

17           And the government has to prove its case -- I'm sure you

18  are familiar with this -- beyond a reasonable doubt, and both

19  sides get to present evidence.  The government has to present

20  evidence in order to prove guilt beyond a reasonable doubt.  The

21  defendant doesn't have to present evidence.  He doesn't have a

22  burden of proving anything.  He can of course present evidence if

23  he wants to.

24           I'm going to introduce the lawyers and the defendant.

25           So on the government's side we have two lawyers

1   representing the government, Mr. Hotaling and Miss Malizia.

2          MR. HOTALING:  Good morning.

3          MS. MALIZIA:  Good morning.

4          THE COURT:  And these are Justice Department lawyers

5   working in the local Justice Department office here in Chicago.

6          And the defendant in this case is Mr. El Bey, and he is

7   at the defendant's table.

8          THE DEFENDANT:  Good morning, everyone.

9          THE PROSPECTIVE JURORS:  Good morning.

10         THE DEFENDANT:  Nice to see you.

11         THE COURT:  And Mr. El Bey has decided to be his own

12  lawyer, in effect.

13         You can sit down, Mr. El Bey.

14         He is not a lawyer, but in our system if a party wants

15  to represent himself, not have a lawyer, that is his right.

16         We have one more person I should introduce you to,

17  Mr. Fuentes, sitting in the back there.  Mr. Fuentes is a lawyer,

18  and I have appointed him what is called standby counsel, which

19  means that he is available to Mr. El Bey, to the defendant, if

20  Mr. El Bey has a legal question.

21         So Mr. Fuentes is not his lawyer, he is not going to be,

22  you know, making arguments to the jury or cross examining

23  witnesses, or anything like that, but he is a resource for Mr. El

24  Bey if he has any questions.

25         So the way this -- and of course, you will hear a lot

1 more about the case as we go on.

2       The way we -- the way we do the jury selection process

3 is that I ask -- beginning with the 14 who are in the jury

4 box -- I will ask individual questions, and I'll ask some, you

5 know, root questions, you know, yes-or-no type questions.

6       Now, if for any reason a question makes you

7 uncomfortable, or you don't want to give an answer in front of

8 this large group of people, you just say -- you utter the word

9 "sidebar," and what that means is that you'll come over to a

10 point over here, and where there is a white noise machine, and

11 you will answer the question privately to me and to the -- Mr. El

12 Bey and to the government lawyers.

13       So I say, if there is any embarrassment or, you know,

14 don't hesitate to say "sidebar" and then we will interrupt the

15 process and give you a chance to answer the question privately.

16       Now, the reason we have so many potential jurors here is

17 that the parties have a right to object to a particular potential

18 juror.  And they can object because they think the juror may

19 be -- you know, he or she has made up his mind, or has strong

20 antipathy to the type of person the defendant is, or maybe don't

21 like the Internal Revenue Service.

22       So I say a lawyer can -- one of the lawyers or I myself

23 can say we don't think this juror is the right person for this

24 type of case.

25       But in addition to that, each side has a right to

1    exclude a potential juror without giving a reason.  And it's a

2    limited right, they can't eliminate everybody, but they get a

3    number of opportunities.

4            So it's unlikely that all 14 of you will be selected for

5    the jury.

6            And if you're not selected, if you are excused, don't

7    feel that you're not competent or anything of that sort.  It's

8    just that the parties do have this right to object, and that

9    results in having to have successive waves of jurors.

10           The side -- as I say, if you don't want to answer the

11   question in public and ask for a sidebar, then we will make a

12   note of it.  We won't interrupt the actual questioning.  But at

13   the end of the -- after we have gone through the whole panel of

14   14, the ones who have said sidebar will one by one have a private

15   questioning in the corner there.

16           So as I say, I'm going to go through each of you and ask

17   you a few questions.

18           Okay.  So let me start with Mr. Hibicke.  Am I

19   pronouncing that correctly?

20           PROSPECTIVE JUROR:  Yes.

21           THE COURT:  And your full name is Michael Hibicke, is

22   that correct?

23           PROSPECTIVE JUROR:  Yes.

24           THE COURT:  I'd like to know where you live.  Not your

25   street address, but, you know, city or town.

```
 1              PROSPECTIVE JUROR:  I live in Skokie.

 2              THE COURT:  In Skokie.  Thank you.

 3              And could you tell me what your occupation is, and if

 4  you're married or have adult children, what their occupations

 5  are?

 6              PROSPECTIVE JUROR:  Okay.  I'm a product specialist for

 7  an electrical equipment manufacturer, and my wife is a mechanical

 8  engineer.  And I have no grown children.

 9              THE COURT:  Thank you.  And what -- in terms of

10  educational background, what would have been the highest, you

11  know, level of education that you have?

12              PROSPECTIVE JUROR:  I have a four-year bachelor's

13  degree.

14              THE COURT:  You have a college degree.  All right.

15  Okay.  Thank you.

16              Now, has anybody -- have you or anyone, you know, from

17  your family or very close friend or something, been a party to a

18  lawsuit to your knowledge?

19              PROSPECTIVE JUROR:  Not that I know of.

20              THE COURT:  Okay.  Have you ever been arrested or

21  prosecuted for an offense?  Now, this doesn't include, you know,

22  traffic tickets or anything like that.

23              PROSPECTIVE JUROR:  No, I haven't.

24              THE COURT:  Okay.  Have you ever had an experience with

25  police or prosecutors or criminal defendants that would make it
```

33

1  difficult for you to be impartial in this case?

2          PROSPECTIVE JUROR:  No.

3          THE COURT:  Okay.  Thank you very much.

4          So we will move on to Mr. Kaufman.  And your full name

5  is Barry Kaufman, is that correct?

6          PROSPECTIVE JUROR:  It's actually Aufmann.

7          THE COURT:  Aufmann.  I'm sorry.  I'm sorry.

8          And you live where?

9          PROSPECTIVE JUROR:  I live in DuPage County.

10         THE COURT:  Live in DuPage.  In a particular town?

11         PROSPECTIVE JUROR:  Woodridge.

12         THE COURT:  In Woodridge.  Okay.

13         And your occupation and that of your spouse, if you're

14  married, or adult -- you don't look as if you have adult children

15  yet.

16         PROSPECTIVE JUROR:  No, not yet.

17         I work at Panera Bread and I'm not married.

18         THE COURT:  Okay.  And what is your educational

19  background?

20         PROSPECTIVE JUROR:  Just high school.

21         THE COURT:  High school.  Did you graduate from high

22  school?

23         PROSPECTIVE JUROR:  Yes, sir.

24         THE COURT:  Okay.  Thank you.  And have you ever been a

25  party to a lawsuit or someone very close to you, a member of your

1 family?

2      PROSPECTIVE JUROR:  No, I haven't.

3      THE COURT:  Okay.  Have you ever been arrested or

4 charged for any offense?  This excludes traffic tickets.

5      PROSPECTIVE JUROR:  Yes, sir.  I have been.

6      THE COURT:  And would you like to tell us about it?  Or

7 would you prefer do it privately?

8      PROSPECTIVE JUROR:  I'd prefer not to talk about it.

9      THE COURT:  I'm sorry?

10      PROSPECTIVE JUROR:  I prefer not to talk about it.

11      THE COURT:  I will make a note that he will ask you at

12 sidebar.  I do have to ask you about it.  So but we will do it at

13 sidebar.

14      Have you ever had any experience with police or

15 prosecutors or criminal defendants that would make it difficult

16 for you to be impartial in a case like this?

17      PROSPECTIVE JUROR:  No, sir.

18      THE COURT:  Okay.  Let me move on to Mr. Jones.  And you

19 are -- you live where?

20      PROSPECTIVE JUROR:  Oak Park, Illinois.

21      THE COURT:  Oak Park.

22      And your occupation, that of your spouse, if you are

23 married, or children?

24      PROSPECTIVE JUROR:  My wife and I are retired.

25      THE COURT:  Okay.  What did you do before you retired?

1          PROSPECTIVE JUROR:  I was an educator for 36 years.

2          THE COURT:  Were you a teacher?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  In a high school or --

5          PROSPECTIVE JUROR:  High school and elementary.

6          THE COURT:  Okay.  High school.  Was that in Woodridge?

7          PROSPECTIVE JUROR:  Chicago.

8          THE COURT:  In Chicago.

9          PROSPECTIVE JUROR:  I'm from Oak Park, not DuPage.

10         THE COURT:  I'm sorry.  I'm sorry.  I confused you with

11 Mr. Aufmann.  Okay.  Sorry.

12         And your educational, highest educational?

13         PROSPECTIVE JUROR:  Master's degree.

14         THE COURT:  Master's degree.

15         Okay.  And have you ever been a party to a lawsuit?

16         PROSPECTIVE JUROR:  No, I have not.

17         THE COURT:  No.  Have you ever been arrested or

18 prosecuted?

19         PROSPECTIVE JUROR:  Well, if disorderly conduct counts,

20 that's what I was --

21         THE COURT:  Okay.

22         THE COURT:  Do you want to say what -- what the --

23         PROSPECTIVE JUROR:  I think this was back in the '70s.

24 I think I was running through a hospital making loud noises, and

25 I think I was chasing a nurse at the time.  I don't remember

1    quite.

2            THE COURT:  Okay.  Were you actually -- were you

3    punished?

4            PROSPECTIVE JUROR:  No.  The case was dismissed.  They

5    said don't do that again.

6            THE COURT:  Okay.  So have you had any experience with

7    police, prosecutors, criminal defendants that would make it

8    difficult for you to be impartial?

9            PROSPECTIVE JUROR:  No, your Honor.

10           THE COURT:  Okay.  Thank you very much.

11           PROSPECTIVE JUROR:  You're welcome.

12           THE COURT:  Okay.  Next is Miss Muir?

13           PROSPECTIVE JUROR:  Muir.

14           THE COURT:  And you are Elba?

15           PROSPECTIVE JUROR:  Right.

16           THE COURT:  And you live where?

17           PROSPECTIVE JUROR:  Joliet.

18           THE COURT:  Joliet.  And what is your occupation, that

19   of your -- if you are married -- spouse?

20           PROSPECTIVE JUROR:  Right now I'm a custodian for 202.

21           THE COURT:  Custodian for what?

22           PROSPECTIVE JUROR:  In a school by 202.  Plainfield.

23           THE COURT:  You are a custodian?

24           PROSPECTIVE JUROR:  Yes.

25           THE COURT:  I'm just having --

37

1          PROSPECTIVE JUROR:  You don't hear me?

2          THE COURT:  Yeah, I have trouble hearing.  You said you

3    were a custodian?

4          PROSPECTIVE JUROR:  Custodian, right.

5          THE COURT:  And is that of a particular property or

6    school?

7          PROSPECTIVE JUROR:  A school.

8          THE COURT:  A school custodian, okay.

9          And what is your educational background?

10         PROSPECTIVE JUROR:  Just high school.

11         THE COURT:  Pardon?

12         PROSPECTIVE JUROR:  High school.

13         THE COURT:  High school.  Okay.  And have you ever been

14   a party to a lawsuit?

15         PROSPECTIVE JUROR:  No.

16         THE COURT:  No.  Have you ever been arrested or

17   prosecuted or --

18         PROSPECTIVE JUROR:  No.

19         THE COURT:  Okay.  Have you ever had experience with

20   police, prosecutors, criminal defendants that would make it

21   difficult for you to be impartial?

22         PROSPECTIVE JUROR:  No.  No.

23         THE COURT:  Thank you very much.

24         PROSPECTIVE JUROR:  You're welcome.

25         THE COURT:  Miss Smith?

1          PROSPECTIVE JUROR:  Yes.

2          THE COURT:  Where are you from?  Or where do you live, I

3     mean.

4          PROSPECTIVE JUROR:  Chicago.  Austin area.

5          THE COURT:  Okay.  And what is your occupation or

6     that -- and that of a spouse, if you have a, spouse or a child?

7          PROSPECTIVE JUROR:  I'm a stay at home -- I'm

8     unemployed.

9          THE COURT:  I'm sorry?

10          PROSPECTIVE JUROR:  I do have an adult child, and he

11     is --

12          THE COURT:  Wait.  I'm having trouble hearing you.

13          PROSPECTIVE JUROR:  Yes.  I do have an adult child.  He

14     is -- he go to school for construction carpentry.

15          THE COURT:  Construction.  So did you say a son?

16          PROSPECTIVE JUROR:  Yes.

17          THE COURT:  I see.  And do you work yourself?

18          PROSPECTIVE JUROR:  No.

19          THE COURT:  No.  Okay.  That's fine.

20          And what is your educational background?

21          PROSPECTIVE JUROR:  High school.

22          THE COURT:  High school.  Okay.

23          And have you ever been a party to a lawsuit?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  No.  Have you ever been arrested or

1    prosecuted or --

2            PROSPECTIVE JUROR:  No, sir.

3            THE COURT:  And have you ever had an experience with

4    police, prosecutors, criminal --

5            PROSPECTIVE JUROR:  No, sir.

6            THE COURT:  -- defendants that would make it difficult

7    for you to be impartial in a case like this?

8            PROSPECTIVE JUROR:  No, sir.

9            THE COURT:  Thank you.

10           Okay.  Mr. Kelly?

11           PROSPECTIVE JUROR:  Timothy Kelly.

12           THE COURT:  Timothy Kelly.

13           And where do you live?

14           PROSPECTIVE JUROR:  Wheaton.

15           THE COURT:  Wheaton.  Okay.

16           And what is your occupation and that of your spouse, if

17   you have a spouse, adult children?

18           PROSPECTIVE JUROR:  I'm a regional manager for a

19   national company, my wife is a business owner, and our only adult

20   child is a junior in college.

21           THE COURT:  I see.  Thank you.

22           And what is your educational background?

23           PROSPECTIVE JUROR:  I have a BS.

24           THE COURT:  BS.

25           And have you ever been party to a lawsuit?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  Have you ever been arrested or prosecuted

3  or --

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Have you had any experiences with police,

6  prosecutors that would make it difficult for you to be impartial?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Okay.  Thank you very much.

9          So Miss Fox?

10          PROSPECTIVE JUROR:  Yep.

11          THE COURT:  Shannon Fox.  And where do you live?

12          PROSPECTIVE JUROR:  Lake Villa.

13          THE COURT:  Okay.  And what is your occupation, that of

14  your spouse, if you're married?

15          PROSPECTIVE JUROR:  Customer service.

16          THE COURT:  And have you been -- have you ever -- have

17  you ever been a party -- oh, I'm sorry.

18          What is your educational background?

19          PROSPECTIVE JUROR:  Some college courses, no degree or

20  anything.

21          THE COURT:  Okay.  And have you ever been party to a

22  lawsuit?

23          PROSPECTIVE JUROR:  No.

24          THE COURT:  Have you ever been arrested or prosecuted?

25          PROSPECTIVE JUROR:  No.

41

1          THE COURT:  I should ask, have you or someone very close
2    to you been arrested or prosecuted?
3          PROSPECTIVE JUROR:  No.
4          THE COURT:  And have you had any experience with police,
5    prosecutors, criminal justice system, criminal defendants that
6    would make it difficult for you to be impartial in a case like
7    this?
8          PROSPECTIVE JUROR:  No.
9          THE COURT:  Okay.  Thank you very much.
10         Miss Portale, am I pronouncing that correctly?
11         PROSPECTIVE JUROR:  Portale.
12         THE COURT:  Portale.  I'm sorry.
13         And where do you live?
14         PROSPECTIVE JUROR:  Naperville.
15         THE COURT:  Naperville.
16         And what is your occupation and that of a spouse, if you
17   are married, and adult children?
18         PROSPECTIVE JUROR:  I'm a stay-at-home grandmother.  My
19   husband is president of a relocation company.
20         THE COURT:  Okay.  And what is your educational
21   background?
22         PROSPECTIVE JUROR:  High school.
23         THE COURT:  High school.  Okay.  Great.
24         Now, have you ever been party to a lawsuit?
25         PROSPECTIVE JUROR:  Long time ago my husband and I had a

42

1  problem with a gas station who fixed our car, and we had to take

2  them -- they didn't repair it, and it was a small little -- it

3  was --

4          THE COURT:  What was the outcome of the suit?

5          PROSPECTIVE JUROR:  We won.  They didn't come to court.

6          THE COURT:  Oh, I see.  They defaulted.  Okay.

7          And have you ever been arrested or prosecuted?

8          PROSPECTIVE JUROR:  No.

9          THE COURT:  And have you had any experience with police,

10 prosecutors, criminal defense lawyers that would make it

11 difficult for you to be impartial?

12         PROSPECTIVE JUROR:  No.

13         THE COURT:  Okay.  Well, thank you very much.

14         Miss Shea?

15         PROSPECTIVE JUROR:  Yes.

16         THE COURT:  So where do you live?

17         PROSPECTIVE JUROR:  Elmhurst.

18         THE COURT:  Okay.  And what is your occupation or that

19 of your spouse or adult children?

20         PROSPECTIVE JUROR:  My husband and I are both attorneys.

21         THE COURT:  Uh-huh.  And what kind of practice do you

22 have?

23         PROSPECTIVE JUROR:  I'm a labor and employment lawyer.

24 I work in-house for a corporation.

25         THE COURT:  The what does your husband do?

43

```
 1              PROSPECTIVE JUROR:  He is a partner at a firm in the
 2  City.
 3              THE COURT:  And so what is your educational background?
 4              PROSPECTIVE JUROR:  I have a J.D.
 5              THE COURT:  And have you ever been a party to a lawsuit?
 6              PROSPECTIVE JUROR:  You know, we have not opted out of
 7  some of those class action things you get in the mail, so I don't
 8  know if that makes me technically a party or not.  But we have
 9  not opted out, which I guess makes us in.
10              And then we get a little check for 40¢, or whatever,
11  after the fact.
12              THE COURT:  Right.
13              PROSPECTIVE JUROR:  But we have not been an active
14  participant, neither my husband or I, as a party in a lawsuit.
15              THE COURT:  And have you ever been arrested or
16  prosecuted?
17              PROSPECTIVE JUROR:  I have not.
18              THE COURT:  Have you ever had any -- or anybody close to
19  you arrested or prosecuted?
20              PROSPECTIVE JUROR:  No.
21              THE COURT:  And have you ever had any experience with
22  police, prosecutors, criminal defense that would make it
23  difficult for you to be impartial in a case like this?
24              PROSPECTIVE JUROR:  No.
25              THE COURT:  Okay.  Thank you.
```

44

1           And Miss Morrison?

2           PROSPECTIVE JUROR:  Yes, sir.

3           THE COURT:  Where do you live?

4           PROSPECTIVE JUROR:  I live in Bollingbrook.

5           THE COURT:  Okay.  And what is your occupation or that

6    of a spouse or adult children?

7           PROSPECTIVE JUROR:  I'm a nurse manager and my husband

8    is an operations manager.

9           THE COURT:  And what is your educational background?

10          PROSPECTIVE JUROR:  Associate's degree and some

11   additional classes.

12          THE COURT:  And have you ever been a party to a lawsuit?

13          PROSPECTIVE JUROR:  No, sir.

14          THE COURT:  Have you ever been arrested or prosecuted?

15          PROSPECTIVE JUROR:  No.

16          THE COURT:  Have you ever had experience with police,

17   prosecutors, criminal defense that would make it difficult for

18   you to be impartial?

19          THE DEFENDANT:  No.

20          THE COURT:  Okay.  Thank you very much.

21          Miss Doyle?

22          PROSPECTIVE JUROR:  Yes.

23          THE COURT:  Where are you from?

24          PROSPECTIVE JUROR:  Evergreen Park.

25          THE COURT:  And What is your occupation and that of

```
 1  your --
 2          PROSPECTIVE JUROR:  I'm a sales director and my husband
 3  is a lawyer.
 4          THE COURT:  And what kind of law does he do?
 5          PROSPECTIVE JUROR:  Bankruptcy and divorce.
 6          THE COURT:  And your educational background?
 7          PROSPECTIVE JUROR:  Bachelor's degree.
 8          THE COURT:  Bachelor's degree.
 9          And have you ever been a party to a lawsuit?
10          PROSPECTIVE JUROR:  No.
11          THE COURT:  Have you ever been prosecuted or arrested?
12          PROSPECTIVE JUROR:  No.
13          THE COURT:  And have you ever had any experience with,
14  prosecutors, et cetera, that would make it difficult for you to
15  be impartial in a case like this?
16          PROSPECTIVE JUROR:  No.
17          THE COURT:  Okay.  Thank you very much.
18          Miss Seisser?
19          PROSPECTIVE JUROR:  Yes.
20          THE COURT:  Am I pronouncing that correctly?
21          PROSPECTIVE JUROR:  Yes.
22          THE COURT:  Okay.  And you live where?
23          PROSPECTIVE JUROR:  I live in Addison.
24          THE COURT:  In Addison.
25          And what is your occupation and that of your --
```

1            PROSPECTIVE JUROR:  I'm a floral designer.

2            THE COURT:  You are a floral designer, okay.

3            And what is your educational background?

4            PROSPECTIVE JUROR:  High school, trade school.

5            THE COURT:  High school, trade school.

6            Thank you.  And has anybody or have you or anyone very

7    close to you been a party to a lawsuit?

8            PROSPECTIVE JUROR:  No.

9            THE COURT:  Or been arrested or prosecuted?

10           PROSPECTIVE JUROR:  Yes.

11           THE COURT:  Or had experience with police, prosecutors,

12   et cetera?

13           PROSPECTIVE JUROR:  Yes, I have.

14           I was beaten with a bat and it went to jury trial and

15   basically left a bad taste in my mouth for the judicial system.

16           THE COURT:  Okay.  Let me just make sure I understand.

17   So you were a victim -- you were a crime victim?

18           PROSPECTIVE JUROR:  Um-hum.

19           THE COURT:  And the criminal was prosecuted?

20           PROSPECTIVE JUROR:  He pleaded not guilty.

21           THE COURT:  And what was the outcome?  Was there a

22   trial?

23           PROSPECTIVE JUROR:  Not very pretty.

24           THE COURT:  Excuse me?

25           PROSPECTIVE JUROR:  I said he got his hand slapped.

1  That's all.

2         THE COURT:  I see.  He got a nominal punishment?

3         PROSPECTIVE JUROR:  Yes.  Very nominal.

4         THE COURT:  So have you had any experience with -- maybe

5  what you have just said was the experience -- police, prosecutors

6  that would make it difficult?

7         PROSPECTIVE JUROR:  Yeah.  We did the whole nine yards.

8  We did the list.  We went through the jury trial.

9         THE COURT:  So you would not be -- you would not feel

10  impartial in a case like this, is that what you're saying?

11         PROSPECTIVE JUROR:  The whole thing was just a

12  nightmare.

13         THE COURT:  Okay.  So that's fine.  Thank you.

14         So next is Miss Jerele, am I pronouncing that correctly?

15         PROSPECTIVE JUROR:  Jerele.

16         THE COURT:  Jerele?

17         PROSPECTIVE JUROR:  Yes.

18         THE COURT:  Sorry.  You live where?

19         PROSPECTIVE JUROR:  Glendale Heights.

20         THE COURT:  Your occupation?

21         PROSPECTIVE JUROR:  I work in the finance department for

22  the Village of Carol Stream.

23         THE COURT:  And your spouse or children?

24         PROSPECTIVE JUROR:  I have two adult children who work

25  in marketing and maintenance of condo buildings.

48

1          THE COURT:  And what is your educational background?

2          PROSPECTIVE JUROR:  An associate's degree in accounting.

3          THE COURT:  And have you or anyone very close to you

4  been a party to a lawsuit?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Or been arrested or prosecuted?

7          PROSPECTIVE JUROR:  Well, my son has been arrested for

8  DUI.

9          THE COURT:  I'm sorry, who was?

10          PROSPECTIVE JUROR:  My son was arrested for DUI.

11          THE COURT:  Your son was arrested?

12          PROSPECTIVE JUROR:  And he hasn't gone to trial yet?

13          THE COURT:  He hasn't been?

14          PROSPECTIVE JUROR:  Correct.  He hasn't been -- he

15  hasn't gone to trial.

16          THE COURT:  So this is recent?

17          PROSPECTIVE JUROR:  Yes.

18          THE COURT:  And have you had any experience within the

19  criminal justice system, police, that would make it difficult for

20  you to be impartial in this case?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  Thank you.

23          And finally, the 14th, Mr. Vilmur?

24          PROSPECTIVE JUROR:  Yes.

25          THE COURT:  And you are from?

1          PROSPECTIVE JUROR:  I'm from Palatine.

2          THE COURT:  Palatine.

3          And what is your occupation, that of the spouse,

4  children?

5          PROSPECTIVE JUROR:  I'm a retired electrical engineer,

6  my wife is a homemaker, and I have two adult sons, both in

7  computer science.

8          THE COURT:  Okay.  And your educational background?

9          PROSPECTIVE JUROR:  I have a master's in electrical

10  engineering.

11          THE COURT:  And have you ever -- or, you know, wife or

12  children, someone close to you, ever been a party to a lawsuit?

13          PROSPECTIVE JUROR:  Yes.  It was a traffic accident and

14  it was settled out of court.

15          THE COURT:  A traffic accident.  Were you injured?

16          PROSPECTIVE JUROR:  No.  I injured -- I was -- the other

17  party was injured.

18          THE COURT:  I see.  So but that was settled, okay?

19          PROSPECTIVE JUROR:  Yes.

20          THE COURT:  So have you ever been arrested or

21  prosecuted?

22          PROSPECTIVE JUROR:  No.

23          THE COURT:  No.  And have you had any experience with

24  police, prosecutors, criminal defendants, et cetera, that would

25  make it difficult for you to be impartial in a case like this?

1       PROSPECTIVE JUROR:  No.

2       THE COURT:  Okay.  Okay.  Well, thank you.

3       Now -- now I have to ask some general questions.

4       Okay.  Now, we are going to move to what I call the

5 yes-or-no questions.

6    (Pause.)

7       THE COURT:  And the first of these, I'm going to read

8 you a list of names, and these are people whom the government may

9 or may not --

10       LAW CLERK:  Judge, the defendant is not back in the room

11 yet.

12       THE COURT:  Sorry.  We have to wait for the defendant.

13    (Defendant in.)

14       THE COURT:  Okay.  Now, I'm going to ask you questions

15 that you probably can answer them just by raising your hand or

16 not raising your hand.

17       Again, if there is any of these questions that make you

18 uncomfortable, and you'd rather answer them in private, just say

19 "sidebar" and we are will make a note and at the end of the

20 questioning we will listen to you.

21       Okay.  So first I'm going to read you a list of names.

22 These are people whom the government may or may not call as

23 witnesses.  They probably would like to call them, but, you know,

24 the defendant may object, and I would have to rule on that.

25       But so there is a possibility that these people will

1  testify.  And my question is simply whether you know any of these

2  people.

3          Okay.  First is Kristy Morgan.

4          Next is Denise Shanks.

5          Then Patrick Green.

6          Greg Howard.

7          Darren Bodner.

8          Paul Ponzo.

9          Melia Baker.

10         David Shilney.

11         Kerri, K-e-r-r-i, Kerri McGee.

12         Cary, C-a-r-y, Shaffer.

13         Sharon Garbacz -- I can't pronounce it, it's

14  G-a-r-b-a-c-z.

15         And Marjorie -- I think Huntoon.

16         MS. MALIZIA:  Huntoon.

17         THE COURT:  H-u-n-t-o-o-n.

18         MR. HOTALING:  Huntoon, your Honor.

19         THE COURT:  Well, looks like Huntoon.

20         Well, I guess none of you -- okay.  Fine.

21         Okay, next.  Have someone -- have you or someone else, a

22  friend or something, ever worked in law enforcement as a

23  prosecutor or police officer?

24         Okay.  So could you describe what your involvement was?

25         PROSPECTIVE JUROR:  My nephew is a police officer.

52

1            THE COURT:  Excuse me.  I'm sorry?

2            PROSPECTIVE JUROR:  My nephew is a police officer.  My

3    name is Edith Jerele.

4            THE COURT:  Where is he a police officer?

5            PROSPECTIVE JUROR:  In Rosemont.

6            THE COURT:  In Rosemont?

7            PROSPECTIVE JUROR:  Yes.

8            THE COURT:  Okay.  Anybody else?

9            Yes.

10           PROSPECTIVE JUROR:  Michael Hibicke.

11           Good friend is a sergeant in the Chicago PD.

12           THE COURT:  A good friend is what?  I'm sorry.

13           PROSPECTIVE JUROR:  Sergeant in the Chicago police

14   department.

15           THE COURT:  A police sergeant.

16           PROSPECTIVE JUROR:  Margaret Doyle.

17           My brother is a Chicago police officer.

18           PROSPECTIVE JUROR:  Theresa Shea.  I have several

19   friends that are prosecutors, both at the federal and state

20   level.

21           THE COURT:  You are of course a lawyer.

22           That's it.  Okay.

23           MR. HOTALING:  Judge, there is one more.

24           PROSPECTIVE JUROR:  Barry Aufmann.

25           My sister's fiance is a Chicago police officer.

1          THE COURT:  Okay.  Now, I think I know the answer to
2    this question, whether any of you are lawyers.
3          I know you are.  One lawyer.
4          Are any of you law students by any chance?  No.  No.
5          Have you or someone you know well, your family, worked
6    as either a prosecutor or as a criminal defense lawyer?
7          Yes.
8          PROSPECTIVE JUROR:  Michael Hibicke.  Family friend is a
9    lawyer downtown.
10         THE COURT:  Family friend.  Is that a prosecutor or
11   criminal defense?
12         PROSPECTIVE JUROR:  He is usually on the plaintiff's
13   side.
14         THE COURT:  Anybody else.
15         Yes?
16         PROSPECTIVE JUROR:  Margaret Doyle.  My cousin is a
17   prosecutor.
18         THE COURT:  For the state or federal or --
19         PROSPECTIVE JUROR:  I think the state.
20         THE COURT:  Okay.  Anybody else?
21         Yes?
22         PROSPECTIVE JUROR:  Timothy Kelly.  William Kane,
23   state's prosecutor for 15 or 16 years, now in private practice.
24         PROSPECTIVE JUROR:  And, your Honor, I have several
25   friends that serve on both?  Theresa Shea.

54

1          THE COURT:  Okay.  Have any of you served on a jury

2  before?

3          Yes.  Okay.  Let me just ask a little about your jury

4  experience.  What was the nature -- well, I'll ask each of you

5  separately.

6          What was the nature of the case?  What kind of case?

7          PROSPECTIVE JUROR:  It was for a robbery of a delivery

8  truck.  It was in DuPage County.

9          THE COURT:  It was a criminal case.

10          PROSPECTIVE JUROR:  Edith Jerele.  I'm sorry.

11          THE COURT:  Was there a verdict?

12          PROSPECTIVE JUROR:  Yes.  It is was a guilty.

13          THE COURT:  Guilty verdict?

14          PROSPECTIVE JUROR:  I was an alternate so I didn't

15  serve.

16          THE COURT:  I know.  You were an alternate.  Okay.

17          PROSPECTIVE JUROR:  Steve Jones.  Civil case.

18          THE COURT:  And was there a verdict?

19          PROSPECTIVE JUROR:  Yes.  I think the plaintiff won.  Is

20  that correct?

21          THE COURT:  And were you by any chance the foreman of

22  the jury?

23          PROSPECTIVE JUROR:  No, I was not.

24          THE COURT:  Okay.  Anybody else?

25          Yes.

1          PROSPECTIVE JUROR:  I was on two different juries.  One

2   was a criminal case for child molestation, and the second was a

3   civil case for wrongful termination.

4          Vilmur, Roger.

5          THE COURT:  And what were -- were there verdicts in

6   those cases?

7          PROSPECTIVE JUROR:  Yes, sir.  There were verdicts in

8   both cases.

9          In the child molestation case, one count conviction, and

10  we were deadlocked on the other two.

11         And on the wrongful termination case, we decided with

12  the plaintiff.

13         THE COURT:  And were you the foreman in either of those?

14         PROSPECTIVE JUROR:  No.

15         THE COURT:  Okay.  Thank you.

16         Now, as I mentioned at the outset, this is a case that

17  involves the Internal Revenue Service, and have you or -- have

18  any of you or some of your friends, whether close friends within

19  the family, had any experience with the Internal Revenue Service

20  that might make it difficult for you to be impartial?

21         No.  Okay.

22         Do any of you belong to groups or organizations that

23  advocate non-payment of taxes?

24         No.

25         Or do any of you believe that it's unlawful or otherwise

1    illegitimate for the federal government to collect income tax?

2           Do you -- do any of you have any views about the federal

3    government that may affect your ability to be impartial in a case

4    like this?

5           Do any of you hold any religious, philosophical, moral

6    or other beliefs that would make it difficult for you to sit in

7    judgment on another person, the defendant?

8           Now, at various times during the case I'll have to tell

9    you, you know, what the applicable law is.

10          Now, you're -- the jury, those of you selected for the

11   jury, it's the jury who decides guilt or innocence and the jury

12   who applies the law, the jury finds the facts, you know,

13   determines what the facts are and what happened, and then decides

14   whether what happened was a violation of law.  So you determine

15   the facts and you apply the law to the facts.

16          But I tell you what the law is.  And you are -- the jury

17   is bound by that.

18          You can't say:  You know, Posner, I don't like your law.

19   You don't know the law.  I know more law than you do, which is

20   entirely possible, but you're not allowed to do that, but you

21   have to take the law as I give it to you.

22          So the question is would you -- would any of you feel

23   that you wouldn't be able to apply -- you might not be able to

24   apply the law that I told you because you didn't agree with it?

25   You didn't like it?  And so it would make you uncomfortable to

1  apply it?  Or are you willing to accept what I tell you is the

2  law that binds you?

3          If anyone has difficulty?  No.

4          Well, my last question is:  Are there any other reasons

5  why you might be unable to be impartial in deciding this case?

6          Any of you?

7          Okay.  Well, that completes the questioning.  And what

8  I'm going to do now is I'm going to have a little sidebar

9  conference with the lawyers and with Mr. El Bey to decide whether

10 there are any, you know, people they want selected out, not to be

11 chosen for this jury.

12         Okay.  Is that Mr. Aufmann?

13    (Proceedings heard at sidebar:)

14         THE COURT:  You wanted to answer privately about the

15 arrest?  Yes?

16         PROSPECTIVE JUROR:  I just have a couple of cannabis

17 charges, DUI.  I just don't like telling a lot of people that.

18         THE COURT:  Right.  Of course.  Who would?  Right.

19         PROSPECTIVE JUROR:  I have two charges of cannabis.  One

20 DUI.

21         THE COURT:  And what was the outcome?

22         PROSPECTIVE JUROR:  All of them guilty.

23         THE COURT:  Did you have to serve prison time or --

24         PROSPECTIVE JUROR:  No, sir.

25         THE COURT:  Okay.

1          MR. HOTALING:  Judge, if it's all right, is there

2   anything about that particular experience that would make it

3   difficult for you to be impartial, either to the government or to

4   Mr. El Bey?

5          PROSPECTIVE JUROR:  No.  I was guilty.  No, sir.

6          THE COURT:  So you're not bitter about that?

7          PROSPECTIVE JUROR:  No.  I'm just embarrassed.

8          THE COURT:  Okay.  That's fine.  Okay.  Okay.  Thank

9   you.

10      (Prospective Juror Aufmann exits sidebar.)

11         THE COURT:  Okay.  Well, I don't consider that cause,

12  no, so I'll just ask --

13         MR. HOTALING:  And, Judge, if you are willing to

14  entertain, there are a couple maybe some follow-up questions if

15  we could either bring them over to the sidebar or if you wanted

16  to do it in front of them?

17         But, for example, the woman second on the back row, I

18  can's remember her name.

19         LAW CLERK:  Christine Seisser.

20         MR. HOTALING:  Miss Seisser.  Her husband is a partner

21  in a law firm.

22         MS. MALIZIA:  We are curious to know what type of law

23  her husband practices, if he is involved in criminal law, if he

24  is employed.

25         She is employed in employment and labor.

1        MR. HOTALING:  If he is involved in criminal law, that
2   would be something we would all be interested in knowing.
3        THE COURT:  I can just ask her.
4        MR. HOTALING:  Absolutely.  And we would make that
5   request of the Court.
6        THE COURT:  Okay.
7        MR. HOTALING:  Yes.
8        And then, Judge, I think it might be helpful, I think
9   Miss Seisser, who is number -- she is in the --
10       MS. MALIZIA:  She is --
11       MR. HOTALING:  She is Miss Shea.  She is the one who had
12  the experience with the criminal justice system, where she was
13  the victim of a crime.  It wasn't clear to me kind of what the
14  impact of that was.
15       THE COURT:  I don't want her on the jury.  I do not want
16  her on the jury.
17       MR. HOTALING:  That would be a cause strike?
18       THE COURT:  She was bitter about that experience.
19       MR. HOTALING:  That is the sense I had.
20       THE COURT:  I don't want her.
21       MR. HOTALING:  So that will be --
22       THE COURT:  That's a cause.  But I will -- now, who is
23  it one I'm going to ask about her husband's --
24       LAW CLERK:  Shea.
25       MR. HOTALING:  Judge, 9.

1          THE COURT:  Let me just go and ask her real quick.

2     (Proceedings heard in open court:)

3          THE COURT:  I just have to ask a follow-up question to

4  Miss Shea, because you mentioned your husband is a lawyer,

5  correct?

6          PROSPECTIVE JUROR:  Correct.

7          THE COURT:  So but I don't think I asked you, what kind

8  of law practice does he have?

9          PROSPECTIVE JUROR:  Commercial litigation.

10          THE COURT:  Does he have anything to do with criminal

11  law?

12          PROSPECTIVE JUROR:  No.

13          THE COURT:  No.  Okay.  Thank you.

14          Okay.  I'll be back shortly.

15     (Proceedings heard at sidebar:)

16          THE DEFENDANT:  I just wanted to make a statement too.

17  Anyone who has --

18          THE COURT:  I'm sorry.  What?

19          THE DEFENDANT:  Anyone who has affiliation with any bar

20  or attorney, I want them striked from the list.

21          MR. HOTALING:  So you are making a for-cause strike as

22  to her?

23          PROSPECTIVE JUROR:  Yes.  Anyone who is pertaining to

24  anyone in -- with attorneys, lawyers.

25          THE COURT:  Just so the record is clear, I think we need

1  to have a specific -- if you are making a for-cause strike with

2  respect to any particular juror, if there is a particular person

3  that you are referring to, let's make sure it's on the record.

4           THE DEFENDANT:  Definitely number nine.

5           MR. HOTALING:  Miss Shea?

6           THE DEFENDANT:  Definitely wanted her strike, number

7  nine, and let me see.

8           THE COURT:  Okay.  But I don't think anybody on this

9  jury should be stricken for cause except the woman who is so

10  upset by her criminal experience.  So she is out.

11          That's cause and doesn't count against you.

12          But lawyers are perfectly qualified to sit on juries,

13  and you can strike them, but you will be using -- what are there?

14  -- two of them?  You will be using two of your challenges, and

15  you'll have eight left.

16          THE DEFENDANT:  You will be using two.  There is just

17  one individual.

18          MR. HOTALING:  I think there is only one attorney that's

19  on the bench.

20          THE DEFENDANT:  You keep trying -- I don't need your

21  information.  I wish you'd leave me alone.  He is starting to

22  irritate me.  I don't know like -- I don't know why you are all

23  siccing him on me like this.  Because he is keeping interrupting

24  me.

25          THE COURT:  Who is it you want to --

1          THE DEFENDANT:  I don't need his --

2          THE COURT:  Sorry.  Mr. Fuentes?

3          THE DEFENDANT:  But he keep coming in, interfering with

4   me.

5          THE COURT:  He is trying to see if you need his help.

6          THE DEFENDANT:  You are making them think he is helping

7   me.  I don't need him by me.  I didn't call him, so why he is

8   harassing me?

9          THE COURT:  Let me ask you, would you prefer Mr. Fuentes

10  to leave?

11         THE DEFENDANT:  I do.

12         THE COURT:  And not have anything to do?

13         THE DEFENDANT:  Not have anything to do with it.

14     (Pause.)

15         THE COURT:  We'd like you -- I'd like you to remain, but

16  to sit in the gallery, okay?

17         So he is not going to bother you, he is not going to

18  volunteer anything, but he is going to remain in the gallery.

19         THE DEFENDANT:  I'm being harassed right now.  I'm being

20  harassed.

21         THE COURT:  He is just going to sit there.  He is not

22  going to sit behind me.  He is going to be off there, okay?

23         THE DEFENDANT:  Okay.

24         MR. FUENTES:  May I make a report, Judge?  May I be a

25  heard?

1          THE COURT:  Excuse me?

2          MR. FUENTES:  May I be heard?

3          THE COURT:  Sure.

4          MR. FUENTES:  I will of course fully comply with the

5    Court's orders.  To the extent that the Court's orders make it

6    more difficult to fulfill whatever someone might deem to be my

7    duties as standby counsel, I just want it very clear I'm doing

8    everything in compliance with the Court's order.

9          THE COURT:  Absolutely.  Absolutely.

10          MR. HOTALING:  So maybe we should go back.

11          You were finishing your statements with respect to the

12    cause strike as to Miss Shea but Mr. El Bey just made, I think

13    you denied that for cause, is that right?

14          THE COURT:  Yes.  You want Miss Shea out?

15          THE DEFENDANT:  I do.

16          THE COURT:  Okay.  So that's one of your challenges.

17          MR. HOTALING:  And I'm sorry, Judge, just in terms of

18    the procedure, I think it might make sense if once we finish the

19    cause section, and if he wants to exercise a peremptory --

20          THE COURT:  Wait a second.  We finished with cause.

21    There is no cause.

22          MR. HOTALING:  We'd like to take maybe two or three

23    minutes, we would talk among ourselves.  We don't want to do

24    this --

25          THE COURT:  I understand.  But we are through with

1  cause.

2          MR. HOTALING:  Good.  Perfect.

3          THE COURT:  But you don't know who you want --

4          MR. HOTALING:  We would like the opportunity to have

5  perhaps five minutes of time to go perhaps out in the hallway,

6  talk amongst ourselves, write down any sort of peremptory

7  challenge we would have, and present them in writing to the

8  Court.

9          THE COURT:  I hate to keep the jury waiting.

10         MR. HOTALING:  Judge, we would appreciate the

11 opportunity to have just a few moments of time just to consult

12 amongst the two of us, so we will have a united front with

13 respect to the exercising of our peremptory challenges.

14         THE COURT:  Well, it'd better be quick.

15         MR. HOTALING:  Judge, I think we will.  If we could have

16 two or three minutes, I think we could do it two or three

17 minutes.

18         THE COURT:  Okay.  Okay.  Good.

19         LAW CLERK:  Just to confirm, you want them in writing

20 from both parties, right?  So if they want to strike anybody

21 simultaneously, it counts against both of them?

22         THE COURT:  Yes.  But not with regard to Miss Shea,

23 because Mr. El Bey has made it clear that he wants her stricken.

24         MR. HOTALING:  There --

25         LAW CLERK:  Right.  But if there is any others, if you

1    can submit them.

2            THE COURT:  If you have others, you should write them

3    down, others you want to strike.

4            THE DEFENDANT:  Yes, sir.

5            THE COURT:  Okay.  So --

6            MR. HOTALING:  We will take a couple minutes, if that's

7    okay, and we will be back in three minutes.

8            THE COURT:  Okay.  I'll explain to the jury.

9        (Proceedings heard in open court:)

10           THE COURT:  Sorry about this.

11           As I mentioned at the outset, the lawyers and of course,

12   Mr. El Bey representing himself, they are -- they have a right

13   to -- it's call striking -- they have a right to strike a certain

14   number of jurors without giving a reason.

15           And the government lawyers want to discuss, you know,

16   who they want -- whom they want to strike for a couple of

17   minutes, and Mr. El Bey wants to make a list of people he may

18   want to strike.

19           So it will just -- they will be back in a minute, and it

20   will move very, very quickly.

21           So we will take a lunch break at noon.  And I don't know

22   if you have been told by everybody, but there is a nice cafeteria

23   on the second floor.

24           And I think we will take -- because we want to move

25   along as quickly as possible, I think we will just take a

1   45-minute lunch break.  So that will be fine for the cafeteria,

2   there are a lot of restaurants in the neighborhood, but I think

3   you'll find that going out -- and it's cold, of course -- and

4   finding a restaurant and eating and coming back in 45 is not

5   easy.

6            So the cafeteria, but I mean the cafeteria food is

7   perfectly good.

8            And we pay, don't we?

9            THE CLERK:  Not yet.

10           THE COURT:  But after the trial when the jury is

11  deliberating?

12           THE CLERK:  Then we pay.

13           THE COURT:  Free food.  Do you have your list,

14  Mr. Hotaling?

15           MR. HOTALING:  We do, your Honor.

16           THE COURT:  Do you have your list?  Let's look at the

17  lists.

18     (Proceedings heard at sidebar:)

19           THE DEFENDANT:  I was telling you, Judge, I thought you

20  was going to have him sit in the audience.

21           MR. HOTALING:  Mr. Fuentes, you mean?

22           THE DEFENDANT:  Yes, sir.  He is still up there.  I'm

23  being harassed.

24           LAW CLERK:  Mr. El Bey is objecting to Mr. Fuentes being

25  here, but I think it's important for him to stand and listen to

67

1  the proceedings.

2       THE COURT:  Yeah.  He is not participating, he is just

3  listening.

4       THE DEFENDANT:  I'm being harassed.

5       THE COURT:  He is not harassing.  He is standing here

6  quietly.  He is not going to talk to you unless you ask him a

7  question.

8       THE DEFENDANT:  Okay.  All right.

9       THE COURT:  That leaves Steve Jones.  This is nine.

10      LAW CLERK:  We also struck one for cause.

11      THE COURT:  What?

12      LAW CLERK:  One was struck for cause.

13      THE COURT:  Who is that?

14      LAW CLERK:  That was Christine Seisser, number 12.

15  Seisser.

16      We are left with Steve Jones, Treon Smith, Shannon Fox,

17  and Edith Jerele.

18      THE COURT:  Do they know where they go back to?

19      LAW CLERK:  We will accept these four people.  These are

20  the four who are left.  Steve Jones is juror number 1, Treon

21  Smith, Shannon Fox, and Edith Jerele.

22      Everybody else is excused.

23      THE COURT:  He struck seven.  He has got three left.

24      LAW CLERK:  He struck six.

25      THE COURT:  No.  He has three left.

1          And they struck two.

2          LAW CLERK:  So we are down to these four.  So you may

3  just announce these four and say everybody else is excused.

4          THE COURT:  I will give it back to you.

5          LAW CLERK:  They should go back to the jury room.

6          We didn't have the benefit of hearing the different

7  ones, so we prefer --

8          THE COURT:  We need to put it on the --

9          LAW CLERK:  Juror 1 is going to be Steve Jones.

10         MR. HOTALING:  Number 1, he was a defense strike?

11         THE COURT:  No.  These are the list, only four left.

12         LAW CLERK:  Habicke is a defense strike.  Aufmann is

13  prosecution strike.

14         THE COURT:  Number?

15         LAW CLERK:  Number 2, prosecution.  Number 3, Jones, is

16  juror number 1.  Number 4, Muir, is a prosecution strike.  Number

17  5, Treon Smith is juror number 2.  Timothy Kelly, number 6, is a

18  defendant strike.  Shannon Fox is juror number 3.  Joan Portale

19  is a defense strike.  Theresa Shea, number 9, is a defense

20  strike.  Abbie Morrison, number 10, is a defense strike.

21  Margaret Doyle, number 11, is a defense strike.  Christine

22  Seisser, number 12, is struck for cause.  Edith Jerele, juror

23  number 13, is 4.  Roger Vilmur is a defense strike.

24         THE CLERK:  Okay.  So that was seven peremptories used

25  by the defendant.  Two by the government.

1           LAW CLERK:  Yes.

2           MR. HOTALING:  Judge, just curious, are you going to

3    inform those members of the jury they are now members of the jury

4    or put them someplace else?

5           THE COURT:  You mean with the others?

6           MR. HOTALING:  I mean there are two ways to do it.

7           THE COURT:  So I will fill up --

8           MR. HOTALING:  You can send the 14 back into the pews

9    and then announce the jury.

10          THE COURT:  Wait, I don't understand you.  What are you

11   talking about?

12          I'm going to tell these people there are only four left.

13          MR. HOTALING:  Great.  Thank you.

14      (Proceedings heard in open court:)

15          THE COURT:  Well, as I explained, the lawyers, they have

16   their rights to strike people.  So unfortunately, they have --

17   unfortunately they have exercised them with the result that only

18   four of you are left.  I'm very disappointed.

19          So I'm excusing everybody -- I have to, not my choice --

20   except Mr. Jones and Miss Smith and -- is it -- is it Mr. Fox or

21   Miss Fox?  Miss Fox?  And Miss Jerele, okay.

22          So Mr. Jones, Miss Smith, Miss Fox, Miss Jerele will

23   remain.  They will be part of the jury.  The others are excused.

24          And you should go down to the second floor jury room

25   because you may be given another case.  And I want to

1    emphasize -- sorry -- that you shouldn't feel that by being

2    excused from the jury you are being criticized or -- you know,

3    the lawyers make strategic judgments of some sort, and I'm not

4    allowed to second-guess them.  So that's it.

5           So what we will do, I'd like to have -- so all but four

6    of you will leave.  And we'd like ten from the gallery section to

7    move up into their places.

8           THE CLERK:  Judge, do you want 14 so we can go

9    through --

10          LAW CLERK:  Do you want 14 so we --

11          THE COURT:  Okay.  I'm sorry.  I have been corrected.

12   The four of you who will be in the jury, you should go into the

13   gallery section.

14          That way we can have 14 new people and it will expedite

15   the process.  The four of you are in the jury.  Don't leave, but

16   sit in the gallery portion, and a new 14 will come and sit in the

17   section.

18          So thank you very much.  Sorry to take your time.

19          THE CLERK:  Andrea Chiappelli, C-h-i-a-p-p-e-l-l-i.

20          Susan Fleita, F-l-e-i-t-a.

21          Devon Stokes, S-t-o-k-es.

22          Jeffrey Mauro, M-a-u-r-o.

23          Kevin Adams, A-d-a-m-s.

24          Dominique Sawko, S-a-w-k-o.

25          Michael Lara, L-a-r-a.

71

1          Jeffery Gibbons, G-i-b-b-o-n-s.

2          Kevin Ilagan, I-l-a-g-a-n.

3          Jane Fetty, F-e-t-t-y.

4          Catherine Jegley Chiappa, J-e-g-l-e-y C-h-i-a-p-p-a.

5          Tracy Shoopman, S-h-o-o-p-m-a-n.

6          Mark Bisaillon, B-i-s-a-i-l-l-o-n.

7          Constantine Critikos, C-r-i-t-i-k-o-s.

8          THE COURT:  Okay.  Well, welcome.  And you heard the

9   previous questions so we can probably move a little faster, if I

10  can find everything.

11         Okay.  So Mr. Chiappelli?

12         THE DEFENDANT:  Yes.

13         THE COURT:  Mr. Chiappelli, where are you from?

14         PROSPECTIVE JUROR:  I live in Batavia.

15         THE COURT:  Live in Batavia.

16         And your occupation, that of the spouse, or adult

17  children?

18         PROSPECTIVE JUROR:  I'm a regional manager engineer for

19  a company, and my wife is a chef.

20         THE COURT:  And your educational background?

21         PROSPECTIVE JUROR:  I have an associate technical degree

22  from Italy.

23         THE COURT:  Um-hum.  Okay.  Thank you.

24         And have you ever been a party to -- have you or anyone

25  close to you, like a spouse or child, have you ever been a party

72

1    to a lawsuit?

2          PROSPECTIVE JUROR:  Yes.

3          THE COURT:  Could you tell us about it?

4          PROSPECTIVE JUROR:  Me and my wife used to have a

5    restaurant, and in the construction of the restaurant we had to

6    take a construction company to court.  It was a --

7          THE COURT:  I'm sorry.  What was the outcome of the

8    lawsuit?

9          PROSPECTIVE JUROR:  We won.

10          THE COURT:  You won.  Okay.

11          And have you ever been arrested or prosecuted for any

12    offense?

13          PROSPECTIVE JUROR:  No.

14          THE COURT:  No.  And have you ever had experience with

15    police, prosecutors, criminal defendants, that would make it

16    difficult for you to be impartial?

17          PROSPECTIVE JUROR:  No.

18          THE COURT:  Okay.  Thank you very much.

19          Miss Fleita?

20          PROSPECTIVE JUROR:  Fleita.

21          I'm from Niles.  I'm a stay-at-home mom and volunteer.

22    My husband is a baseball scout and I have a BS/BA.

23          THE COURT:  Thank you very much.  And have you ever been

24    a party to a lawsuit?

25          PROSPECTIVE JUROR:  Class action.

1      THE COURT:  Class action.  Okay.  You were part of a
2  class, right?

3      PROSPECTIVE JUROR:  Yes.

4      THE COURT:  Have you ever been arrested or prosecuted?

5      PROSPECTIVE JUROR:  When I was in school, college, I was
6  ticketed for minor possession of alcohol.  Paid a fine.

7      THE COURT:  Okay.  And have you had any experience with
8  police, prosecutors, et cetera, criminal defenders that --

9      PROSPECTIVE JUROR:  No.

10     THE COURT:  -- that would make it difficult -- thank you
11  very much.

12     Mr. Stokes?

13     PROSPECTIVE JUROR:  Yes.

14     THE COURT:  Yes.  And where do you live?

15     PROSPECTIVE JUROR:  Mount Prospect.

16     THE COURT:  And what is your occupation, that of the
17  spouse, or adult children?

18     PROSPECTIVE JUROR:  Ground service for an airline.  I'm
19  not married.

20     THE COURT:  Okay.  And what is your educational
21  background?

22     PROSPECTIVE JUROR:  High school.

23     THE COURT:  High school.  Have you ever been a party to
24  a lawsuit?

25     PROSPECTIVE JUROR:  No.

1    THE COURT:  Have your been arrested or prosecuted or --

2    PROSPECTIVE JUROR:  Arrested, not prosecuted.

3    THE COURT:  Do you want to tell us about the arrest?  Do

4 you want to do it privately?

5    PROSPECTIVE JUROR:  I will do it privately.

6    THE COURT:  Okay.  Because I do have to ask you about

7 that.

8    And have you had any experience with police,

9 prosecutors, criminal defendants that would make it difficult for

10 you to be impartial?

11    PROSPECTIVE JUROR:  No.

12    THE COURT:  Okay.  Thank you.

13    And next is Mr. Mauro.  And where do you live?

14    PROSPECTIVE JUROR:  I live in Chicago.  West Lakeview.

15    THE COURT:  And what is your occupation?

16    PROSPECTIVE JUROR:  My occupation is a chef partner of

17 an independent restaurant.

18    THE COURT:  And?

19    PROSPECTIVE JUROR:  My wife is in property management.

20    THE COURT:  Property management.

21    And your educational background?

22    PROSPECTIVE JUROR:  Associate's.

23    THE COURT:  Pardon?

24    PROSPECTIVE JUROR:  Associate's.

25    THE COURT:  Associate degree.  Okay, great.

75

1          Have you or anyone close to you ever been a party to a
2   lawsuit?

3          PROSPECTIVE JUROR:  My restaurant has had a couple small
4   lawsuits.

5          THE COURT:  Suits against the restaurant?

6          PROSPECTIVE JUROR:  Civil.

7          THE COURT:  What were the outcome?

8          PROSPECTIVE JUROR:  They were both settled out of court.

9          THE COURT:  They were settled and have you ever been
10  arrested or prosecuted for anything?

11         PROSPECTIVE JUROR:  No, sir.

12         THE COURT:  And have you had any experience with police
13  or the criminal justice system or criminal defendants that would
14  make it difficult for you to be impartial?

15         PROSPECTIVE JUROR:  No, sir.

16         THE COURT:  Okay.  Thank you very much.

17         Mr. Adams?

18         PROSPECTIVE JUROR:  Yes.

19         THE COURT:  Okay.  And you live where?

20         PROSPECTIVE JUROR:  I live in Aurora.

21         THE COURT:  Okay.  And what is your occupation, that of
22  the spouse?

23         PROSPECTIVE JUROR:  I'm an accountant.  I'm single.

24         THE COURT:  An accountant.

25         And your educational background?

1          PROSPECTIVE JUROR:  I have a bachelor's in accounting.

2          THE COURT:  And have you ever been a party to a lawsuit?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Or someone you know involved?

5          Or have you or someone close to you been arrested or

6     prosecuted?

7          PROSPECTIVE JUROR:  No.

8          THE COURT:  Or have you had any experience with police,

9     prosecutors, criminal defendants who would make it difficult for

10    you to be impartial?

11         PROSPECTIVE JUROR:  No.

12         THE COURT:  Okay.  Thank you very much.

13         THE COURT:  Miss Sawko?

14         PROSPECTIVE JUROR:  Sawko.  Sawko.  You pronounce it as

15    V.

16         THE COURT:  Oh, you pronounce it as a V.

17         What nationality is that.

18         PROSPECTIVE JUROR:  It's Polish.

19         THE COURT:  Polish, okay, great.

20         Okay.  Miss Sawko, and you live?

21         PROSPECTIVE JUROR:  I live in Arlington Heights.

22         THE COURT:  And your occupation?

23         PROSPECTIVE JUROR:  I'm an attorney.

24         THE COURT:  What kind of practice do you have?

25         PROSPECTIVE JUROR:  I work in-house for a financial

1  corporation.

2          THE COURT:  And so your educational background?

3          PROSPECTIVE JUROR:  I have a J.D.

4          THE COURT:  And have you ever been a party to a lawsuit?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Have you ever been arrested or prosecuted?

7          PROSPECTIVE JUROR:  I have not.

8          THE COURT:  And have you had any experience with police,

9  prosecutors, et cetera, that would --

10          PROSPECTIVE JUROR:  I have not.

11          THE COURT:  No.  Okay.  Thank you very much.

12          So Mr. Lara?

13          PROSPECTIVE JUROR:  Yes.

14          THE COURT:  You live where?

15          PROSPECTIVE JUROR:  Burbank.

16          THE COURT:  Burbank.  Okay.

17          And do you have an occupation?  I noticed were you a

18  student.

19          PROSPECTIVE JUROR:  I am a student.

20          THE COURT:  Where are you a student?

21          PROSPECTIVE JUROR:  Charleston at Eastern Illinois

22  University.

23          THE COURT:  I see.  At a university.  You are, however,

24  a student.

25          And so your educational background is not complete yet?

```
 1              PROSPECTIVE JUROR:  Not yet.  It will be in May.
 2              THE COURT:  That's fine.  So have you ever been a party
 3   to a lawsuit?
 4              PROSPECTIVE JUROR:  I have not.
 5              THE COURT:  And have you ever been arrested or
 6   prosecuted?
 7              PROSPECTIVE JUROR:  I have not.
 8              THE COURT:  No.  And have you ever had a bad experience
 9   with police, prosecutors, criminal defendants that would make it
10   difficult for you to be impartial?
11              PROSPECTIVE JUROR:  No.
12              THE COURT:  Okay.  Thank you very much.
13              Mr. Gibbons?
14              PROSPECTIVE JUROR:  Yes.
15              THE COURT:  You live --
16              PROSPECTIVE JUROR:  Yes.
17              THE COURT:  Where do you live?
18              PROSPECTIVE JUROR:  River North.  In Chicago.
19              THE COURT:  Chicago.  And what is your occupation or
20   that of the spouse or --
21              PROSPECTIVE JUROR:  Both my spouse and I are management
22   consultants.
23              THE COURT:  And you have educational background?
24              PROSPECTIVE JUROR:  Master's in business administration.
25              THE COURT:  And have you ever been party to a lawsuit?
```

1          PROSPECTIVE JUROR:  Yes, sir.

2          THE COURT:  Pardon?

3          PROSPECTIVE JUROR:  No.

4          THE COURT:  Have you ever been arrested or prosecuted?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  And have you ever had any experience with

7   police or prosecutors or criminal defendants that the would make

8   it difficult for you to be impartial?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  Okay.  Thank you very much.

11         Mr. Ilagan, is that how you pronounce it?

12         PROSPECTIVE JUROR:  Ilagan.

13         THE COURT:  Ilagan?

14         PROSPECTIVE JUROR:  Ilagan.

15         THE COURT:  Okay.  Mr. Ilagan.

16         And you're -- and you live where?

17         PROSPECTIVE JUROR:  I live in Homer Glen.

18         THE COURT:  And what is your occupation and that of a

19  spouse?

20         PROSPECTIVE JUROR:  I am a writer and editor for an

21  outdoors magazine, and I have no spouse.

22         THE COURT:  Okay.  Have you ever been a party to a

23  lawsuit?

24         PROSPECTIVE JUROR:  No, sir.

25         THE COURT:  Have you ever been arrested or prosecuted?

1          PROSPECTIVE JUROR:  No, sir.

2          THE COURT:  And have you ever had any experience with

3 police or other parts of criminal justice system or criminal

4 defendants that would make it difficult for you to be impartial

5 in this case?

6          PROSPECTIVE JUROR:  No, sir.

7          THE COURT:  Okay.  Thank you very much.

8          Miss Fetty?

9          PROSPECTIVE JUROR:  Yes.

10          THE COURT:  Where do you live?

11          PROSPECTIVE JUROR:  I live in Darien.

12          THE COURT:  All right.  And what is your occupation?

13          PROSPECTIVE JUROR:  I'm a middle school science teacher.

14          THE COURT:  You are a science teacher?

15          PROSPECTIVE JUROR:  And my spouse is a science teacher

16 as well.

17          THE COURT:  And spouse or adult children or --

18          PROSPECTIVE JUROR:  My spouse is a science teacher as

19 well.

20          THE COURT:  Science teacher, okay.  Both science

21 teachers.

22          And your educational background?

23          PROSPECTIVE JUROR:  Master's.

24          THE COURT:  Master's degree.  Okay.

25          And have you ever been a party to a lawsuit?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  No.  And have you ever been arrested or

3   charged for any offense?

4          PROSPECTIVE JUROR:  No.

5          THE COURT:  Prosecuted?

6          And have you had any experience with police,

7   prosecutors, criminal defendants that would make it difficult for

8   you to be impartial in this case?

9          PROSPECTIVE JUROR:  No.

10         THE COURT:  Okay.  Thank you very much.

11         Miss -- I may have trouble pronouncing?

12         PROSPECTIVE JUROR:  Chiappa.

13         THE COURT:  Miss Chiappa?

14         PROSPECTIVE JUROR:  Yes.

15         THE COURT:  So Miss Chiappa, where do you live?

16         PROSPECTIVE JUROR:  Wrigleyville.

17         THE COURT:  And what is your occupation or that of a

18  spouse or -- I don't think you have adult children.

19         PROSPECTIVE JUROR:  No.  I work at a visa and passport

20  processing company and I'm an owner.

21         THE COURT:  Have you ever been a party to a lawsuit?

22         PROSPECTIVE JUROR:  No.

23         THE COURT:  Have you ever been arrested or prosecuted?

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  And have you ever had any experience with

1  police, prosecutors, criminal defendants that would make it

2  difficult for you to be impartial?

3             PROSPECTIVE JUROR:  No.

4             THE COURT:  Okay.  Thank you very much.

5             Miss Shoopman?

6             PROSPECTIVE JUROR:  Yes.

7             THE COURT:  Where do you have?

8             PROSPECTIVE JUROR:  I live in Marseilles.

9             THE COURT:  Okay.  And your occupation or that of a

10  spouse?

11             PROSPECTIVE JUROR:  I am a retail manager.  My husband

12  is a truck driver.  I have two grown daughters.  One is in

13  banking and one is in the medical field.

14             THE COURT:  Okay.  Great.  Great.

15             What is your educational background?

16             PROSPECTIVE JUROR:  Just high school.

17             THE COURT:  And have you ever been a party to a lawsuit,

18  you or someone close to you?

19             PROSPECTIVE JUROR:  My husband had a workmen's comp

20  lawsuit about ten years ago.

21             THE COURT:  How did that come out?

22             PROSPECTIVE JUROR:  It settled before it went to trial.

23             THE COURT:  It settled.

24             And have you ever been arrested or prosecuted for

25  anything?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  And have you had any experience with police

3   or prosecutors, criminal defense that would make it difficult for

4   you to be impartial in this case?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  No.  Thank you very much.

7          Mr. Bisaillon, am I pronouncing that right?

8          PROSPECTIVE JUROR:  You are the first one to have ever

9   pronounced it right.  Yes.  Thank you.

10          I'm from Palatine.

11          THE COURT:  Okay.  So where do you live?

12          PROSPECTIVE JUROR:  Palatine.

13          THE COURT:  And what is your occupation, that of a

14   spouse if you have a spouse?

15          PROSPECTIVE JUROR:  Not married.  And I'm an independent

16   consultant for marketing and IT.

17          THE COURT:  What is your educational background?

18          PROSPECTIVE JUROR:  Bachelor's.

19          THE COURT:  Good.  Okay.

20          And have you ever been a party to a lawsuit?

21          PROSPECTIVE JUROR:  No.

22          THE COURT:  And have you ever been prosecuted or

23   arrested?

24          PROSPECTIVE JUROR:  No.

25          THE COURT:  And do you have -- have you had any

1    experience with police, prosecutors, et cetera, that would make

2    it difficult for you to be impartial?

3         PROSPECTIVE JUROR:  Police harassment a little bit.

4    20-some years ago.

5         THE COURT:  And how does it affect your current view of

6    prosecution and so on?

7         PROSPECTIVE JUROR:  Not so much prosecution.  More the

8    actual on the streets cops.

9         THE COURT:  On the street.  Okay.  Great.  And well

10   thank you very much.

11        And next and I believe last, Mr. Critikos, am I

12   pronouncing that correctly?

13        PROSPECTIVE JUROR:  Yes.

14        THE COURT:  And you live where?

15        PROSPECTIVE JUROR:  Prospect Heights.

16        THE COURT:  Okay.  And what is your occupation?

17        PROSPECTIVE JUROR:  Fixed-income analyst.

18        THE COURT:  I'm sorry?

19        PROSPECTIVE JUROR:  I'm an analyst.

20        THE COURT:  And what is your educational background?

21        PROSPECTIVE JUROR:  Master's.

22        THE COURT:  So have you or anyone else close to you ever

23   been a party to a lawsuit?

24        PROSPECTIVE JUROR:  Not that I'm aware.

25        THE COURT:  Have you been arrested or prosecuted ever?

1          PROSPECTIVE JUROR:  No.

2          THE COURT:  No.  Have you had any experience with

3  police, prosecutors, criminal defense, et cetera, that would make

4  it difficult for you to be impartial in this case?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Okay.  Well, thank you very much.

7          So now I'm going to ask the general questions.  You can

8  just raise your hand.

9          Again, if it's embarrassing or something and you'd

10  rather discuss it with me in private, you just say "sidebar," we

11  will make a note of it and call you over later.

12          Okay.  So I'll read you again -- I'll read the list of

13  the potential government witnesses and just ask you to raise your

14  hand if you know any of these people or think you know them.

15          I mean, you might know someone with the same name and

16  wasn't a witness but -- okay.

17          Kristy Morgan.

18          Denise Shanks.

19          Patrick Green.

20          Greg Howard.

21          Darren Bodner.

22          Paul Ponzo.

23          Amelia Baker.

24          David Shilney.

25          Kerri McGee.

1          Cary, C-a-r-y, Shaffer.

2          Sharon, can't pronounce her name -- it's G-A-R-B-A-C-Z.

3          And Marjorie Huntoon, something like -- Huntoon.

4          So I guess not.  Okay.

5          Other questions:  Have you or someone you know -- know

6  well, I mean, not just a casual acquaintance, you know, like

7  family or best friend or something, worked in law enforcement as

8  a police officer, prosecutor?

9          Okay.  Could you explain the nature of your -- what you

10 know about this person or what the law enforcement was?

11         PROSPECTIVE JUROR:  Yes.  My name is Susan Fleita.

12         My sister is a prosecutor, and I have several family

13 members who are police officers.

14         THE COURT:  I'm sorry.  I didn't hear you.

15         PROSPECTIVE JUROR:  My sister is a prosecutor, and I

16 have several family members who are police officers in Oak Lawn.

17         THE COURT:  Okay.  And what about our speaker, our

18 microphone?

19         I think maybe you should repeat it for the microphone.

20 Yeah.

21         PROSPECTIVE JUROR:  My name Susan Fleita.  And my sister

22 is a prosecutor, and like I said I have several family members

23 who are police officers in Omaha.

24         THE COURT:  In Omaha.  Thank you.

25         And there are others of you who have law enforcement

1  contacts.  Yes?

2          PROSPECTIVE JUROR:  My name is Jeffrey Mauro.

3          My father is a retired Chicago police officer.  My uncle

4  is a retired Cook County Sheriff's Department.  And my aunt is

5  retired from the FBI.  And my grandmother is retired from the

6  FBI.

7          THE COURT:  Okay.  That's great.

8          PROSPECTIVE JUROR:  My best friend is a prosecutor,

9  state level.  My name is Dominique Sawko.

10         PROSPECTIVE JUROR:  My name is Catherine Chiappa.  My

11  friend is a Chicago police officer.

12         PROSPECTIVE JUROR:  Constantine Critikos.

13         My friend is a cop and several family members are

14  attorneys.

15         THE COURT:  Okay.  Great.

16         Are any of you law students by any chance?  No.

17         Okay.  So now I think you've probably answered this, but

18  maybe not.

19         Have you or any -- if you've answered it you don't have

20  to repeat yourself.  But have you or someone you know -- know

21  well worked as a prosecutor or criminal defense attorney?  Okay.

22         Have any of you served on a jury before?  Yes?

23         Could you tell us what was the name -- what was the

24  case, nature of case?

25         PROSPECTIVE JUROR:  Kevin Adams.  The case was a DUI.

1          THE COURT:  Was there a verdict?

2          PROSPECTIVE JUROR:  The plaintiff was found not guilty.

3          THE COURT:  Not guilty.

4          And were you the foreperson?

5          PROSPECTIVE JUROR:  No.

6          THE COURT:  Okay.  Thank you very much.

7          Now, next question, as you know the case involves the

8    Internal Revenue Service.  And have you or someone you know,

9    close to you, had any experiences with the IRS that might make it

10   difficult for you to be impartial in deciding this case?

11         No.

12         Do any of you belong to any groups or organizations that

13   advocate non-payment of taxes?

14         Or do any of you believe it's unlawful or otherwise

15   illegitimate for the federal government to collect income taxes?

16         Do you any of you have views about the federal

17   government that might make it difficult for you to be impartial

18   in deciding this case?

19         Do any of you hold any religious, philosophical, moral

20   or other beliefs that would make it difficult for you to sit in

21   judgment on another person?

22         And finally, I will, as I mentioned to the first group,

23   I will be telling you what law to apply to the case.  And

24   would any -- will -- will any of you have feel you might not be

25   able to accept the law as I told you it was?

1      And, finally, are there any other reasons why you might

2   be unable to be impartial in deciding this case?

3      Okay.  Well, then we will have our little cluster, and

4   be very brief, and then we will be ready for a break I think.

5      (Proceedings heard at sidebar:)

6      THE COURT:  Mr. Stokes, could you come over.

7      (Prospective Juror Stokes joins sidebar.)

8      THE COURT:  So Mr. Stokes, you know, I have to ask you

9   this question, but this is in private, it's not going to go

10  anywhere.

11     So you had mentioned you had been arrested?

12     PROSPECTIVE JUROR:  It was a domestic assault.  Charges

13  were dropped.

14     THE COURT:  The charges were dropped.

15     Did you -- do you feel that would affect how you would

16  make a judgment?

17     PROSPECTIVE JUROR:  No, I don't think so.  No.

18     THE COURT:  No.  Okay.  Okay.  Thank you very much.

19     (Prospective Juror Stokes exits sidebar.)

20     THE COURT:  Okay.  I didn't myself sense, did you,

21  any --

22     LAW CLERK:  Possibly Mark Basaillon, I don't know if you

23  had wanted to get a view of police harassment?

24     THE COURT:  Right.  That's marginal.

25     MR. HOTALING:  I'm sorry.  I missed that.

 1          THE COURT:  The one who said he was concerned about
 2  police harassment, not about prosecution.
 3          That's sort of -- I don't know.
 4          MR. HOTALING:  We are okay with that.
 5          THE COURT:  Anyway, let me ask you.  Do you want to go
 6  and confer again?
 7          MS. MALIZIA:  Yes, your Honor.
 8          MR. HOTALING:  And just to make sure.  From the
 9  government we have no requests -- we have no requests for cause
10  strikes.
11          I don't know if Mr. El Bey -- do you have any requests
12  for cause?
13          THE DEFENDANT:  I do have three.
14          MR. HOTALING:  For cause?
15          THE DEFENDANT:  No, not for cause.
16          THE COURT:  You will make your list and the government
17  will.
18          MR. HOTALING:  Thank you, Judge.
19      (Proceedings heard in open court:)
20          THE COURT:  Okay.  The parties are making their list of
21  jurors they would like excused, and they will just be a couple of
22  minutes.
23      (Pause.)
24          THE COURT:  Okay.
25          MR. HOTALING:  We are just writing them down but we will

1  be there in ten seconds.

2      (Proceedings heard at sidebar:)

3          THE COURT:  You don't want to strike any?

4          THE DEFENDANT:  I'm not consenting to any jury

5  selection.  I'm not going to consent to any jury selection.

6          MR. HOTALING:  I don't know what that means.

7          THE DEFENDANT:  I am not consenting.

8          THE COURT:  You can't do that.

9          MR. HOTALING:  No.

10         THE COURT:  So you're not striking anybody.  That's

11  fine.

12         THE DEFENDANT:  I'm not consenting to any of it.

13         THE COURT:  I understand.

14         And you're striking Stokes and Lara.

15         MR. HOTALING:  That's correct.

16         THE COURT:  Okay.

17         MR. HOTALING:  That is juror number 17, is a government

18  strike.  And number 21 is a government strike, Michael Lara.

19         LAW CLERK:  Then we have --

20         THE COURT:  You have 17 too, right?

21         MR. HOTALING:  I'm sorry, sir?

22         THE COURT:  17 also.  Both government strikes.

23         MR. HOTALING:  Absolutely.  Yes.  That's correct, Judge.

24  Thank you.

25         THE COURT:  We will end with too many.

1           We have got to pick alternates.  They each get one more

2   strike for alternates.

3           MR. HOTALING:  Do you want to come up?

4           THE DEFENDANT:  I may.

5           THE COURT:  What are you writing down?

6           LAW CLERK:  The names of the jurors.

7           MR. HOTALING:  With this panel with no strikes we should

8   have a jury.

9           THE COURT:  I have got four from the first and 16.

10          LAW CLERK:  It will just be the first 14 names on the

11  list.

12          THE COURT:  The trial of Socrates, there were 500

13  jurors.

14          MR. HOTALING:  I didn't know that.

15          THE COURT:  Oh, yeah.

16          MR. HOTALING:  You learn something new every day.

17          THE COURT:  It was capital.  Those were the good ole

18  days.  No deliberations, obviously.  Couldn't with 500.

19          MR. HOTALING:  How did they decide?

20          THE COURT:  They had a white marble and a black marble.

21  There were no --

22          THE DEFENDANT:  Judge, I just want to make sure that

23  it's on the record that I'm not consenting to any jury selection.

24          THE COURT:  That's fine.  It's on the record.  Okay.

25          LAW CLERK:  Okay.  Let me just get on the record, so we

93

1    have Andrea Chiappelli is juror number 5, Susan Fleita is juror

2    number 6, Devon Stokes is a government strike, then Jeffrey Mauro

3    is juror number 7, Kevin Adams is juror number 8, Dominique Sawko

4    is juror number 9, then Michael Lara is a government strike, then

5    Jeffrey Gibbons is juror number 10, Kevin Ilagan is juror number

6    11, Jane Fetty is juror number 12, and then Catherine Chiappa is

7    alternate number 1 and Tracy Shoopman is alternate number 2.  And

8    we have a jury.

9            THE COURT:  So I'll read them.

10            LAW CLERK:  Yes.  So you can read the list starting with

11    Chiappelli.

12      (Proceedings heard in open court:)

13            THE COURT:  Okay.  So we will now have a jury.  And I

14    will read the names.

15            And as you know, we take 12 jurors, and two alternate

16    jurors.

17            I have four jurors from the first panel of 14, and that

18    means I have taken eight -- well, ten actually, eight regular and

19    two alternates from this panel.

20            So most of you will be the jurors in this case.

21            So from the first panel:  Mr. Jones, Miss Smith, Miss

22    Fox, Miss Jerele.

23            From this panel:  Miss Chiappelli, Miss Fleita, Mr.

24    Mauro, Mr. Adams, Miss Sawko, Mr. Gibbons, Mr. Ilagan and Miss

25    Fetty.

1          And the two alternates, also from this panel, are Miss
2   Chiappa -- and is it Miss Shoopman?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  Miss Shoopman.  You are the alternates.

5          And just to say a word about the alternates, the
6   alternates will sit with the jury and will listen carefully as
7   the jurors do.

8          But if there are no drop-outs from the first 12, then
9   the alternates will be excused at the end of the case.  But if
10  one or two dropped out then they will be replaced.

11         So I think what we are going to do is break for lunch.
12  And we will -- I want to give you the full 45 minutes.

13         So why don't we reconvene at 12:35.

14         Now, I have to tell you, at the end of the trial of
15  course you will be deliberating, you will get together in private
16  and decide on a verdict.  But until then you must not discuss the
17  case with anybody, including the jurors.

18         So the idea is you don't want to make a premature
19  judgment, you want to listen to all the evidence, the lawyers'
20  arguments, and at the end then you discuss it with the other
21  jurors.  So that's one thing.

22         There are a couple of other things I have to mention to
23  you.

24         Now, of course, it's very common nowadays for people to
25  do research on the Web.  I do it.  Everybody does on it.  Okay?

1          But we don't permit you to do research about the case.
2   All right?  So you can't look up the lawyers, the defendant --
3   you can look me up, don't talk about the case online.
4          But you're not to look for news reporting, anything
5   about this case.
6          Now, the reason for this is -- and there are good
7   reasons for it -- I don't want to do anything that doesn't have a
8   reason, but there are good reasons.
9          The first is that Google, Wikipedia, the rest of the
10  Web, it's a great resource, but it's not vetted, right?  It's not
11  scrutinized for accuracy.
12         So Google will give you access, believe or not, to 250
13  million websites with a total of 15 billion pages.
14         Now, there is a lot of great stuff there but there's
15  also a lot that's inaccurate, and there is no screening, and so
16  you can be mislead if you do Google research.
17         That's the first thing.
18         The second thing is suppose you found something on the
19  Web that was really relevant, interesting, looked truthful, and
20  so forth.  The problem is that if you -- if you then, if you use
21  that in your thinking about the case in your deliberations, the
22  lawyers and Mr. El Bey, representing himself, they wouldn't have
23  had a chance to see what you're relying on.
24         And, you know, they might have very effective responses,
25  but they wouldn't know because you wouldn't be communicating with

1  them.

2          So it's very, very important to avoid doing any of your

3  own research.

4          Now, if you have a question, if you feel there is

5  something you really need to know about in the case and you're

6  not getting it from the lawyers or from me, or what have you,

7  then, you know, write a note and send it to me and, you know,

8  I'll be happy to address it.

9          But should you run into the defendant or into the

10  government's lawyers in the lobby or the lunchroom, or what have

11  you, you're not supposed to talk to them at all.  And, in fact,

12  you're not supposed to discuss the case with anyone until it's

13  all over:  family, friends, people you -- your Facebook friends,

14  people you Tweet with.  All these people.

15          By the end you will be comfortable with the case, and

16  you will have heard all the evidence, all the arguments, the

17  instructions about the law, and then you will deliberate among

18  yourselves.

19          Now, have they all gotten notepads so they can take

20  notes?

21          THE CLERK:  They will, Judge, when they come back from

22  lunch.

23          THE COURT:  Okay.  So when you come back from lunch

24  you'll have notepads.  You can take notes.

25          And the -- and then the trial will start, we have the

1  jury, and you will hear opening arguments.  And then there will

2  be the evidence, the witnesses, and so on.

3         And I will take frequent breaks, so you don't get too

4  bored.  And we are going to end early today, we will end at 3:00.

5  And tomorrow I am unfortunately tied up in the morning, so

6  tomorrow we will start at 2:00 and go to 5:00.

7         And then the rest of the week, depending on the trial,

8  we will have a more normal schedule.  The trial should not take

9  very long, but we figure out -- I can't set a deadline.

10        Now, one thing to think about as the trial begins, you

11  are likely to hear objections made by the lawyers or by Mr. El

12  Bey as his own lawyer.

13        And I have to decide whether to sustain an objection or

14  overrule the objection.  But it's important for you to understand

15  that the objections are not evidence.  The lawyer gets up and

16  says:  Oh, I object.  That's a lot of baloney, or something.  And

17  they don't talk like that.

18        But if there are objections, somehow, and there is also

19  an assertion and not just an appeal to the rules of evidence,

20  then don't think that's evidence.

21        The only evidence would be what the witnesses say under

22  oath, documents that are given to you that have been admitted,

23  and the lawyers or Mr. El Bey, in opening and closing arguments,

24  they will make arguments, they may tell you about evidence that

25  they think you should believe, but lawyers' arguments and Mr. El

1    Bey's arguments, unless he is testifying under oath, are not

2    evidence.

3            And there may be an occasional sidebar, as we had during

4    selection.

5            Okay.  So, now, is this the right time to give the jury

6    oath?

7            THE CLERK:  Yes, Judge.  If we could ask the four to

8    take the box.

9            THE COURT:  Okay.  So the last thing, and then we will

10   break for lunch -- sorry, the last thing before we break for

11   lunch, we'd like the -- let's see.

12           Okay.  Yes, so we want to have the final jury, the four

13   people from the first round in the box to take another oath which

14   is necessary.  So the clerk will read the names and people should

15   be in the box.

16           THE CLERK:  Okay.  The following jurors have been

17   selected to be part of the jury, and please come and sit in the

18   jury box.

19           Steven Jones.  Treon Smith.  Shannon Fox.  Edith Jerele.

20   Andrea Chiappelli.  Susan Fleita.  Jeffrey Mauro.  Kevin Adams.

21   Dominique Sawko.  Jeffrey Gibbons.  Kevin Ilagan.  Jane Fetty.

22   Catherine Chiappa.  And Tracy Shoopman.

23           Okay.  Would each of you stand and raise your right

24   hand.

25       (14 jurors sworn.)

1          THE COURT:  Okay.  Well, thank you very much.  And we

2   will now break -- we will break for lunch and we will reassemble

3   at 12:45.  And thank you very much for taking this time.

4          MS. MALIZIA:  Your Honor, your Honor.  Excuse me.

5          Before we let the jury go could we have a sidebar

6   briefly on just a procedural issue?  Shouldn't take more than ten

7   seconds.

8          THE COURT:  Okay.  Sorry.

9      (Proceedings heard at sidebar:)

10          THE COURT:  Yes.

11          MS. MALIZIA:  So in order to keep the parties from the

12   jury, if you could advise them to use the north elevators and the

13   parties to use the south elevators.

14          LAW CLERK:  We are going to flip them.  The parties will

15   use the north elevators and we will ask the jurors to use the

16   south.

17      (Proceedings heard in open court:)

18          LAW CLERK:  Do you want to tell them about the elevators

19   before we go.

20          THE MARSHAL:  Which elevator do you want the jurors to

21   use, Judge?

22          THE COURT:  The south.

23      (At 11:58 a.m. jury out.)

24          THE COURT:  Now, with regard to those of you who have

25   not been selected for the jury, you should go back to the second

1  floor jury room for possible further assignment.

2       So thank you very much.  We appreciate the time you have

3  given us.

4     (Prospective jurors out.)

5          THE COURT:  Okay.  Great.

6          MS. MALIZIA:  Your Honor, I know we had --

7          THE COURT:  Mr. El Bey, the government lawyers want to

8  say something.

9          MS. MALIZIA:  I know your Honor discussed going until

10 3:00 today.  I don't think our opening statement is going to take

11 longer than 15 to 20 minutes.

12      So we could be prepared to put on evidence this

13 afternoon, or you could release the jurors early.  If you could

14 let us know one way or another your preference.

15         THE COURT:  Well, if we start at 12:45 then I have two

16 and a quarter hours.

17         MS. MALIZIA:  Yes, your Honor.

18         THE COURT:  And so, yes, I would like you to present

19 evidence, yes.

20         MS. MALIZIA:  Great.

21         MR. HOTALING:  Thank you, Judge.

22     (Proceedings recessed from 12:00 p.m. to 12:45 p.m.)

23

24

25

101

1                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3    UNITED STATES OF AMERICA,        )
                                      )
4                   Plaintiff,        )
                                      )   No. 14 CR 447
5              vs.                    )   Chicago, Illinois
                                      )   March 2, 2015
6    HAKEEM EL BEY,                   )   1:00 p.m.
                                      )
7                   Defendant.        )

8
                                 VOLUME 1
9                       TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE RICHARD A. POSNER
10                          AND A JURY

11   For the Plaintiff:          U.S. ATTORNEY'S OFFICE
                                 219 South Dearborn Street
12                               Chicago, Illinois 60604
                                 BY:  MR. CHRISTOPHER HOTALING
13                                    MS. KATHRYN E. MALIZIA

14   The Defendant:             MR. HAKEEM EL BEY
                                 439 Hoxie Avenue
15                               Calumet City, Illinois 60409

16
     Defense Standby Counsel:    JENNER & BLOCK
17                               353 North Clark Street
                                 Chicago, Illinois 60654
18                               BY:  MR. GABRIEL A. FUENTES

19   Official Court Reporter:    MAELLEN E. PITTMAN, FCRR, RDR
                                 219 South Dearborn Street
20                               Room 2342
                                 Chicago, Illinois 60604
21                               (312) 435-5576

22

23

24

25

Malizia - opening                              102

1      (Proceedings heard in open court:)

2           THE COURT:  We seem to have beaten the jury.  Okay,

3      thanks.  I'm glad they didn't have to sit around waiting through

4      these delays.

5           So, Mr. El Bey, so you know, the government gets to make

6      an opening argument first, and if you want to make an opening

7      argument you may.  That comes second.

8           And then we will hear some evidence.

9           MR. HOTALING:  Judge, just so you are aware -- we will

10     deal with it later.

11     (At 1:00 p.m. jury in.)

12          THE COURT:  So welcome back.  I'm sorry I kept you

13     waiting some.  We are a little slow eating lunch.

14          Okay.  So we are going to begin with the opening

15     argument of the government.  And, Miss Malizia?

16          MS. MALIZIA:  Yes, your Honor.  We are ready to proceed.

17           OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

18          MS. MALIZIA:  This is a case about fraud.  Plain and

19     simple.  The defendant, Hakeem El Bey, lied to the IRS in six

20     separate tax returns.  In each of these returns the defendant

21     claimed falsely that he was owed a refund of $300,000, filled out

22     the returns, he signed them, he dated them, and he mailed them to

23     the IRS.  And for two of these returns, the defendant was

24     successful in obtaining that refund.

25          He received two checks from the IRS, each for $300,000.

1           The defendant was able to do this by creating an entity

2      called a trust.

3           As you will hear, a trust is just a term for an entity

4      that holds assets or moneys on behalf of the third party.  It's

5      called a beneficiary.  And the person who manages the trust is

6      called the fiduciary of the trustee.

7           In this case, the defendant created the trust with the

8      IRS in August of 2000.  And he called it the Hakeem El Bey Trust

9      and he appointed himself the trustee and fiduciary.

10          After he created the trust the defendant began filing

11     these six returns, and you'll hear from two agents from the IRS

12     in this case, two revenue agents from the IRS in this case.  They

13     have are going to explain to you that filing a trust return is a

14     lot like filing your own personal taxes; just like with your

15     personal tax return, you have to report to the IRS, how much your

16     trust made during the year.

17          You also have to report other items, such as how much in

18     fiduciary fees the trust paid out.  You have to report in

19     addition how much in taxes were withheld on behalf of the trust.

20          This is again similar to how your employer might

21     withhold taxes from your paycheck, and then at the end of the

22     year, if the amount of the taxes withheld by your employer exceed

23     the amount of taxes actually owed, you might be entitled to a

24     refund.

25          The same is true for a trust.  For example, if the bank

1  where the trust is held withholds more than the amount of tax

2  withheld, that trust might be entitled to a legitimate refund.

3         That's how the process is supposed to work.

4         But as you'll hear in this case, the defendant just made

5  up that information.  In all six of the returns filed by the

6  defendant, he lied about the amount of money the trust earned

7  during the year.

8         As you'll hear and as you'll see on the trust return the

9  defendant earned $900,000 in tax years 2006, '7, '8 and '9.  The

10 defendant didn't explain anywhere on those forms where that money

11 came from, nor did he attach anything to the schedules, documents

12 supporting the tax returns where that money came from, and as you

13 will see from the bank records from the trust entered into

14 approaching the $900,000 the defendant claimed the trust earned

15 each year.

16        In addition, the defendant claims he was paid exactly

17 $900,000 in fiduciary fees to manage the trust each year.

18        Now, if the defendant had actually earned this money he

19 would have been required to report it on his personal tax

20 returns.  But you'll see the defendant's personal tax returns in

21 this case, and you will see that he earned nothing like $900,000

22 in fiduciary fees from his trust.

23        In fact, as you'll hear, the defendant's primary source

24 of income for the past 30 years has been his salary as U.S.

25 postal worker.

1          The defendant also lied on these tax returns about when
2    the trust was founded.  He claims that it was founded in the year
3    of his birth in 1959.  But us you'll see, records from the IRS
4    show that the trust was actually founded in August of 2009.
5          The defendant also lied about the amount of tax withheld
6    in each of these returns.  In each return the defendant claimed
7    that $300,000 was withheld on behalf of the trust.
8          So you will see the IRS is actually required to do that,
9    they have to keep a record of all withholding type entities that
10   are individuals.  And you'll see that there is no record of any
11   withholding by the trust for any of the years the defendant filed
12   trust tax returns.
13         And finally, the evidence will show that there was no
14   basis anywhere at any time for the $300,000 in tax refunds the
15   defendant claimed in each of these tax returns.  The defendant's
16   scheme began in August of 2009 when he created that trust.  He
17   filed the first three returns on behalf of the trust all at once
18   in August, in August of 2009.
19         He mailed them altogether in the same envelope, and sent
20   them to the IRS.  When the IRS received these returns they
21   identified them as frivolous.  And a representative from the IRS
22   is going to be explaining to you that frivolous is just IRS-speak
23   for a term that's been identified as inaccurate, incorrect or
24   false.
25         The IRS gets these three returns, they flag them, and

1  then they send a letter -- they actually send three letters to

2  the defendant, one for each return -- notifying the defendant of

3  that he has two options:

4          He can either file corrected returns within 30 days or

5  he can pay a $5,000 penalty per return.

6          What does the defendant do?

7          Well, as you will hear, he stamps each of these letters

8  that he has received and he sends them back to the IRS without a

9  corrected return and without paying any portion of those

10 penalties.

11         And then within weeks of receiving these letters, he

12 sends a fourth year to the IRS containing the same position as

13 the previous three returns, that is, the same false information

14 about income, the same false action information about the trust

15 withholdings, and above all, the same false information about the

16 $300,000 refund owed to the trust.

17         But this time the defendant's return is not immediately

18 marked as frivolous.

19         The IRS receives millions of tax returns every year and

20 they rely on taxpayers to be honest in filing those returns.  And

21 because of the sheer volume of returns, sometimes a frivolous

22 return is slipped through, and that's what happened here.  The

23 defendant received the $300,000 refund check in exchange for that

24 fourth year.

25         And you will hear how he deposited that refund check in

1  a bank account in his trust name and then how he spent that money

2  on a house, cars, and various personal expenses.

3         And when that money ran out the defendant filed a fifth

4  return containing exactly the same false information as the

5  previous four, and once again that return slipped through

6  undetected and the defendant received a second $300,000 refund

7  check, this time in June of 2010, and again he went out and spent

8  that money on cars and various personal items.

9         The defendant tried this one last time in November

10 of 2010.  This time he was not so lucky.  The IRS rejected his

11 return and did not issue a refund check.

12        Next, you will hear how the defendant in December

13 of 2012 went voluntarily to the IRS's office in Schiller Park,

14 Illinois, where he was interviewed by two IRS criminal

15 investigators.

16        During this interview the defendant, when shown the six

17 returns that he had filed with the IRS, identified his signature

18 on them.  He also confirmed that in exchange for the two returns

19 he had filed in late 2009 and 2010, he had received two $300,000

20 refund checks and he had told the IRS investigators that yes, he

21 had deposited those checks into his bank account and spent the

22 money on a house, on cars, and on his family.

23        Finally, you will hear how the defendant -- that the

24 defendant admitted that he had never earned anything like the

25 $900,000 that he claimed he had earned as a fiduciary for the

1    trust.  And that -- and that he recognized the checks that the

2    agent showed him, he had personally used and written out to buy

3    the house and those cars.

4           In short, the evidence will show that the defendant

5    defrauded the IRS of $600,000 in tax refunds, and that he

6    attempted to obtain a total of $1.8 million, $300,000 per false

7    return by fraud.

8           As you heard earlier, I'm Assistant United States

9    Attorney Kathryn Malizia.  With me at counsel table is Assistant

10   Attorney Christopher Hotaling.  With us is Special Agent Darren

11   Bodner.  You will see him sitting in the gallery throughout this

12   trial.  You will be hearing his testimony later in this trial.

13          The government in this case bears the burden of proof.

14   That's proof beyond a reasonable doubt.  It's the same standard

15   that applies in every criminal courtroom in America.  The

16   evidence in this case will show over the next few days that the

17   defendant is guilty beyond a reasonable doubt of two types of

18   criminal offense:  mail fraud and making false claims to the IRS,

19   which is an agency of the Department of the Treasury.

20          First, the evidence will show that the defendant engaged

21   in a scheme to obtain $1.8 million in tax refunds and that he

22   successful obtained $600,000 in tax refunds by filing false tax

23   returns with the IRS and then obtaining two checks by mail in

24   return for a total of $600,000.

25          The evidence will also show that the defendant filled

1  out and mailed the six returns at issue to the IRS in an attempt

2  to obtain that $1.8 million in tax refunds.

3          I have talked a lot about what the evidence will show

4  and I'm going to spend the next couple of minutes about what that

5  evidence is going to consist of.

6          You will hear from two revenue agents with the IRS, and

7  I expect they are going to testify about how the IRS receives and

8  processes tax returns including, the defendant's own personal

9  returns, as well as the trust tax returns that are at issue in

10  this case.

11          They are also going to explain how trusts work, and how

12  the defendant was able to use trust returns to obtain tax refunds

13  that he was able to get in this case.

14          You will also hear from Special Agent Darren Bodner.  I

15  expect he is going to testify about the defendant's bank records

16  and how that $600,000 in tax refunds was spent by the defendant.

17  He will also summarize the defendant's scheme.

18          Finally, you will hear from Special Agent -- Special

19  Criminal Investigator Greg Howard.  He will testify about his

20  interview of the defendant at the IRS's office in Schiller Park.

21          And at the end of the presentation of all of this

22  evidence, I will have the opportunity to address you again.  And

23  at that time we will ask you, based on all of the testimony and

24  evidence you have heard, to return a verdict of guilty on all

25  counts.

1           Thank you.

2           THE COURT:  Was Mr. Hotaling going to say anything?

3           MS. MALIZIA:  No, your Honor.  The government is

4   entitled to just one opening.

5           THE COURT:  Excuse me?

6           MS. MALIZIA:  We have just one opening.

7           THE COURT:  Okay.  Thank you.

8           Mr. El Bey, would you like to make an opening statement?

9                OPENING STATEMENT BY THE DEFENDANT

10          THE DEFENDANT:  Good afternoon, ladies and gentlemen.

11          My name is Hakeem El Bey and I'm representing myself

12  because I don't -- I don't get involved with fiction, so I'm

13  going to make this statement short and to the point and then we

14  will proceed.

15          I do not consent to the jury selection as well as the

16  Court --

17          MS. MALIZIA:  Objection, your Honor.

18          THE DEFENDANT:  -- is fictitious.

19          THE COURT:  Excuse me?

20          MS. MALIZIA:  Objection.

21          THE DEFENDANT:  Your Honor, this is my opening

22  statement.  If I can't say that, you know, again --

23          MS. MALIZIA:  May we have a sidebar, your Honor?

24          THE COURT:  But, Mr. El Bey --

25          MS. MALIZIA:  Your Honor, your Honor.

```
                         El Bey - opening                    111


 1              THE COURT:  I'm sorry?

 2              THE DEFENDANT:  I got probably ten more words and I'm

 3    going to sit down.

 4              THE COURT:  Okay.

 5              THE DEFENDANT:  What I have to say is not interfering

 6    with anything they are saying.  I'm just putting it out there for

 7    me to defend myself personally, and I didn't --

 8              THE COURT:  Okay.  You can make your statement.

 9              THE DEFENDANT:  Okay.  So again, I am just saying I do

10    not consent to the jury selection as well as the Court is

11    fictitious to the republic of which I stand, to the republic for

12    which I stand.

13              Okay.  As of September 2013, Pope Francis -- okay, Pope

14    Francis put out a --

15              MS. MALIZIA:  Your Honor, objection.

16              THE DEFENDANT:  -- motu proprio.

17              MS. MALIZIA:  Your Honor, may we have a sidebar?

18              THE COURT:  Okay.

19              THE DEFENDANT:  I had three more words to go, your

20    Honor, and I was going to sit down.  Oh, my goodness.

21              THE COURT:  Okay.  Three more words.

22              THE DEFENDANT:  Okay.  And so as I was saying, Pope

23    Francis put out what you call a motu propria.  And Pope Francis

24    said that all corporations are null and void as of September

25    2013.  And the Vatican is ecclesiastical law, and that's all I
```

1  have to say.

2          That's my opening statement.  Thank you very much.

3          MR. HOTALING:  Judge, we would like to have a quick

4  sidebar, please.

5          THE COURT:  Okay.  We will have just a very short one.

6      (Proceedings heard at sidebar:)

7          THE COURT:  Sorry.  Yes.

8          MS. MALIZIA:  Your Honor, the government would move for

9  an instruction that the jury should disregard the defendant's

10  entire opening statement.

11          MR. HOTALING:  It was afoul of everything that your

12  Honor put in your order.  Now, he didn't specifically refer to

13  the Papal bull, or whatever he just referred to, but it's along

14  the same vein of what your Honor excluded a week and a half ago.

15          THE DEFENDANT:  I want to say this.  I didn't interfere

16  with their fictitious and liarly opening statement.

17          All I did was made a statement that's true all about the

18  church.  So all I did was made a statement that didn't offend

19  anyone.  I didn't attack anyone.  I only made a truthful

20  statement.  I'm only following law and nothing else.  So all I

21  want to do is proceed, your Honor.

22          THE COURT:  See, the problem, Mr. El Bey, is that the

23  Pope, and so on, it doesn't have any -- it doesn't have any

24  status in American law, right?  That's the problem.  So it's not

25  addressing the issues in the case.

1      THE DEFENDANT:  But your Honor, you know, that's not

2  true.  The Pope has every -- the Pope controls everything here.

3      THE COURT:  Well, no, no.  The Pope does not control

4  everything here.

5      THE DEFENDANT:  Then I'm wrong.

6      THE COURT:  I mean, you're entitled to your opinion.

7      THE DEFENDANT:  Yes.  It's all about the church, your

8  Honor.

9      THE COURT:  But it's not within the scope of the

10  litigation.

11      THE DEFENDANT:  Well, it is where I'm coming if you are

12  going to let me defend myself, I need to put the things that I

13  need to prove my innocence.  And I can't do it if I can't make a

14  proper statement.  And what I'm going to do is prove my

15  innocence.

16      THE COURT:  How would the Pope be connected with the

17  accusation about the --

18      THE DEFENDANT:  I don't want to give too much

19  information as we go along and show your Honor.  All I want to

20  get, give a fair chance.  I'm not proposing anything, not saying

21  anything wrong.  All I'm asking you is for a fair chance.

22      THE COURT:  I mean, using the Pope --

23      THE DEFENDANT:  I don't know why it offends them.  It

24  shouldn't offend anyone.

25      THE COURT:  But the Pope doesn't have anything to do

1  with the legal system.  I mean, we are not all catholics either.

2       THE DEFENDANT:  I understand that, Judge.

3       Can I just -- if I'm wrong then you will convict me.

4  That's all I want to do.  But in time, you know, that was just

5  the opening statement, and that's all I want to do, is just make

6  my opening statement.  She planting her seed; I want to plant

7  mine.  That's all I did.

8       THE COURT:  You can put -- of course you can present

9  evidence.  It's just that it has to be so the other side, they

10  can object if you are introducing evidence that's not within the

11  scope of the trial.  Then I have to exclude it.  That's the

12  problem.

13       THE DEFENDANT:  So but how would they know it is proper?

14  To me it is included in the trial that's what I'm trying to tell

15  you.  As each day go by, and I present my evidence, you

16  understand why I was doing what I'm doing.  So again, I'm just

17  asking you for a fair chance.

18       THE COURT:  But, you see, if Miss Malizia and

19  Mr. Hotaling, they object, and they say it's not relevant to the

20  trial, you have to explain how it is relevant to the trial.

21       THE DEFENDANT:  And I will as we go along.  But I didn't

22  object to them because what she said was totally untrue.  I

23  didn't object.

24       All I'm saying it was opening statement.  I didn't

25  object to the lies she told, because those are lies.

1          So what I'm saying to you is --

2          THE COURT:  See, the problem with the Pope thing, it's

3   not that what you said about the Pope, I don't know anything -- I

4   don't know enough about the Pope to know what is true and false.

5   But it's not relevant.

6          THE DEFENDANT:  But it is.  I just can't --

7          THE COURT:  How would it be relevant?

8          THE DEFENDANT:  This is the opening statement, Judge.  I

9   can't tell you everything how I'm going to present my case.  What

10  I'm trying --

11         THE COURT:  But is the Pope going to figure in the case?

12         THE DEFENDANT:  It's going to -- it's going to open the

13  door up for me.  And you will understand then.  I just can't say

14  it right now.  This was just the opening statement.

15         THE COURT:  But, okay, but --

16         THE DEFENDANT:  All I'm saying is give me a chance.

17  This is the opening statement.  Some of the statements she made

18  was not true, and so but I didn't object.  You know, it's opening

19  statement.  I'm going to prove it wrong and then she can prove me

20  wrong.

21         THE COURT:  Right.  But I can't let the jury think that

22  the Pope is involved in the case.

23         THE DEFENDANT:  I'm sure they don't.  I just mentioned

24  the Pope.

25         MR. HOTALING:  But that's what he just said.

1          THE DEFENDANT:  That's not true.  It's not what I said.

2          THE COURT:  Why did you mention the Pope?

3          THE DEFENDANT:  Because it's going to help me down the

4    line in my case to prove my innocence.  But again, you are saying

5    it again, but you want me to tell you why and then it'll blow my

6    case out of the water and that's not what I'm trying to do.

7          This is the opening statement, Judge.  All I'm saying is

8    this is opening statements.  Give me a chance to show you.  I

9    can't -- if I tell you everything now I won't have a chance.

10          Again, I just need a fair chance.  All I'm saying, I

11    didn't object to her opening statement, which was not true.  And

12    I didn't lie.  I didn't --

13          THE COURT:  But as I say, there is a difference.  You'll

14    have an opportunity to show that what she said was wrong if you

15    can show that.

16          THE DEFENDANT:  That's what I'm saying.  I didn't

17    object.

18          THE COURT:  But the Pope doesn't have anything to do

19    with it.

20          PROSPECTIVE JUROR:  It will assist as we go along.

21          THE COURT:  But how?

22          THE DEFENDANT:  You want me to tell you again.  You want

23    me to tell you everything right now.

24          MR. HOTALING:  There is an offer of proof, I think is

25    what the Judge is saying, an offer of proof.

1        THE DEFENDANT:  That's what I am --

2        THE COURT:  Suppose I tell everybody else to go away?

3   Will you tell me why?

4        THE DEFENDANT:  No.  You part of the legal system.  I'm

5   going to tell everything when they here?

6        THE COURT:  But I'm not allowed to permit litigants to

7   make statements that are not part of the -- that are not related

8   to American law.

9        THE DEFENDANT:  You can't say that, Judge.

10        THE COURT:  The Pope doesn't have any standing in

11   American law.

12        PROSPECTIVE JUROR:  What I'm saying to you, it is

13   relevant to my case.

14        THE COURT:  How can it be?  If the Pope came here and

15   testified do you --

16        THE DEFENDANT:  He might.  You never know.

17        MR. HOTALING:  I didn't see that subpoena.

18        THE COURT:  I don't have to tell the Pope:  You are a

19   big shot but you can't testify about American law.  Right?

20   That's the problem.

21        THE DEFENDANT:  All I'm saying, Judge, I'm not trying to

22   give no one a hard time, I'm just trying to defend myself.

23   Lawfully.

24        THE COURT:  Fine.

25        THE DEFENDANT:  All I'm saying, my statement, I didn't

1  think it was irrelevant to the case.  I think it's going to

2  enhance me as I go along and prove my innocence.  But you want me

3  to tell you right now, and I can't do that because then I blow my

4  case out of the water.  And then you --

5          MR. HOTALING:  We are happy to go over to the counsel's

6  table, if your Honor would like to hear an offer.

7          THE DEFENDANT:  I don't want to share with my counsel.

8          MR. HOTALING:  I'm not a counsel.  This is the Court.

9          THE DEFENDANT:  I don't want to share it with the Court

10 until it's my time.

11         MR. HOTALING:  Okay.

12         THE DEFENDANT:  So what I'm saying is what I just said I

13 don't think it's relevant to the case.  I don't think it is

14 offensive to anyone.  And so I'm just saying what -- I made a

15 statement and I want to sit down now, just let me prove my case.

16         THE COURT:  But I cannot let you refer to the Pope.  I

17 just can't.  Because he doesn't have any place in American law.

18         THE DEFENDANT:  You don't know that.

19         THE COURT:  No, I do.

20         THE DEFENDANT:  I didn't say he had a place in American

21 law.  I said he was going to help me prove my case.

22         THE COURT:  How can --

23         THE DEFENDANT:  There you go again, you asking me to

24 tell you now and then I can't prove my point.  All --

25         MR. HOTALING:  We are spinning our wheels here.

1          MS. MALIZIA:  Let's just call the first witness.

2          THE COURT:  You'll have a chance to introduce evidence.

3          THE DEFENDANT:  But then if you strike it from the

4   record, then it ain't no good.  That's all I'm saying, Judge.

5   Just give me an opportunity.  If I'm -- you know, if it's

6   irrelevant you can take it away.  But I know it's relevant and

7   that's why I said.

8          THE COURT:  Well, I'll say something.

9      (Proceedings heard in open court:)

10         THE COURT:  So, ladies and gentlemen, please excuse the

11   break.

12         Now, so we have a problem.  So Mr. El Bey has decided,

13   as you know, to represent himself, and that's permitted.  It's

14   his right.

15         But whether he has a lawyer or a defendant is

16   representing himself, anything he says to the Court, any evidence

17   he presents, and so on, is subject to objection by the other

18   side.

19         And the objection made here is that the statements that

20   Mr. El Bey made, including the reference to the Pope, simply do

21   not have any place in an American trial.

22         This is nothing -- this is no disrespect to the Pope and

23   to Roman catholicism.  It's just that it isn't part of the legal

24   system.

25         And so I have to tell you that you have to disregard

Morgan - Direct by Malizia                    120

1  references to the Pope, to religion, and so on.  They simply --
2  they just don't figure in the trial.
3           Either Mr. El Bey committed the fraud that the
4  government charges or he didn't.
5           But in either -- and that's for you to decide.
6           But in either event, I will have to tell you that if
7  either side, you know, makes statements that are just not -- have
8  no status in American law, are not part of the American law, then
9  we have to disregard them.
10          And that's true of the reference to the Pope.
11          So the government, do you want to present evidence now
12  that the opening statements are complete?
13          MR. MALIZIA:  Yes, your Honor.  At this time the
14  government calls its first witness, Kristy Morgan.
15          THE CLERK:  Raise your right hand.
16     (Witness sworn.)
17          THE COURT:  Please be seated.
18          KRISTY MORGAN, GOVERNMENT'S WITNESS, SWORN
19                       DIRECT EXAMINATION
20  BY MS. MALIZIA:
21  Q.  Miss Morgan, would you please state your name and spell it
22  for the court reporter?
23  A.  Kristy Morgan.  K-r-i-s-t-y, M-o-r-g-a-n.
24          MS. MALIZIA:  I trust the court reporter will tell me
25  know if you can't hear me.

1  BY MS. MALIZIA:

2  Q.  Miss Morgan, where do you currently work?

3  A.  I work for the Internal Revenue Service in Ogden, Utah.

4  Q.  And what do you do there?

5  A.  My title right now is the court witness coordinator in

6  criminal investigations.

7  Q.  And how long have you worked in total for the IRS?

8  A.  For the IRS totally, 30 years.

9  Q.  You said your current position was court witness coordinator?

10  A.  Correct.

11  Q.  And how long have you held that position?

12  A.  Since 2009.

13  Q.  And what are your duties as a court witness coordinator?

14  A.  My main responsibility is to assist the special agents and

15  attorneys in preparation for trial.  I secure tax returns and

16  documents that are maintained in the normal course of business, I

17  certify those documents, then testify on behalf of the

18  Commissioner regarding those specific documents.

19  Q.  And approximately how many trials have you testified in?

20  A.  Over a hundred.

21  Q.  Have you held other positions with the IRS?

22  A.  Yes, I have.

23  Q.  What are those positions?

24  A.  Initially I worked a short time in the processing area where

25  returns are processed.  I spent the majority of the first

1  20 years in the examination function.  That's where they do

2  audits.  My title was a report writing technician.

3          I then moved into the frivolous filer department, where

4  I worked as the penalty coordinator for approximately ten years,

5  and then moved into criminal investigations and investigating

6  aide and then the Court witness.

7  Q.  You mentioned you were a frivolous filer coordinator?

8  A.  Correct.

9  Q.  What were your duties as a frivolous filer coordinator?

10  A.  In that department I reviewed tax returns, sought area

11  counsel decisions on whether or not they were frivolous, which is

12  the attorneys for the IRS.  I also sent letters to the taxpayers

13  informing them about the positions they had taken on the tax

14  return, giving them an opportunity to change that position and

15  file a corrected return.

16          I assessed frivolous return penalties if they chose not

17  to change their types of filings.  I also talked with individuals

18  on the phone as far as their options regarding settling their tax

19  returns.

20  Q.  During your three decades with the IRS, have you become

21  familiar with the procedures for receiving, processing and

22  storing federal tax returns?

23  A.  Yes.

24  Q.  Did you receive training on the receipt and storage of

25  federal tax returns by the IRS?

1  A.  Yes, we do.

2  Q.  Could you briefly explain that training?

3  A.  It's called a professional training, career professional

4  training.  We have it every year.

5        A lot of times when you start with the IRS you will

6  first learn about how the returns are received, how though flow

7  through have the processing.

8        So initially I received that training.  It's about three

9  weeks.  In the exam we also get a little bit more technical where

10  we would go in and learn a little bit about how the exam function

11  works and the processing of tax returns there.

12        And then every year we get updates on our job, how the

13  processing would affect what we specifically do.

14  Q.  Does the IRS maintain paper copies and electronic copies --

15  does the IRS maintain both electronic and paper copies of tax

16  returns?

17  A.  Yes, we do.

18  Q.  And is the way the returns are maintained dependent on the

19  type of return?

20  A.  That's correct.

21  Q.  I'd like to talk a little bit about how trust returns are

22  maintained by the IRS.  First, where are trust tax returns

23  maintained?

24  A.  They are considered a business type of return, so they are

25  received in either Ogden or in Cincinnati, depending on where you

1  live.

2  Q.  And what happens after they reach Ogden or Cincinnati?

3  A.  If they are a paper filing, they are opened in the mail room

4  and they are sorted.  They will go to an area called code and

5  edit where they are looked at to make sure if there are schedules

6  that need to be attached or a signature that needs any

7  information that is missing, we correspond with the person who

8  mailed in the trust fund -- or, excuse me -- the trust tax

9  return.

10         If the return is complete, it goes into an area called

11  batching.  They are counted out into groups of up to 100 tax

12  returns.

13         Then to numbering, they will get a document locater

14  number.  That identifies that specific tax return until it is

15  destroyed.

16         Then they go into the data entry area where the data

17  clerks from the tax return and enter it into the computer, and

18  the data is then stored both electronically and then the paper

19  return is also stored.

20  Q.  You mentioned that returns are stored until they are

21  destroyed.  At what time are they destroyed?

22  A.  It depends on the document, but this document -- most

23  documents are stored for six years, approximately six years and

24  eight months, and then the paper return is destroyed.

25  Q.  How about the electronic data that's inputted based on those

1 paper returns?

2 A.   That data can be retrieved.  So we can pull what's called a

3 transcript or review the account by using the IRS computer.

4 Q.  You just testified about what happens when a return is

5 complete, correct?

6 A.   Yes.

7 Q.  What happens when a trust tax return in particular is not

8 complete?

9 A.  If it's not complete and the information isn't received, it

10 is reviewed for different types of information.  For instance,

11 the frivolous filer department would review that if there is

12 certain items on the return that make someone think that it

13 possibly could be frivolous.  It also can go into an exam for a

14 review.

15 Q.  All right.  You mentioned returns can be identified as

16 frivolous, is that right?

17 A.   Yes.

18 Q.  How does the IRS determine whether a return is frivolous?

19 A.  Basically, the frivolous return is something on the face of

20 that document that is substantially incorrect and they will pull

21 them out of the processing area, and they are sent to Ogden for

22 review.

23       That return can also have, for instance, no income, no

24 interest, but a large withholding amount.  Or where

25 mathematically you can tell that it's substantially incorrect;

1  then they will look at that and they may actually talk with area

2  counsel, IRS attorneys, regarding that document also.

3  Q.  Are the individuals who identify returns as frivolous, do

4  they receive any kind of training on how to do that?

5  A.  The actual workers at the IRS?

6  Q.  The workers at the IRS.  And then people who, it sounds like

7  there are additional people who process those returns?

8  A.  Correct, right.

9  Q.  How about we start with the IRS employees who first see the

10 returns?

11 A.  Yes.  They also have their professional training.  They also

12 conduct training for different areas at the IRS.  For instance,

13 people that receive and open the mail, important people that are

14 doing the batch and numbering, they all get a training course

15 regarding different items that they need to look at as they are

16 doing their work and maybe pull that return and send it to Ogden

17 for review.

18 Q.  How about the workers at the Ogden frivolous filer unit, how

19 are they trained?

20 A.  They are trained every year in a program where they are

21 updated on new frivolous arguments and they will get actually

22 different kinds of information during the year.  Also if there is

23 something coming into the IRS that appears to be frivolous, they

24 will get updates that notices and that's also posted on IRS.gov

25 for the tax preparers about identification of different types of

1  frivolous arguments that people may be using.

2  Q.  Despite this training, do frivolous returns sometimes

3  nonetheless make it through the system without being identified

4  as frivolous?

5  A.  Yes, they do.

6  Q.  Why is that?

7  A.  Sometimes it's because the training has not been received

8  when the return is first sent in.  You don't ever know what the

9  understanding of that individual is as far as their job.

10        But the basic responsibility of the Internal Revenue

11 Service is to receive tax returns and process them based on the

12 honesty and the face value of that return filed by the

13 individual.

14 Q.  Once somebody at the frivolous filer unit in Ogden identifies

15 a return as frivolous, is the individual who filed that return

16 notified of the frivolous identification?

17 A.  Yes, they are.

18 Q.  How are they notified?

19 A.  There is letters that go out informing them of that tax

20 return, specifically of what year it is, and when they filed it,

21 as frivolous.  States on the letter that they now have an

22 opportunity to change that filing.  They have approximately

23 45 days to send in a corrected return.

24        Also informs them if they chose not to correct that they

25 are subject to the $5,000 penalty.  That's for them to have the

1  opportunity to file correct.  And if not, then they go on, assess

2  the penalty, and can do an audit.

3  Q.  What happens if in the instance where these letters are sent

4  out but the IRS doesn't receive either a corrected return or an

5  abatement of penalty?

6  A.  Then they will go forward through the examination process

7  where the penalty will be assessed and then the proposed amount

8  of tax will go out to the individual as far as what information

9  the IRS has and what should be reported on their tax return.

10  Q.  Miss Morgan, do you know approximately how many returns per

11  year the IRS processes throughout the United States?

12  A.  I have a few facts as far as filings.  For instance, in 2009

13  there were 144 million tax returns, individual tax returns that

14  come into the center.  That's not counting amended returns or

15  business returns.

16        So there is huge amount of returns that come in every

17  year and the IRS handles all of those.

18  Q.  So 144 million individual returns and the trust returns that

19  you were testifying about earlier wouldn't even fall into that

20  category?

21  A.  No.  The last information I seen there was approximately 47

22  million that were received between Ogden and Cincinnati.

23  Q.  Just trust returns?

24  A.  Just trust returns.

25  Q.  Turning again to individual returns, how are individual

1   returns processed?

2   A.   Paper returns or electronic?

3   Q.   Let's start with paper.

4   A.   Paper basically is the same as the business returns.  They

5   are received and opened in the mail room, sorted by either a

6   1040, 1040 A, 1040 EZ, the type of return they are, then they are

7   looked again at to make sure they are correct, that they have all

8   the schedules as far as if there is a business and they need a

9   Schedule C attached to support that entry.  They are looking for

10  those kind of supporting statements.

11          They want to make sure that it's signed under penalties

12  of perjury.  So that's looked at.

13          If they notice that there is a mathematical correction,

14  that's the only thing that they will look at, is if it's added

15  and subtracted correctly, there may be some correspondence there.

16          Other than that, it goes to the area called batching.

17  It is counted out in groups of 100.  Then to numbering where it

18  gets its document locator number.  And then again to the data

19  entry clerks to enter the information from the tax return into

20  the system.

21  Q.   And how does that process compare for returns that are filed

22  electronically?

23  A.   Basically the same process, only you submit the electronic

24  data through your computer, the computer does the checking, makes

25  sure it's signed properly, that the schedules are there.

1          If there is anything missing then it rejects that right

2     back to you, to your computer or your preparer's computer.

3          If it's okay, then the data is entered into the master

4     file computer, the main IRS computer, and that data is stored.

5     Q.  Are paper returns maintained by the IRS?

6     A.  Yes, they are.

7     Q.  For how long?

8     A.  For six years, and approximately seven years from the time

9     they are received, then destroyed.

10    Q.  Are the data from those paper returns, is that input

11    electronically anywhere?

12    A.  Yes.  The data is stored.

13    Q.  And the data from the electronic data that comes from those

14    paper returns as well as the -- as well as individual returns

15    that are filed electronically, how long is that data stored?

16    A.  It's the same amount of time to produce an actual copy of the

17    electronic filing on a form.  After that then we can just get

18    transcripts of that information.

19    Q.  And did you in preparing for this case today, did you consult

20    electronic and paper databases or obtain information from

21    electronic or paper databases from employees of the IRS?

22    A.  Yes.

23    Q.  And as a result did you obtain copies of tax returns and

24    associated IRS records in connection with this case?

25    A.  I did, yes.

1           MS. MALIZIA:  Your Honor, may I approach the witness?

2           THE COURT:  Sure.

3    BY MS. MALIZIA:

4    Q.  Miss Morgan, I'm handing you what's been marked as Government

5    Exhibits IRS 3 through 21.

6    A.  Thank you.

7    Q.  Miss Morgan, did you have the opportunity to review

8    Government Exhibits IRS 3 through 21 before testifying here

9    today?

10   A.  I did, yes.

11   Q.  Are Government Exhibits IRS 3 through 21 original documents

12   that you in fact certified before your testimony here today?

13   A.  That's correct, yes.

14   Q.  For the record, I'm referring to Government Exhibits 3

15   through 21.  I note for the record that there is no Government

16   Exhibit 16, 17, or 18.

17          Miss Morgan, you said that you certified these records.

18   What does it mean to certify the record?

19   A.  Basically I will take the original tax return and look at

20   that information, compare it with the master file which is the

21   main computer, make sure I have the correct document.

22          We then make a copy of the paperwork, type up -- it's a

23   blue sheet.  On the front of that it's a front states what type

24   of document it is, for who, and how many pages, then it goes into

25   a review where someone will check and make sure that it is

1  correct.

2          It's then signed with the signature for -- usually it is

3  one of the managers in my office.  And it receives a seal,

4  embossed signature type seal on the front of the form to identify

5  that it's a certified copy of a tax document.

6  Q.  Miss Morgan, I'm going to ask Mr. Hotaling to pull up on your

7  screen, if we could display to the witness and the Court what's

8  been marked as Government Exhibit IRS 3, Page 1.

9          Do you recognize this document?

10 A.  Yes.

11 Q.  What is it?

12 A.  This is the actual certification sheet that's attached to all

13 tax returns.

14         MS. MALIZIA:  Your Honor, if we could admit Government

15 Exhibit IRS 3, Page 1 into evidence at this point and publish it

16 to the jury?

17         THE COURT:  Is there any objection?

18         THE DEFENDANT:  I didn't hear the question.  What was it

19 again?

20         MS. MALIZIA:  Asking permission from the Court to move

21 this into evidence and publish it for the jury.  It should be

22 displayed on your screen.

23         THE DEFENDANT:  You said you want to publish it?

24         MS. MALIZIA:  Yes.  You can currently see it, but the

25 jury cannot.

 1             THE COURT:  She doesn't mean --

 2             THE DEFENDANT:  Sure, I understand.  Sure.

 3             THE COURT:  Not publishing a book.

 4             THE DEFENDANT:  No, you know, I'm not consenting to

 5  anything.  No.  So I object.

 6             THE COURT:  Okay.  Objection overruled.

 7      (Government Exhibit IRS 3, Page 1 received in evidence.)

 8  BY MS. MALIZIA:

 9  Q.  Miss Morgan, one more time for the record, is this a copy of

10  one of the certifications you made in this case?

11  A.  Yes, it is.

12             MS. MALIZIA:  Your Honor, at this time the government

13  moves to admit Government Exhibits IRS 2, 3, 4, 5, 6, 7, 8, 9,

14  10, 11, 12, 13, 14, 15, 18, 19, 20, and 21 into evidence.

15             THE COURT:  Where are they admitted?

16             MS. MALIZIA:  What?

17             THE COURT:  I'm sorry.  I'm unclear.  What are you doing

18  with them?

19             MS. MALIZIA:  There is a binder with the exhibits right

20  there, Judge.

21             THE COURT:  Okay.  So this is not something you are

22  putting on the screen.

23             MS. MALIZIA:  We are not presently putting it on the

24  screen, but we would ask permission to publish these excerpts.

25             THE COURT:  When you say publish, what do you mean?

1        MS. MALIZIA:  By publish I mean display to the jury

2   electronically.

3        THE COURT:  Yes.  Okay.

4        MS. MALIZIA:  And for the record, Government Exhibits 3

5   through 21 are admitted into evidence at this time?

6        THE COURT:  Yes.  They are admitted.

7     (Government Exhibits IRS 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12,

8        13, 14, 15, 18, 19, 20, and 21 received in evidence.)

9        MS. MALIZIA:  Thank you, your Honor.

10  BY MS. MALIZIA:

11  Q.  All right.  Ms. Morgan, the documents in front of you consist

12  of federal tax returns received by the IRS as well as documents

13  relating to those returns, correct?

14  A.  Yes.

15  Q.  And specifically, among the documents in front of you are

16  returns filed in the name of both Hakeem El Bey and Hakeem El Bey

17  Trust, is that right?

18  A.  Yes.

19  Q.  These documents also include records from the IRS frivolous

20  filer file in the name of the Hakeem El Bey Trust?

21  A.  Correct.

22  Q.  If we could put up Government Exhibit IRS 20, Page 2 of that

23  exhibit.

24        It should be displayed on your screen?

25        THE COURT:  And the jurors are looking at this also?

1          MS. MALIZIA:  Per the Court's order, we will be

2    publishing this on a rolling basis unless there is an objection.

3          THE COURT:  When you say "publishing," you mean

4    exhibiting it to the jury?

5          MS. MALIZIA:  Exhibiting them to the jury, yes, sir,

6    your Honor.

7    BY MS. MALIZIA:

8    Q.  Miss Morgan, what is the document we are currently looking

9    at?

10   A.  This is what's referred to as a transcript.  This is a

11   business type transcript for Hakeem El Bey Trust.  It has

12   different information regarding the filings, the business

13   address, et cetera, on it.

14   Q.  And to what entity does this transcript refer to?

15   A.  It's showing Hakeem El Bey Trust, Hakeem El Bey, Trustee, and

16   it also lists an employee identification number identifying the

17   trust.

18   Q.  You mentioned the term employee -- employer identification

19   number.  What does that mean?

20   A.  That's a number that's assigned to the trust or business

21   returns, used the same as a Social Security number, that's how

22   the records are kept for the filings of the tax document.

23   Q.  And is that number sometimes referring are referred to as an

24   EIN?

25   A.  It is.

1  Q.  So part of this document has been redacted for reasons of

2  privacy because there is certain sensitive information, but I'd

3  like to draw your attention now to the top left corner of the

4  transcript.

5         What is the partially redacted number on the top left

6  number?

7  A.  That would be the EIN, employee information number, that is

8  assigned to the trust.

9  Q.  How is a trust like this established with the IRS?

10 A.  A request will be made from the person wanting to set up the

11 trust and request a business identification number.  It can be

12 done either through the Internet or through mail or on the phone.

13        That number is assigned and then you will also get an

14 official document with the information and that's what you use to

15 file your tax returns.

16 Q.  Looking at this document, can you tell when the Hakeem El Bey

17 Trust was created with the IRS?

18 A.  Yes.  In about the middle of this document there is a group

19 of numbers begins, with a triple 0 number, that's to the

20 left-hand side.  That shows 0810-2009.  That means that

21 August 10th, 2009, was when this account was established with the

22 IRS.

23 Q.  How do you know that?

24 A.  Based on my -- my actual work experience.  And we also have

25 manuals that we can use to read and understand the different

1  documents we look at.

2  Q.  And based on your training and those manuals, is there some

3  significance to the three-digit code in front of that date?

4  A.  The 0810 number?

5  Q.  Yes.

6  A.  That is always the establishment of an account.  So the first

7  time you file your tax return you would have a 000 number on your

8  account.

9  Q.  We can take that down.

10        Miss Morgan, I'm going to ask you to take a look at

11  Government Exhibits IRS 3, 4 and 5.  At this time it should be in

12  the stack in front of you.  If it's easier we also have a copy of

13  these documents in a binder if you find that easier to refer to.

14  A.  Is the binder in the court?

15  Q.  Yes.  It probably would be easier.

16        MS. MALIZIA:  Permission to approach, your Honor?

17        THE COURT:  Sure.

18  BY MS. MALIZIA:

19  Q.  If you could let me know when you have had a moment to look

20  at those three exhibits?

21  A.  3, 4 and 5, correct?

22  Q.  Yes.

23  A.  Okay.

24  Q.  Are these documents trust returns, Miss Morgan?

25  A.  Yes, sir, this is certified copies of trust returns.

1  Q.  And how did the IRS receive these three trust returns?

2  A.  These tax returns were actually mailed to the IRS.

3  Q.  I'm going to show you what's been marked on the screen right

4  now, Government Exhibit IRS 5, Page 3.  Do you recognize this

5  document?

6  A.  Yes, I do.

7  Q.  What is it?

8  A.  This is the envelope that the three 1041 trusts there were

9  included in -- mailed to the IRS from Hakeem El Bey.

10  Q.  If you could please read the from field for the jury?

11  A.  It shows Hakeem El Bey, care of P.O. Box 5967, River Forest,

12  Illinois, 60305.

13  Q.  And to whom is this envelope addressed?

14  A.  It's addressed to the Department of the Treasury, the

15  Internal Revenue Service, Cincinnati, Ohio.

16  Q.  What is the postmark on this envelope?

17  A.  The postmark on this -- let's pull it up just to make sure.

18  August 13th, yes, '09.

19  Q.  So you testified that the three returns marked Government

20  Exhibits IRS, 3, 4 and 5 were all received in this envelope, is

21  that correct?

22  A.  Yes.

23  Q.  If we could go to Government Exhibit IRS 3, Page 2.  Miss

24  Morgan, what is this document?

25  A.  This is the first page of the 1041, the trust document for

1  2006.

2  Q.  You mentioned 1041.  What does that mean?

3  A.  That is the type of document it is.  Shows it is a U.S.

4  income tax return for estates and trusts.

5  Q.  And what was the tax return name for this return would have?

6  What is the name of the trust entity in this return?

7  A.  Shows Hakeem El Bey Trust.

8  Q.  And who is identified as the fiduciary of this trust?

9  A.  Hakeem El Bey, Trustee.

10  Q.  And is there an EIN number associated with this trust?

11  A.  There is.

12  Q.  And in this document, it is partially redacted.  But based on

13  your review the original documents is this EIN number identical

14  to the EIN number in Government Exhibit 20, which is the

15  transcript you testified about a few moments ago.

16  A.  Yes, it is.

17  Q.  On what date according to this document was the trust

18  created?

19  A.  The trust was -- excuse me?

20  Q.  On what date was the trust created, according to this

21  document?

22  A.  According to this document, the trust was created

23  February 19th, 1959.

24  Q.  If we could put pan out and zoom in on the -- I just ask you

25  to summarize this.  Ms. Morgan, is there a figure -- is income

1  reported for the trust on this return?

2  A.  Yes.  On Line 9, total income shows $900,000.

3  Q.  And are fiduciary fees also reported for the trust on this

4  form?

5  A.  Yes.  That would be on Line 12, $900,000.

6  Q.  And is a deduction or exemption claimed on behalf of the

7  trust in this form?

8  A.  Yes.  The exemption is on Line 20, $7,950.

9  Q.  And are tax withholdings also reported on this trust?

10 A.  Yes.  The federal income tax withheld is on 24E, shows

11 $300,000.

12 Q.  And does this trust return also claim a refund?

13 A.  It does.

14 Q.  In what amount?

15 A.  The amount of the refund requested is 300,000.

16 Q.  Is that trust return also signed and dated?

17 A.  It is signed under penalty of perjury.  Dated August 5th,

18 2009.

19 Q.  And who is it signed by?

20 A.  Hakeem El Bey.

21 Q.  Just a moment.  Now, there is some handwriting at the top of

22 this return.  Was that handwriting placed there by an IRS

23 employee?

24 A.  No.

25 Q.  Do you know the significance of this handwriting?

1  A.   The handwriting, I don't.

2  Q.   Can you tell, looking at this document, when this and two

3  other trust returns mailed in the envelope you testified about

4  earlier were received by the IRS?

5  A.   It shows in the center of the tax return that initially it

6  was received August 14th, 2009.

7  Q.   There are other stamps on here as well, is that right?

8  A.   Yes.

9  Q.   I see stamps at the bottom?

10 A.   Right.  Once the return moves to a different area it's then

11 stamped again, the bottom received date is August 26, 2009, shows

12 it went to the examination function in Cincinnati.

13 Q.   All right.  And after it was received in Cincinnati, is there

14 a final date stamped on this return?

15 A.   Yes.  It was then sent to again frivolous filer,

16 September 4th, 2009.

17 Q.   So you said frivolous filer.  What did you mean by that?

18 A.   That's where the examination function actually handles

19 frivolous types of tax returns.

20 Q.   So for a trust return like this to have been stamped -- I'm

21 assuming FRP, which is the frivolous filer unit?

22 A.   Frivolous return programs is what it stands for.

23 Q.   For the frivolous return to have been stamped like that by

24 the frivolous return program, what would have had to have

25 happened?

1  A.  Someone in the Cincinnati center, been trained, and

2  identified this was possibly a frivolous return.  It goes to

3  Ogden for what's called a second look, someone else to look at it

4  based on their expertise, their training, to see whether or not

5  it was frivolous.

6  Q.  Would that have applied to the other two returns that were

7  mailed in this envelope as well?

8  A.  Yes.

9  Q.  You testified earlier that this trust return claims

10  withholding in the amount of $300,000, is that right?

11  A.  Yes.

12  Q.  Does the IRS keep records of tax withholding by trusts and

13  other entities and individuals in its regular course of business?

14  A.  Yes, we do.

15  Q.  Could you briefly explain what you mean by withholding?

16  A.  By withholding?

17  Q.  What is tax withholding?  In as plain English as you can make

18  it.

19  A.  Basically when you are earning a wage your employer will take

20  a certain amount of your pay and apply it for actual withholding

21  against the tax that you may owe at the end of the year.  It's

22  something that's paid over to on the IRS, which in turn you can

23  use as far as your tax liability.

24  Q.  Pull up Government Exhibit IRS 18.

25          Do you recognize this document?

1  A.  Yes, I do.

2  Q.  What is it?

3  A.  This is a certification of lack of record for a form 3050.

4  Q.  What does it show?

5  A.  It's showing that a search was done for Hakeem El Bey Trust

6  using the employee identification number that I was given.  We

7  were searching for income information, withholding from different

8  parties, third parties, banks, et cetera, for the tax period

9  December 31, 2006, through December 31, 2009.

10        This is the lack of record showing that we have no

11  record of any withholding paid over in those years.

12  Q.  So for this three-year period, the IRS had no record of any

13  withholding by the Hakeem El Bey Trust, correct?

14  A.  Correct.

15  Q.  If you could return briefly to Government Exhibit IRS 4,

16  Page 2.  Is this the second tax return that was received in the

17  envelope about which you testified earlier?

18  A.  Yes.

19  Q.  And for what tax return is this?

20  A.  This is for the 2007 tax period.

21  Q.  And is the information contained in the line items on this

22  trust otherwise identical to the tax return marked Government

23  Exhibit IRS 3?

24  A.  It is.

25  Q.  Is that in the name of the Hakeem El Bey Trust?

1   A.   Correct.

2   Q.   It identifies Hakeem El Bey as trustee?

3   A.   Yes.

4   Q.   Contains the same EIN number.

5   A.   Yes.

6   Q.   The dates on which the trust was created is the same, it is

7   February 19th, 1959?

8   A.   Correct.

9   Q.   And then the line items are also identical as well, is that

10  correct?

11  A.   Yes.

12  Q.   Yes.  Specifically the line items recording the income earned

13  by the trust, the amount paid out in fiduciary fees, the

14  deductions claimed by the trust, the withholding by the trust,

15  and the claim of a $300,000 refund on behalf of the trust?

16  A.   Yes, they are identical.

17  Q.   And is this trust return also signed and dated?

18  A.   It's signed under penalty of perjury by Hakeem El Bey,

19  August 5th, 2009.

20  Q.   If we could turn briefly to Government Exhibit IRS 5, Page 2.

21  This is the third return that was received in the envelope by the

22  IRS in August of 2009?

23  A.   Correct.

24  Q.   And for what tax return is it?

25  A.   This is for the 2008 tax period.

1  Q.  All right.  And is the information contained in this return

2  otherwise identical to the two previous returns about which you

3  already testified?

4  A.  It is.  It's identical.

5  Q.  And is this return also signed and dated?

6  A.  It is signed under penalty of perjury, August 5th, 2009 by

7  Hakeem El Bey.

8  Q.  You testified that all three of these returns were sent, were

9  identified as frivolous and sent to the frivolous filer unit, is

10 that correct?

11 A.  Yes.

12 Q.  What are some of the consequences of having a return

13 identified as frivolous?  I know you testified about this a

14 little bit earlier.  But what happened with these returns in

15 particular?

16 A.  Once they are received in Ogden, then the letters that will

17 go out and talk about the penalty that you could be assessed.

18        Each return is subject to a $5,000 penalty, which would

19 be $15,000 in penalties owed the IRS, and that would not include

20 the tax that you already owe on income if you made that.

21        So there is a lot of different things can happen with a

22 tax return filed like this.  And basically the penalty is one of

23 the biggest ones.

24 Q.  And was that $5,000 penalty assessed by the IRS for these

25 three returns?

1  A.  Yes.

2  Q.  If you could pull up Government Exhibit IRS 11.  This would

3  be Page 2, right behind the certification?

4  A.  Yes.

5  Q.  Do you recognize these documents?

6  A.  I do.

7  Q.  Referring now to Page 1 and 2 of this exhibit, what is this

8  document?

9  A.  This is the actual letter that is sent out to the individual

10 filing the frivolous return.  This is the different types of

11 language that's on the return -- or, excuse me, on the letter to

12 explain that this is frivolous.  Based on the information that's

13 on the tax return, gives them some information regarding the

14 courts, and what they need to do not to be assessed the penalty.

15 Q.  I want to talk a little bit more about this letter in a

16 moment.  But I want to ask you first, does the IRS typically

17 maintain copies of these letters in its files?

18 A.  These are computer-generated so they would not have an actual

19 copy in the file.  So this copy has come back from the individual

20 receiving it or from Hakeem El Bey.

21 Q.  And at this point I'd like to show you Government Exhibit --

22 still on IRS 11, but if we could turn to Page 13.  Sideways on

23 your screen, but I think we might be able to turn it at the very

24 bottom.  Yes.  All right.

25           You said that this letter would have had to have been

1  mailed back to the IRS.  Is this the envelope that it was mailed

2  back in?

3  A.  Yes, it is.

4  Q.  And what is the return address on this envelope?

5  A.  The return address is 227 Markwood Drive, Warner Robins,

6  Georgia, 31093.

7  Q.  And to whom is this envelope addressed?

8  A.  It is addressed to the Department of Treasury, Internal

9  Revenue Service, Austin, Texas, 73301.

10  Q.  And what is the postmark on this envelope?

11  A.  Postmark November 7th, 2009.

12  Q.  Having reviewed all of Government Exhibit IRS 11, were all of

13  those documents, were all of those documents enclosed in this

14  envelope?

15  A.  Yes.

16  Q.  Again, we will go through each of them in turn for the

17  moment, but for the record all of IRS 11 was enclosed in this

18  envelope, correct?

19  A.  Correct.

20  Q.  If we could go back to Government Exhibit IRS 11, Page 2.

21  IRS 11, Page 2.

22        You testified this is a copy of letter that would have

23  been sent with the letter, correct?

24  A.  Yes.

25  Q.  Yes.  Based on the postmark, when was that letter sent?

1  A.  On the postmark when was it sent or received?

2  Q.  Looking at the front -- looking at the face of the letter --

3  and I realize there are some markings on here that may

4  not -- that may have come at a later date, let me back out a

5  second.

6        When the letter -- can you tell from the face of this

7  letter when it would have been sent out to the defendant?

8  A.  So the date on this letter is October 29th, 2009, that's the

9  date at the top.

10  Q.  That's the date on which it would have been mailed based on

11  your procedures?

12  A.  Basically, yes.

13  Q.  And then there are two stamps on the -- there are stamps,

14  there are two received stamps on the front of this envelope.  Do

15  you recognize those?

16  A.  Yes.

17  Q.  Yes.  What do they signify?

18  A.  This would show where the response was mailed back to the IRS

19  and received.  So November 12th, 2009, in Austin, Texas.  And

20  then again, it moved in Austin to a different unit November 17th,

21  2009.

22  Q.  Why would it have moved within the IRS?

23  A.  Basically the first part of the letter is when the mail room

24  people open the correspondence.  Then it's the actual group that

25  would make a decision or work this correspondence.

1  Q.  Now looking at the top of this letter, there are some other

2  stamps on here that contain the defendant's name, Hakeem El Bey.

3  Did the IRS place those stamps on this letter?

4  A.  No.  That's not part of the initial letter.

5  Q.  And does that also apply to the handwriting as well as the

6  stamps?

7  A.  Correct.

8  Q.  I'd like to walk through this letter with you.  Beginning

9  with your Dear Taxpayer, if we could zoom in on the top half of

10  the letter.

11         If we could just -- if you could just read it for the

12  jury?

13  A.  States:  This letter serves to inform you of the potential

14  consequence of the position you have taken, and to offer you an

15  opportunity to correct your submission within 30 days from the

16  date of this letter.

17         It states:  Why are we contacting you?

18         Based on Internal Revenue Code 6702, frivolous tax

19  submissions, we have determined that the information you filed as

20  a return of tax or purported return of tax on August 14th, 2009,

21  is frivolous, and there is no basis in the law for your position.

22         We have made this determination because what you

23  submitted is based on positions that fall under one or both of

24  the following:  Your information is based on positions identified

25  as frivolous under Section 6702.  It refers to some notices.

1          Your information reflects a desire to delay or impede

2    the administration of the federal tax laws.

3    Q.   Great.  Zooming in on the second portion?

4    A.   It states then:  Federal courts, including the Supreme Court

5    of the United States, have considered and repeatedly rejected, as

6    without merit, positions such as yours.  Internal Revenue Code

7    Section 6702 imposes a $5,000 penalty for the filing of a

8    frivolous tax return or purported tax return.

9          We are proposing a $5,000 penalty per return based on

10   your filing of a frivolous tax return or purported tax return.

11         What do you need to do?

12         Send us your corrected returns for the taxable periods

13   within 30 days of the date of this letter.  If you send us

14   corrected returns, we will disregard the frivolous -- previous

15   documents filed and not assess --

16   Q.   It continues onto the second page?

17   A.   -- and will not assess the frivolous tax submission penalty

18   to each correct filed tax return.

19         Then states:  Please attach this letter to your

20   corrected returns, mail to the address shown at the top of this

21   letter.  We have enclosed a copy of this letter for your records

22   and an envelope for your convenience.

23         What happens if you don't respond?

24         If you do not file the corrected returns within 30 days

25   of the date of this letter or you submit instead another document

1   asserting a frivolous position, we will assess a $5,000 penalty

2   for frivolous tax submissions.

3            We will charge this fee for each purported return you

4   file for which you did not file a corrected return.

5            Once we assess the penalty, the IRS will bill you $5,000

6   for each frivolous return or purported return filed.  We will not

7   respond to future correspondence asserting any frivolous

8   position.

9            In addition, if we do not hear from you within the above

10  time frame, we may issue a notice of deficiency.  A notice of

11  deficiency states the amount of additional tax and/or penalties

12  you owe and explains to you your right -- explains your right to

13  contest the deficiency by filing a petition with the United

14  States Tax Court.

15           We have enclosed publication 2105, why do I have to pay

16  taxes, which provides basic information about the tax system.

17           In answering your tax questions we encourage you to seek

18  advice from a competent tax professional or an attorney qualified

19  to practice in your state.  A copy of this letter and any

20  referenced enclosure have been forwarded to your authorized

21  representative.

22  Q.  Looking at the front page of this document, can you tell for

23  what tax -- which tax return, for what tax, for what trust tax

24  return when the letter was mailed in response to, for what tax

25  period?

1  A.  It's for the 2008 tax period that's in the top right hand.

2  Also in the middle of the document it states the tax period.

3  Q.  So that's for a trust return that was filed for tax year

4  2008, is that correct?

5  A.  Correct.

6  Q.  And Pages 3 and 4 of this document contain an identical

7  letter for a trust return filed for tax year 2007?

8  A.  Correct.

9  Q.  And is that also true for Pages 5 and 6 of this letter?  Does

10 it contain a letter, a frivolous filing letter for trust tax

11 return filed in the name of Hakeem El Bey Trust for the tax

12 period December 31, 2006?

13 A.  Yes.

14 Q.  For other documents also enclosed along with these three

15 frivolous filer letters?

16 A.  Yes.  There was additional information with the filing.

17 Q.  If we could go to Page 7 of IRS 11, is this one of the

18 documents that was enclosed with these three letters.

19 A.  Yes.

20 Q.  What is this document?

21 A.  This is actually called a 1040 V, or a payment voucher used

22 usually when you sent a check into the IRS for payment of tax.

23 It's to make sure that the account is credited with your check.

24 Q.  And what is the name of the individual submitting this

25 voucher?

1  A.  Shows Hakeem E. Bey.

2  Q.  And the last four digits of a Social Security number, is that

3  8096?

4  A.  Correct.

5  Q.  And there is a dollar amount on here, 16 801?

6  A.  Yes.  Shows the amount of 16,801.32.

7  Q.  Was payment attached to this payment voucher, either in that

8  amount or any amount?

9  A.  No.  There was no check included.

10 Q.  And a home address of 227 Markwood Drive, Warner Robins,

11 Georgia, is also on the voucher, is that correct?

12 A.  That's correct.

13 Q.  Okay.  If you could go to Page 8.  Was this document also

14 enclosed with the three frivolous filing letters?

15 A.  Yes.

16 Q.  What is this document?

17 A.  This is a 1096 which is actually a transmittal used for

18 businesses, banks, for instance, to send information to the IRS

19 for processing.  Usually information type of documents.

20 Q.  And does this form have any relevance to the $5,000 penalty

21 assessed against the Hakeem El Bey Trust in the three frivolous

22 filing letters about which you testified?

23 A.  As far as this being connected to the frivolous letters, no.

24 It's in addition to what the taxpayer sent in in support of

25 whatever he was mailing backs back to the IRS.

1  Q.  And is the taxpayer's name included in this form?

2  A.  It is.

3  Q.  What is that name?

4  A.  Hakeem El Bey.

5  Q.  And is -- was any payment included with this form?

6  A.  Not -- not with this form, no.  Not a payment.

7  Q.  If we could go to Page 10 of this exhibit.

8          Is this just the second page of that form?  Sorry.

9  A.  It is.  It's the second page, the instructions on that

10 document.

11 Q.  All right.  And moving on to Page 11, do you recognize this

12 document?

13 A.  Yes.

14 Q.  What is it?

15 A.  These are forms 1099 OID.

16 Q.  What is an OID?

17 A.  It stands for:  Original issue discount.  This is a form

18 used, an example would be if you purchased a bond at a reduced

19 price, so the face value is, say, a thousand dollars, you only

20 pay $500.

21         As the bond matures the bank is going to issue a 1099

22 OID that you would report to the IRS.

23         So it's income that you make from this investment.

24 Q.  Does this form have any relevance to the frivolous filer

25 civil penalties assessed against the Hakeem El Bey Trust?

1  A.  This is just documentation attached with the response the

2  taxpayer sent back.

3  Q.  And as with the other documents about which you have

4  testified, was any payment included with this document?

5  A.  No payment was included, no.

6  Q.  If we could turn now to Government Exhibit IRS 6.  It should

7  also be on the screen in front of you.  Is this a trust return?

8  A.  This is a trust return, yes.

9  Q.  What kind of trust return is it?

10 A.  This is an estates and trust form 1041 for 2008.

11 Q.  Tax return 2008, what is the name of the trust on this

12 return?

13 A.  It is Hakeem El Bey Trust.

14 Q.  All right.  And the name of the fiduciary?

15 A.  Hakeem El Bey, Trustee.

16 Q.  And the EIN?

17 A.  The same as the other documents we have looked at.

18 Q.  Is the date of the creation of the trust also the same?

19 A.  It is.

20 Q.  And have you examined this document before and are the line

21 items also the same?

22 A.  Yes.

23 Q.  This trust return is also signed and dated?

24 A.  It is signed by Hakeem El Bey.  The date is November 25th,

25 2009.

1  Q.  Looking at this document, can you tell when it was first
2  received by the IRS?
3  A.  Yes.  The very first received date for this tax return is
4  October -- or, excuse me, December 8th, 2009.
5  Q.  Is there another stamp indicating when it was received by the
6  IRS?
7  A.  It then shows the document was transferred to the frivolous
8  return program October 4th, 2010.
9  Q.  So that's nearly a year later.  It's about ten months later.
10 Why is that?
11 A.  Basically with the amount of tax returns and documents that
12 are received, these types of documents, it takes more time to
13 review them and actually get them to the place for the second
14 look.  So it's basically inventory of the IRS.
15 Q.  So this return was filed as frivolous, but it was filed -- I
16 mean identified as frivolous by the IRS sometime after -- some
17 months after it was received by the IRS, is that right?
18 A.  Yes, sir.
19 Q.  So did the defendant receive a frivolous filer letter in
20 response to that return?
21 A.  As far as this tax document with the received date of October
22 4th, 2010, I would have to look at an account, but in the letter
23 it initially says that we will not talk to you again about this.
24 Q.  Did the IRS issue a refund check as a result of the
25 defendant's filing this return?

1  A.  There was a refund check issued, yes.

2  Q.  If you could turn to Government Exhibit IRS 9.  Is this a

3  copy of that refund check?

4  A.  Yes, it is.

5  Q.  And was this refund check issued based on the information

6  provided in Government Exhibit IRS 6, the tax return about which

7  you just testified?

8  A.  Yes, it was.

9  Q.  For how much was that refund check?

10 A.  The check was for $300,000.

11 Q.  And to what entity was the issued?

12 A.  It was paid to Hakeem El Bey Trust.

13 Q.  And when is it issued?

14 A.  It was issued January 5th, 2010.

15 Q.  You mentioned the trust.  This anyone identified as trustee

16 on this check?

17 A.  Yes.  Hakeem El Bey, Trustee.

18 Q.  How was this check issued?

19 A.  This was what we refer to as a paper check, so it was issued

20 and mailed to the address.

21 Q.  From where was it sent?

22 A.  It's sent from the actual -- from the Austin, Texas, area.

23 Q.  And do you know that because it is also indicated on the

24 front of the return?

25 A.  Yes.

1  Q.  I mean the check?

2  A.  Yes.  The check shows that, yes.

3  Q.  If we could zoom back.  And there is numbers 12/08 on this

4  check.  What are the significance of those numbers?

5  A.  This shows that this refund was issued from a tax return, a

6  form 1041 that was filed for the tax period 2008.

7  Q.  Zoom back out.

8       Can you tell looking at this check whether it was

9  negotiated?

10  A.  Yes, it was.

11  Q.  How can you tell?

12  A.  First of all, by the signing of the check.  There is a

13  signature on it.  And the bank information.

14       Also, to receive this copy of the check through the IRS

15  it has to be negotiated.  We do not keep copies of checks that

16  are not actually negotiated.

17  Q.  If you could turn now to Government Exhibit IRS 7.  Is this

18  yet another trust tax return?

19  A.  It is.

20  Q.  And what kind of return is it?

21  A.  This is a form 1041.

22  Q.  And for what tax return?

23  A.  For the 2009 tax period.

24  Q.  According to the top of this return, was this tax return

25  filed in the name of the Hakeem El Bey Trust?

1  A.  It was.

2  Q.  And is this the name of the fiduciary Hakeem El Bey?

3  A.  It was as a trustee, yes.

4  Q.  Does it contain a EIN number?

5  A.  It has the employer identification number filled out in the

6  return, yes.

7  Q.  And is that the same EIN number that appeared in the

8  transcript marked IRS 20?

9  A.  It is.

10  Q.  Does it contain the same date of creation of the trust as the

11  previous four returns about which you have testified?

12  A.  It does, yes.

13  Q.  Does it contain the same line amount about the trust:

14  Income, amount of withholding, deductions, fiduciary fees, and a

15  claimed refund of $300,000?

16  A.  Yes, it does.

17  Q.  Is this return also signed and dated?

18  A.  It is signed under penalty of perjury by Hakeem El Bey,

19  5-20-2010.

20  Q.  Looking at the face of this document, can you tell when it

21  was first received by the IRS?

22  A.  The date stamped in the middle shows May 24th, 2010.

23         You said initially when it was received?

24  Q.  Is there a second stamp?

25  A.  Yes.  The second stamp shows that it was sent to the

1  frivolous return program August 23rd, 2010.

2  Q.  Once again, there is some lag time between when it's first

3  received by the IRS and when it's identified at frivolous, is

4  that correct?

5  A.  Correct.

6  Q.  Did the IRS issue a refund check in response to this return?

7  A.  Yes.

8  Q.  And was that refund check issued based on information

9  provided in this tax return?

10  A.  Yes, it was.

11  Q.  If we could pull up Government Exhibit IRS 10.

12         Is this a copy of that refund check?

13  A.  Yes, it is.

14  Q.  For how much is this refund check?

15  A.  This refund check is for $300,000.

16  Q.  When was it issued?

17  A.  The date of the check is June 22nd, 2010.

18  Q.  How was it issued?

19  A.  It is again a paper check mailed to Hakeem El Trust, through

20  the mail.

21  Q.  And was it mailed from Austin, Texas?

22  A.  Yes, it was.

23  Q.  To the Hakeem El Bey Trust.  And as with the previous check,

24  the address for the Hakeem El Bey Trust is 10134 South Calumet

25  Avenue, Chicago, is that correct?

1  A.  That's correct.

2  Q.  Looking at the numbers 1209, what are their significance?

3  A.  This is showing that the refund was issued from a tax return,

4  a form 1041 that was received for the tax period 2009.

5  Q.  If we could back out, zoom in on the bottom.  Can you tell

6  whether this check was negotiated?

7  A.  Yes, it has been negotiated.

8  Q.  How can you tell?

9  A.  Based on the signature and the bank information.  And also

10 once again, that we only maintain negotiated checks in our

11 system.

12 Q.  If we could pull up Government Exhibit IRS 8, Page 2 of that

13 exhibit.

14        Is this yet another trust tax return?

15 A.  Yes, it is.

16 Q.  What kind of return?

17 A.  This is a form 1041.  Again, the estate and trust return for

18 2007.

19 Q.  And is this entity identified on this trust identical to the

20 previous five, that is the Hakeem El Bey Trust?

21 A.  Yes.

22 Q.  Is Hakeem El Bey also identified as the trustee as with the

23 previous five returns about which you have testified?

24 A.  Yes.

25 Q.  Is there an EIN number on this trust?

1  A.  There is.

2  Q.  Is it the same EIN number that appears on the five previous

3  trust returns and Government Exhibit IRS 20?

4  A.  Correct.

5  Q.  And is the date on which the entity was purportedly created

6  also listed as February 18th, 1959?

7  A.  Yes.

8  Q.  Are the line items from this trust return identical to the

9  previous five trust returns?

10  A.  Yes, they are.

11  Q.  Specifically, the income earned by the trust, the expenses

12  being paid by the trust, the deductions that apply to the trust,

13  the amount of tax withholding on behalf of the trust, and the

14  $300,000 refund claimed by the trust?

15  A.  Yes.

16  Q.  Is this trust return also signed?

17  A.  Yes, it is signed under penalty of perjury, Hakeem El Bey.

18  Q.  There is no date, correct?

19  A.  This one was not dated, no.

20  Q.  Looking at the face of this document, can you tell when it

21  was first received by the IRS?

22  A.  The Internal Revenue Service received this November 29th,

23  2010.

24  Q.  And is there an FRP stamp on this trust return?

25  A.  There is not an FRP stamp on the face of this document.

1  Q.  But did the defendant -- was a refund check issued based on

2  this trust return, on the 2007 return?

3  A.  Not to my knowledge, no.

4  Q.  All right.  Other than the two refund checks which you have

5  already testified about, are there any other -- were there any

6  other refund checks issued to the Hakeem El Bey Trust as a result

7  of trust returns filed with the IRS?

8  A.  No.

9  Q.  Did the individual Hakeem El Bey file personal returns in the

10 name -- his own name for tax returns through 2006 and 2009.

11 A.  Yes.

12 Q.  I'd like to turn your attention now to what been marked as

13 Government Exhibit IRS 12, 13, 14, and 15.  Let me know when you

14 have had a moment to look at those.

15 A.  Okay.

16 Q.  What are these documents?

17 A.  These are certified copies of the individual income tax

18 returns filed by a Hakeem E. Bey, 2006.  Let me see, make sure.

19 2007, '8, and '9.

20 Q.  To your knowledge were any of these returns filed as

21 frivolous?

22 A.  No, they were not.

23 Q.  Do any of these returns purport -- report income of $900,000?

24 A.  No, there was no reporting of any $900,000 amount.

25 Q.  Did the IRS maintain records of withholdings associated with

1  these returns?

2  A.  Yes.

3  Q.  I'm going to direct your attention now to Government Exhibit

4  IRS -- Government Exhibits IRS 19 A, 19 B, 19 C and 19 D.  If you

5  could let me know what you have had a chance to look at those.

6  A.  Okay.

7  Q.  Based on your review of Hakeem El Bey's personal tax returns

8  and the withholdings -- well, first of all, what are those?

9  Pardon me.  What are Government Exhibits 19 A, 19 B, 19 C, and

10  19 D?

11  A.  These are the third-party income information that report

12  wages, withholding, any mortgage interest.  This is all in these

13  documents.

14  Q.  And do the withholdings, did the IRS withholding in those

15  records match up with the withholdings in Hakeem El Bey's

16  personal tax returns?

17  A.  Yes, they did.

18  Q.  So for years 2006, '7 and '8?  Sorry.  '6, '7, '8 and '9?

19  A.  Yes.  They did match.

20  Q.  Directing your attention to one last exhibit, Government

21  Exhibit IRS 21.  Let me know when you have had a moment to page

22  through that.

23  A.  Okay.

24  Q.  The Government Exhibit IRS 21, what is Government Exhibit IRS

25  21?

1  A.  This is a certified copy of what would be referred to as

2  correspondence.  It includes the second page of a bill and then

3  some attachments.

4  Q.  From whom was this correspondence received?

5  A.  It is received from Hakeem El Bey.

6  Q.  Go to the last page of this exhibit.  Displaying Page 6 of

7  this exhibit right now, is this the envelope in which documents

8  you just reviewed were enclosed?

9  A.  Yes.

10  Q.  And from whom was this envelope sent?

11  A.  It was sent from Hakeem El Bey.

12  Q.  And to whom was this envelope sent?

13  A.  Mailed to the Internal Revenue Service, Cincinnati, Ohio.

14  Q.  Yes.  What is the postmark on this envelope?

15  A.  Postmark shows October 31, 2011.

16  Q.  Do any -- does anything contained within this envelope

17  include payment for the civil penalties assessed against the

18  Hakeem El Bey Trust or bear any relevance to trust returns

19  identified by the IRS as frivolous in this case?

20  A.  There was no payment included, no.

21        MS. MALIZIA:  Your Honor, the government has no further

22  questions for this witness.

23        THE COURT:  Okay.  Thank you.

24        Thank you.  Miss Morgan, you're --

25        THE DEFENDANT:  Judge --

1          THE COURT:  Do you want to cross examine?

2          THE DEFENDANT:  I do.  I do.

3          THE COURT:  Okay.

4          THE DEFENDANT:  Yes, sir, I do.

5                     CROSS EXAMINATION

6  BY THE DEFENDANT:

7  Q.  I just want to ask you, can you state your name for me again?

8  A.  Kristy Morgan.

9  Q.  Okay.  Miss Morgan, how long have you worked for the Internal

10  Revenue Service?

11  A.  30 years.

12  Q.  Okay.  On one of those trusts she asked you did you

13  understand what those alphabets mean, those ARR meant, and you

14  said you didn't understand what that document --

15          MS. MALIZIA:  Objection, your Honor.

16          THE COURT:  I'm sorry, what?

17          THE DEFENDANT:  Your Honor --

18          MS. MALIZIA:  He is mischaracterizing.

19          THE DEFENDANT:  This is what you brought up.  So I'm

20  doing what you brought up.  You asked her did she know what it

21  was.  She says no.  How come I can't ask?

22          MS. MALIZIA:  Your Honor, I believe if we go back to the

23  record I did not in fact ask Miss Morgan that.

24  BY THE DEFENDANT:

25  Q.  She asked you, did you know what those meant, those alphabets

1  over my name on the tax form on 2006 1041.  She asked you did you

2  know what it meant?  You said no.

3            So now I want to ask you --

4  A.  I was not asked what those mean.  Regarding --

5  Q.  She asked you did you know what that meant over my name?

6  A.  No, sir, she did not.

7  Q.  Yes, she did, on 2006.  I circled it the minute she said it.

8  So I'm asking you, do you know what ARR means?

9  A.  I do not.

10  Q.  Okay.  And you got 30 years with the Internal Revenue

11  Service?

12  A.  Correct.

13  Q.  Okay.  Okay.  I'm going to break it down to you.  ARR means:

14  All Rights Reserved.  So now do you know what that means?

15            MS. MALIZIA:  Objection, your Honor.

16            THE DEFENDANT:  Your Honor, I can't -- I can't -- look,

17  did you --

18            THE COURT:  You can't testify.

19            THE DEFENDANT:  I'm not testifying.  I asked her.

20            THE COURT:  No, no.  Look, when you said ARR means all

21  rights reserved, you're testifying.  You're not supposed to

22  testify.

23            THE DEFENDANT:  I'm not.  I'm just suggesting.

24            THE COURT:  You are asking a question.  You told -- you

25  said ARR means something.

1          THE DEFENDANT:  Okay.  I'm not -- I can't --

2          THE COURT:  Now don't you say that.  You ask a question.

3   You don't tell the answer.

4          THE DEFENDANT:  Okay.  I'm sorry.

5          THE COURT:  Do you understand?

6          THE DEFENDANT:  Yes, sir.  I'm sorry.

7   BY THE DEFENDANT:

8   Q.  Okay.  So now -- okay.  Well, that -- I can't do that.  Okay.

9   I got another question since I can't do that.  My hands are tied.

10  So, okay.

11          In here is another question I want to -- okay.  I can't

12  even do that one.  Okay.  Here is a question:  On the document

13  here for the -- for the question to the jurors, question 12 on

14  one, it says that IRS processes tax returns based on voluntary

15  compliance.  Is that true?

16  A.  As far as the IRS receiving tax returns?

17  Q.  Yes.  What I'm saying is this:  This is what the IRS agents

18  wrote, the attorneys, they said that.

19          MS. MALIZIA:  Objection, your Honor.

20          THE DEFENDANT:  Your Honor, she wrote it.  I didn't

21  write it.  I'm just asking a question.  I can't do anything if I

22  can't answer a question that she wrote.  You know, everything I

23  do she objects.  I'm going to just asking what she wrote on the

24  paper.  They can just say anyway.

25          MS. MALIZIA:  Can we just clarify what the defendant is

1  referring to?

2          THE DEFENDANT:  Will you let me say?  I can't tell.

3  Every time I say a word you objected.

4          THE COURT:  What is your question?

5          THE DEFENDANT:  My question is, I just asked her a

6  question.  I asked is the IRS based on voluntary compliances?

7  I'm just asking her is it true?  Is it voluntary to comply to pay

8  taxes or not?  Because that's what they have on here.

9          MS. MALIZIA:  Your Honor, we withdraw our objection if

10 that's the defendant's question.

11         THE DEFENDANT:  I can't say two words.

12         THE COURT:  Do you understand the question?

13         THE WITNESS:  Generally, yes.

14 BY THE DEFENDANT:

15 Q.  Okay.  So you are saying yes?

16 A.  No, I understand the question.

17 Q.  Yes.

18 A.  Now you can have my answer.

19 Q.  Yes, ma'am.

20 A.  The tax laws are based on individuals taking their

21 information, voluntarily putting them on the tax returns, and

22 mailing them to the IRS.

23 Q.  Okay.

24 A.  However, the law states if you don't do that the IRS can come

25 in and file for you because the law states you file and pay your

1  income tax.

2  Q.  Now, you just contradicted yourself.  Because in one case you

3  are saying that the IRS is saying filing taxes is voluntary

4  compliance?

5          THE COURT:  Look, paying taxes is not voluntary.

6          THE DEFENDANT:  That's what it says here.  I'm not

7  saying it.

8          THE COURT:  Come on.

9          THE DEFENDANT:  Judge, I'm not saying it.

10          THE COURT:  You don't pay your tax, you go to jail.

11          THE DEFENDANT:  Judge, I'm just saying what they are

12  saying what they have --

13          THE COURT:  Payment of taxes to the government is not

14  voluntary.

15          THE DEFENDANT:  Okay.  Judge, so you brought in from

16  behind the law.

17          THE COURT:  Just -- look, I'm going to kick you out if

18  you keep on with this nonsense.  You understand that?  You can go

19  watch the case from another room.

20          THE DEFENDANT:  Okay.  I am through.

21          THE COURT:  Don't you say that tax payment is voluntary.

22          THE DEFENDANT:  I just asked a question.  I didn't say

23  it was.  It's on the paper.  I didn't say that, Judge.  But I'm

24  done.  I'm done.

25          MS. MALIZIA:  Your Honor, we have no redirect.

1          THE COURT:  Pardon?

2          MS. MALIZIA:  We have no redirect.

3          THE DEFENDANT:  I'm through with --

4          THE COURT:  All right.  Enough for today.  We will
5    recess now, we will resume at 1:30 tomorrow afternoon.  And I
6    will remind you that you are not to discuss the case with other
7    people or each other.  And we see you all tomorrow.

8       (At 2:58 jury out.)

9          THE DEFENDANT:  Can I ask a question real quick?  Am I
10   allowed to take this book with me?

11         THE COURT:  Sure.

12         MR. HOTALING:  It's yours.

13         And, Judge, obviously we would ask the witness be
14   allowed to step down if there are other matters that we intend to
15   address.

16         THE COURT:  Yes.  Thank you, Miss Morgan, for your
17   testimony.

18      (Witness excused.)

19         THE COURT:  Is there anything else you want to discuss
20   or should we go?

21         MR. FUENTES:  I have a concern as standby counsel, if I
22   may be heard?

23         THE COURT:  Sure.

24         MR. FUENTES:  Judge, when the Court appointed me standby
25   counsel, we gladly agreed to do that, fulfilling I think a

1    responsibility to respond to Court appointments.

2            I'm concerned that at this point I'm not really able to

3    communicate with the client.

4            The Court has even said that I shouldn't really have a

5    discussion with him.  We had a discussion at sidebar where he

6    said that my attempts to give him advice amounted to harassing

7    him, resulting in an order from the Court for me to go back into

8    the gallery and I have refrained from saying anything to him.

9            And, Judge, I think that really undermines the whole

10   function of standby counsel.  If I can't communicate with him I'm

11   not sure why I'm here.

12           The other reason I think I've been here is that the

13   Court expressed a concern with the positions Mr. El Bey was

14   taking.  The Court suggested that at some point Mr. El Bey might

15   forfeit his right to represent himself, in which case the Court

16   might appoint standby counsel to be trial counsel.

17           And when that first came up at the status hearing on

18   February 12th, I think I was careful to mention that Mr. El Bey

19   was going to reserve right to object to that.  He may object to

20   it and he may still.

21           And the reason why I mention it now, Judge, is I'm not

22   sure the direction the standby counsel representation is going in

23   right now, because we had an opening statement in which Mr. El

24   Bey made a pronouncement about the Pope.  I think he prejudiced

25   himself in front of this jury when he did that.

1    I think his cross-examination he just conducted

2 prejudiced himself.  I think that resulted in an argument in

3 front of the jury between Mr. El Bey and the Court.  The Court

4 expressed its obvious displeasure and upset with the defendant.

5 The jury saw that.  I think he prejudiced himself.

6    So I'm concerned if the Court wants standby counsel to

7 continue to stick around while more of this continues, of course,

8 we will comply with what the Court wants us to do.  But my

9 thought is that it might be appropriate at this time if the Court

10 would entertain a request from standby counsel to withdraw and be

11 discharged as standby counsel.

12    Unless the Court thinks that perhaps there is going to

13 be a function for me here.

14    So I hope I have made myself clear.  I'm sorry to have

15 gone on and on.  And I mean no disrespect at all to Mr. El Bey,

16 to counsel, or the Court in my characterizations of what I

17 observed today.

18    THE COURT:  No, I understand your position, Mr. Fuentes.

19    But it is possible -- I mean, there are two

20 possibilities.  One, Mr. El Bey, if you continue disobeying my

21 orders you are out of here.  You will be tried in absentia.  You

22 will be sent to some room and you can watch this on TV or I will

23 have you arrested and put in jail.

24    You are disobeying my orders.

25    THE DEFENDANT:  Okay, Judge.

1          THE COURT:  You must not say that the payment of taxes

2     is voluntary.

3          THE DEFENDANT:  Judge, I didn't say that.

4          THE COURT:  It's a crime not to pay taxes.

5          THE DEFENDANT:  It was on the paper.  I didn't say that.

6          THE COURT:  I don't give a damn what it is.  You are not

7     to say things like that.  You are not obeying my order.

8          THE DEFENDANT:  I haven't --

9          THE COURT:  You're not bringing the Pope into this case.

10          THE DEFENDANT:  Okay.

11          THE COURT:  Now --

12          THE DEFENDANT:  I'm not trying to disrespect you in any

13     way, form or fashion.  I was asking a question on the paper,

14     that's all I asked.

15          I don't feel I did anything wrong.  I just asked what

16     was on her paper.  They wrote the paper, I didn't, Judge.  I just

17     asked the question.

18          THE COURT:  What she explained, which is obvious, is

19     that the Internal Revenue Service, the government would like

20     people to pay the taxes that are due.  If they don't pay the

21     taxes that are due, then they are sued, prosecuted, arrested,

22     what have you.

23          THE DEFENDANT:  Okay.

24          THE COURT:  In fact, they are drained dry by the

25     Internal Revenue Service of all their money because you have to

1   pay taxes.

2          THE DEFENDANT:  Okay.  Judge, I'm not --

3          THE COURT:  Don't you try to create an impression that

4   paying taxes is voluntary in the United States.

5          And I don't want that little flag showing either.  And I

6   don't want any crap about the trimmings on this flag showing this

7   is an admiralty court.  This is wrong.

8          I have told you in my order there is going to be nothing

9   about admiralty, and if you disobey my order again you are out of

10  here.

11         Now, if you are out of here, Mr. Fuentes will be your

12  lawyer.

13         That's why I want you, Mr. Fuentes, to remain around.  I

14  know it's very frustrating for you.  You are not being treated

15  well.  But I want you to be here because you may have to be his

16  lawyer --

17         MR. FUENTES:  Understood.  And I will comply with all

18  court orders.

19         THE DEFENDANT:  Can I just say one thing, Judge?

20         THE COURT:  Sure.

21         THE DEFENDANT:  I'm not trying to disrespect your orders

22  in any way, form or fashion.  And you -- you keep talking about

23  Mr. Fuentes, but you don't think I'm being disrespected or

24  belittled, everything I say, I say one word, she objected.

25         THE COURT:  Because you are not a lawyer and you don't

1  know what the law is.  You don't know law.

2          THE DEFENDANT:  Judge, I don't have to be a lawyer to

3  know the law.  I know what exactly the law is.  I understand it.

4  I'm trying --

5          THE COURT:  You don't know the law because this stuff

6  that you have been shoving at me for the last month about the

7  Stamp Act and about the Foreign Sovereign Immunities Act and

8  about the admiralty law and about the Uniform Commercial Code and

9  about the common law, this is all complete bullshit.

10          This has absolutely nothing to do with this case.  And

11  I'm telling you that.

12          And when the Judge says this is what's the law relevant

13  to this case, and this other stuff isn't, you have to obey me and

14  not keep arguing with me.

15          And if you keep arguing, I kick you out, and I appoint

16  Fuentes and he becomes the lawyer, and you don't get to say

17  anything.

18          THE DEFENDANT:  I'm not trying to argue with you.

19          THE COURT:  If you don't understand that -- you better

20  understand that.  I have been very patient with you.  My patience

21  is running out.  And I want you to understand that.

22          THE DEFENDANT:  I hear you, Judge.  I understand.

23          THE COURT:  So see you all tomorrow.

24          MR. HOTALING:  Was it 1:30 or 2:00 o'clock tomorrow?

25          LAW CLERK:  1:30 or 2:00?  You have said different

1   times.

2            THE COURT:  1:30.

3            MR. HOTALING:  1:30.  Great.  Thank you, your Honor.

4            MS. MALIZIA:  Thank you, Judge.

5         (Proceedings adjourned at 2:49 p.m. to 1:30 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25