178

1                    IN THE UNITED STATES DISTRICT COURT
                       NORTHERN DISTRICT OF ILLINOIS
2                            EASTERN DIVISION

3   UNITED STATES OF AMERICA,          )
                                       )
4                      Plaintiff,      )
                                       )  No. 14 CR 447
5              vs.                     )  Chicago, Illinois
                                       )  March 3, 2015
6   HAKEEM EL BEY,                     )  1:30 p.m.
                                       )
7                      Defendant.      )

8
                               VOLUME 2
9                     TRANSCRIPT OF PROCEEDINGS
                BEFORE THE HONORABLE RICHARD A. POSNER
10                           AND A JURY

11  For the Plaintiff:          U.S. ATTORNEY'S OFFICE
                                219 South Dearborn Street
12                              Chicago, Illinois 60604
                                BY:  MR. CHRISTOPHER HOTALING
13                                   MS. KATHRYN E. MALIZIA

14  The Defendant:              MR. HAKEEM EL BEY
                                439 Hoxie Avenue
15                              Calumet City, Illinois 60409

16
    Defense Standby Counsel:    JENNER & BLOCK
17                              353 North Clark Street
                                Chicago, Illinois 60654
18                              BY:  MR. GABRIEL A. FUENTES

19  Official Court Reporter:    MAELLEN E. PITTMAN, FCRR, RDR
                                219 South Dearborn Street
20                              Room 2342
                                Chicago, Illinois 60604
21                              (312) 435-5576

22

23

24

25

1      (Proceedings heard in open court:)

2           THE CLERK:  14 CR 447, U.S.A. versus Hakeem El Bey.  For

3    trial.

4           THE COURT:  Good afternoon.  I'm going to make a brief

5    statement before the jury comes in.

6           MS. MALIZIA:  Your Honor, for the record, Kathryn

7    Malizia and Christopher Hotaling for the United States.

8           MR. HOTALING:  Good afternoon, your Honor.

9           MR. FUENTES:  For the record, Gabriel Fuentes, standby

10   counsel, is present.  The defendant is present in court.

11          THE DEFENDANT:  Defendant Hakeem El Bey is present.

12          THE COURT:  Hi, Mr. El Bey.

13          THE DEFENDANT:  Good afternoon.  How are you doing

14   today?

15          THE COURT:  Okay.  So I want to make a brief statement

16   before the jury enters.  Sit down, relax.

17          So I want to apologize, Mr. El Bey, for something

18   yesterday.

19          I got -- I was disturbed when you -- remember, you asked

20   Miss Morgan what does an ARR mean, and she said she didn't know

21   and you said it means all rights reserved.

22          And I got annoyed because you were answering a question,

23   which is not proper on cross-examination.

24          What I realized, belated, is that I had promised you at

25   the beginning -- because you are not a lawyer -- I would brief

1   you before each new phase of the case, and I neglected to do that

2   with cross-examination.

3        I should have told you -- I'm telling you now -- that

4   when you cross-examine a witness you ask questions and you can't

5   supply the answer.

6        Okay.  So to clarify.

7        Now, I am concerned by the fact -- and we have been

8   through this a lot -- that you have made statements to the jury

9   which have violated my orders.  So I just -- so yesterday there

10  were several things you made, and I just want to remind you that

11  you have to accept my rulings on matters of law.

12       Now, I could be wrong, but if -- should you be

13  acquitted, of course, that's the end of the case.  Should you be

14  convicted and you want to appeal, you can challenge my rulings.

15       And as I said yesterday, I've tried cases over the years

16  and occasionally there have been appeals and I have been

17  reversed.  And contrary to I think to a concern you had, if a

18  district court decision -- a district court case that I have

19  presided over is appealed, I'm not allowed to have anything to do

20  with that appeal.  No one can consult me about it.

21       So -- okay.  So I'll just mention these five statements

22  you made, which you shouldn't make.  Because -- because I have

23  ruled that they are not appropriate.

24       One is that you didn't consent to jury selection.

25       Another is that -- this Court is fictitious because of

1    the -- because of the gold fringe on the flag, which means that

2    is an admiralty court.  So that's not true.

3          Then you said the Pope had declared all corporations

4    null and void.  Well even if the Pope -- I don't think he did

5    that -- but if he did that that would not have a bearing on

6    American law.

7          And you also implied that the payment of federal taxes

8    is voluntary, which it is not.  But it was a confused exchange,

9    and later when the jury comes in I'm going to try to clarify that

10   issue about voluntary payment of taxes.

11         Just one more question, this is for Miss Malizia:  How

12   many more witnesses do you anticipate?

13         One reason I'm asking is that I received a couple of

14   notes from jurors expressing concern about next week.

15         MS. MALIZIA:  Your Honor --

16         THE COURT:  And I'm going to -- I think it very unlikely

17   the case would last to next week.

18         MS. MALIZIA:  Your Honor, we also think it's very

19   unlikely the case will last through next week.  Of course some of

20   that will depend on whether or not the defendant puts on a case.

21         The government anticipates calling six custodial

22   witnesses today.  We anticipate their testimony will take 10 to

23   15 minutes at most, including cross, after which we will put on

24   three IRS representatives, and we anticipate their testimony

25   should be concluded by the end of the morning tomorrow.

1          THE COURT:  Okay.  And the next point about it, I was

2     wondering, with Miss Morgan's examination yesterday, several of

3     the Internal Revenue forms were identical except for maybe

4     dates -- well, except for dates.

5          Is there any way in which if -- the documents are

6     essentially identical to each other, is there some way in which

7     you can save some time by not examining the witness about the

8     identical portions of those documents?

9          MS. MALIZIA:  Oh, your Honor, we did try to -- we did

10    try to run through that portion of the examination in summary

11    fashion.  Each of those trust returns that I believe you are

12    referring to actually is a charged count in the indictment.

13         THE COURT:  Oh, no.  I understand they are critical.

14         What I'm wondering is whether you could say to Miss

15    Morgan, because it says here:  Looking at this document, do you

16    see the $900,000 figure, do you see the $300,000 figure?  Is

17    there anything else that would -- is there any difference from

18    these other documents other than the date?

19         MS. MALIZIA:  Your Honor, going forward we will do our

20    best to --

21         THE COURT:  Okay.  That's fine.

22         MS. MALIZIA:  -- proceed in more summary fashion to save

23    time.

24         THE COURT:  That's fine.

25         Okay.  Well, you can bring the jury in now.

1    MS. MALIZIA:  Your Honor, if we could have just a couple

2  moments for a few housekeeping matters before you bring the jury

3  in?

4    THE COURT:  Well, I don't know if I can catch them.

5    MS. MALIZIA:  I didn't realize that you were just

6  calling them in.

7    THE COURT:  That's fine.  I'm sure they can be

8  intercepted.

9    Yes.

10    MS. MALIZIA:  The government has two new exhibits.  They

11  are not new, per se, they are replacement exhibits for the

12  currently existing Wells Fargo 1.  These are clearer copies of

13  Wells Fargo 1 and Wells Fargo 2.

14    They are account applications that we will be

15  introducing today through a bank custodian.

16    If I may tender a copy to --

17    THE COURT:  And you are going to show a copy to Mr. El

18  Bey?

19    MS. MALIZIA:  Yes.  Mr. El Bey and standby counsel both

20  have copies.

21    THE COURT:  All right.  That's fine.

22    MS. MALIZIA:  Your Honor, the government does share the

23  Court's concerns that some of what happened yesterday may have

24  been potentially prejudicial to the defendant.  But more

25  importantly, perhaps, has left a misimpression with the jury in

1  certain respects.  And in that vein the government has a couple

2  of suggestions that we will hope you entertain.

3           Just to sort of cabin off some of the defendant's

4  conduct from what the jury should be hearing, the government

5  would suggest from this point forward proceeding with speaking

6  objections only.  And to the extent the Court wants to --

7           THE COURT:  What?  Speaking objections?  What does that

8  mean?

9           MS. MALIZIA:  Yes, your Honor.  It's customary in many

10  courtrooms for lawyers just to object by objecting, and if the

11  Court wants to hear the counsel's rationale we can discuss it at

12  sidebar.  And in this way we may be able to sort of minimize some

13  of what took place yesterday in terms of the defendant's

14  disruptive behavior.

15          THE COURT:  So but by -- what you mean by "speaking

16  objection" is that --

17          MS. MALIZIA:  Literally.

18          THE COURT:  -- the objection is one word or something?

19          MS. MALIZIA:  Yes.  Literally just the word:  Objection.

20  And if your Honor wishes to rule on it, a one-word ruling.

21          But if you think it merits further discussion, we could

22  have the discussion at sidebar.

23          THE COURT:  Okay.  That's fine.

24          Is that it?.

25          MS. MALIZIA:  That's it.  Thank you.

1            THE COURT:  Okay.  Yes.

2            THE DEFENDANT:  I did -- I did want to say something,

3   your Honor.

4            THE COURT:  Sure.

5            THE DEFENDANT:  I'm going to be on my best behavior

6   today.  And if I offended you yesterday it wasn't intentionally.

7   I just felt like, you know, everything was going against me.  No

8   for me and yea for them.

9            So it wasn't even.  It wasn't an even courtroom, let's

10  just say court.

11           So -- but I will honor your rules and won't be

12  disrespectful in any way.

13           THE COURT:  That's fine.

14      (At 1:46 p.m. jury in.)

15           THE COURT:  So welcome back.  Before we resume the

16  government's case, I have some remarks I'd like to make.

17           First, I received two notes from jurors who have

18  expressed concern about commitments they have next week and, you

19  know, anxiety about whether the trial will still be going on next

20  week.

21           That is very, very unlikely.  So I think you can set

22  those fears aside.

23           In the unlikely event that the trial does extend to next

24  week, then we will make appropriate arrangements in response to

25  on your concerns, because we do have alternate jurors.

1       So I want to try to clarify some remarks I made at the

2  close of yesterday's session.

3       So this is a difficult case because Mr. El Bey has

4  decided, you know, to represent himself without a lawyer.  He is

5  entirely entitled to do that.  That's fine.  But of course, it

6  creates difficulties.  And we try to minimize these difficulties.

7       But you'll recall that yesterday I asked all of the

8  prospective jurors during the jury selection process -- that

9  means all of you -- whether you would accept and abide by my

10  instructions of law even if you disagreed with the law, and you

11  all said you would.

12       And a prospective juror who wouldn't agree to accept and

13  abide by the judge's instructions would not be permitted to serve

14  on a jury.

15       So the jury determines the facts, applies the law to the

16  facts, and so decides, you know, the guilt or innocence of the

17  defendant.

18       But the law that the jury applies is the law given by

19  the judge.

20       Now, this rule also binds the lawyers and it binds a

21  party like Mr. El Bey, who has decided to represent himself.

22  Whatever anybody thinks should be the law, is the law, really is

23  the law, and so on.  You have to accept my instructions on the

24  law.

25       And of course, if Mr. El Bey is convicted -- if he is

1    acquitted.  Of course, that's the end of everything.  If he is

2    convicted he can appeal, he can challenge my rulings.  But during

3    the trial he, like the jurors, like the lawyers, have to abide by

4    what I say the rule is.

5            And at several points yesterday Mr. El Bey made

6    arguments that were contrary to the law as I stated it, and my

7    duty to try to dissuade him, prevent him from making such

8    arguments.

9            But I think it's very important for you as jurors to

10   understand that any difficulties that I have had with Mr. El Bey

11   over what he can or cannot state the applicable law to be has

12   nothing to do with the question of the guilt or innocence of the

13   charges that the government has brought against him.  And that

14   guilt or innocence, that's the issue for you.

15           So I mean you're going to decide whether to convict or

16   acquit him of particular charges.  Whether he abides by my

17   instructions as to what he can say and, you know, what legal

18   positions he can assert, that's a complete -- that's a complete

19   side issue which you should ignore.

20           You can have a defendant who has perfectly comported

21   himself in a courtroom, complete obedience to the judge's

22   instructions, and he would be convicted if the jury found him

23   guilty, right?  No matter how smooth he was.

24           And conversely, you can have a defendant who is

25   difficult and has arguments with the judge, and so on, but he can

1    still be innocent.  If he is innocent then he is innocent.

2         So you don't have to worry about the exchanges that Mr.

3    El Bey and I have had.  And I don't want you to feel any

4    hostility to Mr. El Bey just because I got annoyed occasionally.

5         You are just concerned with whether the government can

6    prove beyond a reasonable doubt that he is guilty, and if it

7    can't then he walks.

8         Now, there are a couple of other minor points -- again,

9    trying to clarify some remarks I made yesterday.

10        So I expressed a concern when Mr. El Bey was cross

11   examining Miss Morgan, the Internal Revenue Service employee who

12   was the first witness, I got concerned because when he asked her

13   what does ARR mean, and she said she didn't know, he said:  It

14   means all rights reserved.

15        Now, that was improper because when you're examining a

16   witness, you're asking questions, you're not answering questions,

17   you know.  It's like -- not like a ventriloquist dummy, you know.

18        So but I had been remiss because I hadn't explained to

19   Mr. El Bey in advance that he mustn't answer questions that he

20   asks on cross-examination.

21        Because I -- I had planned and begun to give Mr. El Bey

22   a short briefing before each new phase of the trial so that he

23   would be better prepared for how to participate, since he is not

24   a lawyer.

25        So before the opening statements, I told him a little

1 about opening statements.

2       But I neglected before cross-examination to explain the
3 limits on cross-examination.

4       So he made a mistake, but I consider myself responsible
5 because I hadn't briefed him adequately.

6       The other and final point I just wanted to make --
7 almost final -- there was an exchange, another exchange between
8 Mr. El Bey and Witness Morgan concerning taxation, and Mr. El Bey
9 said -- I'll read this back to you, it says that IRS processes
10 tax returns based on voluntary compliance, is that true?

11       And Miss Morgan said:  As far as the IRS receiving tax
12 returns?

13       And he said:  Yes.  What I'm saying is this, this is
14 what the IRS agents wrote:  Is it voluntary to comply to pay
15 taxes or not?

16       And she said:  The tax laws are based on individuals
17 taking their information voluntarily , putting this on that,
18 returns, and mailing them to the IRS.

19       And he said:  Okay.

20       And then she said:  However, the law states that if you
21 don't do that the IRS can come in and file for you because -- and
22 then there are missing words.

23       And then Mr. El Bey said, which concluded the exchange:
24 Now, you just contradicted yourself because in one case you're
25 saying that the IRS says filing taxes is voluntary.

1       And that's when I said:  Paying taxes is not voluntary.
2  And that is absolutely clear.

3       I think the confusion here is over the term "voluntary."

4       So the IRS prefers that taxpayers file their tax returns
5  on time without being dragged down to the local IRS office by
6  their hair.  So everyone is supposed to file his tax return,
7  unless asked for an extension, by April 15th.

8       But the IRS doesn't come to you on April 15th and yank
9  you down to the IRS office.  So they are trying to get your
10  cooperation.

11       But it is very important that we all understand that the
12  payment of taxes is not voluntary.  You must pay taxes.  And
13  that's an example of the rule of law which I tell you that's the
14  rule of law, it is the rule of law, it can be challenged but in
15  the Court of Appeals, but not by me.

16       Now, this is also something of a red herring because
17  it's important to understand, Mr. El Bey is not charged in this
18  case with not paying taxes.  He is charged with obtaining tax
19  refunds from the Internal Revenue Service by fraud.  So his duty
20  to pay taxes is not an issue.

21       And similarly, when I said at the very end of the jury
22  phase of the trial yesterday, when I said:  If you don't pay
23  taxes you go to jail, what I was simply saying was you must pay
24  taxes, and if you don't pay taxes it's criminal and you can be
25  sent to jail.

1    I was not talking about Mr. El Bey, because he isn't

2   charged with tax evasion.

3    Now, as I said, I want -- it's very important that you

4   keep separate in your minds Mr. El Bey's tendency to make

5   statements that go outside the proper scope of the trial and his

6   guilt or innocence, which is the only issue you are concerned

7   with.

8    So what I want to do now is just take a minute, I want

9   to repeat to each of you a question I asked you as prospective

10  jurors and see whether you are -- will give the same example.

11   So do we have a list of the names of everybody?

12   THE CLERK:  Sure.

13   THE COURT:  Take your time.  We can wait.

14   THE CLERK:  I have a list here somewhere.

15   THE COURT:  Okay.  Thank you very much.  Okay.

16   MS. MALIZIA:  Your Honor, before you proceed, could we

17  have a quick sidebar, please?

18   THE COURT:  Excuse me?

19   MS. MALIZIA:  Before you proceed, may we have a quick

20  sidebar?

21   THE COURT:  Okay.

22    (Proceedings heard at sidebar:)

23   MS. MALIZIA:  Sorry, your Honor.  What question were you

24  about to ask the jury?

25   THE COURT:  Oh, just whether you feel you can be

1    impartial.

2            MR. HOTALING:  Fair and impartial.

3            MS. MALIZIA:  You are just going to poll them by names?

4    Would your Honor entertain polling them by --

5            MR. HOTALING:  It's okay.  No.  I mean, it's a

6    little -- it's a little odd but --

7            THE COURT:  It is.

8            MR. HOTALING:  So we were a little taken aback, so

9    that's the reason we asked for the sidebar.  It's a little off

10   the beaten path for us.

11           So just to make sure again, you intend to ask each

12   member, each juror that particular question:  Is there anything

13   that would impact your ability to be fair and impartial with

14   respect to this case moving forward?

15           THE COURT:  Well, I think it will be even briefer.

16   Whatever the question --

17           MR. HOTALING:  That you posed yesterday.

18           THE COURT:  Yeah.  I think it was the last question.

19           MR. HOTALING:  You are just going to go by juror name?

20           THE COURT:  Exactly.

21           MR. HOTALING:  Thank you, Judge.

22       (Proceedings heard in open court:)

23           THE COURT:  Okay.  So Mr. Adams, is there any reason why

24   you might be unable to be impartial in deciding this case?

25           JUROR ADAMS:  No.

```
 1          THE COURT:  Thank you.
 2          Miss Chapelli?
 3          JUROR CHAPELLI:  Yes.
 4          THE COURT:  Mr. Chapelli, I'm sorry about that.
 5          Mr. Chapelli, is there any reason why you might be
 6  unable to be impartial in deciding the case?
 7          JUROR CHAPELLI:  No.
 8          THE COURT:  Miss Fetty.
 9          JUROR FETTY:  Yes.
10          THE COURT:  Is there any reason why you might be unable
11  to be impartial in deciding the case?
12          JUROR FETTY:  No.
13          THE COURT:  Miss Fleita, is there any reason why you
14  might not be able to be impartial in deciding the case?
15          JUROR FLEITA:  No.
16          THE COURT:  Was there an answer?
17          THE CLERK:  She said no.
18          JUROR FLEITA:  Yes, I can be impartial.
19          THE COURT:  Okay.  Mr. -- sorry.  Miss Shannon -- Miss
20  Shannon -- sorry -- Miss Fox, is there any reason you might be
21  unable to be impartial --
22          JUROR FOX:  No.
23          THE COURT:  -- in deciding this case?
24          Thank you.
25          Mr. Gibbons, is there any reason you might be unable to
```

1   be impartial in deciding this case?

2         JUROR GIBBONS:  No.

3         THE COURT:  Mr. Ilagan, is there any reason why you

4   might not be impartial?

5         JUROR ILAGAN:  No.

6         THE COURT:  Miss Chiappa --

7         JUROR CHIAPPA:  Yes, here.

8         THE COURT:  -- is there any reason why you might not be

9   able to be impartial in deciding this case?

10        JUROR CHIAPPA:  No.

11        THE COURT:  Miss Jerele, is there any reason you might

12  not be impartial -- might be unable to be impartial in deciding

13  this case?

14        JUROR JERELE:  No.

15        THE COURT:  Miss Jones -- Mr. Jones, is there any reason

16  why you might be unable to be impartial in deciding --

17        JUROR JONES:  Yes, your Honor.  No, your Honor.

18        THE COURT:  Excuse me?

19        JUROR JONES:  No, your Honor.

20        THE COURT:  Thank you.

21        Mr. Mauro, is there any reason why you might be unable

22  to be impartial in deciding this case?

23        JUROR MAURO:  No.

24        THE COURT:  And Miss Sawko, is there any reason why you

25  might be unable to be impartial in deciding this case?

1          JUROR SAWKO:  No.

2          THE COURT:  And Miss Shoopman, is there any reason why

3    you might be unable to be impartial in deciding this case?

4          JUROR SHOOPMAN:  No.

5          THE COURT:  And finally, Miss Smith, is there any reason

6    why you might be --

7          JUROR SMITH:  No.

8          THE COURT:  Okay.  Thank you very much.

9          And we will now proceed to the trial itself.

10         And Miss Malizia, do you have additional witnesses?  Or

11   Mr. Hotaling?

12         MR. HOTALING:  Yes.  At this time, your Honor, the

13   government calls to the stand David Shilney.

14         THE CLERK:  Raise your right hand.

15      (Witness sworn.)

16         THE CLERK:  Be seated.

17          DAVID B. SHILNEY, GOVERNMENT'S WITNESS, SWORN

18                       DIRECT EXAMINATION

19   BY MR. HOTALING:

20   Q.  Good afternoon, sir.

21   A.  Good afternoon.

22   Q.  Could you please introduce yourself to the jury by stating

23   and then spelling your name?

24   A.  David B. Shilney.  D-a-v-i-d, middle initial B, last name

25   Shilney, S-h-i-l-n, as in Nancy, -e-y.

1  Q.  And, sir, where do you work?

2  A.  For United States Postal Service.

3  Q.  And how long have you worked for the United States Postal

4  Service?

5  A.  More than 30 years.

6  Q.  And within which division or department at the postal service

7  do you currently work?

8  A.  I work for Central Illinois District.  I'm the manager of

9  human resources.

10  Q.  And how long have you served as the human resources director?

11  A.  Close to four years.

12  Q.  What are your duties and responsibilities as the director of

13  human resources?

14  A.  I oversee all the support functions for the -- for

15  operations, training, personnel, complement, safety, injury comp.

16  Q.  So would it be fair to say that based on your many years

17  working at the United States Postal Service, that you are

18  familiar with the various forms and documents that the department

19  uses, processes and keeps in its records?

20  A.  Yes.

21  Q.  How does the postal service keep and maintain its human

22  resources records?

23  A.  Well, right now we keep them on a server.  The personnel

24  files are kept in what's a -- it's an eOPF, an employee -- eOPF

25  is employee personnel folder.  Employees have access to their own

1  folder and human resources has access to those folders.

2  Q.  Certainly.  And so just to make sure I'm clear, are those

3  human resources records kept in hard copy, are they kept

4  electronically, or both?

5  A.  They started out hard copy.  They are now electronically.

6  Everything was scanned into the electronic version.

7  Q.  And how long are human resources records kept?

8  A.  It would depend on the function.

9  Q.  Depending on what, for example?

10 A.  Well, safety records are kept for five years.  OPF records

11 are kept for the life of the employee, as long as the employees

12 work for postal service.  When they retire they are transferred

13 over to OPM, which is the Office of Personnel Management.

14 Q.  And who has access to human resources records?

15 A.  Human resources employees.

16         MR. HOTALING:  Your Honor, may I approach the witness?

17         THE COURT:  Sure.

18 BY MR. HOTALING:

19 Q.  Sir, I am showing you what has been marked for identification

20 as Government Exhibit USPS 1.  If you could take a look at that.

21 Do you recognize that exhibit, sir?  Do you recognize that

22 exhibit?

23 A.  Yes, I do.

24 Q.  And what is it?

25 A.  These are records that were kept in the eOPF, scanned in.

Shilney - Direct by Hotaling                    198

1  Q.  And how is it that you are familiar with the types of

2  documents that are contained within that exhibit?

3  A.  They are used in daily business for postal service employees.

4  Q.  Now, was that exhibit that you have in front of you and the

5  documents contained within it made at or near the time of the

6  events appearing in them?

7  A.  Yes.

8  Q.  Is it the regular practices of the United States Postal

9  Service to make or maintain these types of records?

10  A.  Yes.

11  Q.  Were these records kept in the course of the regularly

12  conducted business activity of the United States Postal Service?

13  A.  Yes.

14       MR. HOTALING:  Your Honor, at this time I move for the

15  admission into evidence of Government Exhibit USPS 1.

16       THE COURT:  Okay.  That's granted.

17     (Government Exhibit USPS 1 received in evidence.)

18       MR. HOTALING:  Your Honor, I have no further questions

19  and I would tender the witness for cross-examination.

20       THE COURT:  Okay.  Mr. El Bey, do you want to

21  cross-examine this witness?

22       THE DEFENDANT:  No, not right now.  No.

23       THE COURT:  Thank you.  You're excused.

24     (Witness excused.)

25       MS. MALIZIA:  Your Honor, the government calls Cary

1  Shaffer.

2         THE COURT:  Okay.

3         MR. HOTALING:  Judge, if it's okay, I'm going to

4  retrieve the exhibit that the witness just testified about.

5         THE COURT:  Sure.  Sorry.

6         Would you raise your right arm, please.

7     (Witness sworn.)

8         CARY SHAFFER, GOVERNMENT'S WITNESS, SWORN

9              DIRECT EXAMINATION

10        THE COURT:  Okay.  Be seated.

11 BY MS. MALIZIA:

12 Q.  Mr. Shaffer, will you please state and spell your name for

13 the jury.

14 A.  My name is Cary Shaffer.  C-A-R-Y, S-H-A-F-F ER.

15 Q.  Mr. Shaffer, what do you do for a living?

16 A.  I am the president of Shaffer Hyundai Mitsubishi.

17 Q.  Where is that located?

18 A.  Merrillville, Indiana.

19 Q.  And how long have you been in business?

20 A.  I have been in business 33 years.  25 years at that address

21 in Merrillville.

22 Q.  What are your duties and responsibilities as the owner and

23 president of Cary Shaffer -- excuse me, of Shaffer Hyundai?

24 A.  Well, I basically watch over my management, my service

25 department.  I do payroll.  Other than that my managers pretty

1  much run the store.

2  Q.  As the president and owner of Shaffer Hyundai, are you

3  familiar with how business records are maintained there?

4  A.  Yes, I am.

5           MS. MALIZIA:  Your Honor, may I approach the witness?

6           THE COURT:  Yes.

7  BY MS. MALIZIA:

8  Q.  Mr. Shaffer, I'm showing you what's been marked as Government

9  Exhibit Shaffer 1, 2, 3 and 4.

10          Mr. Shaffer, do you recognize the documents I have just

11 handed you?

12 A.  Yes, I do.

13 Q.  Did you review them today before your testimony?

14 A.  Yes, I did.

15 Q.  Are they business records maintained by Shaffer Hyundai?

16 A.  Yes.  They are hard copies of transactions.

17 Q.  When you say "transactions," are you referring to --

18 A.  To the purchase of an automobile; sale of an automobile.

19 Q.  Is it the regular practice of Shaffer Hyundai to generate

20 such records at or near the time of an automobile sales

21 transaction?

22 A.  Yes, it is.

23 Q.  And after such a transaction is completed, how are those

24 records maintained by Shaffer Hyundai?

25 A.  We keep hard copies of what we call deal jackets that are in

1  file cabinets for a period of seven years, and then they are

2  electronically kept.

3  Q.  And do you maintain business records in this matter as part

4  of your regular course of business?

5  A.  Yes, I do.

6  Q.  And are Government Exhibit Shaffer Hyundai 1, 2, 3 and 4 true

7  and accurate copies of business records maintained by Shaffer

8  Hyundai?

9  A.  Yes, they are.

10         MS. MALIZIA:  Your Honor, the government moves to admit

11  Government Exhibits Shaffer 1, 2, 3 and 4.

12         THE COURT:  Admitted.

13      (Government Exhibits Shaffer 1, 2, 3 and 4 received in

14        evidence.)

15         THE COURT:  Yeah, that's fine.

16         MS. MALIZIA:  Your Honor, we have no further questions

17  for this witness.  We would tender him for cross-examination.

18         THE COURT:  Mr. El Bey, do you want to cross-examine --

19         THE DEFENDANT:  I do.

20         THE COURT:  -- Mr. Shaffer.

21                     CROSS-EXAMINATION

22  BY THE DEFENDANT:

23  Q.  Good afternoon, Mr. Shaffer.

24  A.  Good afternoon.

25  Q.  I just want to stand up and say hi.  Good to see you.

Jackman - Direct by Hotaling                202

1  A.  Yeah.  Same here.

2          THE COURT:  Is that it?

3          THE DEFENDANT:  That's it.

4          THE COURT:  Thank you, Mr. Shaffer.  You are excused.

5      (Witness excused.)

6          MR. HOTALING:  Your Honor, at this time the government

7  calls to the stand Shannon Jackman.

8          And, your Honor, I'm just going to retrieve the exhibits

9  from the last witness.

10          THE COURT:  Miss Jackman, would you raise your right

11 hand.

12      (Witness sworn.)

13          THE COURT:  Thank you.

14          SHANNON JACKMAN, GOVERNMENT'S WITNESS, SWORN

15                      DIRECT EXAMINATION

16 BY MR. HOTALING:

17 Q.  Good afternoon, ma'am.  Could you please introduce yourself

18 to the jury by stating and spelling your name?

19 A.  Shannon Jackman.  S-H-A-N-N-O-N, J-A-C-K-M-A-N.

20 Q.  Ma'am, where do you work?

21 A.  Circle Buick GMC.

22 Q.  How long have you worked for Circle Buick?

23 A.  Two years.

24 Q.  Within which division or department at Circle Buick do you

25 work?

1  A.  I'm a title clerk.

2  Q.  And what are your duties and responsibilities as a title

3  clerk?

4  A.  I collect and prepare data, and then make the title work or

5  send the title information down to the state for titling new

6  vehicles.

7  Q.  How long have you served in that position as title clerk?

8  A.  Two years.

9  Q.  So again, would it be fair to say that based on your time

10 working with Circle Buick that you're familiar with the various

11 forms and documents the company uses, processes and keeps in its

12 records?

13 A.  Yes.

14 Q.  How does Circle Buick keep and maintain its sales records in

15 connection with purchases of cars?

16 A.  All of the information is collected and then kept inside of a

17 deal bag, and those deal bags are kept for approximately ten

18 years and organized chronologically by alphabet.

19 Q.  Are they kept in hard copy or electronically?

20 A.  Hard copy.

21 Q.  I think you said that they are kept for ten years, is that

22 right?

23 A.  Ten years, yes.

24 Q.  Who has access to those reports?

25 A.  The front office desk is who has access, unless it's after

1  hours.  And then we will send one of the PDI kids to retrieve a

2  document if we need to.

3          MR. HOTALING:  And, your Honor, may I approach?

4          THE COURT:  Yes.

5  BY MR. HOTALING:

6  Q.  Ma'am, I'm showing you what has been marked for

7  identification as Government Exhibit Circle 1, if you wouldn't

8  mind taking a look at that.  Do you recognize that?

9  A.  Yes.

10  Q.  What is it?

11  A.  A bill of sale.

12  Q.  And how is it that you are familiar with that type of

13  document?

14  A.  One of these is collected for every deal and I see every deal

15  that comes through.

16  Q.  And was this exhibit and the documents that are contained in

17  that exhibit made at or near the time of the act or events

18  appearing in them?

19  A.  Yes.

20  Q.  Is it the regular practice of Circle Buick to make or

21  maintain these types of records?

22  A.  Yes.

23  Q.  And were these records kept in the course of the regularly

24  conducted business activity of Circle Buick?

25  A.  Yes.

1          MR. HOTALING:  Your Honor, at this time I move for the

2   admission of Government Exhibit Circle 1.

3          THE COURT:  Okay.  Thank you.  I want to --

4          THE DEFENDANT:  Yes.

5          THE COURT:  Do you have any objection?

6          THE DEFENDANT:  Yes, I do, Judge.

7          THE COURT:  I'm sorry.

8          THE DEFENDANT:  I'm sorry.  I forgot your name.

9          THE WITNESS:  Shannon.

10         MS. MALIZIA:  Your Honor?

11         THE COURT:  Yes.

12         MS. MALIZIA:  Your Honor, I think maybe the defendant

13  misunderstood.

14         THE COURT:  I'm sorry.  Wait.  I can't hear you.

15         MS. MALIZIA:  I think maybe the defendant misunderstood

16  what you were asking him.

17         MR. HOTALING:  I think he was asking whether or not you

18  had an objection to the admission of the evidence.

19         THE DEFENDANT:  Oh, no.  Not at all.  I'm sorry.

20      (Government Exhibit Circle Buick 1 received in evidence.)

21         MR. HOTALING:  And with that being done, Judge, I would

22  now tender the witness for cross-examination.

23         THE DEFENDANT:  Are you sure?

24         MR. HOTALING:  I'm positive.  All yours.

25                     CROSS-EXAMINATION

1  BY THE DEFENDANT:

2  Q.  I'm sorry.  I just wanted to ask you a quick question.  I

3  don't think you was there when I purchased the -- purchased the

4  convenance.  And so what I wanted to know was on it, because when

5  I purchased it it was for my church.  And I bought it for my

6  church --

7         MR. HOTALING:  Judge, I'm going to have to object at

8  this point.  Assuming facts not in evidence.

9         THE COURT:  No, I'll let him go on.

10  BY THE DEFENDANT:

11  Q.  I was just wondering, all I was trying to find out was when I

12  purchased it was that because it was for the church, I wanted to

13  make sure -- was that on there?  Because he put it on there when

14  I bought the car.

15  A.  Not that I'm aware of.

16  Q.  Huh?

17  A.  Not that I'm aware of, it doesn't say it on here.

18  Q.  Because it was from the trust for my church.  It was for my

19  church.  That's why it was on there.

20         THE COURT:  She answered your question.

21         THE DEFENDANT:  Okay.  I'm not going to ask anything.

22         THE COURT:  Thank you.

23         MR. HOTALING:  No redirect, your Honor.

24         THE COURT:  Okay.  Well, thank you very much.

25      (Witness excused.)

1         MS. MALIZIA:  Your Honor, the government calls Sharon

2    Garbacz.

3              THE COURT:  Raise your right hand.

4         (Witness sworn.)

5              THE COURT:  Okay.  Please be seated.

6            SHARON GARBACZ, GOVERNMENT'S WITNESS, SWORN

7                        DIRECT EXAMINATION

8    BY MS. MALIZIA:

9    Q.  Miss Garbacz, I apologize, I'm going to butcher your name.

10   But will you please state it and spell it for the jury?

11   A.  Sharon Garbacz.  S-h-a-r-o-n.  Garbacz, G-a-r-b, as in boy,

12   -a-c, as in cat, -z, as in zebra.

13   Q.  Mrs. Garbacz, what do you do for a living?

14   A.  Office manager for a car dealership.

15   Q.  What car dealership is that?

16   A.  Mancari's of Oak Lawn.

17   Q.  Where is that located?

18   A.  Oak Lawn, Illinois.

19   Q.  How long have you worked there?

20   A.  Two and a half years.

21   Q.  Have you worked at other Mancari Chrysler locations?

22   A.  Yes.  I worked at the Orland Hills location.

23   Q.  When was that?

24   A.  1999 through 2006.

25   Q.  You said you are currently the office manager of Mancari

1  Chrysler in Oak Lawn?

2  A.  That's correct.

3  Q.  What are your duties and responsibilities as the office

4  manager?

5  A.  As office manager I oversee a staff of about 11 girls,

6  whatever takes place in a dealership relative to the sale of a

7  vehicle.  From inception, when the paperwork comes upstairs, for

8  it to be processed, license and title to be taken care of, for

9  accounts receiving, accounts payable, human resources.

10        And then ultimately I'm responsible for the financial

11  statement that's due at the end of the month for sales.

12  Q.  Is it fair to say that as part of your experience as office

13  manager for Mancari Chrysler you are familiar with how business

14  records are processed and maintained there?

15  A.  Absolutely.

16        MS. MALIZIA:  Your Honor, may I approach the witness?

17        THE COURT:  Yes.

18  BY MS. MALIZIA:

19  Q.  Miss Garbacz, I've handed you what's been marked as

20  Government Exhibit Mancari 1 and 2.  Are you familiar with these

21  records?

22  A.  I am.

23  Q.  What are they?

24  A.  They are records involved with the sale of a vehicle.

25  Q.  Is it the regular practice of Mancari to generate such

1  records at the time of a car sales transaction?

2  A.  Yes.

3  Q.  And after such a transaction is complete, how are such

4  records maintained?

5  A.  We keep them in alphabetical file, according to the year that

6  they are sold.

7  Q.  And are they stored on site at Mancari Chrysler?

8  A.  Yes.  In our office.

9  Q.  In what format are they stored?

10 A.  We have paper files.  Each customer has a deal jacket.

11 Q.  And for how long are such records maintained?

12 A.  We keep them for ten years.

13 Q.  Is it part of your regular course of business to maintain

14 these records for a period of ten years?

15 A.  Yes.

16 Q.  And looking now at Government Exhibit Mancari 1 and 2, are

17 these true and accurate copies of business records maintained by

18 Mancari Chrysler?

19 A.  Yes.

20        MS. MALIZIA:  Your Honor, the government moves to admit

21 Government Exhibit Mancari 1 and 2.

22        THE COURT:  Yes.

23     (Government Exhibits Mancari 1 and 2 received in evidence.)

24        MS. MALIZIA:  The government has no further questions

25 for this witness.  We tender for cross-examination.

1          THE DEFENDANT:  No.

2          THE COURT:  No cross-examination.  Okay, thank you.

3          Thank you very much.

4       (Witness excused.)

5          MR. HOTALING:  Your Honor, at this time the government

6    calls to the stand Kerri McGee.

7          THE COURT:  Raise your right hand.

8       (Witness sworn.)

9          THE COURT:  Thank you.  Please be seated.

10             KERRI MC GEE, GOVERNMENT'S WITNESS, SWORN

11                        DIRECT EXAMINATION

12   BY MR. HOTALING:

13   Q.  Good afternoon, ma'am.  Would you please introduce yourself

14   to the jury by stating and spelling your name.

15   A.  My name is Kerri McGee.  K-E-R-R-I, M-C-G-E-E.

16   Q.  Ma'am, where do you work?

17   A.  Stewart Title.

18   Q.  And how long have you worked for Stewart Title?

19   A.  Ten years.

20   Q.  And what type of company is Stewart Title?

21   A.  Stewart Title is a real estate insurance title company.

22   Q.  And within which division or department at Stewart Title do

23   you currently work?

24   A.  I'm in the underwriting division.

25   Q.  And how long have you served in that position with the

1  underwriting?

2  A.  Six years.

3  Q.  And what are your duties and responsibilities in the

4  underwriting department?

5  A.  My primary responsibilities are to review documents, address

6  questions, answer concerns for clients who are performing real

7  estate transactions, or for clients who will be performing real

8  estate transactions.

9  Q.  So would it be fair to say that based on your time working

10 with Stewart Title you are familiar with various forms and

11 documents that the company uses, processes, and keeps in its

12 records?

13 A.  Yes.

14 Q.  How does Stewart Title Company keep and maintain records

15 associated with the closings on real estate?

16 A.  Documents are procured through public real estate transaction

17 websites, such as the county recorder's offices, or documents

18 provided to us by lenders or sellers' and buyers' attorneys.

19 Q.  And then are those kept at Stewart Title?

20 A.  Those documents, the original documents are scanned into an

21 electronic device for storage, and the original documents are

22 either returned to the lender or destroyed.

23 Q.  And how long are closing records kept at Stewart Title?

24 A.  Documents are kept for a minimum of seven years.

25 Q.  And who has access to those?

1  A.  The documents are restricted access to my underwriting team,

2  our legal counsel, or any party that is given access specifically

3  to a particular file.

4          MR. HOTALING:  Your Honor, may I approach?

5          THE COURT:  Sure.

6  BY MR. HOTALING:

7  Q.  Ma'am, I'm showing you what's been marked for identification

8  as Government Exhibit Stewart Title 1.  If you want to take a

9  look at that and let me know when you are finished.

10         Do you recognize that exhibit?

11  A.  I do.

12  Q.  And what is it?

13  A.  These are documents that are collected as part of a real

14  estate transaction.

15  Q.  And how is it that you are familiar with those type of real

16  estate closing documents?

17  A.  These documents were provided as part of a purchase of a

18  home.

19  Q.  And was that exhibit and the documents contained in it mailed

20  at or near the time of the act of the events appearing in them?

21  A.  Yes.

22  Q.  Is it the regular practice of Stewart Title to make or

23  maintain these types of records?

24  A.  Yes.

25  Q.  And were these records kept in the course of the regularly

Baker - Direct by Malizia                    213

1  conducted business activity of Stewart Title?

2  A.  Yes.

3        MR. HOTALING:  Your Honor, at this time I move for the

4  admission of Government Exhibit Stewart Title 1.

5        THE COURT:  Okay.

6     (Government Exhibit Stewart Title 1 received in evidence.)

7        MR. HOTALING:  And I have no further questions, and I

8  would tender for cross-examination.

9        THE DEFENDANT:  No, Judge.

10        THE COURT:  No questions.  Okay.

11        Thank you very much.

12     (Witness excused.)

13        MS. MALIZIA:  Your Honor, the government calls Melia

14  Baker.

15     (Witness sworn.)

16        THE COURT:  Thank you.  Please be seated.

17           MELIA BAKER, GOVERNMENT'S WITNESS, SWORN

18                      DIRECT EXAMINATION

19  BY MS. MALIZIA:

20  Q.  Miss Baker, would you please state and spell your name for

21  the jury?

22  A.  Melia Baker.  M-E-L-I-A, B-A-K-E-R.

23  Q.  Miss Baker, where do you work?

24  A.  I work at Wells Fargo Bank in Glenview, Illinois.

25  Q.  Is that a branch location of Wells Fargo?

1  A.  Yes.

2  Q.  How long have you worked there?

3  A.  Two years at this branch.

4  Q.  What is your current position there?

5  A.  I'm a store manager.

6  Q.  What did you do before you were a store manager?

7  A.  I was a personal banker.

8  Q.  And where was that?

9  A.  In Arizona.

10 Q.  Was that also for Wells Fargo?

11 A.  Yes.

12 Q.  And what did you do before that?

13 A.  I was a service manager.

14 Q.  Also for Wells Fargo?

15 A.  Yes.

16 Q.  And did you have any other positions with Wells Fargo?

17 A.  I was a teller with Wells Fargo.

18 Q.  For approximately how long in total have you worked for Wells

19 Fargo Bank?

20 A.  Seven years.

21 Q.  You said that you are currently a store manager?

22 A.  Yes.

23 Q.  As part of your duties as a store manager, are you familiar

24 with how bank records are maintained by Wells Fargo?

25 A.  Yes.

Baker - Direct by Malizia                    215

1          MS. MALIZIA:  Your Honor, may I approach the witness?

2          THE COURT:  Yes.

3   BY MS. MALIZIA:

4   Q.  Miss Baker, I'm showing you what's been marked as Exhibit

5   Wells Fargo 1 A, 1 -- 1 A -- sorry -- 1 B, 2 B, and 3 -- and

6   Government Exhibits Wells Fargo 3 through 11.

7          Miss Baker, do you recognize these documents?

8   A.  Yes.

9   Q.  Did you review them before your testimony today?

10  A.  Yes.

11  Q.  What are they?

12  A.  They are Wells Fargo statements, check -- copies of checks,

13  and copies of deposit slips.

14  Q.  Is it fair to say they are bank records maintained by Wells

15  Fargo?

16  A.  Yes.

17  Q.  Is it the regular practice of Wells Fargo to keep such

18  records -- or, rather, is it the regular practice of Wells Fargo

19  that such records are generated at around the time of the

20  transaction they record?

21          So, for example, if a customer comes in and makes a

22  deposit, does Wells Fargo generate a record of that deposit at or

23  around the time it's made?

24  A.  Yes.

25  Q.  And does Wells Fargo then maintain records of those

1 transactions?

2 A.  Yes.

3 Q.  And how long does Wells Fargo maintain those records?

4 A.  We are required to keep them for seven years.

5 Q.  And are they stored electronically, on paper, or both?

6 A.  Electronically.

7 Q.  Those records are maintained as part of Wells Fargo's regular

8 course of business?

9 A.  Yes.

10 Q.  And are the exhibits before you true and accurate copies of

11 Wells Fargo business records?

12 A.  Yes.

13       MS. MALIZIA:  Your Honor, the government moves to admit

14 Government Exhibit 1 B, 2 B -- sorry -- Government Exhibit Wells

15 Fargo 1 B, 2 B and 3 through 11 into evidence.

16       THE COURT:  That's fine.

17    (Government Exhibits Wells Fargo 1 B, 2 B, and 3 through 11

18      received in evidence.)

19       MS. MALIZIA:  Your Honor, the government has no further

20 questions for this witness and tender her for cross-examination.

21       THE DEFENDANT:  No.

22       THE COURT:  Do you have any questions?  No.

23       Okay.  Well, thank you.  You are excused.

24    (Witness excused.)

25       MR. HOTALING:  Your Honor, at this time we are going to

1  call Revenue Agent Paul Ponzo to the stand.

2         I think we have concluded our business record portion of

3  today.

4         THE COURT:  Raise your right arm.

5      (Witness sworn.)

6         THE COURT:  Please be seated.

7            PAUL PONZO, GOVERNMENT'S WITNESS, SWORN

8                    DIRECT EXAMINATION

9  BY MR. HOTALING:

10 Q.  Good afternoon, sir.  If you could please introduce yourself

11 to the jury by stating and then spelling your name?

12 A.  My name is Paul Ponzo.  The last name is spelled P-O-N-Z-O.

13 Q.  Sir, where do you work?

14 A.  I am a revenue agent with the Internal Revenue Service.

15 Q.  Is the Internal Revenue Service oftentimes referred to as the

16 IRS?

17 A.  It is.

18 Q.  I think you said you were a revenue agent, is that right?

19 A.  That's correct.

20 Q.  How long have you worked for the IRS as a revenue agent?

21 A.  28 and a half years.

22 Q.  And could you please explain to the members of the jury what

23 your duties and responsibilities are as an IRS revenue agent?

24 A.  As a revenue agent I was assigned to audit tax returns to

25 determine the substantially correct amount of tax.  And that just

1  means I audited tax returns, but I didn't audit every single

2  line.  I just audited significant lines on the return.

3  Q.  And what type of training did you receive when you first

4  began working for the IRS?

5  A.  When I first started I went through five phases of training.

6          The first phase was individual income tax returns.  The

7  next phase was small business, self-employed tax returns.  The

8  next phase was partnerships.  The next phase was corporations.

9  And then the last phase was advanced corporate topics.

10 Q.  Do you still continue to receive on-the-job training with the

11 IRS?

12 A.  I do.

13 Q.  Now, I think one of the things you mentioned just a moment

14 ago was that one of your previous responsibilities was to audit

15 tax returns, is that right?

16 A.  That's right.

17 Q.  Approximately how many times have you audited federal income

18 tax returns?

19 A.  I did about 150 audits in my career.

20 Q.  Can you tell us a little bit about some of the other

21 responsibilities that you have had with the IRS since you first

22 began back in the 1980s?

23 A.  After I was revenue agent in the field doing audits, then I

24 became a revenue agent reviewer.  And that entailed reviewing

25 closed audit files of other revenue agents for correctness,

1  completeness, correct application of the tax law.

2  Q.  How about after that?

3  A.  After that I was assigned to the Illinois Gaming Board, and I

4  assisted the gaming board in financial investigations and I

5  provided training for currency transaction reports.

6  Q.  What was your next assignment after the Illinois Gaming

7  Board?

8  A.  After the gaming board I was the abuse of trust coordinator

9  for the Midwest area, which was Illinois, Indiana, and Michigan.

10 Illinois, Indiana, and Wisconsin at the time.

11 Q.  We'll come back to what your responsibilities were as the

12 abuse of trust coordinator in just a moment.

13        So what position did you hold after abuse of trust

14 coordinator?

15 A.  I investigated individuals who promoted abuse of tax schemes.

16 Q.  And what position did you hold next?

17 A.  Next I became our grand jury revenue agent.

18 Q.  And is that the position that you currently hold?

19 A.  Yes.

20 Q.  What are your duties as the grand jury agent?

21 A.  I assist the criminal division of IRS, and I provide analysis

22 and support to the litigation team.

23 Q.  And just one question about your background, sir.  Could you

24 tell the members of the jury a little bit about your educational

25 background.

1  A.  I have a business degree, bachelor's of business

2  administration from Loyola University of Chicago.

3  Q.  And I think that you touched on this just a moment ago.  You

4  indicated that one of your responsibilities was as the abuse of

5  trust coordinator, is that right?

6  A.  That's right.

7  Q.  What were your responsibilities as the trust coordinator?

8  A.  At the time the Kansas City Service Center received trust

9  returns, and they sent the returns up to here, up to Chicago, and

10  I reviewed the returns for any scheme-type activity.  And then I

11  sent the returns that had significant items on them out to the

12  field to be audited.

13  Q.  And as part of that job, did you receive training in trusts?

14  A.  I did.

15  Q.  Now, what is the identifying tax form number for a trust

16  return?

17  A.  It's Form 1041.

18  Q.  How many 1040 trust returns would you estimate you have

19  reviewed in your career?

20  A.  I reviewed a few thousand of those.

21  Q.  And are you familiar with the federal tax requirements

22  surrounding the filing of Form 1041, simple trust returns?

23  A.  I am.

24  Q.  So I'd like to spend a couple moments talking about trusts

25  and how they are dealt with at the IRS.

1          And starting off just kind of at the base level, what is

2  a trust?

3  A.  A trust is an arrangement between two individuals, where one

4  individual manages the assets for the benefit of another

5  individual.

6  Q.  Now, what's the term used for the person who manages the

7  assets of the trust?

8  A.  That person is called the trustee, or sometimes called the

9  fiduciary.

10 Q.  And what's the term for the person for whose benefit the

11 trust was established?

12 A.  That person is called the beneficiary.

13 Q.  So would it be fair to say that the trust is an arrangement

14 in which assets such as money or property are managed by the

15 trustee or fiduciary for the benefit of another person, the

16 beneficiary?

17 A.  That's correct.

18 Q.  Now, are you familiar with the term simple trust?

19 A.  Yes.

20 Q.  What is a simple trust?

21 A.  A simple trust is a trust that has to distribute all of its

22 income annually.

23 Q.  And to whom is the simple trust required to distribute its

24 income on an annual basis?

25 A.  To the beneficiary.

1  Q.  Now, in general how does a trust obtain income?

2  A.  The trust obtains income through investments, so it could be

3  dividend income, interest income, capital gain income.

4  Q.  For tax years 2006 through 2009, what type of tax return was

5  a trust required to file on an annual basis?

6  A.  Form 1041.

7  Q.  And I think you know, you testified a moment ago, that you

8  are familiar with Form 1041 trust returns, is that right?

9  A.  Correct.

10 Q.  Now, for tax years again 2006 through 2009, what kind of

11 information did the IRS require to be provided on a 1041 trust

12 return?

13 A.  First, the name of the trust, the name of the trustee, the

14 employer identification number, the address, and then the income

15 and expenses of the trust.

16 Q.  Now, a moment ago you mentioned employer identification

17 number.  Is that sometimes referred to as an EIN?

18 A.  Yes.

19 Q.  What is an EIN?

20 A.  It's a number, similar to a Social Security number, but it's

21 for entities other than a person.

22 Q.  And would it be something that a trust would be assigned?

23 A.  Yes.

24 Q.  And how does a trust go about receiving an EIN?

25 A.  They apply to the IRS for the EIN.

1  Q.  Now, when is a trust required to file a 1041 tax return?

2  A.  A trust has to file a return when the trust has any taxable

3  income, gross income of $600 or more, or a beneficiary that's a

4  non-resident alien.

5  Q.  Who is required to file the trust form 1041?

6  A.  The trustee or fiduciary.

7  Q.  And who is required to sign the trust form 1041?

8  A.  Also the trustee/fiduciary.

9  Q.  Does the IRS rely on the information contained in a form 1041

10 tax return when determining and issuing refunds to trusts?

11 A.  Yes.

12 Q.  Now, since we have been talking about trusts in general, I'd

13 like to get a little bit more specific and talk about some trust

14 returns that are connected to this particular case.

15 A.  Okay.

16       MR. HOTALING:  Your Honor, may I have continuing

17 permission to approach the witness?

18       THE COURT:  Yeah.  You really don't have to ask me

19 unless you are planning, you know, some kind of violent assault

20 or something.

21       MR. HOTALING:  I will try to avoid that.

22       So I will take that as continuing permission to approach

23 the witness.

24       THE COURT:  Yes.

25       MR. HOTALING:  Thank you, your Honor.

1  BY MR. HOTALING:

2  Q.  I'm showing you what has been marked for -- already been

3  admitted into evidence as Government Exhibit IRS 3.

4          Now, do you recognize that exhibit, sir?

5  A.  Yes.

6          MR. HOTALING:  And, your Honor, with your permission may

7  we show a copy of this exhibit to the jury?

8          THE COURT:  Yes.

9  BY MR. HOTALING:

10  Q.  And I'd like to ask you a series of questions about this

11  particular return.

12  A.  Okay.

13  Q.  Okay?

14          And I'd like to start off at the top of the return,

15  okay?  For what tax year was this particular 1041 filed?

16  A.  For the tax year 2006.

17  Q.  And what's the name of the trust that's identified on this

18  return?

19  A.  Hakeem El Bey Trust.

20  Q.  And what is the name listed as the fiduciary?

21  A.  The Hakeem El Bey, comma, Trustee.

22  Q.  What's the address for the Hakeem El Bey Trust?

23  A.  C/O P.O. Box 5967.

24  Q.  Now, on the right-hand side in box C you see employer

25  identification number, do you see that?

1  A.  I do.

2  Q.  And you just testified about what an EIN is, correct?

3  A.  Correct.

4  Q.  Now, what are the unredacted numbers for this particular EIN?

5  A.  27-6169586.

6  Q.  Okay.  Now, under box D below, when does it say that this

7  trust was created?

8  A.  February 19th, 1959.

9  Q.  And does this form indicate what type of trust the Hakeem El

10  Bey Trust is?

11  A.  It does on the left side under A, the second box is checked:

12  Simple trust.

13  Q.  Now let's move down to box F.  In box F what box is checked?

14  A.  The initial return.

15  Q.  What's that mean?

16  A.  This is the first return this trust has filed.

17  Q.  Now we're going to move down to the next section, the section

18  that is marked and identified as income.  Is there a total income

19  figure listed on this form 1041 for the Hakeem El Bey Trust?

20  A.  There is.

21  Q.  What line is the total income figure on?

22  A.  Line 9.

23  Q.  And what's the amount listed?

24  A.  900,000.

25  Q.  Now, does this form 1041 list the source or sources for that

1  $900,000 in income?

2  A.  No, it does not.

3  Q.  Now, where on this form 1041 on the screen and that you have

4  in front of you would the sources of income be listed?

5  A.  They would be listed anywhere on lines 1 through 8.

6  Q.  And just so that we're clear, what are some of the types of

7  income that could be listed on lines 1 through 8?

8  A.  Interest income, dividend income, rents or royalties.

9  Q.  Is anything listed on this return on any of lines 1 through

10 8?

11 A.  There is a zero in Line 1 and also a zero in Line 8.  Other

12 than that there is nothing listed.

13 Q.  Is it unusual for Line 9 to have a number in it yet there be

14 no sources on that income for lines 1 through 8?

15 A.  Yes.

16 Q.  Why do you say that?

17 A.  There should be some source of income to total Line 9 and

18 there isn't in this case.

19 Q.  Now, given that lines 1 through 8 are blank on this return,

20 what if anything should have been included with the return?

21 A.  Sometimes I've seen schedules attached to the return

22 identifying the source of an income.

23 Q.  Was there a schedule or anything attached to this tax return

24 when it was filed that listed the sources of income for the

25 trust?

1  A.  No, there was not.

2  Q.  So the only thing that was filed in connection with this

3  particular return was this single piece of paper?

4  A.  Yes.

5  Q.  Now, is a trustee or fiduciary of a trust entitled to be paid

6  for his or her work for the trust?

7  A.  Yes.

8  Q.  What is a trustee entitled to be compensated for?

9  A.  Any type of meetings that takes -- takes care of, any other

10 business it transacts on behalf of the trust.

11 Q.  So let's back out and let's move down now to the next section

12 of Government Exhibit IRS 3, the deductions section.

13         Are you familiar with the concept of tax deductions?

14 A.  Yes.

15 Q.  What are deductions?

16 A.  Deductions reduce taxable income.

17 Q.  Are deductions relevant to personal tax returns?

18 A.  They are.

19 Q.  Are they also relevant to trust tax returns?

20 A.  Yes.

21 Q.  Now, would it be fair to say that the more deductions you

22 have, the less taxable income you have?

23 A.  That's correct.

24 Q.  Now, could you give some examples to the members of the jury,

25 some examples of deductible trust expenses?

1  A.  Taxes, fiduciary fees, interest expense, or the income

2  distribution deduction.

3  Q.  Now, you just mentioned a moment ago one of those being

4  fiduciary fees.  What are fiduciary fees?

5  A.  Fiduciary fees are fees paid to the fiduciary of the trust.

6  Q.  Would those be fees that are paid to the trustee then also?

7  Same thing, fiduciary or the trustee?

8  A.  That's correct.

9  Q.  Now, you also mentioned income distribution deduction.  What

10 does that mean?

11 A.  That's the amount that is distributed to the beneficiary.

12 Q.  And were there any deductions claimed on Government Exhibit

13 IRS 3 that you have in front of you?

14 A.  Yes.  On Line 12, fiduciary fees, 900,000.

15       MR. HOTALING:  Now, back up for just a second, and just

16 to the top two, income and deductions.

17 BY MR. HOTALING:

18 Q.  So that $900,000 -- go ahead -- that $900,000 in fiduciary

19 fees, is that the same amount as the total income reported on

20 Line 9?

21 A.  Yes, it is.

22 Q.  $900,000 in income?  $900,000 in fiduciary fees?

23 A.  Correct.

24 Q.  Now, in a simple trust arrangement, as the Hakeem El Bey

25 Trust is as indicated at the top of this return, is the trustee

1  supposed to distribute its income after expenses to the

2  beneficiary of the trust?

3  A.  Yes.

4  Q.  Now, what line on this 1040 trust return would indicate that

5  distribution?

6  A.  Line 18, income distribution deduction.

7  Q.  And again, looking at Government Exhibit IRS 3, is there any

8  listed income distribution deduction to the beneficiary in 2006

9  for the Hakeem El Bey Trust?

10 A.  No, there is not.

11 Q.  So according to this document, did the fiduciary pay himself

12 all of the income as a fee?

13 A.  Yes.

14 Q.  Did the beneficiary receive anything?

15 A.  No.

16 Q.  Is it unusual that this trust paid 100 percent of its income

17 to the fiduciary or trustee?

18 A.  Yes, it is.

19 Q.  Why do you say that?

20 A.  The intent of the trust is for the benefit of the beneficiary

21 and the beneficiary didn't receive anything.

22 Q.  Are fiduciary fees income to the fiduciary?

23 A.  Yes, they are.

24 Q.  And where would the fiduciary report those fees, those

25 fiduciary fees to the IRS?

1  A.  When the fiduciary or trustee files his or her 1040, they

2  should be reported as income on their 1040.

3  Q.  Now, I'm showing you what's been marked and was previously

4  admitted into evidence as Government Exhibit IRS 12.

5         MR. HOTALING:  And, your Honor, with your permission I'd

6  like to show this particular exhibit to the members of the jury.

7  BY MR. HOTALING:

8  Q.  Do you recognize that exhibit, sir?

9  A.  Yes, I do.

10 Q.  What is it?

11 A.  It's a certified copy of the Hakeem El Bey form 1040, U.S.

12 individual income tax return, for the year 2006.

13 Q.  Did the defendant Hakeem El Bey report $900,000 as fiduciary

14 fee income on his personal form 1040 for tax year 2006?

15 A.  No, he did not.

16 Q.  Where should that have been reported on his personal tax

17 return?

18 A.  The typical place would be on Line 21:  Other income.

19 Q.  We will just blow that up to make sure the members of the

20 jury see what we are talking about.

21        Again, you referred to on the personal income form 1040,

22 Line 21, listed other income?

23 A.  Correct.

24 Q.  That's where it should have been reported if he had received

25 $900,000 in fiduciary fees?

1  A.  Yes.

2  Q.  Okay.  Now, let's turn back again to IRS 3.  Are you familiar

3  with the term exemption?

4  A.  I am.

5       MR. HOTALING:  Okay.  So blow up that deduction section.

6  Yeah.  Perfect.  Thank you.

7  BY MR. HOTALING:

8  Q.  What is an exemption?

9  A.  An exemption is an amount allowed by law which reduces

10  taxable income.

11  Q.  And does the amount of the exemption vary depending on the

12  type of tax return and the type of entity filing a tax return?

13  A.  Yes.

14  Q.  Can you explain that?

15  A.  If a person -- if it's a personal return, an exemption is one

16  amount.  And for trust returns an exemption is a different

17  amount.

18  Q.  What is the permitted exemption amount for a simple trust

19  return?

20  A.  $300.

21  Q.  Could it be more or less than $300?

22  A.  No, it can't.

23  Q.  So is there a line on this particular form 1041 for an

24  exemption?

25  A.  Yes, there is.  Line 20.

1  Q.  So again, focusing on Line 20 here, what is the amount of the

2  exemption that this particular 1041 trust return is claiming?

3  A.  7,950.

4  Q.  So would it be fair to say that 7,950 is a larger exemption

5  than the $300 permitted exemption?

6  A.  Yes, it is.

7  Q.  So let's keep talking about the different entries on this

8  form 1041 trust return.  And actually I'd like to move down to

9  the next section of the return, which is identified as:  Tax and

10  payments.

11          And moving down to the next line, Line 22, what is

12  taxable income?

13  A.  Taxable income is total income less total deductions.

14  Q.  And what is the amount of total income reflected for the

15  Hakeem El Bey Trust on Government Exhibit IRS 3?

16  A.  It's negative $7,950.

17  Q.  Now, if that number were correct, would there be any taxes

18  owed for this trust?

19  A.  No, there wouldn't.

20  Q.  Why do you say that?

21  A.  On negative taxable income there is no tax due.

22  Q.  And what line lists total tax on Government Exhibit IRS 3?

23  A.  Line 23:  Total tax.

24  Q.  Now, this section is also referred to as tax and payments at

25  the bottom that we currently have blown up.  What does payments

1  refer to in this section?

2  A.  Payments refer to any payments made on behalf of the trust,

3  such as withholding or maybe estimated tax payments.

4  Q.  Now, you just mentioned withholdings.  What does that mean?

5  What are withholdings?

6  A.  Withholdings are amounts taken out of income.

7  Q.  Now, is there a place on form 1041 to put the amount of money

8  that had previously been withheld for a trust?

9  A.  Yes.  Line 24-E:  Federal income tax withheld.

10  Q.  And why would a trust want to have federal income tax

11  withheld?

12  A.  To reduce the tax due and owing when the trust files the tax

13  return.

14  Q.  Now, on the trust tax return filed for Hakeem El Bey in

15  Government Exhibit IRS 3, is there an amount listed as withheld

16  on Line 24-E?

17  A.  Yes, there is.  300,000.

18  Q.  And is that one-third of the total income reported on this

19  form of $900,000?

20  A.  It is.

21  Q.  Now, if taxes had been withheld by the IRS for the Hakeem El

22  Bey Trust, would the IRS have a record of those withholdings?

23  A.  Yes.

24  Q.  I'm showing you what's already been admitted into evidence as

25  Government Exhibit IRS 18.  Do you recognize that?

1  A.  Yes.

2  Q.  What is it?

3  A.  It's a certified lack of record for the Hakeem El Bey Trust

4  for the years 2006 through 2009.

5  Q.  Now, did you review Government Exhibit IRS 18 to determine

6  whether the Hakeem El Bey Trust had taxes withheld for the year

7  2006 as reported to the IRS?

8  A.  I did.

9  Q.  And were there any taxes withheld for that trust?

10  A.  No, there was not.

11  Q.  And how does the document tell you that information?

12  A.  It's a lack of record.  That means there is no record of any

13  withholding for the trust for these years.

14  Q.  So as far as you're aware based on your review of the records

15  in this case, is there any documentation that supports the claim

16  that the Hakeem El Bey Trust had $300,000 in taxes withheld?

17  A.  There was no withholding.

18  Q.  Now, let's keep going.  And I'd like to turn your attention

19  back to IRS 3, which is still up on the screen.  Is there a form

20  on this form 1041 to indicate total payments?

21  A.  Yes.  Line 25.

22  Q.  And what is the payment listed in Line 25?

23  A.  300,000.

24  Q.  Is that the same amount that's been reflected on 24-E as the

25  withholding amount?

1  A.  Yes, it is.

2  Q.  Now, are total payments from Line 25 taken into account in

3  determining whether a taxpayer is due a refund or has a balance

4  due in the form of taxes to be paid?

5  A.  Yes.

6  Q.  Where is that indicated on Government Exhibit IRS 3?

7  A.  Line 28 is overpayment or Line 27 would be tax due.

8  Q.  And what happens when a taxpayer overpays the IRS?

9  A.  The IRS refunds that amount.

10 Q.  On the Hakeem El Bey form 1041 for tax year 2006 that's on

11 the screen in front of you, is there an overpayment listed on

12 Line 28?

13 A.  Yes, there is.

14 Q.  How much?

15 A.  300,000.

16 Q.  And is a refund being requested on Line 29?

17 A.  Yes, there is.

18 Q.  How much?

19 A.  300,000.

20       MR. HOTALING:  Now, if we could back that out and then

21 go on the bottom of the return.

22 BY MR. HOTALING:

23 Q.  Now, is there a space for a signature on this particular

24 form 1041?

25 A.  Yes.

1  Q.  And is there a signature there that's blown up on the screen?

2  A.  Yes.

3  Q.  What does the signature read?

4  A.  The signature line reads Hakeem El Bey, and then above the

5  signature:  ARR.

6  Q.  Now, what affirmation did the defendant make when he signed

7  this return?  And by answering that question, if you could read

8  the sentence immediately above the signature that begins:  "Under

9  penalties of"?

10 A.  Under penalties of perjury I declare that I have examined

11 this return, including accompanying schedules and statements, and

12 to the best of my knowledge and belief it is true and correct and

13 complete.

14        I can't make out that next word.

15        And then it says:  Preparer other than taxpayer, is

16 based on all information of which preparer has any knowledge.

17 Q.  And what date is written to the right of the signature?

18 A.  August 5th, 2009.

19 Q.  And you can also see it in the blown-up portion there.  On

20 what date was this return received by the IRS?

21 A.  Actually it's up --

22 Q.  Actually, blow it up.  There you go.

23 A.  It's August 14th, 2009.

24 Q.  So is it unusual for a trust return for tax year 2006 to be

25 filed in August of 2009?

Ponzo - Direct by Hotaling                    237

1  A.  Yes.

2  Q.  Why do you say that?

3  A.  It's a late-filed return.

4  Q.  Now, one last question about this particular tax return.  Is

5  there anything handwritten on the top and right-hand side of the

6  form 1041, Government Exhibit IRS 3?

7  A.  Yes, there is.

8  Q.  What is it?

9  A.  It says:  Docket number 2002053704.

10 Q.  Sir, I'm showing you what has been marked for identification

11 as Government Exhibit Mecklenburg 1.  Do you recognize that

12 exhibit, sir?

13 A.  I do.

14 Q.  What is it?

15 A.  It's the certified records from the County of Mecklenburg,

16 State of North Carolina.

17 Q.  And does this document contain the seal of Mecklenburg

18 County, North Carolina, on the front page?

19 A.  Yes, it does.

20         MR. HOTALING:  Now, your Honor, at this time I would

21 move for the admission of Government Exhibit Mecklenburg 1

22 pursuant to Rules 902(1) and 803(8).

23         THE COURT:  Okay.

24         MR. HOTALING:  And with your permission, I'd like to

25 show this particular exhibit to the jury.

Ponzo - Direct by Hotaling                    238

1          THE COURT:  All right.

2   BY MR. HOTALING:

3   Q.  It's the second page of the exhibit you have in front of you,

4   and it's also the page that's currently on the screen in front of

5   the jury.

6          Is there a signature on this particular page?

7   A.  Yes.  There is three signatures at the bottom.

8   Q.  And is this document itself dated?

9   A.  Yes.

10  Q.  What's the date?

11  A.  March 18th, 2002.

12  Q.  And I'd now like to turn your attention to the small writing

13  that's in the upper right-hand corner.  Is there a Mecklenburg,

14  North Carolina, register of deeds instrument number on this form?

15  A.  Yes.  It's the last line.

16  Q.  Could you read that number, please?

17  A.  2002053704.

18  Q.  And does that number match the number that was handwritten on

19  the top and on the right-hand side of Government Exhibit IRS 3?

20  A.  Yes, it does.

21  Q.  Sir, I am now showing you what has been admitted into

22  evidence as Government Exhibit IRS 4.

23          MR. HOTALING:  And, your Honor, with your permission may

24  I show this particular exhibit to the jury?

25          THE COURT:  Sure.

1          MR. HOTALING:  IRS 4, can we blow up the top, please?

2    BY MR. HOTALING:

3    Q.  Sir, for which particular tax year was this 1041 trust return

4    filed?

5    A.  For the year 2007.

6    Q.  And is this also for the Hakeem El Bey Trust?

7    A.  It is.

8    Q.  And is the information that is contained in the top portion

9    of this particular return identical to what was contained in the

10   exhibit that you just talked about, Government Exhibit IRS 3?

11   A.  Yes, it is.

12   Q.  Same EIN?

13   A.  Yes.

14   Q.  Same date of creation?

15   A.  Yes.

16   Q.  Same address?

17   A.  Yes.

18          MR. HOTALING:  So let's blow that out, focus briefly on

19   the next section, the income section.

20   BY MR. HOTALING:

21   Q.  Does this contain a -- does that reflect a claimed total

22   income of $900,000?

23   A.  Yes, it does, on Line 9.

24   Q.  Is that the same information that was contained on Government

25   Exhibit IRS 3?

1  A.  Yes, it is.

2       MR. HOTALING:  Let's move to the next section, the

3  deduction section.

4  BY MR. HOTALING:

5  Q.  Does this particular return contain the exact same

6  information as was contained in Government Exhibit IRS 3?

7  A.  Yes, it does.

8  Q.  Same fiduciary fee deduction?

9  A.  Same one, yes.

10 Q.  Same exemption amount?

11 A.  Yes.

12 Q.  Going back --

13      THE COURT:  Why don't you just ask him whether all the

14 numbers are the same?

15 BY MR. HOTALING:

16 Q.  Agent Ponzo, with respect to this particular exhibit, are all

17 the numbers in each of the sections identical to that which was

18 contained in Government Exhibit IRS 3?

19 A.  Yes.  They are all -- all the numbers on the return from

20 the --

21 Q.  And does it have the same date of April -- excuse me --

22 August 5th, 2009?

23 A.  Yes.

24 Q.  Showing you next what has already been admitted into evidence

25 as Government Exhibit IRS 5.

1          MR. HOTALING:  Your Honor, may I show this to the jury?

2          THE COURT:  Sure.

3   BY MR. HOTALING:

4   Q.   For what particular tax year was this return filed?

5   A.   This is for the year 2008.

6   Q.   And does this exhibit contain the exact same information as

7   just testified with respect to Government Exhibit IRS 3 and IRS

8   4?

9   A.   Yes, it does.

10  Q.   Are there any differences in terms of numbers between those

11  three returns?

12  A.   There are no differences.

13  Q.   Does this also contain a signature of the defendant?

14  A.   Yes, it does.

15  Q.   And does it have the same document number on the top and

16  right-hand side?

17  A.   It does, yes.

18  Q.   Now, for any of the three returns that you just testified

19  about, Government Exhibit IRSs 3, 4 and 5, did the IRS issue a

20  refund in the requested amount of $300,000 to the defendant?

21  A.   No.

22  Q.   Okay.  Now that we have spent some time talking about those

23  three returns that have the date of August 5th, 2009, I want to

24  spend some time talking about three other tax returns the

25  defendant filed after these first three in August of 2009.

1  A.  Okay.

2  Q.  Specifically, next I'd like to talk about what has already

3  been admitted into evidence as Government Exhibit IRS 6.

4         Do you recognize that?

5         MR. HOTALING:  And, your Honor, with your permission,

6  may I show this particular exhibit to the jury?

7         THE COURT:  Sure.

8  BY MR. HOTALING:

9  Q.  Do you recognize this exhibit?

10  A.  I do.

11  Q.  For what tax year was this particular return submitted to the

12  IRS?

13  A.  For the year 2008.

14  Q.  And for what entity?

15  A.  The Hakeem El Bey Trust.

16  Q.  So with respect to this particular exhibit, and specifically

17  focusing on the numbers in the income, deductions and tax and

18  payment section, is the information on this return identical to

19  the information that you just testified in connection with IRSs

20  3, 4 and 5?

21  A.  Yes.

22  Q.  Same income?

23  A.  Same income, correct.

24  Q.  Same deductions?

25  A.  Same deduction.

1  Q.  Same exemption?

2  A.  Same exemption, yes.

3  Q.  Same requested refund amount?

4  A.  Yes.

5  Q.  Does this also contain a signature at the bottom?

6  A.  It does.

7  Q.  In the name of Hakeem El Bey?

8  A.  Yes.

9  Q.  What is the date written next to this particular return?

10 A.  November 25th, 2009.

11          MR. HOTALING:  Back it up.

12 BY MR. HOTALING:

13 Q.  And then also there is a document number along the top and to

14 the right.  Is that the same number that you have testified about

15 earlier with respect to the previous three returns?

16 A.  Yes.

17 Q.  Now, Agent, for this particular return, Government Exhibit

18 IRS 6, is there a slightly different ending than what was

19 resolved after -- after the filing of Government Exhibits 3, 4

20 and 5?

21 A.  Yes.

22 Q.  I'd like to show you what's already been admitted into

23 evidence as Government Exhibit IRS 9.  Do you recognize that?

24 A.  I do.

25          MR. HOTALING:  Your Honor, may I show it to the members

1  of the jury?

2          THE COURT:  Sure.

3  BY MR. HOTALING:

4  Q.  Agent, what is this?

5  A.  It's a certified copy of a check that was issued to the

6  Hakeem El Bey Trust.

7  Q.  When was this check issued?

8  A.  Check was issued January 5th, 2010.

9  Q.  And what was the amount of this refund?

10  A.  300,000.

11  Q.  So let's move onto the next.  Showing you what's already been

12  admitted into evidence as Government Exhibit IRS 7.  Do you

13  recognize that?

14  A.  I do.

15  Q.  What is it?

16  A.  It's a certified copy of the Hakeem El Bey Trust for the year

17  2010 -- excuse me -- 2009.

18  Q.  Now, does -- I think you just indicated this was for the

19  Hakeem El Bey Trust, is that right?

20  A.  That's right.

21  Q.  Same EIN number?

22  A.  Yes.

23  Q.  Same date of creation?

24  A.  Yes.

25  Q.  With respect to the numbers that are contained on this

1  return, does it have the same total income amount?

2  A.  Yes, sir, it does.

3  Q.  And when I say the same income amount, same income amount

4  with respect to all of the previous returns that you have already

5  testified about today?

6  A.  Correct.

7  Q.  Same fiduciary fee deductions?

8  A.  Correct.

9  Q.  Same exemption?

10  A.  Yes.

11  Q.  Same amount of withholdings?

12  A.  Yes.

13  Q.  And same amount of tax -- excuse me -- same amount of refund

14  requested?

15  A.  Yes.

16  Q.  Again down at the bottom does this particular return have a

17  signature?

18  A.  It does.

19  Q.  And what does it say?

20  A.  Hakeem El Bey, without recourse.

21  Q.  And to the right of that is there a date written?

22  A.  Yes, there is:  May 20th, 2010.

23  Q.  And again on the side of the document does it have the same

24  document number that was listed on the four previous returns that

25  you have testified about?

1  A.  Yes, it does.

2  Q.  That number from the Mecklenburg County register of deeds?

3  A.  Correct.

4  Q.  Now, with respect to this particular return, Government

5  Exhibit IRS 7, do we have a similar ending to that which you just

6  testified about in connection with Government Exhibit IRS 6?

7  A.  Yes.

8  Q.  Showing you what has already been admitted into evidence as

9  Government Exhibit IRS 10, do you recognize that?

10 A.  Yes.

11 Q.  What is it?

12 A.  It's a certified copy of a refund check.

13       MR. HOTALING:  And, your Honor, may I show this

14 particular exhibit to the jury?

15       THE COURT:  Sure.

16 BY MR. HOTALING:

17 Q.  Sir, when was that check issued?

18 A.  June 22nd, 2010.

19 Q.  What was the amount of this particular refund check?

20 A.  300,000.

21 Q.  To whom was this check made payable?

22 A.  Hakeem El Bey Trust, the Hakeem El Bey, Trustee.

23 Q.  Now, Agent, there is one more tax return that I'd like to

24 talk with you about today.  And I'm showing you what has already

25 been admitted into evidence as Government Exhibit IRS 8.  Do you

1  recognize that?

2  A.  Yes.

3  Q.  What is it?

4  A.  It's the certified copy of the Hakeem El Bey Trust form 1041

5  for the year 2007.

6          MR. HOTALING:  And, your Honor, with your permission may

7  I show this particular exhibit to the jury?

8          THE COURT:  Yes.

9  BY MR. HOTALING:

10 Q.  I think you indicated that this was another tax return for

11 the Hakeem El Bey Trust, is that right?

12 A.  Correct.

13 Q.  In which the defendant Hakeem El Bey is listed as the

14 trustee?

15 A.  Yes.

16 Q.  For what particular tax year was this return filed?

17 A.  2007.

18 Q.  Has the same EIN number?

19 A.  It does.

20 Q.  Same date of creation?

21 A.  Yes.

22 Q.  And then with respect to the numbers section in the income,

23 deductions, tax and payment sections, are those numbers identical

24 to the five returns that you've already testified about today?

25 A.  Yes, they are.

1  Q.  Same income amount of $900,000?

2  A.  Yes.

3  Q.  Same fiduciary fee deduction?

4  A.  Yes.

5  Q.  Same exemption amount of 7,950?

6  A.  Yes.

7  Q.  Same withholding of $300,000?

8  A.  Correct.

9  Q.  And same request for a refund of $300,000?

10  A.  Yes.

11  Q.  Now, down at the bottom of this return is there a signature?

12  A.  Yes, there is.

13  Q.  Again under the penalty of perjury?

14  A.  Yes.

15  Q.  And what date -- excuse me -- what name is written down there

16  in the signature block?

17  A.  Signature line reads:  Hakeem El Bey.

18  Q.  Now, is there a date on this particular return?

19  A.  No, there isn't.

20       MR. HOTALING:  Back it up please, Kathryn.

21  BY MR. HOTALING:

22  Q.  And then on the right-hand side does that have the same

23  document number we've talked about with respect to the previous

24  five returns?

25  A.  Yes.

1  Q.  The same Mecklenburg County register of deeds number?

2  A.  Correct.

3  Q.  Now, sir, did the IRS issue a refund check to the defendant's

4  trust for tax year 2007 in connection with the filing of this

5  particular tax return?

6  A.  No.

7          MR. HOTALING:  Your Honor, may I have a moment?  Just a

8  moment?

9          THE COURT:  Okay.

10          MR. HOTALING:  Your Honor, I have no further questions

11  for this witness, and I would tender him for cross-examination.

12          THE COURT:  Okay.  Well, I think this is a good time to

13  take a break.

14          And, Mr. El Bey, you'll have your opportunity to

15  cross-examine when we come back.

16          THE DEFENDANT:  Okay.

17          THE COURT:  And we'll say 15 minutes we will come back.

18          MR. HOTALING:  Thank you, Judge.

19      (At 3:09 p.m. jury out.  Proceedings recessed to 3:34 p.m.)

20          THE COURT:  You can bring back the jury.

21          Everybody can sit down.  Relax.

22      (At 3:35 p.m. jury in.)

23          THE COURT:  Welcome back.  Please be seated.

24          And I think we were -- you had finished and we were

25  ready for --

1          MR. HOTALING:  Yes, your Honor.  And I have tendered

2  Agent Ponzo to the defendant for cross-examination.

3          THE COURT:  Right.  So, Mr. El Bey, do you wish to cross

4  examine Mr. Ponzo?

5          THE DEFENDANT:  I do.

6                         CROSS-EXAMINATION

7  BY THE DEFENDANT:

8  Q.  Mr. Ponzer, right?

9  A.  Ponzo.

10  Q.  Oh, Ponzo.  Sorry.

11  A.  That's okay.

12  Q.  I'm going to start and ask you a question.  When you do a

13  1041 do everybody who do the 1041 have to fill out a form 56 to

14  go with the 1041?

15  A.  Not that I know of, no.

16  Q.  Yeah, okay.  Okay.  Everyone has to fill out a form 56.

17  A.  No.

18  Q.  I'm sorry.  But, anyway -- okay.

19          I notice we was talking about income and then wages.

20  And, you know, and then with the trust, I had Hakeem El Bey

21  Trust, and then I had Hakeem El Bey, Trustee.

22          So the "trust" was all capitalized, did you notice that?

23  A.  Yes.  On the line, on the first line, Hakeem El Bey Trust was

24  all in capital letters.

25  Q.  Yes, sir.  Yes, sir.  So anything that's all capitalized

1 means that it's a corporation, okay.  And then if you --

2          MR. HOTALING:  Judge, I'm going to object to the form of

3 the question.  It's not a question.

4          THE COURT:  Well, it should be cast as a question.  If

5 you want to ask him whether capitalization means that it's a

6 corporation, that's fine to ask as a question.

7          You just don't want to tell him.

8          THE DEFENDANT:  Okay.  I don't want to be -- I don't

9 want to be -- I want to be on my best behavior.

10          THE COURT:  That's fine.

11 BY THE DEFENDANT:

12 Q.  And so as the trustee, it's how you was taught in school,

13 upper case and lower case.  I don't know if you noticed it.  As

14 the trustee, upper case, lower case?

15 A.  The first line is all capital and the second line is upper

16 and lower case.

17 Q.  Yes, sir.  Yes, sir.  Okay.

18          So the question that I want to ask you is, is income for

19 corporations and wages for men and women?  Citizens, American

20 citizens.

21 A.  I don't understand the question.

22 Q.  The question I'm asking you is, is income for corporations

23 and wages for men and women who work?  You know, American

24 citizens.

25 A.  Wages are income also.

1  Q.  Okay.  Okay.  I'm going to leave that alone too.

2        Okay.  So now I'm going to go with this.  Do all

3  American citizens have birth certificates?

4  A.  I don't know.

5  Q.  Okay.  I mean, do you -- when you are born in a hospital, I

6  think you have three days to get your birth certificate, parents

7  to get your birth certificate?

8  A.  I don't know those rules.  I don't know.

9  Q.  Do you have a birth certificate?

10 A.  I do.

11 Q.  Are you an American citizen?

12 A.  I am.

13 Q.  Okay.  So, you know, on the trust -- on the trust they say

14 the date of the creation of the trust, they had February 19,

15 1959.

16 A.  That's what the form said, yes.

17 Q.  Yes, sir.  That was the date that I came into the world.

18 A.  I don't know.

19 Q.  Oh, I'm just telling you.  That is my -- that's my birthday.

20 That's the day that I was birthed.

21        MR. HOTALING:  Judge, just a regular objection from what

22 we had from yesterday as to the testifying.

23        THE COURT:  Well, he just wanted to mention his

24 birthday.

25        MR. HOTALING:  We will acknowledge and take notice and

1  we will stipulate to the fact that his birthday is that

2  particular day.

3  BY THE DEFENDANT:

4  Q.  Okay.  What I wanted to say -- I don't want to do anything

5  wrong -- what I want to say to you was that when I created the

6  trust, the 1041 trust, I had to have a fiduciary, okay, and so my

7  fiduciary was the Treasurer of the United States, at the time was

8  Timothy Geithner.

9       So I know you said you have been in working with the

10 Internal Revenue 29 years.  Can I ask you a question?  I'm just

11 curious, though.

12      Here you have a man who is sending in three trusts and,

13 you know, they put a red flag up and they send frivolous back to

14 me, and so here I send three more, and then they send me two

15 checks.

16      So do IRS make mistakes like that?  Do you think that

17 was a mistake?

18 A.  The trusts were not entitled to any refund.

19 Q.  That's not what I asked you though.  I'm just trying to stay

20 on point.

21      I say:  Do Internal Revenue make those kind of mistakes?

22 If it sent three trusts, don't you think a red flag would be -- I

23 mean, any corporation who sees that a man is sending trusts, they

24 wouldn't make that mistake.  They have a red flag by my name.

25      And so what I'm saying is, you know, if you stopped and

1  think about it, you know, when I sent the -- you know, they know

2  I had sent three in before already.  So now here I send two more

3  and they send me the checks.  Back-to-back.

4          So now if it has the same identical information on the

5  trust that it had for the other three, now I'm just saying, is

6  that logical to you?  I'm just asking a question.

7          MR. HOTALING:  Judge, again, I'm going to object to the

8  form of the question.

9          THE COURT:  No, I think the question is clear enough.  I

10 think he is asking whether the Internal Revenue Service would

11 make a mistake of this kind.

12         THE DEFENDANT:  Back-to-back.

13         THE COURT:  Isn't that the question?

14         THE DEFENDANT:  Yes, sir.  That's exactly the question.

15 BY THE DEFENDANT:

16 Q.  Where a man who has sent three in before and they sent

17 frivolous to him.  So now here I send three more and they send me

18 two checks.

19 A.  The IRS accepts the returns when they are filed, and then

20 later on it's determined whether they need to be audited or not.

21 I don't know why a check went out.

22 Q.  But they did in a six-month period of time?

23 A.  I don't know why that happened.

24         THE DEFENDANT:  Okay.  No more questions, sir.

25         THE COURT:  Thank you, Mr. El Bey.

1          THE DEFENDANT:  Thank you.

2          MR. HOTALING:  Judge, I just want to just redirect just

3    really, really briefly.

4                      REDIRECT EXAMINATION

5    BY MR. HOTALING:

6    Q.  The question that Mr. El Bey just asked you about in terms of

7    all of those different returns, you've testified now about all

8    six returns, is that right?

9    A.  All six trust returns, correct.

10   Q.  All six trust returns, 1041s, for the tax here 2006, 2007 and

11   2008?

12   A.  And '9.

13   Q.  And '9.  And there was six returns, is that correct?

14   A.  Correct.

15   Q.  And was the information in terms of who was identified as the

16   trustee on every single one of them?

17   A.  Yes.

18   Q.  Despite the fact that they were frivolous filing returns, it

19   was the same information at the top, is that right?

20   A.  Correct.

21   Q.  And the same signature down at the bottom?

22          THE COURT:  I don't understand what this has to do with

23   the cross-examination.

24          MR. HOTALING:  It goes to the issue about whether or not

25   the fact that the IRS might have -- the fact that the IRS files

1  frivolous filers returns, that the checks were issued, and that

2  the fact that he was -- you know, he continued to file the

3  returns after receiving the frivolous filers notice.

4          I just want to make sure that it's clear that it's

5  consistent across all six returns.

6          THE COURT:  Well, I don't understand.  Mr. El Bey's only

7  question, as I understood it, was whether Mr. Ponzo could explain

8  why, after having rejected several of these requests, they had

9  sent him these checks.  That was the only question, and he said

10 he didn't know.

11         MR. HOTALING:  And I just want to reaffirm that it's the

12 same --

13         THE COURT:  I don't understand the reaffirmation.

14         I mean, the redirect examination is because something

15 new had come out in cross-examination.  I don't see anything came

16 out that's -- that would warrant repeating what had gone on in

17 your extensive direct examination.

18         MR. HOTALING:  Judge, I posed the question.  If there is

19 an objection, then your Honor will overrule it.

20         THE COURT:  I object.  So we will move on.

21         THE DEFENDANT:  And I did have one more question, if

22 it's okay.

23         THE COURT:  Pardon?

24         THE DEFENDANT:  I just have one more question, if it's

25 okay.

1          THE COURT:  All right.  Then Mr. Hotaling will get to --

2          THE DEFENDANT:  I don't want to step out of my bounds.

3                    RECROSS-EXAMINATION

4    BY THE DEFENDANT:

5    Q.  This was -- I got thrown off a little bit, this was the main

6    question I wanted to ask you.  We was talking about the birth

7    certificates.

8          So now what I'm saying to you, I know you said anyone

9    can create a trust.  So if anyone can create a trust then I'm

10   just saying that we created a trust, where the money gonna come

11   from?

12         So my question to you is was the trust created at the

13   date of my birth?  Because if not, then how was I able to get the

14   money?

15         I'm just saying, I just wanted to know:  How was I able

16   to get some money on the trust that I haven't created?  And so

17   now I -- you know, I said wait a minute, I mean, let me see.  So

18   now I filed for some money from a trust and I get it.

19         So what I'm saying is -- that was my question that I was

20   really asking you about, you know, do they make those kind of

21   mistakes, Internal Revenue Service.  Because if I didn't put

22   anything in it how can I get anything out?

23         That's just my question.  That's all I wanted to know.

24   A.  I don't understand the question.

25   Q.  Okay.  The question was, I never created a trust before.  I

1  have never put anything into a trust.  So now I file for a trust

2  and I send it out -- I make the Treasury my fiduciary -- and then

3  I asked for the going rate, whatever, anyway, I asked -- I can't

4  say what I wanted to say, so I got to be careful.

5         So anyway, I asked for some funds and they denied me the

6  first three times, and then the next two times I received some

7  funds.

8         So what I'm saying to you is if I didn't put anything in

9  it, why did they send me something back?

10 A.  I don't know why they sent you any funds.

11 Q.  And then they wouldn't make that kind of mistake because they

12 turned me down the first three times, so what -- they got

13 generous and wanted to give me something this time?

14         MR. HOTALING:  Judge, this is argumentative.

15         THE DEFENDANT:  I'm just asking a question.  I am just

16 asking --

17         MR. HOTALING:  It's not really a question.

18         THE DEFENDANT:  I'm sorry.  Okay.

19         THE COURT:  I think Mr. Ponzo said he doesn't know.

20         THE DEFENDANT:  That's fine.  That's fine.

21         THE COURT:  That's fair.  You don't know why they sent

22 the checks.

23         THE WITNESS:  I don't know.

24         THE COURT:  Right.  He doesn't know.

25         Okay.  Well, thank you very much, Mr. Ponzo, for your

1  testimony.  So we will go on.

2          Do you have another witness?

3          MR. HOTALING:  We do, your Honor.  At this time the

4  government calls to the stand Special Agent Darren Ponzo --

5  excuse me, Darren Bodner -- my apologies -- Special Agent Darren

6  Bodner.

7          THE COURT:  Mr. Bodner, raise your right hand.

8      (Witness sworn.)

9          DARREN BODNER, GOVERNMENT'S WITNESS, SWORN

10                   DIRECT EXAMINATION

11  BY MR. HOTALING:

12  Q.  Sir, could you please introduce yourself to the jury by

13  stating and then spelling your name?

14  A.  Yeah.  Darren Bodner.  D-A-R-R-E-N.  last name Bodner, B, as

15  in boy, -O-D-N-E-R.

16  Q.  And, sir, where do you work?

17  A.  I work for the Internal Revenue Service, criminal

18  investigation division.

19  Q.  And how long have you worked for the IRS criminal

20  investigation service?

21  A.  I started in around June 20, 2011.  So I have worked there a

22  little bit over three and a half years ago.

23  Q.  And I believe you said your position was a special agent, is

24  that right?

25  A.  Correct.

1  Q.  And is that your current assignment with the IRS?

2  A.  It is.

3  Q.  And what types of things do you investigate as a special

4  agent with the IRS criminal investigation squad?

5  A.  We perform investigations into criminal violations of the

6  Internal Revenue Code, Bank Secrecy Act, and money laundering.

7  Q.  Before you worked for the IRS, what did you do?

8  A.  Well, after I graduated college I worked for a public -- two

9  public accounting firms, PricewaterhouseCoopers and Ernst &

10 Young.  Then I went to law school.

11        After that I worked for a short time in federal

12 litigation before doing some discovery work.  And after that I

13 started with the IRS.

14 Q.  Now, during your time in law enforcement have you received

15 any sort of specialized training?

16 A.  I have.

17 Q.  Could you tell us a little bit about that?

18 A.  Yeah.  When I first started I was sent to -- down to the

19 federal law enforcement training center for a five- or six-month

20 training program, basically had two parts.

21        The first part was more law enforcement-related

22 techniques, such as firearms training, investigating crime

23 scenes, things like that.

24        The second part was an IRS-specific training program and

25 it was more of class-orientated.

1          We had very intensive training on the Internal Revenue

2    Code, training on the Internal Revenue manual -- which is kind of

3    an IRS procedure book -- as well as how the Internal Revenue

4    Service criminal investigation conducts investigations:  how we

5    perform interviews, how we gather records, how we prepare

6    reports, how we -- the types of records that are available to us.

7    Q.  And could you just tell us a little bit about your

8    educational background?

9    A.   Yeah.  I graduated from the University of Wisconsin with a

10   bachelor's of business administration degree, double-majored in

11   accounting and risk management.

12          Following that I graduated from the Loyola Chicago

13   school of law with a juris doctorate.

14   Q.  Now, Agent, are you one of the case agents for this

15   particular investigation involving the defendant, Hakeem El Bey?

16   A.   I am.

17   Q.  And what does it mean to be a case agent?

18   A.   I am the primary agent in charge of the investigation.  I

19   analyze records, I gather records, I prepare prosecution reports,

20   or prepare reports, including the prosecution report.

21   Q.  And when did this investigation begin?

22   A.   It began -- I became involved with the investigation on or

23   around March 2013.

24          Prior to my arrival it was being investigated by other

25   agents as part of a larger investigation into similar types of

1  activities in the Chicago area.

2  Q.  Now, Agent Bodner, do you see the person that you know as

3  Hakeem El Bey in the courtroom today?

4  A.  I do.

5  Q.  And I'd ask you to tell me -- please tell me where he is

6  seated and to identify an article of clothing.

7  A.  Yeah.  He is seated at that table wearing a dark blue

8  sweater.

9         MR. HOTALING:  And, your Honor, I would ask the record

10  reflect the fact that the witness has identified the defendant.

11         THE COURT:  That's fine.

12  BY MR. HOTALING:

13  Q.  Now, during the course of your participation in this

14  investigation, sir, have you had an opportunity to collect and

15  review documents?

16  A.  I have.

17  Q.  And as a law enforcement agent how do you go about collecting

18  documents in an investigation?

19  A.  We have the ability to subpoena records from various

20  institutions, such as banks, or pretty much any company or entity

21  that gathers records that are relevant to our investigation.

22  Q.  And what types of documents have you had an opportunity to

23  examine and review as part of this particular investigation?

24  A.  During this investigation I examined bank records, I analyzed

25  those bank records.

1          We also gathered records from several entities that the

2     defendant made purchases from.

3          And that's in addition to tax records that I reviewed.

4     They are sent to the Internal Revenue Service.

5     Q.   And so, Agent, throughout the course of the testimony for the

6     rest of the day -- and we will see if it goes into tomorrow --

7     I'd like to talk about a number of the documents that you

8     collected during the course of the investigation.  I'd like to

9     start back in 2002.

10         I'm showing what has already been admitted as Government

11    Exhibit USPS 1.

12    A.   Yes.

13    Q.   Do you recognize that?

14    A.   I do.

15    Q.   And what is it?

16    A.   These are documents received from the United States Postal

17    Service.

18    Q.   And based on your --

19         MR. HOTALING:  And, your Honor, with your permission,

20    may I show a portion of this particular exhibit to the members of

21    the jury?

22         THE COURT:  Yes.

23    BY MR. HOTALING:

24    Q.   Wait for a moment for it to flash up.

25         Now, so based on your review of this particular exhibit

1  and this particular page that's in front of you right now, at

2  least going back to 1984, where did the defendant work?

3  A.   The United States Postal Service.

4  Q.   And what position did he hold at the U.S. Postal Service?

5  A.   I believe he has a mail handler.

6  Q.   And is he still employed with the postal service?

7  A.   I believe he is still employed.

8  Q.   And in what capacity?

9  A.   I don't believe he is on active duty.  I believe he is

10  receiving some sort of disability workers compensation.

11  Q.   Now, turning back to this particular exhibit --

12         MR. HOTALING:  And if we could go moving -- it's the

13  first two pages.

14  BY MR. HOTALING:

15  Q.   So now you have the document that's in front of you as well

16  as in front of the jury.  What is the title of this document?

17  A.   This is an affidavit.

18  Q.   And what's the date of this document?

19  A.   It is dated -- there is a stamp dated February 16th, 1993.

20  Q.   Now, in the first blank space at the top of the document,

21  under where it says:  Affidavit, there is the name Frederick Wade

22  Jones.  Do you see that?

23  A.   Yes.

24  Q.   Based on your investigation in this case, who is Frederick

25  Wade Jones?

1  A.  It is the birth name of the defendant.

2  Q.  And what was Frederick Wade Jones intending to do by the

3  filing of this affidavit?

4  A.  Change his name from Frederick Wade Jones to Abdul Hakeem

5  Muhammad.

6  Q.  Now, I'd like to turn your attention to the fourth page of

7  this very same exhibit.  And what's the title of this document?

8  A.  This is a request for a name change.

9  Q.  And what's the date of this document?

10  A.  There is a stamp dating it March 29th, 2002.

11  Q.  And so whose name is being changed by way of this document?

12  A.  The name is being changed from Abdul Hakeem Muhammad to

13  Hakeem El Bey.

14  Q.  And is that the defendant in this case?

15  A.  It is.

16  Q.  And his name change was changed to Hakeem El Bey at least as

17  of March 29th, 2002, is that correct?

18  A.  Correct.

19  Q.  Sir, I'm showing you what has been marked for identification

20  in a smaller version as Government Exhibit Summary Chart 1.

21  A.  Yes.

22  Q.  Do you recognize that?

23  A.  I do.

24  Q.  And what is it?

25  A.  It is a flow chart of some of the major events that occurred

1  in this investigation.

2  Q.  And did you either personally prepare or assist in the

3  preparation of this exhibit?

4  A.  I did.

5  Q.  And would this exhibit assist in your testimony today?

6  A.  It would, yes.

7          MR. HOTALING:  Your Honor, at this time I would seek

8  permission to use the chart -- and I have a blowup of the

9  chart -- as a demonstrative exhibit throughout the course of the

10  rest of Agent Bodner's testimony.

11          THE COURT:  Yeah.  That's fine.

12          MR. HOTALING:  And, your Honor, may I put it up on the

13  board to show it to the members of the jury?

14          THE COURT:  Sure.

15          MR. HOTALING:  Thank you.

16  BY MR. HOTALING:

17  Q.  And again, obviously many of these entries are covered up,

18  but generally speaking what is the particular exhibit?

19  A.  It's a flow chart of some of the activities that occurred

20  that were learned of during the investigation.

21  Q.  What -- when was the first major event in this investigation?

22  A.  I would say August 14th, 2009.

23  Q.  And then in terms of going back a little bit in time, how did

24  things first kind of initiate?  What was the first step on this

25  particular investigation?

1  A.  Well, maybe prior to that was when Mr. El Bey or the

2  defendant filed a -- filed a document with the Mecklenburg County

3  register of deeds.

4  Q.  And approximately when did that happen?

5  A.  Sometime in 2002.

6  Q.  Okay.  So let's go ahead and reveal our first entry on our

7  timeline, which again, for the record indicates -- you know what,

8  sorry about that.  That's not our first exhibit.  I apologize.

9          So what happened in March of 2002?

10  A.  The defendant filed a document with the Mecklenburg County

11  register of deeds, basically declaring that he is a Moorish

12  American.

13          MR. HOTALING:  And, your Honor, with your permission if

14  I could show what's already been admitted into evidence as

15  Government Exhibit Mecklenburg 1.

16          THE COURT:  Sure.

17  BY MR. HOTALING:

18  Q.  And I'd like to turn your attention to the page of this

19  exhibit that's currently on the screen in front of you.  What is

20  the title of this particular page of the exhibit?

21  A.  It's a declaration of national Moorish name and title of

22  reclamation.

23  Q.  Now, what is the defendant intending to do here?

24  A.  I believe basically declaring that he is a Moorish American,

25  and it kind of goes through the progression of his names.

1  Q.  And with what government agency was this document filed?

2  A.  It was filed with the Mecklenburg County register of deeds.

3  Q.  And we have already -- the members of the jury have already

4  heard about the particular number that's up in the upper

5  right-hand corner that had been filed from the number that had

6  been assigned as part of the register of deeds for Mecklenburg

7  County.

8        Now, is that particular number that's on there, does

9  that have significance for this investigation?

10 A.  It does.

11 Q.  Why?

12 A.  It was handwritten on the forms 1041 filed by the defendant.

13 Q.  So speaking of the defendant's filing of trust returns, when

14 did the defendant first file form 1041 trust returns for the

15 Hakeem El Bey Trust?

16 A.  August 14th, 2009.

17 Q.  Okay.  So now let's go ahead and reveal that particular

18 entry, which again for the record indicates on August 14th, 2009,

19 the defendant files forms 1041 for the Hakeem El Bey Trust for

20 the years 2006, 2007 and 2008.

21       How much of a refund did the defendant claim was due to

22 his trust in each of those tax returns filed by the IRS

23 August 14th, 2009?

24 A.  Each of these forms 1041 requested a refund of $300,000.

25 Q.  And did the IRS issue any $300,000 refund of the defendant's

1  trust in connection with those three trust returns received by

2  the IRS on August 14th, 2009?

3  A.  No, it did not.

4  Q.  Now, after the defendant filed these trust returns in August

5  2009, what did the IRS do in response?

6  A.  The IRS issued what's called 3176 C letters, or otherwise

7  know as frivolous filer letters.

8  Q.  So let's go ahead and reveal our next entry on our timeline.

9  On what date were those sent out?

10 A.  I believe they are sent out on, on or about November or

11 October 29th, 2009.

12 Q.  And so the next entry on our time line shows that on that

13 date the IRS issued frivolous filer notices regarding those forms

14 1041 for tax years 2006, 2007 and 2008.

15       Now, are there financial penalties associated with

16 filing frivolous tax returns?

17 A.  There can be, yes.

18 Q.  And did Kristy Morgan testify yesterday in this trial about

19 those frivolous filer notices that were sent to the defendant in

20 October of 2009?

21 A.  She did.

22 Q.  And we'll come back to those in just a moment.

23       But before we do so, what significant event took place

24 after the IRS mailed the frivolous filer notices to the defendant

25 in late October 2009?

1  A.  Well, a short time after -- after the IRS sent out these

2  letters, the defendant opened up two bank accounts at Wells Fargo

3  Bank.

4  Q.  So let's go ahead and reveal our next entry, November 6,

5  2009.  The defendant opens Wells Fargo accounts for the Hakeem El

6  Bey Trust.

7  A.  Correct.

8  Q.  So, Agent Bodner, I'm showing you what has already been

9  admitted into evidence as Government Exhibit Wells Fargo 1 B.

10          Do you recognize that?

11  A.  I do.

12  Q.  And do you recognize that set of exhibits that you have in

13  front of you?

14  A.  I do.

15  Q.  What are they?

16  A.  It's an account application for Wells Fargo Bank accounts

17  5730 and 6928.

18          MR. HOTALING:  And, your Honor, with your permission may

19  we show this particular exhibit to the jury?

20          THE COURT:  Yes.

21  BY MR. HOTALING:

22  Q.  Now, turning to the first account, I believe that you

23  referred to it -- what are the last four digits of the first

24  number -- the first bank account that was opened?

25  A.  5730.

1   Q.  And on what date was the 5730 account opened at Wells Fargo?

2   A.  They are opened on November 6 -- it was opened on November 6,

3   2009.

4   Q.  Now turning to the second account, what are the last four

5   digits of that account number?

6   A.  6928.

7   Q.  And was that opened on the same date?

8   A.  Yes.

9   Q.  Now, turning to the third and fourth pages of this exhibit.

10  A.  Okay.

11  Q.  That one.

12          And then whose signature appears in the signature block

13  on this page?

14  A.  Hakeem El Bey.

15  Q.  How about the next page?  Whose signature -- whose signature

16  appears in the signature box on these pages?

17  A.  It's signed by Hakeem Bey.

18  Q.  Now, I'd like to ask you some questions about these

19  particular Wells Fargo accounts for the defendant's trust.  And I

20  mentioned -- I think you mentioned a moment ago that they were

21  both opened on November 6, 2009, is that right?

22  A.  Yes.

23  Q.  Now, as part of your duties as the case agent did you

24  subpoena Wells Fargo for copies of the bank statements for the

25  5730 and the 6928 account?

1  A.  An agent with IRS CI subpoenaed those documents.

2  Q.  And for what time period did the IRS subpoena records from

3  Wells Fargo for these two accounts?

4  A.  Basically from the -- when the accounts were opened through

5  when they were closed.  Or covered those periods.

6  Q.  Sir, I'm showing you what has already been admitted into

7  evidence as Government Exhibit Wells Fargo 3 and Wells Fargo 7.

8  Do you recognize those?

9  A.  I do.

10 Q.  What are they?

11 A.  These are bank statements for Wells Fargo account 5730 and

12 Wells Fargo account 6928.

13          MR. HOTALING:  And, your Honor, with your permission may

14 I show to the members of the jury certain pages of this

15 particular bank statements.

16          Okay.  I'll take that as a yes.

17 BY MR. HOTALING:

18 Q.  Now, when was the -- and so let's put up the 5730, which is

19 Wells Fargo 3.

20          When was the -- what was the initial deposit made into

21 the 5730 account?

22 A.  It was a deposit made on November 6th for $100.  And it was

23 actually a transfer, but yes.

24 Q.  And what was the ending balance in this account as of

25 December 4th?

1  A.  The ending balance as of December 4th was $13.50.

2  Q.  So the ending balance on 2-4 of $13.50, is that right?

3  A.  December 4th.

4  Q.  December 4th, yes.

5       Now let's turn briefly to the December 2009 statement

6  for the 5730 account.

7       In the account summary section, what was the beginning

8  balance for this account as of the beginning of December 2009?

9  A.  As of December 5th it was $13.50.

10  Q.  And what was the ending balance as of January 7th, 2010?

11  A.  It was a negative balance of $465.72.

12  Q.  I'm going to ask the same series of questions with respect to

13  the 6928 account, which is Government Exhibit Wells Fargo 7.

14       What was the initial deposit made into the 6928 account?

15  A.  It was an initial deposit of $40.

16  Q.  And on what date?

17  A.  November 6.

18  Q.  And what the ending balance as of November 30th?

19  A.  Appears to be $88.50.

20  Q.  And let's look real quickly at the December 2009 statement

21  for the 6928 account.  What was the beginning balance?

22  A.  Beginning balance on December 1st was $88.50.

23  Q.  How about the ending balance?

24  A.  Was $34.

25  Q.  Okay.  Agent, now that we have just briefly described the

1  opening in the first couple of months of these two trust accounts

2  for the defendant's trust, let's talk about the next significant

3  event on the time line.

4  A.  Okay.

5  Q.  What happened on November 12th, 2009, in this case?

6  A.  I believe on November 12th the IRS received back the

7  frivolous filer letters that were sent to the defendant, which

8  were sent on November 7th, 2009.

9  Q.  So again, the next entry on our time line reads:

10         November 7th, 2009, defendant mails frivolous filer

11 notices back to the IRS.

12 A.  Correct.

13         MR. HOTALING:  And, your Honor, at this time if I may

14 show to the members of the jury what's already been admitted into

15 evidence as Government Exhibit IRS 6?

16         THE COURT:  Sure.

17         MR. HOTALING:  May we show that to the jury?

18         THE COURT:  Okay.

19 BY MR. HOTALING:

20 Q.  Now, what is this exhibit, sir?

21 A.  This is a form 1041 trust tax return for tax year 2008.

22 Q.  And when was this particular return submitted?

23 A.  It was received by the IRS on December 8th, 2009.

24 Q.  Go ahead and reveal our next entry, December 8th, 2009:

25         Defendant files form 1041 for the tax year 2008 for the

Bodner - Direct by Hotaling                    275

1  Hakeem El Bey Trust.

2  A.  Correct.

3  Q.  Now, how much of a refund did the defendant claim for his

4  trust in this particular return for tax year 2008?

5  A.  300,000.

6  Q.  Now, in connection with this particular return, did the IRS

7  issue the requested refund to the defendant?

8  A.  It did.

9  Q.  And what was the amount of the refund the defendant received?

10 A.  $300,000.

11         MR. HOTALING:  And, your Honor, with your permission,

12 may I show what's already been admitted into evidence as

13 Government Exhibit IRS 9 to the jury?

14         THE COURT:  Okay.

15 BY MR. HOTALING:

16 Q.  And again, is this a copy of the check the defendant

17 received?

18 A.  It is.

19 Q.  Let's go ahead and reveal our next entry on the time line.

20 January 5th, 2010, U.S. Treasury issued a $300,000 refund check

21 to the Hakeem El Bey Trust?

22 A.  Correct.

23 Q.  Now, again, focusing on the check itself that's in front of

24 you, what's the amount of the check?

25 A.  $300,000.

1  Q.  And what's the -- what is the check number?

2  A.  231002741293.

3  Q.  And what's the date of this check?

4  A.  January 5th, 2010.

5  Q.  And to whom is this check made payable?

6  A.  Hakeem El Bey Trust, Hakeem El Bey, Trustee.

7  Q.  And to what address was it sent?

8  A.  10134 South Calumet Avenue, Chicago, Illinois, 60628.

9  Q.  Now, are you aware if this was a paper hard copy check or was

10 this an electronic direct deposit?

11 A.  This was a paper check.

12 Q.  And how was this check, paper check sent to the defendant?

13 A.  It was mailed to the defendant.

14 Q.  And from where did the IRS mail this check to the defendant?

15 A.  The Austin, Texas, RFC, which I believe is a regional finance

16 center.

17 Q.  And when was the check mailed to the defendant?

18 A.  On or about January 5th, 2010.

19 Q.  Now, Agent, now that we have talked about the check itself

20 let's talk for a few minutes about what the defendant did after

21 he received it.  And we will come back in a moment to what the

22 defendant did with the check after he received it.

23        Did the defendant make any significant or expensive

24 purchases after the IRS mailed him the refund check on or about

25 January 5th, 2010?

1  A.  He did.

2  Q.  What did he buy?

3  A.  He purchased a 2010 Hyundai Genesis.

4  Q.  I'm showing you what's already been admitted into evidence as

5  Government Exhibit Shaffer 1.  Do you recognize that?

6  A.  I do.

7  Q.  What is it?

8  A.  This is -- it is documentation received from Shaffer Hyundai

9  regarding the sale of a vehicle.

10        MR. HOTALING:  And, your Honor, with your permission may

11  I show a copy of this to the jury and also review our next entry

12  on the time line, January 9th, 2010, defendant purchases 2010

13  Hyundai Genesis for $27,614.

14  BY MR. HOTALING:

15  Q.  Focusing now on what's in front of the jury as Government

16  Exhibit Shaffer 1, which company generated this form?

17  A.  Shaffer Hyundai.

18  Q.  And where is Shaffer Hyundai located?

19  A.  They are located in Merrillville, Indiana.

20  Q.  Now, under the box labeled vehicle being purchased, what does

21  this exhibit say in terms of the type of car being purchased?

22  A.  It's a new 2010 Hyundai Genesis.

23  Q.  And who is listed on this document --

24        MR. HOTALING:  Go ahead and pull it up.

25  BY MR. HOTALING:

1  Q.  And who is listed on this document near the top of it as the

2  purchaser of this 2010 Hyundai Genesis?

3  A.  Hakeem El Bey.

4  Q.  And how about the particular address that's listed for Mr.

5  El Bey?

6  A.  10134 South Calumet, Chicago, Illinois, 60628.

7  Q.  And on what date did the defendant purchase this car?

8  A.  January 9th, 2010.

9  Q.  Now, let's focus for a minute --

10         MR. HOTALING:  Kathryn, if we can back out and if we

11 could focus on the right-hand side.  Yeah.  Perfect.  Thank you.

12 BY MR. HOTALING:

13 Q.  Now let's focus for a moment on the right-hand side of the

14 document that's now blown up in front of the jury.  What was the

15 price for the car?

16 A.  $24,657.

17 Q.  Now, were there some extras that the defendant bought for the

18 car?

19 A.  There were.

20 Q.  There was a protection package and then there is a grill?

21 A.  Correct.

22 Q.  Now, with all the extras and the taxes, what was the total

23 price for car that the defendant bought on January 9th, 2010?

24 A.  $27,000 -- $27,614.

25         MR. HOTALING:  Kathryn, if we could back out again.

1  BY MR. HOTALING:

2  Q.  And at the bottom of this particular document does the sales

3  contract contain a signature for the purchaser of the car?

4  A.  It does.

5  Q.  Whose signature is down there as the purchaser?

6  A.  Hakeem El Bey.

7  Q.  Now, based on your review of this exhibit as well as the

8  defendant's bank records, how did the defendant purchase this

9  car?

10  A.  Using funds from his Wells Fargo bank accounts.

11  Q.  Did he actually pay with cash money or did he pay by check?

12  A.  He paid by check.

13  Q.  And how many checks did the defendant use to pay this 20

14  thousand -- 27,614 for the Hyundai Genesis?

15  A.  He used two checks.

16  Q.  Now, sir, I'm going to show you -- I'm going to put up on the

17  screen, with the Judge's permission, what's already been admitted

18  into evidence as Government Exhibit 5 A and 5 B.

19          Do you know what those documents are?

20  A.  Yes.  These are checks from Wells Fargo account 5730.

21  Q.  Now, let's start first with Government Exhibit Wells Fargo

22  5 A, which is the document that's on the left-hand side of the

23  screen.

24          Now, what is the name of the account on which this check

25  was drawn?

1  A.  The trust agreement for Hakeem El Bey, Hakeem Bey, Trustee.

2  Q.  And from which of the defendant's trust accounts that he

3  opened on November 6, 2009, was this check drawn?  Was it a 5730

4  account or the 6928 account?

5  A.  It was the 5730 account.

6  Q.  And what's the check number for this exhibit?

7  A.  413.

8  Q.  On what date was check number 413 written?

9  A.  January 9th, 2010.

10 Q.  And to whom was the check written?

11 A.  Shaffer Hyundai.

12 Q.  What is the amount of this check?

13 A.  $614.

14 Q.  And who signed it?

15 A.  Hakeem El Bey.

16 Q.  And what's written in the memo line next to his signature?

17 A.  New car.

18 Q.  Now, focusing for a moment --

19         MR. HOTALING:  If we could back out, Kathryn.

20 BY MR. HOTALING:

21 Q.  Now focusing on the information that's below and to the left

22 of the information you just talked about on the face of the

23 check, does this information tell you when this check was cashed

24 by Shaffer Hyundai?

25 A.  It does.

1  Q.  When was check number 413 cashed?

2  A.  January 21st, 2010.

3  Q.  Now, let's talk about the check that's on the right-hand side

4  of the page or on the screen, Government Exhibit Wells Fargo 5 B.

5        Was this also drawn from the trust account for Hakeem El

6  Bey, Hakeem El Bey, Trustee?

7  A.  Yes.

8  Q.  And for which trust account?

9  A.  5730.

10 Q.  And what's the check number here?

11 A.  414.

12 Q.  And on what date was this check written?

13 A.  January 9th, 2010.

14 Q.  To whom?

15 A.  Shaffer Hyundai.

16 Q.  And what's the amount of this particular check?

17 A.  $27,000.

18 Q.  And who signed the check?

19 A.  Hakeem El Bey.

20 Q.  And what's written to the left of his signature?

21 A.  New car, and then some numbers I can barely read.

22       MR. HOTALING:  And then so let's go ahead and back that

23 out, Kathryn, if that's all right?  And then again the bottom

24 information that's very similar to the one on the right -- on the

25 left-hand side.

1  BY MR. HOTALING:

2  Q.  Does this information tell you when the check was cashed by

3  Shaffer Hyundai?

4  A.  It does.

5  Q.  Where was check number 414 cashed?

6  A.  January 28th, 2010.

7  Q.  Okay.  Agent, now that we have talked about the purchase the

8  defendant made after he received this $300,000 refund check, I

9  want to come back and talk about what he did with the check

10  itself in early January 2010.

11       And in doing so I'd like to talk about the check and the

12  bank records for the Wells Fargo 5730 trust account.  And you

13  still have Government Exhibit IRS 9 in front of you, is that

14  right?

15  A.  I have IRS 9.

16  Q.  You know what, we'll go ahead and put it up on the screen in

17  front of you.

18  A.  Perfect.

19  Q.  IRS 9, which is the copy of the U.S. Treasury check?

20  A.  It is, yes.

21  Q.  Now, you've testified about the top portion of the check.

22  Now, I'd like to draw your attention down to the bottom part of

23  the exhibit.

24       Is that a copy of the back of the Treasury check?

25  A.  It is.

1  Q.  And whose signature endorsement appears on the back of the

2  check?

3  A.  Hakeem Bey.

4  Q.  And based on your review of the Hakeem El Bey Trust Wells

5  Fargo bank accounts, into which account did the defendant deposit

6  this check?

7  A.  I believe this was deposited into Wells Fargo bank account

8  5730.

9  Q.  And at this time I would like to go ahead and publish a

10 particular portion of Government Exhibit Wells Fargo 3, which

11 again is the bank records associated with the 5730 account.

12          And according to the activity summary that's at the

13 bottom of this page, what was the beginning balance in the

14 account as of January 8th, 2010?

15 A.  It was a negative balance of $465.72.

16 Q.  So now let's go ahead and turn to the next page of the

17 exhibit.

18          For the entry dated January 8th, 2010, there appears to

19 be a deposit.  Do you see that?

20 A.  Yes.

21 Q.  What is the amount of that deposit?

22          MR. HOTALING:  I think it's January 8th.  Perfect.

23 BY THE WITNESS:

24 A.  Yeah.  It's $1,118.01.

25 BY MR. HOTALING:

1  Q.  And according to this statement, what is the source of that

2  $1118.01 deposit?

3  A.  United States Postal Service salary.

4  Q.  Now, let's move down the statement to January 11th, 2010.

5  Was there a deposit listed there?

6  A.  There is.

7  Q.  In what amount?

8  A.  $300,000.

9  Q.  And what was the source of that $300,000 deposit?

10 A.  The United States Treasury refund check.

11 Q.  Now, let's go ahead and confirm that information.

12        MR. HOTALING:  If we can go ahead and back that out,

13 Kathryn.

14 BY MR. HOTALING:

15 Q.  And I'm going to put on the screen in front of you, and with

16 the Court's permission I'm going to show you what's already been

17 admitted into evidence as Government Exhibit Wells Fargo 4, just

18 to refresh your recollection.

19        Do you recognize that?

20 A.  I do.

21 Q.  What is it?

22 A.  It is a deposit item for Wells Fargo bank account 5730.

23 Q.  And I think you said -- for what particular account for those

24 deposit items?

25 A.  Wells Fargo bank account 5730.

1  Q.  Now, I'd like to turn your attention to the last page of that

2  particular exhibit, what's now on the screen in front of the

3  members of the jury.

4  A.  Okay.

5  Q.  Is this a copy of the U.S. Treasury check, refund check,

6  which is the same as Government Exhibit IRS 9 that we have

7  already talked about --

8  A.  Yes.

9  Q.  -- that was found in the deposit records for the Hakeem El

10  Bey Trust Wells Fargo account 5730, Government Exhibit Wells

11  Fargo 4?

12  A.  Yes.

13  Q.  Now, focusing on the typed information on the bottom left of

14  this exhibit, into which account does it say that the check was

15  deposited?

16  A.  Account 5730.

17  Q.  And again, that's similarly reflected on the bank statements

18  that you just talked about, reflecting that there was a $300,000

19  deposit on the bank statement?

20  A.  Yes.

21  Q.  Associated with this particular check.

22          So let's go ahead and unveil the next portion of our

23  time line, January 10th -- January 11th, 2010:  Defendant

24  deposits the $300,000 refund check into the 5730 Wells Fargo

25  account.

1           Again, just to make sure we are clear about the time

2    line, the IRS mailed the refund check to the defendant on or

3    about January 5th, 2010, is that right?

4    A.  Correct.

5    Q.  And once he received it he went and purchased the Hyundai

6    Genesis on January 9th, 2010, is that right?

7    A.  Correct.

8    Q.  And then he actually deposited the refund check into his

9    account on January 11th?

10   A.  That is correct.

11   Q.  Now, do the records in Government Exhibit Wells Fargo 3 that

12   we have been talking about reflect when Shaffer Hyundai cashed

13   the two checks from the defendant to purchase that new car?

14   A.  They do.

15           MR. HOTALING:  So let's go again and let's go ahead and

16   put Wells Fargo 3 back up.

17   BY MR. HOTALING:

18   Q.  Now, one of the checks that was used to purchase the car was

19   check number 413 for $614, is that right?

20   A.  Correct.

21   Q.  Now, looking at the bottom of this page, very near the

22   bottom --

23           MR. HOTALING:  Go ahead and blow up the whole bottom.

24   BY MR. HOTALING:

25   Q.  -- when did check number 413 clear the 5730 account?

1  A.  January 21st.

2  Q.  Now, let's turn to the next page of the exhibit.  Again at

3  the bottom.

4       The other check used to purchase the car was check

5  number 414 for $27,000, is that right?

6  A.  Correct.

7  Q.  And according to this bank statement that is currently in

8  front of the jury, when did check number 414 clear this account?

9  A.  January 28th.

10  Q.  What was the ending balance for this account as of

11  February 4th, 2008?  February 4th, 2010.

12       What's the ending balance as of February 4th?

13  A.  It was 228,760 -- $228,762.98.

14  Q.  Now, Agent, now that we have talked about the $300,000 refund

15  check and the defendant's purchase of the Hyundai Genesis, let's

16  move forward in the time to the end of February 2010.

17       Did the defendant make another purchase at the end of

18  February 2010?

19  A.  He did.

20  Q.  What did he buy?

21  A.  He purchased another vehicle.

22  Q.  Let's go ahead and unveil our next entry:  February 26, 2010,

23  the defendant purchases a 2011 Hyundai Sonata.

24       MR. HOTALING:  And, your Honor, with your permission I'm

25  going to show the witness as well as members of the jury what has

1  already been admitted into evidence as Government Exhibit Shaffer

2  2.

3          THE COURT:  Are we going to go car by car?

4          MR. HOTALING:  We are going to go car by car, Judge.

5          THE COURT:  Pardon?

6          MR. HOTALING:  Yes.

7          THE COURT:  Why don't you just add them together?  It's

8  like pulling teeth, right?

9          MR. HOTALING:  I hope not, Judge.

10          THE COURT:  We have six cars, is it, or eight?

11          MR. HOTALING:  Judge, there are six cars.

12          THE COURT:  Why can't you present the six cars at once?

13          MR. HOTALING:  I'm going in chronological order to --

14          THE COURT:  Why is chronological order important?

15          You want to show that he used the money he got from the

16  Internal Revenue Service to buy six cars.  Maybe other things,

17  but so far we heard about the six cars.  We had the

18  representatives of the dealers, which is fine.

19          I'm just asking what is the point in having to go

20  separately through each car?

21          MR. HOTALING:  Judge, the point of it is is so that we

22  can show the members of the jury on which date each car is

23  particularly purchased, how much each car is purchased for, the

24  fact that the defendant himself --

25          THE COURT:  Sure.  You can put it on the table, six

1  cars, date purchased, amount of money, source of money, right?

2          MR. HOTALING:  That is certainly one way to do that,

3  Judge.  That is certainly one way to do that.

4          Because we represent --

5          THE COURT:  You are going to put us all to sleep, your

6  know.  Not another car.

7          MR. HOTALING:  It is certainly not my intention to put

8  the members of the jury to sleep.

9          THE COURT:  We have heard about four cars.

10         MR. HOTALING:  It is certainly not my intention.

11         THE COURT:  Pardon?

12         MR. HOTALING:  It's not my intention to put the members

13  of the jury to sleep.

14         THE COURT:  But each car is like the other car, and each

15  of these checks is like the other checks.  I just don't get the

16  point.

17         MR. HOTALING:  And, Judge, if we could enter into an

18  agreement between Mr. El Bey and myself, with the government,

19  with respect to the information that's contained in the documents

20  so that we can create a summary chart, I'm happy to do that.  I

21  am.

22         THE COURT:  You don't need an agreement in order to make

23  a summary of data that are in documents which have been admitted

24  into the record.  It's just a matter of presentation.

25         MR. HOTALING:  Okay, Judge.  Then we will do it like

1  this.

2  BY MR. HOTALING:

3  Q.  Obviously we have a summary chart that's been prepared by

4  Agent Bodner?

5  A.  Yes.

6  Q.  And you have assisted in the preparation of this?

7  A.  I have.

8  Q.  So what I'm going to ahead and do, is I'm going to read and

9  unveil each one of these particular entries.

10         THE COURT:  Okay.

11         MR. HOTALING:  Is that okay?

12         THE COURT:  Sounds great.

13         MR. HOTALING:  Okay.  And that will just bypass, which I

14  think is the issue that your Honor has addressed.

15  BY MR. HOTALING:

16  Q.  Based on information that has already been admitted in the

17  documents that you have reviewed, correct?

18  A.  Correct.

19  Q.  Okay.  Next March 22nd, 2010, the defendant purchased a house

20  at 439 Hoxie Avenue for $120,000?

21  A.  Correct.

22  Q.  Now, do the records and the documents that were previously

23  admitted as part of Stewart Title Number 1 confirm the closing

24  statements that establishes that this house was purchased?

25  A.  Correct, it does.

1  Q.  Who purchased that particular house?

2  A.  Hakeem El Bey.

3  Q.  And was a check generated from a particular account?

4  A.  Yes, it was.

5  Q.  And was that one of the trust accounts that you've talked

6  about?

7  A.  It is, yes.

8  Q.  And again, was money from that used to make the purchase of

9  this house for $120,000?

10  A.  Correct, yes.

11  Q.  Okay.  Let's move on.

12      Next entry, on April 1st, 2010, did the defendant open a

13  next trust account?

14  A.  He did.  Opened up another account at Wells Fargo Bank.

15  Q.  What is the last four digits of that particular trust?

16  A.  1206.

17  Q.  And again, it was in the name of the Hakeem El Bey Trust?

18  A.  Hakeem El Bey Trust.  Hakeem El -- or Hakeem Bey, Trustee.

19  Q.  Next moving forward to May 24th, 2010, did the defendant file

20  yet another form 1041 for the Hakeem El Bey Trust?

21  A.  He did.

22  Q.  Is that for tax year 2009?

23  A.  Yes.

24  Q.  And did it claim a refund?

25  A.  It did.

1  Q.  In what amount?

2  A.  $300,000.

3  Q.  And did the IRS pay out on that particular refund request?

4  A.  It did.

5  Q.  Moving forward to our next entry, June 22nd, 2010.  On what

6  date did the U.S. Treasury issue a refund check to the Hakeem El

7  Bey account?

8  A.  June 22nd, 2010.

9  Q.  Is that Government Exhibit IRS 10, I believe?  I don't have

10  it in front of me.  But --

11         MR. HOTALING:  We can put it up.  I think it's

12  Government Exhibit IRS 10.

13  BY MR. HOTALING:

14  Q.  But again, that's already been testified to, it's already

15  been admitted into evidence?

16  A.  Yes.

17  Q.  So we have a $300,000 refund check issued to the account?

18  A.  Yes.

19  Q.  To the trust?

20  A.  Yes.

21  Q.  Moving forward about a week, June 28th, 2010, did the

22  defendant deposit that $300,000 refund check that he got from the

23  IRS into the 1206 Wells Fargo account for his trust?

24  A.  He did.

25  Q.  So let's talk about a variety of purchases that he made.

1  Again, based on your review of all the records that have been

2  accumulated and admitted into evidence in this case, on June 30,

3  2010, did he purchase a 2011 Honda Sonata for $26,526?

4  A.  He did.

5  Q.  That was from Shaffer Hyundai?

6  A.  It was.

7  Q.  July 9th, 2010, did he purchase a 2010 Jeep Patriot for

8  $21,459?

9  A.  He did.

10  Q.  Did he purchase that from Mancari Jeep?

11  A.  He did.

12  Q.  Moving forward next, August 13th, 2010, did the defendant

13  make yet another purchase in the amount for a 2010 Buick LaCrosse

14  for $35,780?

15  A.  He did.

16  Q.  And was that from Circle Buick?

17  A.  It was, yes.

18  Q.  Based on your review of the documents that you've collected

19  as part of this case and have been admitted into evidence?

20  A.  Yes.

21  Q.  Moving forward about two weeks to the end of August 2010,

22  August 28th, 2010, the defendant purchased a 2011 Jeep Grand

23  Cherokee for $36,149?

24  A.  He did.

25  Q.  Did he do that from Mancari Jeep?

1  A.  He did, yes.

2  Q.  Moving forward about a month and a half to October 8th, 2010,

3  did the defendant purchase a 2021 Honda Genesis for $25,107?

4  A.  Yes.

5  Q.  So a fourth car purchased from Shaffer Hyundai?

6  A.  Yes.

7  Q.  Moving forward to our last entry on the time line,

8  November 29th, 2010, what did he do on or about then?

9  A.  He filed another 1041 trust tax return for tax year 2007.

10  Q.  And again, and that's based on your review of the IRS records

11  in this case?

12  A.  It is.

13  Q.  Now, sir, obviously we have just gone through fairly quickly

14  a review of your defendant's tax returns, and some documents that

15  you had collected during the course of this investigation.

16        As part of your duties in this case did you create a

17  chart that summarized the deposits into and withdrawals out of

18  the Wells Fargo bank accounts?

19  A.  I did.

20  Q.  I'm showing you what's been marked for identification as

21  Government Exhibit Summary Chart 2 and Summary Chart 3.

22  A.  Yes.

23  Q.  Okay.  Do you recognize those?

24  A.  I do.

25  Q.  What are they?

1  A.  The first is a chart summarizing the deposit activity into

2  Wells Fargo bank accounts 5730, 6928, and 1206.

3  Q.  And did you either prepare these charts yourself or assist

4  with their preparation?

5  A.  I did.

6  Q.  And would these charts assist with the conclusion of your

7  testimony today?

8  A.  Yes.

9  Q.  And do these charts accurately summarize the bank records

10 that you have collected and testified about today?

11 A.  They do.

12       MR. HOTALING:  Your Honor, at this time I would move for

13 the admission of Government Exhibit Summary Charts 2 and 3 into

14 evidence.

15       THE COURT:  That's -- they are admitted.

16    (Government Exhibits Summary Charts 2 and 3 received in

17       evidence.)

18       MR. HOTALING:  And copies have been provided to the

19 defendant, your Honor, just so the record is clear.

20 BY MR. HOTALING:

21 Q.  Now, let's start first with the deposit pie chart.

22       Now, for what account -- I think you indicated the

23 account.  So what time periods does that chart cover?

24 A.  This is from the opening of the account through

25 November 29th, 2010.

1  Q.  Now, according to this chart, how much in refund checks were

2  deposited into the Wells Fargo bank accounts?

3  A.  $600,000.

4  Q.  And what percentage of the total amount of money that was

5  deposited into these accounts does the $600,000 represent?

6  A.  95 percent.

7  Q.  How much money from the postal service was deposited into

8  these Wells Fargo Bank accounts?

9  A.  $15,599.

10  Q.  And this was money associated with the disability from the

11  postal service, is that right?

12  A.  Disability or for postal service payments.

13  Q.  And what percentage does that represent?

14  A.  2 percent.

15  Q.  And the final category includes miscellaneous deposits/items.

16  What does that mean?

17  A.  That's other checks that were deposited into the account,

18  other items that could be reversal of transactions, plus any

19  interest earned on the account.

20  Q.  And what percentage does that particular amount represent?

21  A.  $17,136, or 3 percent of the total.

22  Q.  So now let's turn to the next chart, Government Exhibit

23  Summary Chart 3.  And this is a chart reflecting withdrawals from

24  the account, is that right?

25  A.  Yes.  Withdrawals or expenditures.

1  Q.  And for which accounts?

2  A.  Wells Fargo accounts 5730, 6928 and 1206.

3  Q.  Now, and so basically the time period of the deposits?

4  A.  Correct.

5  Q.  Now, according to this chart how much money was withdrawn

6  from the defendant's Wells Fargo accounts for vehicle purchases?

7  A.  $200,290.

8  Q.  And what percentage of the total amount of withdrawals does

9  that represent?

10  A.  39 percent.

11  Q.  How much money was withdrawn from the account for the

12  purchase of the defendant's house at 439 Hoxie Avenue, that we've

13  referred to throughout the course of your testimony, as reflected

14  on the time line chart as referred to?

15  A.  Well, he used a cashier's check to complete the purchase of

16  property, and that was $115,500, or 22 percent of the total

17  withdrawals or expenditures.

18  Q.  How much money was withdrawn from the account as cash

19  withdrawals?

20  A.  $51,959.

21  Q.  And what percentage of the total amount does that represent?

22  A.  That's 10 percent.

23  Q.  And finally, how much money was withdrawn from the accounts

24  as other purchases or miscellaneous transactions?

25  A.  That would be $150,297.

1  Q.  But what does that mean?  What are miscellaneous purchases

2  and miscellaneous transactions?

3  A.  It's mostly bank card or debit card purchases.  From the face

4  of the bank statements I see purchases for jewelry, furniture,

5  electronic stores, travel expenses, hotels, airfare.  I think a

6  few casinos.  As well as other daily living expenses, such as

7  groceries or other items.

8  Q.  And so what percentage does that 150,297 reflect of the total

9  pie?

10  A.  29 percent.

11          MR. HOTALING:  Judge, I have no further questions for

12  the witness and I would tender him for cross-examination.

13          THE COURT:  Okay.  Thank you, Mr. Hotaling.

14          Mr. El Bey, do you want to ask some questions?

15          THE DEFENDANT:  Yes, I have some questions.

16                    CROSS-EXAMINATION

17  BY THE DEFENDANT:

18  Q.  Mr. Bodner, I do want to thank you for making a beautiful

19  point with when you brought up the -- my file in Mecklenburg

20  County, and it pertains to the trust.

21  A.  I recall.

22  Q.  Well, the docket number that they was showing on the --

23  A.  Correct.

24  Q.  -- trust?

25  A.  It was written on the trust tax forms.

1  Q.  Yes.  The docket number also on the Mecklenburg filing?

2  A.  Correct.

3  Q.  Yes, sir.  Which showed that this is a treaty trust with the

4  United States of America.  And so I did want to thank you for

5  that.

6         And so --

7  A.  I'm not aware of it showing that, but okay.

8  Q.  Yes, sir.  That's fine.  So -- just a few more other

9  questions.

10        If the Internal Revenue Service knew that they had made

11  a mistake, why didn't they cancel like they do everybody's bank

12  account, why don't they shut it down?  Why did they let me

13  proceed to do what I do?

14        That's your question.

15  A.  The IRS processes returns based on the information that's

16  stated on the returns.

17  Q.  Sir, I filed six filings.

18  A.  Yes.

19  Q.  You don't think a red flag went up?

20  A.  Based on the first three filings?

21  Q.  No.  Based on the six filings.

22  A.  Based on six filings.

23        Like I said from the testimony earlier in the day, the

24  IRS processes millions of tax returns.  And they process those

25  tax returns based -- with the information that's based on the

1  face of the tax returns.

2          They process those tax returns.  And there are programs

3  in place to identify frivolous returns, and not all of those are

4  identified.

5  Q.  All my information was the same on every one of my filings?

6  A.  Well, I would disagree with that.

7          You initially did file three forms 1041.  They were

8  filed in the same envelope.

9  Q.  Three?  I filed six.

10  A.  Yes.  You initially filed in August 2009.

11  Q.  But I said all six, though.  I'm not talking about a part.

12  I'm talking about everything.

13  A.  Definitely.

14  Q.  So everything, every filing had same things.  Maybe different

15  dates, but same information.

16  A.  Different dates and even different addresses, and the way

17  they were filed.  The first three were filed in the same

18  envelope --

19  Q.  Okay.

20  A.  Three returns in the same envelope.

21  Q.  But they had the same information though.

22          MR. HOTALING:  Judge, can the witness be allowed to

23  answer, finish his answer?

24          THE COURT:  Had you finished, Mr. Bodner?

25          THE DEFENDANT:  Wow.

1          THE WITNESS:  No.

2          THE DEFENDANT:  He is a grown man.

3          THE COURT:  Okay.  Well, let Mr. Bodner answer.  He said

4   he didn't finish his answer.

5   BY THE WITNESS:

6   A.  Yeah, the -- you initially filed three form 1041s in the same

7   envelope using a post office box.

8          Your subsequent returns, you filed three separate ones

9   in -- at different times in different envelopes using an actual

10  residential address.

11         So I wouldn't say that they are exactly the same.

12  BY THE DEFENDANT:

13  Q.  But did they have the same information, every one of the

14  1041s, they had the same information with the same document with

15  the docket number.

16         So what I'm saying to you is that if you got the same

17  information six times, and you mean to tell me you all couldn't

18  figure that out and then you -- when you figured it out why

19  didn't you shut the bank account down then?

20  A.  Well, like I said before, it's not the same exact

21  information.  It is the same numbers, other than what I

22  previously discussed before.

23         But as what other -- I'm not an expert on IRS processes

24  of tax returns.

25         But as other people have testified today, or during this

1  trial, the IRS processes tax returns based on the information

2  that you enter on -- that a taxpayer enters on the face of the

3  tax return.

4  Q.  All six of them had the same information.

5  A.  And it does have programs to identify frivolous or fraudulent

6  tax returns.  And it did initially identify those three returns

7  as frivolous or fraudulent.

8  Q.  Again, jurors, I want you all to know I'm a minister, so --

9          MR. HOTALING:  Judge, objection.

10          THE COURT:  What's your objection?  I'm sorry.  You want

11  to have a sidebar or what?

12          MR. HOTALING:  Actually that would be great.

13          THE COURT:  Okay.  Excuse us for a second.

14     (Proceedings heard at sidebar:)

15          COURT REPORTER:  Stand by the mike, please.

16          MR. HOTALING:  Sure.  Absolutely.

17          Judge, my objection is to the fact that he is injecting

18  himself, interjecting the fact that he is a minister, what

19  relevance that possibly has.

20          THE COURT:  I'm sorry.  I didn't even hear that.

21          MR. HOTALING:  He says I'm a minister, and my objection

22  is is what's the relevance of that?  It's inserting his own

23  personal background.  So if he wants to get up and testify and

24  tell the members of the jury that he is a minister, that's fine.

25          But it's an improper question to be posed on

1  cross-examination.

2       THE COURT:  So I'm asking you, what was the question?

3       THE DEFENDANT:  There was a question.  It just stated I

4  was a minister.

5       THE COURT:  Yes, but remember, in cross-examination you

6  are asking questions.

7       THE DEFENDANT:  Okay.

8       THE COURT:  Later, after the government's case is over

9  and it's the turn of the defense, you can testify too and say

10 anything that is relevant.

11      But when you are asking a question, you don't want to

12 make statements.  I mean, that's -- you ask questions.

13      THE DEFENDANT:  Okay.  Okay.

14      MR. HOTALING:  Thank you, Judge.

15   (Proceedings heard in open court:)

16 BY THE DEFENDANT:

17 Q.  Okay.  Going back on the automobiles, the conveyances that I

18 purchased -- I can't -- I'm not -- I can't say that --

19      THE DEFENDANT:  See, I'm cut off again, Judge.  I don't

20 want to say the wrong thing, but I'm just trying to state the

21 fact.  And I don't want to offend anyone, but I can't state a

22 fact.

23      THE COURT:  Okay, let's have another quick sidebar.

24   (Proceedings heard at sidebar:)

25      THE COURT:  Okay.  This is what I think.  I think what

1  you want to ask him is:  Would you, Mr. Bodner, would you be

2  surprised if a minister bought vehicles for --

3           THE DEFENDANT:  Oh, no, that's not --

4           THE COURT:  Isn't that what you want to do?

5           THE DEFENDANT:  No.  Something else.

6           THE COURT:  Okay.  What I thought is you wanted to ask a

7  question that way, because later you could explain to the jury

8  about the minister.

9           What is it you want to ask him?

10          THE DEFENDANT:  What I was going to ask him was from the

11 questions that the attorney here asked him, I was going to tell

12 him that the vehicles, that the vehicles that I bought was for my

13 church and the home.  And so the reason -- that's the reason that

14 six of them were bought.

15          So I wanted to ask him, did he notice that they were all

16 written with the contract that they was in the trust by my

17 church.  That's all I was going to ask him, but I wanted to since

18 I said -- I said I was a minister, I don't want to offend anyone,

19 I don't want you to get mad at me.

20          THE COURT:  As I say, when you are cross-examining you

21 are asking questions rather than telling the witness things.

22          Now, you might have to tell something as a precursor to

23 asking questions.

24          THE DEFENDANT:  Okay.  Okay.

25          THE COURT:  But I thought what you were driving at was

1    that a person might buy things for other people.

2             THE DEFENDANT:  Oh, no.  I wasn't going to say nothing

3    like that.

4             THE COURT:  What is it exactly you want to ask him?

5             THE DEFENDANT:  Well, I was going to ask him, I was

6    going to come back again to your question about the automobiles,

7    the reason six automobiles were bought.

8             And I was going to ask him did he notice that on my

9    billing, the conveyance of the automobiles, it was written on the

10   contract that it was for my church.

11            And what I'm saying is I was just going to ask him, you

12   know, that wasn't revealed because maybe it seemed like I just

13   went out and bought a whole bunch of cars when I was doing it for

14   my -- my organization.

15            It's -- it's -- you know, I hold service every Friday

16   and Sunday.  I'm a law-abiding citizen.

17            THE COURT:  You, of course, can testify to that when

18   you --

19            THE DEFENDANT:  Why would I want to get my --

20            THE COURT:  I mean, you can testify to that.  But the

21   cross-examination, I say, is just for asking questions, and the

22   testimony is --

23            THE DEFENDANT:  That's what I'm going to do.  I don't

24   want to get on nobody's bad side.  I'm trying to be good all day.

25            THE COURT:  All right.

1          MR. HOTALING:  So I guess, again, I just want to make

2    sure that we're all clear so we don't have to jump back up and

3    come on over here.

4          THE DEFENDANT:  That's cool.

5          MR. HOTALING:  So we would have an issue if you

6    were -- I mean, you can obviously put up the document.  If there

7    is something on the document that you want to ask the witness

8    about, I wouldn't have any objection to that.

9          And if he wants to say:  On the face of this does it

10   show X?  That's fine.

11         THE DEFENDANT:  We have shown it a hundred times.  I

12   ain't going to do it no more.  I'm not going to ask the question.

13         MR. HOTALING:  I want to make sure you have every right

14   to ask him any question you want.  If that's what you want to do,

15   we will put it up on the screen for you.  We will assist you in

16   asking that particular question.

17         If you don't, obviously we would have an objection:

18   Didn't you know or don't the documents reflect that I bought it

19   for the church, without having a reference to the document.

20         THE DEFENDANT:  I'm going to be very careful.

21         THE COURT:  Okay.  That's fine.

22         MR. HOTALING:  Thank you, your Honor.

23       (Proceedings heard in open court:)

24   BY THE DEFENDANT:

25   Q.  About the banking, the percentage that you drew up and

1  analyzed as far as me as a postal worker and me with the trust --

2  A.   Um-hum.

3  Q.   -- how could you dissect which way I did it, if I was

4  using -- I never had cash in my hand?  Always a card.

5       So what I'm trying to ask you is how can you dissect

6  what I bought when -- and at the time I wasn't disabled at the

7  time, I was at work at the time that it came.

8       So that wasn't true.

9       So I'm just curious, how could you come up with a value

10 on particular things that I bought?

11 A.   Well, some of the information was taken straight from the

12 face of the bank statements, but the other information was taken

13 from the records we subpoenaed.

14      The six individuals here -- who were here today all

15 represented companies that we got documents from, representing

16 the purchases Mr. El Bey or the defendant made from those

17 companies.  We then traced those purchases to the checks received

18 from Wells Fargo Bank.

19 Q.   But you only had three car people and a mortgage.  So what

20 I'm saying, that still didn't answer my question.  The question

21 I'm trying to get around to, we understood those.  So my question

22 to you is how did you dissect it to break it into -- in a pie?

23 A.   Yeah.

24 Q.   In a circle?

25 A.   Well, that circle, I broke it up between major categories.

1  The vehicle purchases, which we heard from all the

2  representatives from the dealerships; the cashier's check for the

3  purchase of your property or the documentation for the purchase

4  of your property, which we heard from the property company; and

5  that the other items were taken from your bank statements.

6           When you make a cash withdrawal on your bank statement

7  is a detail, it lists out ATM or cash withdrawal.  When you make

8  a bank card purchase it says you purchased this item from

9  Walgreens, from this particular hotel, this particular furniture

10 store.

11          So I summarized the data based off that information and

12 I put into the categories listed on this pie chart.

13 Q.  But I mean, how could you separate it from the postal check

14 to there?

15 A.  Well, the postal checks are also in the deposit activity, is

16 also listed out through each specific transaction.

17          So for each deposit made by -- for United States Postal

18 Service payment or receipt of salary or income, there is a

19 separate entry on your bank statement.

20 Q.  I only saw one on there, and that's not my salary.  That was

21 probably because I only had worked a few days.

22          But what I'm saying is you took it and you ran with it

23 in saying that, you know, I was only making $1100, is what you're

24 saying.  But what I'm saying is anyway -- anyway we will leave

25 that alone.

1           I have a question for you, I do want to ask you, though.

2    You know, when we hit on the name changes?

3    A.   Yes.

4    Q.   Am I a criminal?  Did I have a record, or a background as a

5    thief, a murderer?  When you checked -- I'm just saying, because

6    you presented my name change as if it was a bad thing.  And it

7    almost to me made the jury look like:  Why is he changing his

8    name?  What is he running from?  And I have never did anything in

9    my life, so --

10          MR. HOTALING:  Judge, objection.  I'm sorry, Mr. El Bey,

11   I'm sorry.

12          I have to object to the testimonial component of the

13   question, if there is a question.

14          THE COURT:  Well, I think the question was why the

15   government had bothered with the name change.

16          THE DEFENDANT:  That's what the question was, Judge.

17          THE COURT:  What is -- people do change their names.  So

18   what is that germane to, I think?

19   BY THE WITNESS:

20   A.   It was just to show that you are who you are.  That I

21   didn't -- that you started off, you were born Frederick Wade

22   Jones, and your -- because some of the records from the United

23   States Postal Service that we reviewed are from Frederick Wade

24   Jones, but that your current name is Hakeem El Bey.

25          And that's the names that are used on these trust

1  returns, on your bank statements, and other documents we have

2  seen in the trust.

3  BY THE DEFENDANT:

4  Q.  Okay.  I was just wondering, because, you know, it could give

5  off a bad effect, like I'm running from something, I'm a mass

6  murderer or a robber or a stealer.

7         I've worked all my life, okay?  So I just want to, that

8  was important to me because you made it look like it seemed like

9  that I was running from something and I'm not.

10         THE COURT:  No, the government is not criticizing you

11  for changing your name.

12         THE DEFENDANT:  Okay.  Thank you very much.

13         MR. HOTALING:  And, Judge, just to make sure, and we're

14  happy to stipulate to this, the government is not in any way

15  ascribing anything criminal associated with the name change.  We

16  are not making any allegations with respect to the name change.

17  Just the agent testified the purpose for that.

18         THE COURT:  Okay.  Well, this is I think a good time to

19  break for the day, and we are going to start tomorrow at 9:30.

20         And thank you very much to the jurors for your patience

21  in listening, it was a longish, longish afternoon.

22         MR. HOTALING:  And, Judge, we have no redirect for the

23  witness.  So we ask the witness be excused.

24         THE COURT:  Okay.  So you are excused, Mr. Bodner.

25  Thank you very much for your testimony.

1     (Witness excused.)

2     (At 4:57 p.m. jury out.)

3          THE COURT:  Is there anything we need to discuss with

4  the lawyers?

5          MR. HOTALING:  Judge, I think there probably is one

6  issue.  I think we only have one more witness tomorrow.

7          MS. MALIZIA:  Yes.  That's right.

8          MR. HOTALING:  And then it would be our intention that

9  we would probably rest an hour into tomorrow's day.

10          So I don't know if Mr. El Bey is in a position to let us

11  know if he has got exhibits that he intends to use?

12          THE DEFENDANT:  Yes, I do.  I have some exhibits.

13          THE COURT:  Okay.  Well, thank you, Mr. Hotaling.

14          So, yeah, Mr. El Bey, you should be prepared that after

15  about an hour --

16          THE DEFENDANT:  Okay.

17          THE COURT:  -- around 10:30 it will be your case --

18          THE DEFENDANT:  Okay.

19          THE COURT:  -- to present evidence, testimony,

20  witnesses, anything you want.

21          THE DEFENDANT:  Okay.  I don't have a problem.  I'll be

22  ready tomorrow.

23          MR. HOTALING:  I don't know if there is a list of

24  potential witnesses that Mr. El Bey can provide us.

25          THE DEFENDANT:  I'm going to find out tonight, because I

1    don't know if they can get off to come.  That's why I hadn't

2    submitted the list yet.

3           MR. HOTALING:  Can you just give us a hint as to the

4    number of witnesses?

5           THE DEFENDANT:  It would be no more than three.

6           THE COURT:  I'm sure you can deal with that.

7           MR. HOTALING:  I'm sorry, your Honor?

8           THE COURT:  I'm sure you can deal with that.

9           MR. HOTALING:  I'm sure we can, Judge.

10          THE COURT:  Okay.  Well, thank you very much.  See you

11   all tomorrow.

12          MR. HOTALING:  I'm sorry, Judge.  Just one more thing

13   real quick.

14          Depending on how long the defense case is, do you expect

15   that we would then proceed to closings in the afternoon?

16          THE COURT:  Sure.

17          MR. HOTALING:  Do you anticipate needing to do an

18   additional jury instruction conference?  Is there anything you

19   need from us in terms of jury instructions?

20          THE COURT:  Let me just ask my law clerks.

21          MR. HOTALING:  Sure.

22          THE COURT:  Okay.  So I have some revisions.  So we will

23   have -- at some point we will have a short instructions

24   conference.

25          MR. HOTALING:  Okay.

1      MS. MALIZIA:  Would you like to do that before court

2  tomorrow or at the lunch break?

3      THE COURT:  No, I think -- no, I think the best time for

4  the instructions conference would be after the -- you know,

5  before the -- well, actually it should be right -- it should be

6  before the closing arguments.

7      MR. HOTALING:  Correct.

8      THE COURT:  So you know what you can argue.

9      MR. HOTALING:  Correct.

10      THE COURT:  But I think after the evidence.

11      MR. HOTALING:  And, Judge, if I might, because as part

12  of preparing for closings I think it's helpful to know.

13      Do you anticipate any sort of changes to the elements

14  instructions or to any of the definitional instructions that the

15  government offered with respect to --

16      THE COURT:  I don't think so.  I thought the changes I

17  would make would be simply to try to eliminate jargon.

18      LAW CLERK:  I don't think there were additional changes

19  in addition to what was discussed at the last conference.

20      MR. HOTALING:  I know you had asked that we eliminate

21  demeanor from the credibility instruction.

22      THE COURT:  That's right.  Exactly.

23      MR. HOTALING:  I think that there were some other ones

24  too.

25      THE COURT:  So you will get a chance to go over that

314

1  with Mr. El Bey.

2          MR. HOTALING:  Okay.  Thank you.

3      (Proceedings adjourned at 5:01 p.m. to 9:30 a.m.)