315

```
 1                 IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
 2                         EASTERN DIVISION

 3  UNITED STATES OF AMERICA,          )
                                       )
 4                   Plaintiff,        )
                                       )  No. 14 CR 447
 5            vs.                      )  Chicago, Illinois
                                       )  March 4, 2015
 6  HAKEEM EL BEY,                     )  9:30 a.m.
                                       )
 7                   Defendant.        )

 8
                              VOLUME 3
 9                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE RICHARD A. POSNER
10                         AND A JURY

11  For the Plaintiff:         U.S. ATTORNEY'S OFFICE
                               219 South Dearborn Street
12                             Chicago, Illinois 60604
                               BY:  MR. CHRISTOPHER HOTALING
13                                   MS. KATHRYN E. MALIZIA

14  The Defendant:             MR. HAKEEM EL BEY
                               439 Hoxie Avenue
15                             Calumet City, Illinois 60409

16
    Defense Standby Counsel:   JENNER & BLOCK
17                             353 North Clark Street
                               Chicago, Illinois 60654
18                             BY:  MR. GABRIEL A. FUENTES

19  Official Court Reporter:   MAELLEN E. PITTMAN, FCRR, RDR
                               219 South Dearborn Street
20                             Room 2342
                               Chicago, Illinois 60604
21                             (312) 435-5576

22

23

24

25
```

316

1          (Proceedings heard in open court:)

2                  THE CLERK:  14 CR 447, U.S.A. versus Hakeem El Bey.

3                  For trial.

4                  MS. MALIZIA:  Good morning, your Honor.

5                  Kathryn Malizia and Chris Hotaling on behalf of the

6     United States.

7                  MR. HOTALING:  Good morning, your Honor.

8                  THE COURT:  Good morning, everybody.

9                  THE DEFENDANT:  Good morning, everyone.

10                 MR. FUENTES:  Gabriel Fuentes here, standby counsel.

11    Thank you.

12                 THE COURT:  So before we bring in the jury, I want to

13    explain particularly of course to Mr. El Bey the next phase in

14    the case.

15                 Now, we're not finished with the government's case

16    because the government has one more witness, right?  That's

17    correct?

18                 MS. MALIZIA:  That's correct, your Honor.

19                 THE COURT:  And then you rest.

20                 Okay.  At that point it's your turn, Mr. El Bey, and you

21    will be able to introduce documents the way the government did.

22    You'll be able to testify.

23                 If you're asked a question that you think is an improper

24    question, you can make an objection and then I rule on the

25    objection.

317

1          THE DEFENDANT:  I don't plan on testifying, no.

2          THE COURT:  Okay.  That's fine.  You have absolutely no

3     obligation to testify.

4          But now with regard to the exhibits, here is the

5     problem:  So you have to give a copy -- or if you don't have

6     extra copies we'll make extra copies -- you have to give the

7     copies of your exhibits to the government so that they can make

8     objections if they want and then I rule on the objections.

9          So that has to be done before we bring in the jury.

10    That's done out of the presence of the jury.

11         THE DEFENDANT:  Okay, Judge.  Okay.

12         Judge, I don't have a problem with that.  We talked

13    about it.

14         The only documents I'm bringing are just documents from

15    Internal Revenue Service.

16         THE COURT:  I'm sorry.  I didn't hear you.

17         THE DEFENDANT:  The only documents I'm going to bring,

18    enter into the case are documents just from Internal Revenue

19    Service.  Just the documents they use, Internal Revenue Service.

20         I'm not bringing anything but Internal Revenue Service

21    documents.  So I don't see why that would be a problem.

22         THE COURT:  I see.  So your exhibits will be --

23         THE DEFENDANT:  Only from Internal Revenue Service.

24         THE COURT:  Like theirs.

25         THE DEFENDANT:  My only exhibits I'm bringing is from

1  Internal Revenue Service and mail from --

2          MR. HOTALING:  The government?

3          THE DEFENDANT:  -- the government, yes, sir.

4          THE COURT:  Okay.  So -- but we need you to --

5          THE DEFENDANT:  I have copies for everybody.

6          THE COURT:  -- tell them in advance or show them in

7  advance.

8          THE DEFENDANT:  Okay.  In my time I will.  I got copies

9  for everybody.  He was over at my house, so I did everything I

10  needed do.

11          MR. HOTALING:  We would appreciate a copy whenever you

12  would be willing to offer it to us.

13          THE COURT:  Okay.  So the government has one witness,

14  but the -- the objections that the government may or may not

15  make -- I suppose they wouldn't object if it's their own

16  documents -- but they have a right to object to any exhibits you

17  wish to introduce, and that has to be done out of the presence of

18  the jury.

19          So I'd rather do it now.

20          THE DEFENDANT:  Okay.  I will.

21          THE COURT:  So if you could tell them what the documents

22  are and give them a copy.

23          THE DEFENDANT:  I will get them.

24          THE COURT:  Great.

25          THE DEFENDANT:  I have one for everyone.  Would you like

1    one now?

2         THE COURT:  Sure.

3         THE DEFENDANT:  Can I approach the bench, your Honor?

4         THE COURT:  Of course.

5         THE DEFENDANT:  I'm harmless.

6         THE COURT:  That's fine.

7         THE DEFENDANT:  I promise.

8         THE COURT:  No problem.

9         THE DEFENDANT:  I'm harmless.

10        LAW CLERK:  Thank you very much.

11        THE DEFENDANT:  This is documents from my trust to prove

12   my case, Judge, just from Internal Revenue Service.  Just to show

13   that I haven't defrauded the government.

14        That's all I want to do.

15        But I'm not doing anything exquisite or that I -- just

16   straight to the facts.  And I have one witness.

17        THE COURT:  Um-hum.

18        THE DEFENDANT:  Okay.

19        MS. MALIZIA:  Your Honor, we would object to this from a

20   foundation standpoint.  This is not --

21        THE COURT:  I'm sorry.  Could you speak a little louder?

22        MS. MALIZIA:  We would object to this from a foundation

23   standpoint.

24        This is not a document that the government admitted in

25   their case, and it's a little unclear to me how Mr. El Bey

1    intends to tender it.

2         THE DEFENDANT:  It was documents sent to me from the

3    government for my trust.  And it's -- I don't know what you are

4    objecting about.  It's part of the case.

5         THE COURT:  Is it an authentic document?

6         MS. MALIZIA:  I have no idea, your Honor.

7         THE DEFENDANT:  It's authentic.  It's from the Internal

8    Revenue Service.  It has a date.  It's from the Internal Revenue

9    Service.  It says for Internal Revenue Service use only.

10        It's everything from the -- I just made copies of it,

11   Judge.  I got it put up in my files.

12        Only thing I did was made 17 copies to let them see,

13   everybody see.

14        I haven't objected to anything they said.  And this is

15   dealing with the case, Internal Revenue Service, and it's dealing

16   with the trust.  Everything they show, it goes on there.  One

17   exhibit.

18        THE COURT:  I mean, the difficulty is that it looks

19   like -- it looks like a copy of an authentic IRS document, but

20   the government is entitled to some kind of --

21        THE DEFENDANT:  It is a copy, Judge.  Same thing they

22   sent me, but a copy.

23        I haven't did anything.  Yes, Judge, look at the

24   document.  I don't even -- me and you both know that, come on,

25   Judge.  Look, we's trying to do everything, I be trying to be

1  good, be honest.  I'm trying to be fair, Judge.  And all I want

2  is a little fairness back.

3       I don't want to sit in nobody's jail.  I don't want to

4  do anything.  I need a fair chance to show what they're saying is

5  wrong.  And I can't do that without this.  You're not giving me a

6  chance.

7       THE COURT:  Okay.  Let me just ask the government

8  lawyers:  Is Mr. Bodner still present?

9       MS. MALIZIA:  He is present in court, your Honor.  He is

10 not, however, an IRS revenue agent.  He is a criminal

11 investigator and could not --

12      THE COURT:  Yes.  But as a criminal investigator he sees

13 a lot of IRS documents.  Would he be able to testify that --

14      MS. MALIZIA:  That this is an original IRS document.

15 No, your Honor, he could not.

16      THE DEFENDANT:  It got numbers at the top.  Judge, it

17 got docket number -- it got numbers at the top that we can call

18 and find out.  It's an original letter from the Internal Revenue

19 Service.

20      I wouldn't dare bring anything in here that wasn't true.

21 I have been holding case -- I have been holding that for this

22 time for my exhibits.

23      MR. HOTALING:  Judge, if we could just have a moment?

24      THE COURT:  Excuse me?

25      MR. HOTALING:  If we could have a moment, please?

1          THE COURT:  Of course.

2          MR. HOTALING:  And Judge --

3          THE COURT:  You are conferring.

4          MR. HOTALING:  If you would allow us an opportunity to

5     confer quickly and we will be back to you in just a moment.

6          THE COURT:  Okay.

7     (Pause.)

8          THE COURT:  Okay.  So yes?  You wish to say something,

9     Ms. Malizia?

10          MS. MALIZIA:  Your Honor, we are willing to stipulate on

11     the authenticity of this exhibit.

12          THE COURT:  Excuse me?

13          MS. MALIZIA:  We are willing to stipulate to the

14     authenticity of this exhibit.  And if Mr. El Bey wishes to move

15     it into evidence now, it could potentially be relevant to our

16     direct examination of Special Agent Howard.

17          Of course, this is an order of proof issue.  So if Mr.

18     El Bey chooses instead to introduce it in his affirmative case,

19     we would have the right to call Agent Howard in rebuttal.  It's

20     really just a question of how the Court wants to handle it.

21          THE COURT:  Well, that's fine.

22          THE DEFENDANT:  I wouldn't have a problem with that at

23     all.

24          THE COURT:  So it's in.

25          MS. MALIZIA:  Okay.  Good.

323

1    MR. HOTALING:  And, Judge, just so the record is clear,
2 should we just mark this as Defense Exhibit No. 1?
3    THE DEFENDANT:  Yes.  I have two more.
4    MR. HOTALING:  So for purposes of the record Defense
5 Exhibit No. 1 has been admitted into evidence.
6    THE COURT:  Yes.
7    (Defense Exhibit 1 received in evidence.)
8    THE DEFENDANT:  Should I show all my exhibits?
9    THE COURT:  Yes.
10    MR. HOTALING:  All good.  All good.
11    THE DEFENDANT:  The exhibits, Judge, just the envelopes
12 that they mailed to me.
13    THE COURT:  Okay.  Excuse me just one second.
14    THE DEFENDANT:  Yes, sir.
15    (Pause.)
16    THE COURT:  Yes.
17    THE DEFENDANT:  Yes, sir.  Judge, do you want to take a
18 look at them?  Is it okay if I pass them up?
19    THE COURT:  Do you have copies for the government?
20    THE DEFENDANT:  I couldn't make copies for them though,
21 Judge.
22    MR. HOTALING:  He has shown them to us in the room while
23 you were talking with the CSO.
24    THE COURT:  Oh, they are just the envelopes.
25    THE DEFENDANT:  Yes, sir.  That's all.

324

1    THE COURT:  I'm just a little puzzled.

2    Okay.  So do you have an objection?

3    MS. MALIZIA:  Your Honor, they appear to be envelopes

4 that we, as counsel, would have mailed to the defendant

5 containing I suspect discovery.  I'm not really sure what their

6 relevance would be.

7    THE COURT:  Yes.  It has Mr. Hotaling's name.

8    MR. HOTALING:  I think there is an issue of relevance.

9    Obviously if they were envelopes submitted by the IRS,

10 that is germane to what we are talking about.  I guess we would

11 ask for an order of proof as to the relevance of why he would

12 intending to be using envelopes that we sent to him, from the

13 government, in connection with this litigation.

14    THE DEFENDANT:  Okay.  And I can answer that.

15    THE COURT:  Yes.

16    THE DEFENDANT:  The purpose of this is they had me down

17 for mail fraud.  My point is, I work for the postal system.  I

18 know exactly how the postal system work.

19    And, Judge, that red stamp mark on there, that's mail

20 fraud.

21    THE COURT:  The red stamp is mail fraud?

22    THE DEFENDANT:  Yes, sir.

23    THE COURT:  Where it says:  Postage $3?

24    THE DEFENDANT:  Yes, sir.  Because it hasn't been

25 cancelled out.  So either --

1        MR. HOTALING:  You are accusing us of mail fraud?

2        THE DEFENDANT:  Your name on it.  You sent it.

3        You got me for mail fraud.  I'm going to show you what

4  mail fraud really is.

5        MS. MALIZIA:  Your Honor, we object.

6        THE DEFENDANT:  I can prove the point.  And then I would

7  subpoena -- I would like to subpoena the postmaster.

8        THE COURT:  Okay.  But, wait.  But the problem, Mr. El

9  Bey --

10        THE DEFENDANT:  Yes, sir.

11        THE COURT:  -- is that if Mr. Hotaling has committed

12  mail fraud, then you could certainly -- you could write the U.S.

13  Attorney, his boss --

14        MR. HOTALING:  He is my boss.

15        THE COURT:  -- and say that Mr. Hotaling should be

16  investigated and possibly prosecuted for mail fraud.

17        But it wouldn't have anything to do with your case.

18        THE DEFENDANT:  It would.  Because they got me for mail

19  fraud.

20        THE COURT:  No, I know.  But if you are guilty of mail

21  fraud, the fact that others, including government officials, are

22  also guilty of mail fraud would not be a defense.

23        THE DEFENDANT:  Okay.  But what I'm trying to show to

24  you is, it has the same stamp on it that my envelopes had on it.

25  So my point to you is this:  I work for the postal service, I

326

1　know exactly how it work.  It has to be cancelled out.  That

2　hasn't been cancelled out.

3　　　　　So just like if I subpoenaed the postmaster, he would

4　tell them they are not responsible for the mail fraud, he is.

5　　　　　Just like with me.  I wouldn't be responsible for it,

6　they would be.

7　　　　　THE COURT:  I know.  But my point is even if they have

8　committed mail fraud -- which I think somewhat unlikely, but even

9　if there -- but who knows?  We just heard yesterday --

10　　　　　THE DEFENDANT:  I'm telling you facts, Judge.  I'm just

11　not going on.  I have been there 31 years.

12　　　　　THE COURT:  I understand.  We just heard yesterday --

13　　　　　THE DEFENDANT:  I beg your pardon?

14　　　　　THE COURT:  We just heard yesterday that Hillary

15　Clinton, when she was Secretary of State, did not use the

16　official email.  And as a result, 55,000 or 50,000 pages of

17　documents were not kept in the proper way.

18　　　　　Okay.  So government officials can engage in misconduct.

19　That's true.  And then it could even be in the Justice

20　Department.

21　　　　　But it wouldn't make any difference to your case.

22　Because it's not a defense to a criminal prosecution that other

23　people, even the prosecutors, are engaged in criminal activity

24　unless that criminal activity directly affects you.

25　　　　　THE DEFENDANT:  Let me ask you a question, Judge.

1        THE COURT:  If their witnesses perjured themselves, that
2  would be misconduct highly relevant to your defense.
3        But how would what they do with their mailings -- I
4  mean, you got it, it was delivered.  If it was --
5        THE DEFENDANT:  Whoever name is on the envelope --
6        THE COURT:  Pardon?
7        THE DEFENDANT:  -- is who is responsible.  So whoever
8  name is on this envelope is responsible.  Just like my name on --
9  can I explain to you?
10        THE COURT:  But you got it.  But it was delivered to
11  you.
12        THE DEFENDANT:  Yeah, it was delivered to me, I know.
13        But what I'm trying to say to you, Judge, is this:
14  Whenever a stamp is put on an envelope, it automatically inject
15  in the universal postal system.
16        So what I'm saying to you is this:  They step in because
17  if -- if it hasn't been cancelled out, it's very important.  If
18  it has not been cancelled out, then someone has committed mail
19  fraud if the individual bring it to a point.
20        THE COURT:  No, no.
21        THE DEFENDANT:  And then he can ask to have the
22  postmaster subpoenaed.
23        THE COURT:  No, I understand your point.  The problem is
24  it's not relevant because it's not -- it does not concern your
25  conduct.

1          So this is a trial about whether you defrauded the

2    government and violated mail fraud statutes.

3          THE DEFENDANT:  Yes, sir, so --

4          THE COURT:  So their conduct is not --

5          THE DEFENDANT:  So I still want to subpoena the

6    postmaster who stamped my envelopes that they say was mail fraud.

7          I want to go upstairs and fill out -- because I want to

8    subpoena him to prove that I haven't committed mail fraud.  I

9    want to get that off me too.

10         THE COURT:  Okay.  But that's a separate issue,

11   subpoenaing the postmaster.  That's separate from --

12         THE DEFENDANT:  So in other words, I can't --

13         THE COURT:  So these envelopes you cannot admit.

14         THE DEFENDANT:  Okay.

15         THE COURT:  But we are admitting -- I'm admitting your

16   communication from the government.

17         THE DEFENDANT:  That's fair, Judge.  That's fine.

18         THE COURT:  Do you have any additional?

19         THE DEFENDANT:  No, no.  I'm not.

20         THE COURT:  So the way it will work is that when the

21   government's case is finished, I will explain to the jury it's

22   now your turn, and that you have an exhibit you wish to --

23         THE DEFENDANT:  Share with them.

24         THE COURT:  -- admit, and that I have agreed that -- and

25   the government has agreed that it's an admissible document.

1          And, you know, you probably want to explain it to the

2    jury.

3          THE DEFENDANT:  Yeah, I will.  I will.  And I promise

4    not to do anything to offend anyone and it won't be long.

5          MS. MALIZIA:  Excuse me, your Honor.  I think we have

6    agreed that that exhibit has already been admitted, if I'm

7    correct.

8          THE COURT:  Excuse me?

9          MS. MALIZIA:  I think we have agreed that that exhibit

10   has already been admitted into evidence, is that right?

11         THE COURT:  Oh, I didn't know that.  This was a -- this

12   was a --

13         MS. MALIZIA:  This is a defense exhibit.  We would

14   stipulate to its authenticity.

15         If the defendant wishes to have it admitted now, we are

16   fine with that.  However, we may wish to use it in our

17   affirmative case or, alternatively, if the Court wishes to admit

18   it after the government has rested, we would reserve our right to

19   call Agent Howard back in rebuttal to testify about the content

20   of this document.

21         THE COURT:  Yes, yes.  You say this has already been

22   admitted?

23         MS. MALIZIA:  Well, we --

24         MR. HOTALING:  We are okay with that.

25         MS. MALIZIA:  The defendant consented to its admission

1 earlier, and we are fine with it being admitted now with the

2 expectation that we may use it in our case.

3          THE COURT:  Okay.  Well, see, the way this works, Mr. El

4 Bey, so the government presents its case, almost finished, then

5 you have your case.  Then the government has an opportunity to

6 rebut.

7          THE DEFENDANT:  I don't have a problem with that, your

8 Honor.

9          THE COURT:  But that's -- and this document, which has

10 been admitted, you can refer to, the government.

11          THE DEFENDANT:  Yes.  I don't have a problem with that.

12          THE COURT:  Okay.

13          MS. MALIZIA:  So just to be clear --

14          THE COURT:  Hold on.

15          Yes.

16          MS. MALIZIA:  Just to be clear, your Honor, since this

17 document has been admitted, the government can use it in its

18 affirmative case with the next witness?

19          THE COURT:  Yes.  Yes.

20          MS. MALIZIA:  Thank you.

21          THE COURT:  Okay.  Well, I think we are about ready for

22 the jury now.

23          MS. MALIZIA:  Your Honor, just to raise the issue, there

24 is a forfeiture allegation in this indictment.  And if Mr. El Bey

25 exercises his right not to waive his right to a forfeiture jury,

1    we will need to advise this jury that they will have to stay and

2    decide the forfeiture question as well.

3              I just wanted to raise this issue for your Honor.  It's

4    something that --

5              THE COURT:  This is raising it awfully late.

6              MS. MALIZIA:  Your Honor, it's -- I'm raising it only

7    because typically defense will waive the right to a forfeiture

8    jury.  I'm not sure that that will be the case here.  Mr. El Bey

9    has thus far not stipulated or waived his right to anything;

10   raising it now, because it's traditionally something that is

11   addressed after the government rests before the jury deliberates.

12             THE COURT:  When you say "addressed," you mean --

13             MS. MALIZIA:  With the jury.

14             THE COURT:  Pardon?

15             MS. MALIZIA:  With the jury.  They are typically advised

16   after the government rests, that if the defendant exercises his

17   right to a forfeiture jury they may be detained to decide issues

18   of forfeiture as well.

19             THE COURT:  Well, I'm sorry I didn't tell them earlier,

20   because, you know, they are anxious about next week.

21             MR. HOTALING:  Judge, it --

22             MS. MALIZIA:  I doubt it will take long, your Honor.

23   It's -- I can tender a copy of the forfeiture instructions to the

24   Court right now.

25             Or alternatively, Mr. El Bey -- again, this is presuming

1  that he is found guilty -- would perhaps elect to waive his right

2  to a forfeiture jury.

3        THE DEFENDANT:  Judge, all I'm saying is I just need a

4  level playing field.  You know, every time I look up it's

5  something new.  I haven't did any -- you know, you got it on me,

6  and I'm doing the best I can because I can't admit the evidence

7  that I want to admit because I'm limited.  You have got me

8  limited.

9        So now, every time I look up you give them everything

10  they want.

11        MS. MALIZIA:  Your Honor --

12        THE DEFENDANT:  You giving them everything.  You make

13  this so I can't win.  You making this so I can't win, Judge, you

14  making it so I can't raise a defense.

15        THE COURT:  Wait a second.  But I haven't said anything

16  yet about the forfeiture except I am surprised to have it --

17  maybe I'm supposed to know it, right? -- but I'm surprised to

18  have it mentioned so late.

19        And when am I supposed to tell the jury about this?

20        MS. MALIZIA:  Your Honor, typically it's after the close

21  of all evidence.

22        After the government rests, defense rests, but before

23  the jury deliberates, if the defendant elects to exercise his

24  right to a forfeiture jury they may be retained to decide issues

25  of forfeiture as well.

333

1          THE COURT:  Well, how would that work?  I mean, what
2     kind of a -- are you going to present a parade of witnesses
3     again?

4          MS. MALIZIA:  It's argument.  Pure argument.

5          Your Honor, I can tender a copy of the instructions
6     right now.  They are short, they are straightforward.  There are
7     only -- there is two items of property that they will have to
8     decide whether or not they are forfeitable as proceeds of the
9     crime.

10          THE COURT:  Just two.

11          MS. MALIZIA:  Just two.  There is the house and one of
12     the vehicles.

13          THE DEFENDANT:  I'm not trying to forfeit anything, your
14     Honor.  I don't know what we talking about this for.  We didn't
15     mention this in the beginning.  I don't know why we are doing
16     this now.  So why are -- why are we doing this, Judge?  I haven't
17     got --

18          THE COURT:  Okay.  Let me try to --

19          MR. HOTALING:  Judge, actually what guides this
20     particular process in terms of forfeiture -- which again, this is
21     forfeiture that was alleged in the indictment way back last year
22     so there is lots of notice here on this, and --

23          THE COURT:  What is it you want to forfeit?  The house?

24          MR. HOTALING:  The house and a car.

25          THE COURT:  One car?

1          MS. MALIZIA:  One car.

2          MR. HOTALING:  It's alleged in the indictment.

3          It's governed by Rule 32.2 of the Federal Rules of

4   Criminal Procedure.

5          And it is in terms, of when:  As soon as practical after

6   a verdict or finding of guilty, on any count in the indictment or

7   information regarding which criminal forfeiture is sought, the

8   Court must determine what property is subject to forfeiture under

9   the applicable statute.

10          Under the prevailing law, because we are in the middle

11  of a trial, the jury is required to make the finding with respect

12  to whether or not the property is in fact proceeds traceable to

13  the mail fraud scheme.  And that's --

14          THE COURT:  I see.  You wouldn't --

15          MR. HOTALING:  It's argument.

16          THE COURT:  Because -- but you would be relying on all

17  the -- on exhibits.

18          MR. HOTALING:  Already admitted.

19          MS. MALIZIA:  That's correct.

20          THE COURT:  Because you had all that about --

21          MR. HOTALING:  Correct.

22          THE COURT:  -- the cost of the house and the cars, and

23  so on?

24          MS. MALIZIA:  That's right.

25          MR. HOTALING:  Correct.

1        THE COURT:  Well, Mr. El Bey, the government is entitled

2  to seek forfeiture.  It would be very brief and it would just use

3  the documents they have.

4        THE DEFENDANT:  I already know they going to do it,

5  Judge.  So you know what --

6        THE COURT:  But wait a second.

7        THE DEFENDANT:  It's not an even playing field, Judge.

8  I don't have a chance.

9        THE COURT:  But see, the problem is I can't -- the

10  government is entitled to seek forfeiture.

11        Now, the question for you is whether you would like me

12  to decide the forfeiture issue or the jury.  That's the only

13  thing, unfortunately, that is open.

14        THE DEFENDANT:  No.  I would like the jury to decide.

15        THE COURT:  Okay.

16        THE DEFENDANT:  They don't -- if they going to decide

17  everything, let them do everything.

18        THE COURT:  Okay.  That's fine.

19        Okay.  I think we are all set now.

20        MS. MALIZIA:  Your Honor, looking ahead, would you like

21  to see a copy of our proposed forfeiture jury instructions?

22        THE COURT:  Yeah.  That would be nice.  Thank you.

23        MS. MALIZIA:  I have also tendered a copy to defense

24  counsel for the record.

25        MR. HOTALING:  Judge, just to make sure we are

1    clarified, you don't have to inform the jury that they are going

2    to have to make this finding.  We just need to relay this to the

3    Court that this is an issue.

4              THE COURT:  I'm sorry.  I don't have to do what?

5              MR. HOTALING:  You don't have to tell the jury that if

6    they find -- like right now, you don't have to tell the jury that

7    if they find him guilty they are going to have to stick around

8    and do the forfeiture.

9              The reason that we raise this is because this is an

10   issue that you need to know as part of your --

11             THE COURT:  when do you want me to tell the jury?

12             MR. HOTALING:  Judge, I think it would be something, now

13   that we have addressed and now that we do know that Mr. El Bey is

14   seeking a forfeiture jury, that we would tell them after they

15   return their verdict.

16             MR. FUENTES:  Judge, the defendant stepped out of the

17   courtroom.

18             MR. HOTALING:  Oh, I didn't even know he left.  I'm

19   sorry.

20        (Pause.  Defendant in.)

21             THE COURT:  Okay.  Welcome back.  So we're all -- excuse

22   me?

23             THE DEFENDANT:  You made me nervous.  I had to use the

24   washroom.

25             THE COURT:  I'm sorry.  I'm sorry.

1          MR. HOTALING:  You make me nervous too.

2          To clarify now, for purposes of the record now that the

3    defendant is present, I think under the rule the appropriate

4    procedure is what we would do is that if and only if the jury

5    returns a verdict of guilty, at that point in time the judge

6    would inform them that they still have one additional

7    responsibility that they need to complete.

8          THE COURT:  Okay.

9          MR. HOTALING:  And that is to entertain argument with

10   respect to forfeiture.

11         Again -- and so I think that's what we would do.

12         Now that we have addressed this issue, I think we have

13   addressed all the notice issues and that the Court is fully

14   addressed of that issue.

15         THE COURT:  Okay.  So we will call in the jury and we

16   will move quickly.

17     (At 10:12 a.m. jury in.)

18         THE COURT:  All right.  Welcome back.

19         I'm sorry that we kept you waiting.  There was some

20   administrative matters that had to be attended to.  I didn't

21   think they would take so long, but they did.

22         But anyway, we will move quickly today.  The trial is

23   nearing its end.

24         So the government has one more witness that it wants to

25   present.

1        So, Ms. Malizia.

2        MS. MALIZIA:  The government calls Special Agent Greg

3   Howard.

4        THE CLERK:  Raise your right hand.

5     (Witness sworn.)

6        THE CLERK:  Be seated.

7        STEPHEN GREG HOWARD, GOVERNMENT'S WITNESS, SWORN

8                    DIRECT EXAMINATION

9   BY MS. MALIZIA:

10  Q.  Special Agent Howard, would you please state your name and

11  spell it for the jury?

12  A.  Stephen Howard.  S-T-E-P-H-E-N, H-O-W-A-R-D.  I go by Greg.

13  Q.  Special Agent Howard, where do you currently work?

14  A.  I work for the IRS criminal investigation division in

15  Phoenix.

16  Q.  And where did you work before you took that post?

17  A.  Here in Chicago.

18  Q.  How long did you work in the Chicago office of the IRS?

19  A.  A little over six and a half years.

20  Q.  And what is your position with the -- what was your position

21  with the Chicago field office of the IRS?

22  A.  Also a special agent.

23  Q.  What were your duties as a special agent?

24  A.  Primarily to investigate violations of the Internal Revenue

25  Service Code and related offenses.

Howard - Direct by Malizia                              339

1   Q.  What did you do before you joined the IRS?

2   A.  I worked in banking for approximately five years.

3   Q.  Could you tell us a little bit about your educational

4   background?

5   A.  I have a bachelor's degree in law enforcement and a master's

6   degree in accounting.

7   Q.  Special Agent Howard, are you familiar with the investigation

8   of the defendant, Hakeem El Bey?

9   A.  Yes, I am.

10  Q.  What was your role in that investigation?

11  A.  I was the primary investigator regarding Mr. El Bey.  I

12  conducted an interview with him and reviewed bank and tax

13  filings.  Bank records and tax filings.

14  Q.  Directing your attention to December 21st, 2012, did you

15  interview the defendant on that date as part of your

16  investigation?

17  A.  Yes, I did.

18  Q.  Would you recognize the defendant if you saw him today?

19  A.  Yes.

20  Q.  I want you to look around the courtroom, and if you see the

21  defendant, if you see Mr. El Bey, identify him by an article of

22  his clothing.

23  A.  Yes.  He is at the defense table wearing a black and gray

24  sweater and a black hat.

25          MS. MALIZIA:  Your Honor, may the record reflect that

Howard - Direct by Malizia                          340

1  Special Agent Howard has identified the defendant Hakeem El Bey?

2          THE COURT:  Yes.

3  BY MS. MALIZIA:

4  Q.  Turning back to the interview of Mr. El Bey, where did that

5  interview take place?

6  A.  The IRS office in Schiller Park.

7  Q.  Was anyone else present during the interview?

8  A.  Yes.  Another Special Agent, Pat Creen.

9  Q.  How did you introduce yourselves to the defendant?

10 A.  As special agents with the IRS criminal investigation.

11 Q.  Did you also display your badges or creds?

12 A.  Yes.

13 Q.  Did you explain to the defendant -- was the defendant under

14 arrest when he was at the IRS's offices?

15 A.  No.

16 Q.  Were any promises or threats made to the defendant to induce

17 him to submit to this interview?

18 A.  No.

19 Q.  During the interview of the defendant, did you ask the

20 defendant his date of birth?

21 A.  Yes.

22 Q.  How did he respond?

23 A.  He said it was February 19th, 1959.

24 Q.  Did you ask him his current address?

25 A.  Yes.

1  Q.  How did he respond?

2  A.  439 Hoxie Avenue in Calumet City.

3  Q.  Did you ask him what his birth name was?

4  A.  Yes.

5  Q.  How did he respond?

6  A.  He stated it was Frederick Wade Jones.

7  Q.  Did you ask him whether he had changed his name?

8  A.  Yes.

9  Q.  How did he respond?

10  A.  That he had.  First to Abdul Hakeem Muhammad, and then again

11  in approximately 2002 to Hakeem El Bey.

12  Q.  Did you ask the defendant where he was employed?

13  A.  Yes.

14  Q.  How did he respond?

15  A.  That he had been employed with the United States Postal

16  Service at the bulk mail center in Forest Park, Illinois.

17  Q.  Did he say how long he had been employed there?

18  A.  Yes.  At the time of the interview it was approximately

19  28 years.

20  Q.  Did you ask him whether he was currently working for the

21  postal service?

22  A.  Yes.

23  Q.  How did he respond?

24  A.  He said that at the time of the interview he had been off on

25  workmen's compensation for about a year.

Howard - Direct by Malizia                342

1  Q.  During the interview did you show the defendant copies of tax

2  returns in the name of the Hakeem El Bey Trust for tax years 2008

3  and 2009?

4  A.  Yes.

5          MS. MALIZIA:  If we could pull up Government Exhibits

6  IRS 6 and 7.

7          Your Honor, these have already been admitted into

8  evidence.  The government requests permission to publish on a

9  rolling basis evidence that has already been admitted.

10          Sorry, your Honor.  May we have permission to publish to

11  the jury evidence that has already been admitted?

12          THE COURT:  Sure.

13          MS. MALIZIA:  Thank you.

14          THE COURT:  Yes.

15  BY MS. MALIZIA:

16  Q.  All right.  Mr. Howard, you have displayed on your screen

17  Government Exhibits IRS 6 and 7.  Are these copies of the returns

18  you showed to the defendant?

19  A.  Yes, they are.

20  Q.  Did you ask the defendant whether he had filed these two

21  returns?

22  A.  Yes.

23  Q.  How did he respond?

24  A.  He said that he did file them.

25  Q.  Did you ask him about the address on the returns?

1  A.  Yes.

2  Q.  And that address is 10134 South Calumet Avenue, Chicago,

3  Illinois, is that correct?

4  A.  Yes, that's correct.

5  Q.  What did he say about this address?

6  A.  That that was his parents' address, which is where he was

7  staying at the time these returns were prepared and filed.

8  Q.  Did you ask him about the line items on this form?

9  A.  Yes.

10  Q.  And did he say how he had come up with these various line

11  items?

12  A.  Yes.  He stated that he came up with them on his own from

13  studying on the Internet.

14  Q.  Did you ask him specifically about the $900,000 listed as

15  trust income on these forms?

16  A.  Yes.

17  Q.  How did he respond?

18  A.  That he had added up his income earned over the years of

19  working, and that's how he arrived at that figure.

20  Q.  Did you ask the defendant why this figure did not change

21  between the 2008 and the 2009 return?

22  A.  Yes.

23  Q.  How did he respond?

24  A.  That he just went with the same figure for both years.

25  Q.  Did you ask --

1      THE COURT:  Could you speak a little louder, Mr. Howard?

2      THE WITNESS:  Sure.  I apologize.

3      THE COURT:  A little louder.

4      THE WITNESS:  Sure.

5  BY MS. MALIZIA:

6  Q.  Did you ask the defendant how -- did you ask the defendant

7  how he came up with the $900,000 amount in fiduciary fees?

8  A.  Yes.

9  Q.  How did he respond?

10  A.  That he knew at the time but he didn't recall when we spoke

11  with him -- with him.

12  Q.  Did he say anything else about this figure?

13  A.  Yes.  I believe he also stated with regard to this figure

14  that he chose to reserve his rights.

15  Q.  Did you ask the defendant what he meant by, quote, reserve

16  his rights?

17  A.  Yes.

18  Q.  How did he respond?

19  A.  We asked him, by stating that, if he refused to answer

20  questions.  And he said no, that he just was reserving his rights

21  with certain questions.  And the interview continued.

22  Q.  And did the defendant later say that he, quote, reserved his

23  rights with respect to other questions during your interview?

24  A.  Yes.

25  Q.  Did he continue, however, to voluntarily answer questions on

1  which he did not, quote, reserve his rights?

2  A.  Yes.

3  Q.  Did you ask the defendant whether he did in fact receive

4  $900,000 each year as the fiduciary of the Hakeem El Bey Trust?

5  A.  Yes.

6  Q.  How did he respond?

7  A.  That he had not.

8  Q.  Did you ask him about the exemption amount listed on these

9  forms of $7,950?

10  A.  Yes.

11  Q.  How did he respond?

12  A.  That he knew at the time these returns were prepared, but he

13  did not remember when we spoke to him.

14  Q.  Did you ask him about the withholding amount of $300,000?

15  A.  Yes.

16  Q.  How did he respond?

17  A.  That he wanted to reserve his rights.

18  Q.  Did you ask Mr. El Bey about the handwriting at the top and

19  along the sides of these forms that reads:  Docket number

20  2002053704?

21  A.  Yes.

22  Q.  How did he respond?

23  A.  That he had filed a document in North Carolina declaring his

24  Moorish nationality.

25  Q.  During this interview did you show the defendant copies of

1  two Treasury checks?

2  A.  Yes.

3          MS. MALIZIA:  If we could pull up now Government Exhibit

4  IRS 9 and 10 and display both of them on the screen.

5  BY MS. MALIZIA:

6  Q.  Special Agent Howard, are these copies of the checks that you

7  showed Hakeem El Bey?

8  A.  Yes, they are.

9  Q.  Did you ask him whether he received them?

10  A.  Yes.

11  Q.  How did he respond?

12  A.  That yes, he did receive them.

13  Q.  Did you ask him whether he had deposited them in his bank

14  account?

15  A.  Yes.

16  Q.  How did he respond?

17  A.  That he did deposit them into trust accounts at Wells Fargo

18  Bank.

19  Q.  Did you ask the defendant about the endorsements on the back

20  of these checks?

21  A.  Yes.

22  Q.  How did he respond?

23  A.  That they were his signature.

24  Q.  Did you ask the defendant whether he had received a total of

25  $600,000 in refunds as a result of depositing these checks?

1  A.  Yes.

2  Q.  How did he respond?

3  A.  That he did receive that money.

4  Q.  During your interview did you show the defendant copies of

5  tax returns in the name of Hakeem El Bey Trust for tax years

6  2007, 2006 and 2008, two of those forms being from tax year 2007?

7  A.  Yes.

8  Q.  I think we will have to show these in tandem, but displayed

9  on the screen in front of you --

10         MS. MALIZIA:  If we could pull up Government Exhibits

11  IRS 3, 4, 5 and 8 in succession.  Beginning with 3 -- well, you

12  know what, if we go to the default folder they should be in

13  there.

14         MR. HOTALING:  3.

15         MS. MALIZIA:  Right.

16  BY MS. MALIZIA:

17  Q.  Was this one of the returns -- this is Government Exhibit IRS

18  3.  Was this one of the returns you asked the defendant about?

19  A.  Yes.

20  Q.  And you showed him a copy of this return, correct?

21  A.  That's correct.

22         MS. MALIZIA:  If we could pull up Government Exhibit IRS

23  4, Page 2.  It should be -- I think we should just stick to the

24  default folder for now.

25  BY MS. MALIZIA:

1  Q.  This is Government Exhibit IRS 4.  Is this -- did you show
2  this tax return to the defendant?
3  A.  Yes.
4         MS. MALIZIA:  Pull up Government Exhibit IRS 5, Page 2.
5  BY MS. MALIZIA:
6  Q.  Did you also show this form to the defendant?
7  A.  Yes.
8         MS. MALIZIA:  And Government Exhibit IRS 8, Page 2.
9  BY MS. MALIZIA:
10 Q.  This is the fourth of those returns you showed to the
11 defendant?
12 A.  Yes.
13 Q.  Did you ask the defendant to identify the signature on each
14 of these returns?
15 A.  Yes.
16 Q.  How did he respond?
17 A.  That they each appeared to be his signature.
18 Q.  Did he say anything else about these four returns?
19 A.  That he did not recall filing them.
20 Q.  Did you ask the defendant whether he had received frivolous
21 filer letters from the IRS?
22 A.  Yes.
23 Q.  How did he respond?
24 A.  That he had.
25         MS. MALIZIA:  Can we pull up Government Exhibit IRS 21.

1  BY MS. MALIZIA:

2  Q.  Did you also ask the defendant about correspondence he had

3  sent to the IRS?

4  A.  Yes.

5  Q.  All right.  This is Page 2 of Government Exhibit IRS 21.  Did

6  you show -- did you show -- this is Page 1 of that -- Page 2 of

7  that exhibit.  Did you show this to the defendant?

8  A.  Yes.

9  Q.  Did you ask him about the stamps and handwriting on this

10  form?

11  A.  Yes.

12  Q.  How did he respond?

13  A.  That it was his handwriting.

14  Q.  Did you -- if we can take a moment to address what's on the

15  screen.

16       Agent Howard, I think if you double click with your

17  finger at the bottom of the corner of the screen, we may be able

18  to clear this sort of splatter-paint effect.  If you can try that

19  for me right now.  Bottom left corner.  Let me try this.

20       THE WITNESS:  No, it's just making it worse.

21       MS. MALIZIA:  It's a little distracting.

22       Here you go.  It's whoever put it on the screen, you've

23  got to use that screen.

24  BY MS. MALIZIA:

25  Q.  You said that the defendant admitted to receiving frivolous

1  filer letters from the IRS, is that right?

2  A.  Yes.

3  Q.  Did you show the defendant three frivolous filer

4  letters -- did you show the defendant copies of frivolous filer

5  letters that had been sent to him by the IRS?

6  A.  Yes.

7  Q.  And what did he say?  Did he recognize them?

8  A.  Yes.

9       MS. MALIZIA:  If we could pull up Government Exhibit 11.

10  BY MS. MALIZIA:

11  Q.  Displayed on your screen is Government Exhibit IRS 11.  Is

12  this a copy of one of the letters you showed to the defendant?

13  A.  Yes.

14  Q.  Did you ask him about the address at the top of this letter?

15  A.  Yes.

16  Q.  How did he respond?

17  A.  That he had purchased a home at that address for his wife in

18  approximately 2004 -- for his wife and children -- because she

19  had a disease that required her to be in a warmer climate.

20  However, Hakeem El Bey never lived at that address.

21  Q.  Special Agent Howard, I'm going to show you on the Elmo

22  what's been marked and admitted as Defense Exhibit 1.

23       Did you show the defendant this document?

24  A.  I believe that he showed it to me.

25  Q.  Thank you.

1          So the defendant showed this document to you during your

2    interview of the defendant?

3    A.   That's correct.

4    Q.   And what if anything did he say about it?

5    A.   He asked why he would receive this letter, stating there was

6    an overpayment due to him, if something was wrong with what was

7    going on with him in having filed these tax returns and obtaining

8    the money and the refund checks.

9    Q.   Did you say anything in response?

10   A.   Yes.  Special Agent Creen and I attempted to explain to him

11   that tax returns -- the IRS is a voluntary compliance tax system.

12   Taxpayers are expected to file timely, accurate returns.  They

13   are signed under penalty of perjury.  The IRS expects those

14   returns to be true and accurate, and they are processed as such

15   initially.

16          In this instance he had filed a Form 1041 trust return

17   claiming $300,000 in withholding.  The IRS believed that to be

18   true and accurate.

19          When the system, again, talked to itself essentially --

20   each tax year is on a different module, so to speak -- so when

21   that tax return was filed that this letter pertains to, the

22   system knew that fraudulent refunds had been issued.

23          So this had been applied to those periods because the

24   system believed that that withholding was true and accurate.

25   Q.   And you explained this to the defendant?

1  A.  Yes.

2  Q.  During your interview of the defendant did you ask him

3  whether he filed personal returns?

4  A.  Yes.

5  Q.  How did he respond?

6  A.  That he did file personal returns every year.

7  Q.  Did you ask the defendant whether he spent the money he

8  received from the two $300,000 Treasury checks?

9  A.  Yes.

10 Q.  How did he respond?

11 A.  That he did spend it.

12 Q.  Did he say how he spent it?

13 A.  Yes.  On vehicles, a home, and giving it to family.

14        MS. MALIZIA:  If we could pull up Government Exhibit

15 Wells Fargo 10 A.

16 BY MS. MALIZIA:

17 Q.  Displayed on your screen, Agent Howard, is Government Exhibit

18 Wells Fargo 10 A.  Did you show the defendant a copy of this

19 check?

20 A.  Yes.

21 Q.  For the record, this is a check for $35,780 made out to

22 Circle, is that correct?

23 A.  Yes.

24 Q.  What did the defendant say about this check?

25 A.  It was for the purchase of a Buick LaCrosse.

1          MS. MALIZIA:  Back out of this and go to Government

2   Exhibit Wells Fargo 2, Page 53.

3   BY MS. MALIZIA:

4   Q.  Did you show him a copy of a check for $756.20?

5   A.  Yes.

6   Q.  And was this a check to Mecklenburg County?

7   A.  Yes.

8   Q.  And what did he say about this check?

9   A.  It was for use tax on a vehicle he had purchased.

10  Q.  Did you also show him a check for -- drawn on his account for

11  $115,500?

12  A.  Yes.

13         MS. MALIZIA:  This would be Government Exhibit Wells

14  Fargo 6 A, if you can find it.

15  BY MS. MALIZIA:

16  Q.  Go to Page 2 of that exhibit.  Displayed on your screen is

17  Government Exhibit Wells Fargo 6 A, Page 2.  Is this a copy of a

18  check that you showed the defendant in the amount of $115,500?

19  A.  Yes, it is.

20  Q.  Did you ask the defendant about this check?

21  A.  Yes.

22  Q.  What did he say?

23  A.  It was for the purchase of the home in Calumet City on 439

24  Hoxie Avenue.

25         MS. MALIZIA:  If we could pull up Government Exhibit

1  Wells Fargo 8 A.

2  BY MS. MALIZIA:

3  Q.  Displayed on your screen is what has already been admitted as

4  Government Exhibit Wells Fargo 8 A.  Did you show the defendant a

5  copy of this check?

6  A.  Yes.

7  Q.  This is a check for $21,459 made out to Mancari's Chrysler

8  Jeep, is that correct?

9  A.  Yes.

10  Q.  And what did the defendant say about this check?

11  A.  It was for the purchase of a Jeep.

12      MS. MALIZIA:  Pull up one last check, Government Exhibit

13  Wells Fargo 10 B.

14  BY MS. MALIZIA:

15  Q.  Did you show the defendant a copy of this check?

16  A.  Yes.

17  Q.  To be clear, this is a check for $36,149 made out to

18  Mancari's, is that right?

19  A.  That's correct.

20  Q.  What did the defendant say about this check?

21  A.  This went along with the prior check that I was just shown.

22  He traded in the vehicle he had purchased for a different vehicle

23  that was four-wheel drive.  And this was the additional payment

24  for that vehicle.

25  Q.  In addition to showing the defendant these checks, did you

Howard - Cross by The Defendant                355

1  also ask him about certain large dollar items from his Wells
2  Fargo bank account ending 5730?.
3  A.  Yes, I did.
4  Q.  Was one of these items a $27,000 payment in January of 2010?
5  A.  Yes, it was.
6  Q.  Was another item a $27,007 payment in February of 2010?
7  A.  Yes.
8  Q.  What did the defendant say about these items?
9  A.  They were for the purchases of two Hyundai vehicles, a Sonata
10 and a Genesis.
11        MS. MALIZIA:  We have no further questions for this
12 witness, your Honor.
13        THE COURT:  Thank you.
14        Mr. El Bey, do you wish to cross-examine Mr. Howard?
15        THE DEFENDANT:  Yes.
16                    CROSS-EXAMINATION
17 BY THE DEFENDANT:
18 Q.  What's your name again?
19 A.  Legally, Stephen Howard.  I go by Greg, my middle name.
20 Q.  Okay.  Now, I remember talking to you when I came to your
21 office.
22        THE DEFENDANT:  He is under oath, right?  You did swear
23 him in?
24        THE COURT:  Excuse me?
25        THE DEFENDANT:  He did swear on The Bible?

Howard - Cross by The Defendant                356

1            THE COURT:  Oh, yeah.  Yeah.

2            THE DEFENDANT:  Okay.

3    BY THE DEFENDANT:

4    Q.  Because when I talked to you all, I did reserve my rights.

5    But all of these exhibits that she showed, you and me never had

6    that discussion.  I never showed you anything.

7            Only thing you had when me and you talked was the

8    1099 OID, which you asked me about.  But the most of the part you

9    asked me about different people.

10           You have never talked with me about anything but other

11   people.

12           You asked me did I know about this person.  I said no, I

13   did not.

14           You asked me how did I know the process.

15           I told you I learned the process through Winston Stroud.

16           And then we talked about my personal life.  I told you I

17   was about to have a knee replacement, that was why I was off my

18   job.

19           And those are the only things -- and you under oath --

20   and these are the only things that me and you talked about.

21           So now, you never showed me any of these exhibits and

22   you never asked me anything like that.  And you under oath, and I

23   think that's wrong of you to come in and tell the people that.

24           MS. MALIZIA:  Objection, your Honor.  This is testimony.

25   Narrative.

1          THE DEFENDANT:  Judge, I have to get that out because he

2    never asked me any of that.  You under oath.

3          THE COURT:  But, Mr. El Bey --

4          THE DEFENDANT:  Yes, sir.

5          THE COURT:  -- when the government's case is over and

6    it's your case --

7          THE DEFENDANT:  Okay.

8          THE COURT:  -- you may testify, of course.

9          But when you're cross-examining the witness, you have

10    to -- you can just ask questions.  You can't --

11          THE DEFENDANT:  Okay.  Okay.  And that's good.

12          THE COURT:  So you can ask him didn't you say this or

13    didn't you say that.

14          THE DEFENDANT:  Oh, okay.  I'm sorry.

15    BY THE DEFENDANT:

16    Q.  So if I asked you, if you said all these things to me and you

17    told me that I had been committing fraud, why didn't you arrest

18    me?

19    A.  You had not been indicted at that time.  The investigation

20    was still ongoing.

21    Q.  So let me ask you a question.  When Internal Revenue --

22    actually, I started doing the trust in 2006, is that correct?

23    A.  I didn't understand the question.  Can you repeat it?

24    Q.  When I started doing my trust, I did my trust, I started in

25    2006, is that correct?

1  A.  I believe that was the first year a tax return was filed for
2  the trust.
3  Q.  So you going to wait six years to indict me?  At that time in
4  2012 it would have been six years?
5           MS. MALIZIA:  Objection, your Honor.
6           THE COURT:  Well, no, he is just asking why --
7           THE DEFENDANT:  I'm asking a question.
8           THE COURT:  -- why the government waited to indict him.
9           THE DEFENDANT:  That's right.  I just want to know.  If
10  it is true --
11           MR. MALIZIA:  Your Honor --
12           THE DEFENDANT:  -- then let me know.
13  BY THE DEFENDANT:
14  Q.  So now, a question.  So if you had all this on me and I
15  showed you all of that, and, you know, because when I -- you
16  called -- actually you came to my house, you put a card in my
17  door and I said wow.
18           So when I saw the card I called you.
19           And you said:  Why don't you just come in and talk to
20  me?
21           I said:  I don't have no problem with that.
22           So actually, it was my aunt's funeral -- I left her
23  funeral, like I told you, I left my aunt's funeral.
24           MS. MALIZIA:  Your Honor, objection.  Sidebar.
25           THE COURT:  But again, Mr. El Bey, you must ask

1  questions.

2          THE DEFENDANT:  Well, that's what I was fittin' to do.

3  Okay.  I never get to say what I want to say.  I get cut off what

4  I'm saying.

5  BY THE DEFENDANT:

6  Q.  But anyway, so if the Internal Revenue Service knew that they

7  had sent me $600,000, and that I had put it in an account -- and

8  I'm talking to you about all this, all this illegal activity that

9  you're saying I'm doing, like buying cars for my family -- and

10 you had one thing right:  I did buy a house for my wife because

11 she was sick, but I did live there, and that was a wrong too.

12         That was -- so what I'm saying to you is this:  I

13 bought -- you know, when I talked to you you -- we talked like

14 men, and you asked me about the 1099 OID, the form 56, you asked

15 me did I sign those.

16         Actually I had brought you a case with all kind of legal

17 documents on it, and you had acknowledged that and you said:

18         Mr. El Bey, I don't have a problem.  And these were your

19 exact words.

20         MS. MALIZIA:  Objection, your Honor.  The witness is

21 testifying.

22         THE DEFENDANT:  I'm not testifying.

23         MS. MALIZIA:  If he wants to ask a question --

24         MR. HOTALING:  Where is the question?

25         THE DEFENDANT:  I'm fittin' ready to ask him a question,

1  if I could talk.  I can't say two words.

2         THE COURT:  See, the problem was you were telling him

3  the answer.

4         THE DEFENDANT:  No, I was going to ask him.

5         THE COURT:  Well, what is the question?

6  BY THE DEFENDANT:

7  Q.  The question was:  Do you remember me talking about my knee

8  replacement?

9  A.  I believe -- I believe so, yes.

10  Q.  Oh, you believe so?

11  A.  I don't recall specifically if it was a knee problem or I

12  don't -- I didn't know if it was a back problem.  Or I didn't

13  recall.

14  Q.  Do you recall what you told me at the beginning of that

15  conversation?

16  A.  About your knee?

17  Q.  Not just my knee.  As we was talking, I asked you -- I said I

18  just wanted to ask you a question, why did you all call me in.

19  A.  I don't recall you asking me that.  But we called you in

20  because we wanted to speak with you about the filing of these

21  fraudulent trust returns.

22  Q.  Okay.  So a question, but she said I can't -- I just got to

23  ask questions.

24         Okay.  Well, I will wait until I make my presentment

25  then.  I'm through with them questions right now, because I can't

361

1  say what I want to say so --

2          THE COURT:  You are free to ask him questions.

3          THE DEFENDANT:  Well, Judge, any question I ask, because

4  I'm limited, I only get to throw one chip in and that's it.

5  Everybody else get to throw a hundred chips.

6          THE COURT:  But is there any question that you want to

7  ask him that he hasn't answered?

8          THE DEFENDANT:  Yes.

9  BY THE DEFENDANT:

10 Q.  Has everything that you said in this court been true?

11 A.  Yes.

12 Q.  Under oath?

13 A.  Yes.

14         THE DEFENDANT:  Okay.  Judge, I'm done.

15         THE COURT:  Okay.  Thank you, Mr. El Bey.

16         MS. MALIZIA:  We have no redirect, your Honor.  May the

17 witness be excused?

18         THE COURT:  So is that the close of the government's

19 case?

20         MS. MALIZIA:  No, your Honor.  If we could have a

21 moment?

22         But may the witness be excused?

23         THE COURT:  Yes.  Thank you, Mr. Howard.

24    (Witness excused.)

25         THE COURT:  Do you want to have a sidebar or do you want

1 to just talk to me?

2     MR. HOTALING:  Judge, if we could have just a quick

3 sidebar?

4     THE COURT:  Yeah, sure.

5    (Proceedings heard at sidebar:)

6     MS. MALIZIA:  Your Honor, we would move to admit

7 Government Exhibit Summary Chart 1 into evidence.  I believe we

8 neglected to do so yesterday.  But we believe we have laid a

9 sufficient foundation to admit it as evidence.

10     MR. HOTALING:  And that's the blowup chart that we went

11 through, the flow chart that we talked about that Agent Bodner

12 testified in detail about that summarized the purchases of the

13 cars and summarized the purchase of the house, that we have had a

14 conversation about.

15     THE COURT:  It was my suggestion.

16     MR. HOTALING:  And so as a following up to that, we

17 would ask that it be admitted into evidence as a 1006 summary.

18     THE COURT:  I think that's fine.  It is admitted as a

19 1006 summary.

20     MS. MALIZIA:  All right.

21     THE DEFENDANT:  A 1006 summary?

22     MR. HOTALING:   I'm sorry.  I shouldn't use the legal

23 jargon.  So I apologize, Judge, for the use of the legal jargon.

24     THE DEFENDANT:  They talk over my head all the time.

25     MR. HOTALING:  No, I sorry.

1          THE COURT:  That's the way we talk.

2          MR. HOTALING:  And I don't mean to do so.

3          THE COURT:  They don't talk English.

4          MR. HOTALING:  It's horrible.  We are lawyers.  You know

5    how it is.

6          It's a summary chart that we move into evidence, like we

7    have moved the other documents into evidence.  So the documents,

8    the records that go into the chart itself would also be admitted

9    into evidence as a summary of all of the different things that we

10   have accumulated.

11         THE DEFENDANT:  The summary chart that you spent four

12   hours on yesterday and you didn't admit.  Put everybody to sleep.

13         MS. MALIZIA:  Your Honor --

14         THE DEFENDANT:  I'm just saying, your Honor --

15         MS. MALIZIA:  Your Honor, if the defendant has an

16   objection, we can recall --

17         THE DEFENDANT:  I have an objection.

18         MS. MALIZIA:  We can recall the agent or you could admit

19   it over his objection.

20         THE COURT:  Well, I think I will admit it.

21      (Government Exhibit Summary Chart 1 received in evidence.)

22         MR. HOTALING:  And then if we -- your Honor, if we could

23   just have, the two of us, have a very brief moment, we might be

24   in a position --

25         MS. MALIZIA:  To rest.

364

1          MR. HOTALING:  -- to rest.

2          So if we could just maybe have a minute, just so we can

3   sit at the table and deal with it.

4          THE COURT:  Yes.

5          MR. HOTALING:  Thank you, Judge.

6          MS. MALIZIA:  Thank you.

7          THE DEFENDANT:  You know what, Judge, okay, I want to

8   say this because I already see what's going on now.

9          So, you know, what I'm saying to you is this:  You know,

10  this is -- again, this is not an even playing field and it's

11  not -- you got these -- these levels and you got these boxes in

12  here.  And they haven't been removed so the court would be even.

13         And I think that you are biased to these, so you're not

14  giving me a fair chance.  I don't even have a chance.  Everything

15  I say, it's objected, or you say it's irrelevant.

16         THE COURT:  No, but --

17         THE DEFENDANT:  And so I can't get my point across to

18  anyone.  So I'm sitting here looking stupid.

19         THE COURT:  Mr. El Bey, no, no, you are not stupid.

20  Your problem is you are handicapped because you don't have a

21  lawyer.

22         THE DEFENDANT:  I don't have to be a lawyer.

23         THE COURT:  You can't do it -- you have a right to

24  defend yourself without a lawyer.  That's fine.  But --

25         THE DEFENDANT:  You have admitted everything they do.

1  You don't give me any chance.

2         THE COURT:  But the problem is because you don't have a

3  lawyer, you don't know what is admissible and what isn't.  I have

4  to rule on the basis of the law.  I am -- my hands are tied.

5         THE DEFENDANT:  Okay.  I understand.

6         THE COURT:  So it's a rule.  I didn't make it up.

7         THE DEFENDANT:  You are punishing me for not being a

8  lawyer.  I got it.

9         THE COURT:  When you are -- when you are cross-examining

10  a witness you can only ask questions.  That's the rule.

11         Now, because you're not a lawyer it's difficult for you

12  to abide by these rules.  I understand that.  I'm trying to give

13  you every opportunity, but I do have to enforce these rules.

14         THE DEFENDANT:  Okay.

15         THE COURT:  So I'm sorry.

16         MR. HOTALING:  Thank you, Judge.  If we could just have

17  a moment.

18     (Pause.)

19         THE DEFENDANT:  Okay.  What I want to say is, when we

20  first got here, when I admitted my first exhibit she said:  Why

21  wasn't this shown to me before?

22         And then you got right on here and then you put my

23  exhibit forward and you knew that was going to be my first

24  exhibit.

25         So is that fair?  Because the first thing she said was:

1  Why haven't we saw this?  And she was sitting around, I know you

2  heard it.

3        What I'm saying to you is this --

4        THE COURT:  I'm going to --

5        THE DEFENDANT:  My exhibit that I was going to show,

6  they displayed it before I could and you knew it was going to be

7  my exhibit.

8        And she never had the exhibit because she admitted it

9  when I gave to it her.  That's why we had to go over there and

10 study and object to it.

11       THE COURT:  But what is the problem with it?

12       THE DEFENDANT:  The problem is she admitted it before I

13 did.

14       THE COURT:  But what difference is it?

15       THE DEFENDANT:  Because I was -- okay, never mind.

16       MS. MALIZIA:  Your Honor, I --

17       THE COURT:  I mean, I'm just asking you.

18       THE DEFENDANT:  Well, come on, Judge.  You just put

19 yourself in my place.  How would you feel?

20       THE COURT:  I don't understand.

21       THE DEFENDANT:  I know.  I know.

22       THE COURT:  It was your document and it is admitted.

23 Was admitted.

24       THE DEFENDANT:  You knew she didn't have it.  They

25 didn't get it until this morning when I gave it to them.  So now

1 they are going to display it before I can display it and refer

2 the jury from the real truth, and you know that.  So --

3          MR. HOTALING:  You agreed to that procedure.

4     (Defendant leaves sidebar.)

5          MS. MALIZIA:  Your Honor, I think -- I'm not going to

6 speak outside of the presence of the defendant.

7          THE COURT:  All right.

8     (Proceedings heard in open court:)

9          THE COURT:  I apologize for these interruptions, ladies

10 and gentlemen of the jury.  It's inevitable trial process.

11          So where are we, Ms. Malizia?

12          MS. MALIZIA:  Your Honor, at this time the government

13 rests.

14          THE COURT:  Okay.  Thank you.

15          So, Mr. El Bey, it's your turn.

16          THE DEFENDANT:  Yes.

17          THE COURT:  Let me just remind you, if you have

18 witnesses or a witness that you want to question, again, as with

19 the cross-examination, you could just ask questions to the

20 witness.  You can't --

21          THE DEFENDANT:  Yes, I will.

22          THE COURT:  If you decide you want to testify yourself,

23 then you'll be like the other witnesses in the witness box and

24 then you will be able to talk.  You will be the question and

25 answer.  So --

1          THE DEFENDANT:  Okay.  May I approach the jury box and

2   give them a copy?

3          THE COURT:  Sure.  A copy of what, I should ask?

4          THE DEFENDANT:  Of what I gave you.

5          THE COURT:  The one we have discussed?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Okay.

8          MR. HOTALING:  Okay.  And again --

9          MS. MALIZIA:  For the record, your Honor, I believe this

10  is Defense Exhibit 1.

11         THE COURT:  What's --

12         THE DEFENDANT:  It's not 1 anymore.

13         MS. MALIZIA:  Your Honor, could we see copy of what the

14  defendant is tendering to the jury?

15         THE COURT:  Yes.

16         THE DEFENDANT:  I gave them a copy.

17         MS. MALIZIA:  I believe this is what has previously been

18  admitted as Defense Exhibit 1 for the record.

19         THE COURT:  Yes.  Ms. Malizia just wants to verify this.

20         THE DEFENDANT:  I gave them a copy, Judge.  I only had

21  enough for the jury.

22         THE COURT:  Well, Ms. Malizia, why don't you look at one

23  of the juror's copies.

24         MS. MALIZIA:  Thank you.

25         Your Honor, the juror just handed me what appears to be

1  an identical copy of what has been admitted into evidence as

2  Defense Exhibit 1.

3          THE COURT:  Okay.  Then...

4          THE DEFENDANT:  Okay.  Again, your Honor, let me say

5  this.

6          THE COURT:  Okay.  Well, you want to stand in front of

7  the podium.

8          THE DEFENDANT:  I came to you, I tried to be a

9  completely honest man.  I came to you with my document this

10 morning, and they didn't have the document.

11         So now they took the document and showed it, and it was

12 supposed to be my exhibit first.  So now she gets up and tells

13 them that it's a document already been admitted.

14         But they didn't have it this morning until I gave to it

15 them, so now they have to take it and use it against me.  But

16 I'll continue anyway.

17         MS. MALIZIA:  Your Honor, perhaps this would be more

18 appropriate at sidebar, your Honor.

19         THE DEFENDANT:  This is my title to the car.

20         THE COURT:  Yeah.  Now Ms. Malizia is right.  An

21 objection to a procedure, that's not -- that has to be decided by

22 the judge rather than by the jury.  So if you want to -- if you

23 want to --

24         THE DEFENDANT:  You say I can call my witness?

25         MR. HOTALING:  No.

1      THE COURT:  Well, do you have anything further to say

2  about this document?

3      THE DEFENDANT:  Yes, I do.  You want me to say it before

4  I call my witness?

5      THE COURT:  You can do it in any order you want.

6      THE DEFENDANT:  Okay.

7      THE COURT:  But just let me say to the ladies and

8  gentlemen of the jury, this question that Mr. El Bey just raised

9  about -- I don't know -- the order in which it was given, it's

10  not germane.

11      THE DEFENDANT:  Jurors, jurors, I just want to show you

12  a copy of what the Internal Revenue Service sent me.

13      THE COURT:  Wait, wait.  There is a problem, Mr. El Bey.

14      THE DEFENDANT:  Yes, sir.

15      THE COURT:  If you are going to be testifying you have

16  to be sworn and sit in the jury box.

17      THE DEFENDANT:  I'm not testifying.

18      THE COURT:  Well, but are you talking to the jury about?

19  This is also not closing argument where you'll be able to

20  summarize your case to the jury.

21      What you can do now --

22      THE DEFENDANT:  Can I call my witness?

23      THE COURT:  -- you can call a witness and interview a

24  witness and you testify yourself and that's it.

25      THE DEFENDANT:  Okay.  I would like to call my witness,

El - Direct by The Defendant                    371

1   your Honor.

2           THE COURT:  Okay.

3           THE DEFENDANT:  Zakar Ali El Bey.

4      (Witness affirmed.)

5           THE COURT:  Thank you.  Please be seated.

6           ZAKAR ALI EL BEY, DEFENDANT'S WITNESS, AFFIRMED

7                    DIRECT EXAMINATION

8   BY THE DEFENDANT:

9   Q.  Mr. El Bey, have you ever heard of a trust?

10  A.  Yes, sir.

11          COURT REPORTER:  Could I have your name?

12          THE WITNESS:  My name is Zakar, Z-A-K-A-R, Ali, A-L-I,

13  E-L, El.

14          I only use Bey in reference to what say -- what's on my

15  birth certificate.  For it is a Moorish family name.  But I don't

16  want the government to intervene with my personal affairs.

17          So I only use Bey when it's referring to family affairs.

18  So it's just Zakar Ali El.

19  BY THE DEFENDANT:

20  Q.  Again, I'm going to ask you a question:  Do you know anything

21  about the 1041 trust?

22  A.  Yes, I do.

23  Q.  And do you have one?

24  A.  I've filled out for one in previous years.  I didn't have all

25  the correct procedures to go through with it so I kind of left it

El - Direct by The Defendant                372

1  alone.

2  Q.  Can anyone fill one out?

3  A.  Anyone that has a Social Security number.  Because the number

4  on the back of the card is the number of the trust.

5          MS. MALIZIA:  Your Honor, we are going to object to this

6  line of testimony.

7          THE COURT:  Why?

8          MS. MALIZIA:  He isn't --

9          THE COURT:  Do you want to discuss the ground for your

10  objection?  All right.  We will have a sidebar.

11          We will have a sidebar.

12      (Proceedings heard at sidebar:)

13          MS. MALIZIA:  Your Honor, if Mr. El Bey is going to

14  offer this witness as some kind of expert on trusts, or even as

15  somebody with knowledge of trusts, we need to know something

16  about his background to qualify him to testify about them.

17          He just stated that -- he is stating requirements for

18  filing a trust.  I'm not -- it's not entirely clear to me that he

19  is qualified to do so.

20          THE DEFENDANT:  You will get a chance to cross-examine

21  him so you can ask him.  That problem is solved.

22          MS. MALIZIA:  There is also an issue of relevance here

23  but we will wait.

24          THE DEFENDANT:  The case is over a trust so it is

25  relevant.

El - Direct by The Defendant                 373

1       MR. HOTALING:  I mean, obviously, Judge, there are
2  issues of qualifications, so --
3       THE COURT:  Well --
4       MR. HOTALING:  One option, Judge, is to actually voir
5  dire this witness outside the presence of the jury.
6       THE COURT:  If Mr. El Bey learned about trusts from this
7  man, I think that's germane.
8       MS. MALIZIA:  I'm not -- it's not entirely clear to me
9  that this man is qualified to talk about the requirements for a
10  simple trust.
11       THE COURT:  Yes.  But what if he gave misleading
12  information to Mr. El Bey?
13       THE DEFENDANT:  Or who said your witnesses were
14  qualified to say what they say?
15       MS. MALIZIA:  We qualified them on the record.
16       THE DEFENDANT:  Well, okay.
17       MS. MALIZIA:  That's why.
18       THE DEFENDANT:  I'm qualifying him on my record now.
19       THE COURT:  I'm going to overrule the objection.
20     (Proceedings heard in open court:)
21       THE COURT:  There is an objection.  I overruled it.  I'm
22  going to permit the question and answer to stand.
23  BY THE DEFENDANT:
24  Q.  The question was:  Could anyone file a 1041 trust?
25  A.  Anyone that finds out that they have a Social Security

El - Direct by The Defendant                    374

1 number.  In the back of the card there is a red letter.  The red
2 letter tells you one of 12 banks that's in the United States held
3 by the Federal Reserve, and the eight-digit number is the account
4 that's attached to the person on the Social Security card and
5 their birth certificate.  For they are the human resource.
6 Q.  Do all American citizens -- I won't say that.  I won't say
7 that.  I'm going to get in trouble.
8        So if -- let's just say if any American citizen decide
9 to fill out a 1041 and asked for some funds and they got it and
10 they didn't put any money into it, how is that possible?
11 A.  Because the number on the front of the card is the entity
12 that was created off the birth certificate.
13        The number on the back of the card is the bank, the
14 Federal Reserve Bank that holds that name in trust since its
15 creation on the birth certificate.
16        So again, I could speak to you about the bankruptcy, but
17 you didn't ask that question so I'll leave it alone.
18 Q.  So I got one question for you.  Do you have a dollar bill?
19 A.  I don't have one on me.  But in the left-hand corner of the
20 dollar bill, on the side of George Washington, you will see the
21 number, a letter for the Federal Reserve Bank, and then it has it
22 in the circle enclosed, the Federal Reserve Bank.
23        And, once again, the account number of whose ever Social
24 Security number is on the back number, for all of the people are
25 resources.  We are the chattel property of the corporation.

El - Direct by The Defendant                 375

1  Q.  Okay.  So let me ask you a question.  If the Internal Revenue

2  Service sent you a document saying that you overpaid anything, is

3  that saying that you owe them or they owe you?

4  A.  It can work both ways.  But if you -- it can be discharged.

5  Because, once again, as of the bankruptcy of the United States,

6  the only money is the people.

7  Q.  Okay.  So --

8          MS. MALIZIA:  Your Honor, I'm sorry.  We have to object

9  to that last response.

10          THE COURT:  All right.  Well, we will have another

11  sidebar.  Sorry.

12     (Proceedings heard at sidebar:)

13          THE COURT:  Look, when you make your rebuttal you can

14  correct any mistakes that he made.  I don't want to stifle him so

15  he doesn't have any defense at all.  All right?

16          MS. MALIZIA:  All right.

17          THE COURT:  The one document --

18          MS. MALIZIA:  If you are willing to let in testimony on

19  this sovereign citizen nonsense --

20          THE COURT:  I didn't say I was letting it in.  On

21  rebuttal -- on rebuttal --

22          MS. MALIZIA:  That's exactly what he just testified to.

23          THE COURT:  Look.  On rebuttal if you show, you know,

24  it's errors, it's irrelevant, it's not qualified, then I will

25  exclude that.

1          Do you really think the jury is going to be dazzled by

2    this evidence?

3          MS. MALIZIA:  Your Honor, we are concerned that he is

4    dangerously close, if he has not already violated your order on

5    this sovereign citizen defense, would put it charitably.  But

6    certainly, the testimony relates to that subject matter.

7          THE COURT:  Well, if you want to object to the sovereign

8    citizen --

9          MS. MALIZIA:  That is what we are objecting to right

10   now.

11         THE COURT:  Well, you didn't say that.  All right?

12         THE DEFENDANT:  This has nothing to do with the

13   sovereign citizen.

14         MR. HOTALING:  He is just talking about the bankruptcy

15   of the United States, Judge.  Those were the last three words

16   that came out of his mouth, that the United States is bankrupt.

17   That goes to the whole core and crux of what this whole

18   defense --

19         THE COURT:  I didn't understand that that was your

20   objection.

21         MS. MALIZIA:  That is what we are objecting to.

22         THE COURT:  Well, you didn't say it.

23         MS. MALIZIA:  I'm saying it right now.

24         THE COURT:  Well --

25         THE DEFENDANT:  Judge, I asked the man a question.

1       THE COURT:  You can't -- I know.  But look, you can't

2  get into all this stuff about --

3       THE DEFENDANT:  I'm not getting into anything --

4       THE COURT:  -- about bankruptcy of the United States.

5       MR. HOTALING:  That's what he just said.

6       THE DEFENDANT:  That's not me.

7       MR. HOTALING:  The question is --

8       THE DEFENDANT:  What I'm saying is you all haven't given

9  me an opportunity to do anything.  You might as well just go on

10 and convict me if you are doing to do what you're doing.  I don't

11 know why we been doing this here because you're not giving me a

12 fair chance.  You know, everything I do, if they say it it goes.

13      THE COURT:  But if he gives answers -- if he starts

14 talking about the bankruptcy and the sovereign citizen --

15      THE DEFENDANT:  Judge, just tell him he can't say that

16 then.  I don't think we got to keep coming over having these

17 meetings.  That's not me saying it.  I just keep saying --

18      THE COURT:  You can't allow a witness to talk about the

19 government being bankrupt and he being a sovereign citizen or

20 something.

21      THE DEFENDANT:  Okay.  I don't know if he said sovereign

22 citizen or not.  But I'm just saying, tell him he can't say it.

23 Why are we keep having these meetings?  You making me come over

24 here.  We keep coming over here.

25      THE COURT:  Okay.  But I want -- all right.  I want the

1  -- if you make an objection, I want you to articulate the

2  objection, tell me what the objection is, and I'll rule on it.

3          MS. MALIZIA:  And you would like us to do that in front

4  of the jury?

5          THE COURT:  Yes.

6          MS. MALIZIA:  All right.

7          THE COURT:  Otherwise we are going to have a sidebar

8  every five minutes.

9          THE DEFENDANT:  Yeah.  That's what I'm saying.

10         MS. MALIZIA:  I think to avoid potential prejudice to

11  the defendant, that would actually be my suggestion.  But if you

12  want us to discuss this in front of the jury, we are happy to

13  accommodate the Court.

14         THE COURT:  Well, what do you think?

15         LAW CLERK:  I think the sidebars are probably in the

16  defendant's interest to the extent that the discussion is of

17  either the relevance of the bankruptcy or why the U.S. is --

18         MR. HOTALING:  My guess is we are going to see more

19  answers -- my guess is we are going to see more answers along

20  this line that we have just now seen.

21         THE DEFENDANT:  Well, Judge, you can't do any guessing.

22         MR. HOTALING:  Well, wait, let me finish.

23         THE DEFENDANT:  I didn't --

24         MR. HOTALING:  We have already heard about the Federal

25  Reserve and that money is being held in trust by the United

El - Direct by The Defendant                    379

1    States by the Federal Reserve, the fact that the government is

2    bankrupt.

3            This is all along this path, Judge, that you've

4    excluded.

5            THE COURT:  Okay.  Now I understand.

6            MR. HOTALING:  And that's where he has gone.

7            THE COURT:  So, look, Mr. El Bey, you may --

8            THE DEFENDANT:  All they got to do is ask.

9            THE COURT:  Look, you may ask -- you may ask him

10   perfectly proper questions.  But if he gives responses which are

11   improper, I can't let him testify.

12           THE DEFENDANT:  Okay.  And I'm good with that.

13           THE COURT:  Okay.

14           MR. HOTALING:  And so procedurally, Judge, would you

15   like -- how would you want to us to do this moving forward?

16           THE COURT:  We will do it with the sidebars if there are

17   further objections.  Just when you make your objection, give me a

18   chance to do something, maybe without having to hear the ground

19   of the objection.

20           MR. HOTALING:  I think we will make every effort to do

21   so, Judge.  Thank you.

22      (Proceedings heard in open court:)

23           THE COURT:  Okay.  Sorry, ladies and gentlemen, with the

24   constant interruptions.

25           So, Mr. El Bey, do you want to continue?

El - Direct by The Defendant                    380

1          THE DEFENDANT:  Yes, sir.

2    BY THE DEFENDANT:

3    Q.  Mr. El, in your experience with the Internal Revenue Service,

4    would you say when you owe money to the Internal Revenue Service

5    that they would notify you first, and if you don't pay they come

6    get it in any way, form or fashion?  In your opinion?

7    A.  From my experience is when you owe the IRS any kind of money,

8    they will come at your wages, they will garnish your check, they

9    will go into your account and take whatever they said that you

10   owe.

11   Q.  And so on that note, let me ask you:  Have you ever known

12   them to wait five or six years before they come get the money?

13   Or would they just go and get it after a certain period of time?

14   A.  Well, being that they are a collection agency for the U.S.

15   Treasury Department, they don't have to wait.  They can go into

16   your money wherever it's at.

17   Q.  Okay.  So do the Internal Revenue Service also collect for

18   child support?

19          THE COURT:  Collect for what?  I didn't hear you.

20   BY THE DEFENDANT:

21   Q.  Do they collect for child support?

22   A.  They are responsible for any collection of any U.S. currency.

23          THE COURT:  Let me just remind Mr. El Bey, and also

24   remind the witness, that you are testifying from your personal

25   experience, right?

1          THE WITNESS:  Right.

2          THE COURT:  Because he is --

3          THE DEFENDANT:  Judge, I'm just asking the question.

4          THE COURT:  -- he is not qualified as an expert on the

5    operation of the Internal Revenue Service.  But his own

6    experiences he can tell about.

7          THE DEFENDANT:  Yes, sir.  Yes.  We haven't had any

8    experts here since the trial began, so I'm just saying, like they

9    asked them, I'm asking too.  So okay.

10          THE COURT:  I mean, the witnesses who testified for the

11   government, they were testifying about things they had personal

12   experience with knowledge of in their jobs.  Or Mr. Howard, he

13   was reporting on his conversations with you.

14          THE DEFENDANT:  Okay.

15          THE COURT:  But without special qualifications a witness

16   can't be asked about the operation of a government agency that he

17   is not employed by.

18          THE DEFENDANT:  Okay.

19          THE COURT:  Just about his own experiences with that

20   agency.

21   BY THE DEFENDANT:

22   Q.  Okay.  Let me ask you about an experience that you had.  Did

23   you ever work for the postal service?

24   A.  Yes, I did.

25   Q.  So if I send you some mail through the postal service and I

1  did not -- let's just say the postal service did not cancel the

2  stamp, what reference would there be for you, to you?

3  A.  From my experience, just as a regular citizen, the United --

4  the UPU gets involved, because the postal service is an

5  international business and everyone must receive mail.

6          If the stamp is not cancelled, then they can call mail

7  fraud on anybody that actually circulated the mail without

8  cancelling the stamp.

9  Q.  Okay.  I got to be careful what I say.  Sometimes I don't get

10  the proper words.  If you just bear with me a minute.

11          Getting back to the 1041s, is the 1041 different from

12  the 1040 as far as filing taxes?

13  A.  The 1040 to my knowledge is what we use as our personal

14  income.  Because, once again, we all know that we're property or

15  corporations.

16          The 1041 is the trust.  You can pay or receive from the

17  corporation, meaning the job that you have actually worked by

18  that taxes you have paid.  Or if you obtained the knowledge and

19  found out about the trust, then you can also collect on the

20  trust.

21          But, once again, you have to obtain that knowledge.

22  That's not something you don't want to go out there and jump

23  into.

24          You want to find out -- that's why I left it alone.  I

25  didn't have enough knowledge so I didn't go forth with it.

1  Q.  Okay.  That's good.

2        So have everything that I've asked you since you took an

3  oath to swear to tell the truth, has it been truthful?

4  A.  Everything that I personally experienced and what I have read

5  by the government manuals and books, yes.

6  Q.  No, I'm talking about everything I have asked you here today.

7  A.  And I've answered to, yes.  I'm not going off of my feeling.

8  I'm going off of what I've seen and what I've experienced.

9        THE DEFENDANT:  Okay.  Okay.  I'm going to retire and

10  give it to the prosecution.

11        THE COURT:  Thank you, Mr. El Bey.

12        Do you wish to cross-examine this witness, Ms. Malizia?

13        MS. MALIZIA:  I have just a few questions, your Honor.

14                    CROSS-EXAMINATION

15  BY MS. MALIZIA:

16  Q.  What was -- your last name was Mr. El?  Mr. --

17  A.  Zakar Ali El.  I only use Bey on the birth certificate.

18  Q.  Mr. El, have you ever worked for the IRS?

19  A.  No, I haven't but --

20  Q.  Have you ever -- have you ever worked for a financial

21  institution?

22  A.  No, but they have books out.

23  Q.  Mr. El --

24  A.  No, ma'am.  No, I haven't.

25  Q.  -- have you ever worked for the Social Security

384

1   Administration?

2   A.  No, I haven't.

3   Q.  Have you ever worked for the United States Department of

4   Justice?

5   A.  No, ma'am.

6   Q.  Have you ever worked for any federal law enforcement agency?

7   A.  No.

8           MS. MALIZIA:  I have no further questions.

9           THE COURT:  Thank you.

10          THE DEFENDANT:  I do have one more question.

11          THE COURT:  Do you have any redirect --

12          THE DEFENDANT:  Yes, I have one question.

13          THE COURT:  -- Mr. El Bey?

14                      REDIRECT EXAMINATION

15  BY THE DEFENDANT:

16  Q.  Have you ever worked for any federal agency?

17  A.  Yes.  I was in the military.

18  Q.  Any other federal agency?

19  A.  None other than the post office and the military, no.

20          THE DEFENDANT:  Okay.  That's all I wanted to know.

21          THE COURT:  Thank you.  Any recross?

22          MS. MALIZIA:  No recross, your Honor.

23          THE COURT:  Okay.  Thank you very much, Mr. El.  You are

24  excused.

25      (Witness excused.)

385

1          THE COURT:  Mr. El Bey, do you have any other witnesses

2     you'd like to call, or would you like to testify, or do you have

3     additional exhibits or anything?

4          THE DEFENDANT:  Well, you have my other exhibits that

5     you said wouldn't be admissible.

6          THE COURT:  Right.  Well, I have -- yeah, we have

7     the --

8          THE DEFENDANT:  So, no.  I -- Judge, I have to say what

9     I have to say.  Because I think this is very important.

10          THE COURT:  Well, do you want to make a statement?

11          THE DEFENDANT:  Yes, I do.

12          THE COURT:  Now, remember, this is not closing argument.

13          THE DEFENDANT:  No, no, no.  I'm not -- I just want to

14     make a statement.

15          MR. HOTALING:  Sidebar.

16          MS. MALIZIA:  Your Honor, sidebar, please.

17          THE DEFENDANT:  No, I don't need no sidebar.  I just

18     want to stand up and talk.

19          THE COURT:  I'm sorry.  We have to have a sidebar.

20          THE DEFENDANT:  Okay, then don't worry about it.  Don't

21     even worry about it.

22          No.  Don't worry about it.  I just wait until I do what

23     I have to do.

24       (Proceedings heard at sidebar:)

25          THE COURT:  So the problem is that we have to know what

1  statement you want to make, because I have to decide whether it's
2  proper.
3          So if it's closing argument -- in other words, when you
4  say, summarize the case to the jury, which you'll have a chance
5  to do, that's fine.
6          THE DEFENDANT:  Okay.
7          THE COURT:  But virtually any other statement would just
8  not be proper.
9          THE DEFENDANT:  Okay.  I wasn't going to make a
10 statement that was going to be a problem, but I do want to say
11 something to you.
12         THE COURT:  Okay.
13         THE DEFENDANT:  I think it's very important.
14         I came here in good faith.  And again, I presented my
15 exhibit that they did not have.  And you allowed them to show my
16 exhibit before I did.
17         So, you know, that is really unfair.
18         And, you know, I think I'm going to have to ask the
19 Court to recuse you, Judge, because you're not being fair.
20         I don't have a chance.  You're not giving me a fair
21 chance to do anything.  You give them anything they want, and I
22 ask you for anything, it's that:  You don't -- you're not an
23 attorney, and that's all you say.
24         THE COURT:  The exhibit -- that exhibit was in the
25 record, wasn't it?

1          MS. MALIZIA:  Your Honor, I believe we addressed this

2     before the Court today twice.

3          It was admitted into evidence.  And we -- as we

4     explained to the Court and to the defendant, we could, because it

5     was admitted, we planned to use it in our case in chief with our

6     agent.

7          If the Court did not wish to admit it at that time or

8     the defendant objected to that, we could recall our agent in

9     rebuttal, at which the time we could offer it in rebuttal.

10          THE DEFENDANT:  Judge, when I gave you the document

11     first thing he did was:  Oh, no, no.

12          MR. HOTALING:  That's not true.

13          THE DEFENDANT:  Yes, you did.  You said:  We didn't have

14     this.  Why wasn't we given this.

15          That's the first thing you said, was why wasn't we given

16     this.  And then you turn right around and they use it before, you

17     know -- and you knew it was going to be my first exhibit.

18          So you, as a judge, shouldn't have allowed them to do

19     that.  You asked me to present my exhibits, you turned down my

20     envelopes.  So the only exhibit I had to present, you let them do

21     it before I did so --

22          THE COURT:  I understand your concern.

23          But the government's case had not ended.  This was a

24     document in the record.  They were entitled to use it.

25          THE DEFENDANT:  Yeah, but don't call it my Exhibit 1 if

1  you are going to let them use it, because it's not my exhibit.

2  It's already been admitted.  So it made me look real bad.

3            THE COURT:  It doesn't matter.

4            THE DEFENDANT:  And then when I started talking about it

5  you --

6            THE COURT:  You wouldn't like it marked as a government

7  exhibit.

8            THE DEFENDANT:  They didn't even have it.  I brought it

9  here this morning.

10            THE COURT:  Yes, I know.

11            THE DEFENDANT:  Why did you allow them to admit it

12  before me?

13            THE COURT:  It's better to be called a defendant's

14  exhibit because it's your only exhibit.

15            THE DEFENDANT:  Why did you let them use it first if you

16  knew it was my exhibit, was my only exhibit and --

17            THE COURT:  Because their case wasn't finished.

18            THE DEFENDANT:  Judge, they didn't have it, they got it

19  from me this morning.  How are you going to let them use my

20  exhibit?

21            THE COURT:  Because their case wasn't -- look, you

22  listen to me.

23            THE DEFENDANT:  Why did you give it to them?

24            THE COURT:  You listen to me for a second.  That

25  document was part of the record.  The government before its case

1 ended was entitled to use anything in that.

2       THE DEFENDANT:  That I give them?

3       THE COURT:  It's in the record.  Yeah.  It doesn't

4 matter.  It could come from Mars.  It's in the record.  They

5 could use it.

6       Do you understand that's their right?

7       THE DEFENDANT:  It wouldn't have been there and brought

8 it in, then they couldn't have used it.  You made me use my

9 exhibit before anybody come in, and then you let them use it

10 before me.  You know that's not right.

11       THE COURT:  Their case wasn't finished.  They had to use

12 it before you.

13       THE DEFENDANT:  Okay.  I can't -- you know what, I don't

14 even know why we having these sidebars.  I'm done with the

15 sidebars.

16       THE COURT:  Fine with me.

17   (Proceedings heard in open court:)

18       THE COURT:  Well, Mr. El Bey, do you have any additional

19 documents you want to introduce?  Or do you want to testify

20 personally?  Do you have additional witnesses you want to

21 testify?

22       THE DEFENDANT:  No.

23       THE COURT:  If not, then you rest.

24       Is there any rebuttal from the government?  The

25 government is entitled to rebuttal.

1    MS. MALIZIA:  No, your Honor, we have no rebuttal case.

2    THE COURT:  Okay.  Well, okay, ladies and gentlemen.  So

3  that concludes the evidentiary phase of the case.  The next phase

4  is instructions to the -- no, I'm sorry.  The next phase is

5  closing arguments.

6    So the government and Mr. El Bey, they are each entitled

7  to make a statement to you which is not evidence, not testimony,

8  but it's their effort to summarize what they think the evidence

9  you've heard, the witnesses and the documents, have established.

10  All right?

11    So it's argument, it's not testimony.  You have heard

12  the testimony, you have seen a lot of documents, that's the

13  evidence.  And the closing argument is an attempt to explain it,

14  unify it, and show how it either supports conviction or supports

15  acquittal, depending on who is presenting the closing argument.

16    And we have to have, as the lawyers and parties, we have

17  to have a short conference in advance in order to settle on the

18  instructions, which I will give you to guide your deliberations.

19    So the reason that I have to have this conference with

20  them before the closing arguments is that their closing arguments

21  have to be consistent with the instructions I'm going to give

22  you.

23    So what I anticipate is taking a break now, for the

24  jury, excusing the jury so we will have the instructions

25  conference, and then return for the closing arguments.

1        Now if this instruction is protracted, I'll make your

2   break into lunch and extend it.  But maybe it only will last a

3   few minutes.

4        So I'll ask you to remain in the jury room for a little

5   while.  And if it looks as if there is going to be delay and

6   postpone your lunch, then I will release you for lunch.

7        (At 11:24 a.m. jury out.)

8        THE COURT:  Can I have my --

9        LAW CLERK:  Judge, if we can have a moment with you

10  briefly?  There was one additional.

11       THE COURT:  Okay.  I have to talk to my law clerk.

12       MR. HOTALING:  Judge, do you want to do this now?

13       THE COURT:  I just have to talk to my law clerk for a

14  second.  Then we will have the conference.

15       But are people permitted at the conference?  I mean is

16  the audience permitted at a --

17       MR. HOTALING:  At a jury instruction conference?

18       THE COURT:  Yes.

19       MR. HOTALING:  It can be done in open court, Judge, it

20  can be done in chambers, as long as it's on the record we can do

21  it however you would prefer.

22       THE COURT:  I forget how I did it the last time I had a

23  trial.

24       MR. HOTALING:  We can certainly do jury instructions in

25  open court.

392

1          THE COURT:  What do you prefer?

2          MR. HOTALING:  Whatever you prefer, your Honor.

3          THE COURT:  Mr. El Bey, would you like the audience

4   present when we discuss the jury instructions or not?

5          THE DEFENDANT:  Yeah.  I won't bother me.

6          THE COURT:  Okay.  So then they can stay.

7          Okay, I'll be back in one second.

8      (Pause.)

9          THE COURT:  Okay.  So --

10         LAW CLERK:  Judge, the defendant is not in the

11  courtroom.

12         THE COURT:  Oh.  So we will wait for Mr. El Bey to

13  return.

14     (Defendant in.)

15         THE COURT:  So I have the instructions -- so I have the

16  instructions that were proposed by the government.  And I think I

17  had discussed some changes I had wanted to make in them and I

18  think Mr. El Bey did not propose instructions, is that correct?

19         Yeah.  But of course you can comment, so I thought what

20  I would do is --

21         THE DEFENDANT:  I didn't get any, Judge.

22         THE COURT:  Excuse me?

23         MR. HOTALING:  The ones that were filed with the Court,

24  I have with the ones I just printed out.  We can look together at

25  them if you like.

1          THE DEFENDANT:  Okay.  That's no problem.

2          MR. HOTALING:  These are the ones that were filed on the

3     docket, the publicly filed ones.  We can talked about it.

4          THE COURT:  See, it doesn't really matter.  I'm going to

5     read them out loud, and these are the government's instructions

6     with my modifications.

7          And then you, both sides, can suggest changes.  So most

8     of this will be reading.  But I will indicate where I'm making

9     some changes.

10         Or should I just indicate my changes, or what?

11         MS. MALIZIA:  That might be more efficient, your Honor.

12         THE COURT:  I'm sorry?

13         MS. MALIZIA:  That might be more efficient, your Honor.

14         THE COURT:  Okay.  So Mr. El Bey has your instructions?

15         MR. HOTALING:  Yes, Judge.

16         THE DEFENDANT:  Yes.

17         MR. HOTALING:  Yes, Judge.

18         THE COURT:  You all have the instructions?

19         MR. HOTALING:  Yes, we are all working off the same set.

20         THE COURT:  I will just indicate the change I'd like to

21    make and you tell me if you disagree.

22         MR. HOTALING:  And, Judge, if I might, you know, it

23    might be easier -- I don't -- I'm not suggesting that you read

24    each one.  If we could go through each one, though, because

25    obviously, for example, on the first instruction there are some

1  bracketed portions, and I think we just need to figure out if we

2  are going to remove brackets, for example, on Page 1.

3          THE COURT:  Where do you see brackets?

4          MR. HOTALING:  In the government's proposed instruction,

5  in instruction number 1, the first -- actually the second

6  sentence:  I will give each of you a copy of these instructions

7  to use in the jury room or each of you has a copy of these

8  instructions to use in the jury room.

9          I wasn't sure if there was particular language you

10  intended to use.  Are you going to give 12 copies of the

11  instructions to the jurors?

12          THE COURT:  Yes.  They should each have a copy.

13          MR. HOTALING:  Great.

14          So we would eliminate the second?

15          THE COURT:  Let me ask you, when do I excuse the

16  alternates?

17          MR. HOTALING:  At the conclusion of the jury

18  instructions and before you discharge the jury to begin their

19  deliberations, you would excuse at that point.

20          THE COURT:  Okay.  So I'll -- all right.  So I'll tell

21  them:  I will now instruct you on the law you must follow and

22  you'll each have a copy of the instructions in the jury room.

23  Okay.

24          Is there any other bracketed, anything else?

25          MR. HOTALING:  Not on number 1.

1       THE COURT:  Anything else you'd like me to discuss?

2       Well, let me read you my changes.  And then you can tell

3  me what you think of those, and then you can go back and make

4  changes.

5       You have one blank here.  This is on Page 15.

6       MR. HOTALING:  You know what, Judge, I think -- we will

7  withdraw that.

8       You know, Judge, we will actually withdraw government

9  instruction number 14, because we didn't actually proffer Agent

10 Ponzo as an opinion or an expert witness.

11      THE COURT:  Yeah, okay.  My law clerk pointed out a

12 problem.

13      I asked my secretary to retype the instructions with the

14 changes I had made.  I have some additional changes, but as a

15 result this copy is not identical.

16      So should we get -- is Pat here?

17      Could you come up for a second, Pat?

18      LAW CLERK:  Judge, if I may suggest maybe we break for

19 lunch early, and we take our lunch hour to get clean copies.

20      THE COURT:  No, no.  That's not necessary.

21    (Pause.)

22      THE COURT:  Okay.  So my secretary is going to get the

23 original, and then I'll be able -- and it will have -- and then

24 that will indicate the changes I made and that are on this draft.

25      But we can, while waiting, I do want to discuss the

396

1  principal change that I have made.

2      It has to do with, beginning with government instruction

3  27.

4      So my problem I had -- this with this other case -- the

5  jurors of course are not lawyers, and I don't like the idea of

6  throwing legalese at them.

7      And so look at Page 29.  So, okay.  So you have number

8  one, defendant may -- and such.

9      Okay.  Number two, the claim was false, fictitious or

10 fraudulent.

11     What is that supposed to be about?

12     MR. HOTALING:  I guess I'm not --

13     THE COURT:  What's the difference between false and

14 fictitious?

15     MR. HOTALING:  Judge, I don't have the benefit of a

16 dictionary in front of me so I can't give you a --

17     THE COURT:  Well, a dictionary is not going to help you.

18 If you don't know what fictitious means you're not going to learn

19 it from a dictionary.

20     MR. HOTALING:  Fictitious is made up.

21     THE COURT:  What's false?

22     MR. HOTALING:  Not true.

23     THE COURT:  Well, if it's made up it's not true.  Unless

24 you think fiction can be truer than fact, right?

25     MR. HOTALING:  And, Judge, I --

1          THE COURT:  Isn't fraudulent -- the claim was

2    fraudulent, right?

3          MR. HOTALING:  And, Judge, obviously the reason that we

4    are doing this is because we wanted to make sure that we are

5    tracking not only the statutory language that fits the offense of

6    conviction or potential offense of conviction, but also the

7    indictment.

8          So that if the jury wants to take a copy of the

9    indictment and they want to match it up with the instructions, so

10   that I just want to make sure that we are following along exactly

11   here.  I mean, Judge --

12         MR. FUENTES:  I mean --

13         THE COURT:  That's a legitimate point, yes.

14         MR. HOTALING:  I mean, just so we're clear, the

15   indictment says that the defendant made, presented and caused to

16   be presented to the IRS, an agency of the United States

17   Department of --

18         THE COURT:  That's fine.

19         MR. HOTALING:  -- knowing that the claim was false,

20   fictitious, and fraudulent.

21         THE COURT:  What?

22         MR. HOTALING:  Knowing that the claim was false,

23   fictitious and fraudulent.

24         THE COURT:  And fraudulent?

25         MR. HOTALING:  It's charged in that way, yes.

1       THE COURT:  But this says "or fraudulent."

2       MR. HOTALING:  Judge, that goes again to the idea of

3 charging in the -- charging in the disj- --

4       MR. MALIZIA:  Conjunctive.

5       MR. HOTALING:  -- charging in the conjunctive and

6 proving in the disjunctive, which as the -- well, as the Seventh

7 Circuit has said repeatedly, that that's a permissible way of

8 charging..

9       THE COURT:  Are you going to tell the jury that,

10 conjunctive or disjunctive?

11       MR. HOTALING:  No.  I just want them to say that the

12 claim was false, fictitious or fraudulent.

13       THE COURT:  Well, you are worried about them comparing

14 the instructions with the indictment, and the indictment says:

15 false, fictitious and fraudulent.  And then they might say to

16 themselves:  Well, I don't know, maybe it's false -- maybe it's

17 false, maybe it's fictitious, maybe it's fraudulent, but we're

18 not sure it's all three.

19       MR. HOTALING:  Judge, again, the law of the circuit is

20 that you charge this way in the indictment, you prove this way in

21 the instructions.

22       So that's what the --

23       THE COURT:  What a stupid indictment then.

24       MR. HOTALING:  I would disagree with that, Judge.

25       THE COURT:  Because the indictment says it's going to be

1  false, fictitious and fraudulent, and then you tell the jury that

2  even though the indictment says that they don't have to find

3  that.

4          MR. HOTALING:  This is what the law requires the

5  government to prove beyond a reasonable doubt.

6          THE COURT:  Even though it's not consistent with the

7  indictment.

8          MR. HOTALING:  Judge, it's consistent with the law.

9  It's consistent with the law.

10         THE COURT:  But it's not consistent with the indictment.

11         MR. HOTALING:  No, it is consistent with the indictment.

12         THE COURT:  No, it isn't.  Because false, fictitious and

13 fraudulent does not mean the same thing as false, fictitious or

14 fraudulent.

15         MR. HOTALING:  Judge, you're right.  But under the

16 law -- and again I hate to keep citing to the law, Judge.

17         THE COURT:  The law.  Honestly.

18         MR. HOTALING:  Again, it's a problem with us being

19 lawyers, Judge, but if it's properly charged --

20         THE COURT:  It certainly is a problem.  And there is

21 nothing that requires you in the indictment to say false,

22 fictitious and fraudulent.  That's not the law.

23         MR. HOTALING:  That's what the statute refers to.

24         THE COURT:  The statute doesn't require proof of false,

25 fictitious and fraudulent.  It's forbidding those --

1    MR. HOTALING:  Yes.

2    THE COURT:  It's forbidding each of them, not the

3  conjunction of them.

4    MR. HOTALING:  Judge, I'm not sure how you want to

5  resolve this.  We can --

6    THE COURT:  I understand your concern.  You want to make

7  sure that they can do this in the disjunctive.  I don't know what

8  to do about it.

9    I don't really understand four either:  The defendant

10  acted with the intent to defraud.

11    You say it's false.  You say the defendant -- or, the

12  jury has to find that it was false.  And it was a claim against

13  the Internal Revenue Service.  How could there not be intent to

14  defraud?

15    MR. HOTALING:  Judge, I think that's why the Seventh

16  Circuit committee feels that it's necessary to include, you have

17  to show that there was an intent to defraud.

18    THE COURT:  But if one, two and three show -- if one,

19  two and three are satisfied, then of course there was intent to

20  defraud.

21    MR. HOTALING:  And, Judge, I'm going to be honest, it's

22  been a while since I looked at the law under 287.  I don't know

23  if the Seventh Circuit has made the specific determination, but

24  287 is specific intent crimes.

25    THE COURT:  These pattern instructions are not binding.

1   They are not the law.  They are suggestions.

2           The other thing --

3           MR. HOTALING:  Actually, Judge -- I'm sorry.

4           Going to that particular -- I'm actually looking at the

5   book if you don't -- and so it's bracketed in the pattern, in the

6   jury instruction book.

7           And looking at the comment, the fourth element, "intent

8   to defraud" is bracketed because it's unsettled in this circuit

9   whether proof of intent to defraud is required under Section 287,

10  and it cites a particular case in 1996.

11          THE COURT:  Of course there has to be intent to defraud.

12  The point is that the first three points make crystal clear that

13  the person has to be acting intentionally, using a false

14  statement, in order to get something from the Internal Revenue

15  Service.

16          MR. HOTALING:  Yes.

17          THE COURT:  That is so clear that it's just muddied up

18  by this pattern instruction.

19          MR. HOTALING:  You mean the fourth element.

20          THE COURT:  And the pattern instruction is not the law.

21  It's just a suggestion.  The lawyers who draw up these --

22          MR. HOTALING:  Patterns.

23          THE COURT:  -- suggestions -- forget the pattern -- they

24  do not understand that jurors do not -- do not get legal jargon.

25  And it's not that difficult to state things in language which

1    ordinary people can understand.

2           Now, the other thing that bothers me about the

3    instructions is this concept of materiality, all right?

4           So materiality is not a word that most people use.  Now,

5    you tell me what does materiality mean?

6           MR. HOTALING:  That it has the ability to influence the

7    decision-maker, that it was made in such a way that it had the

8    ability to influence the person to whom the statement was

9    directed.

10          THE COURT:  Okay.  So what you want to say is the

11   defendant made a false statement that was important to the

12   Internal Revenue Service's decision.  Is that what you mean?

13          MR. HOTALING:  That it had the ability to influence the

14   decision-maker of that body.  That the statement was such that it

15   had the ability, that they were in a position to rely on it, that

16   they did rely on it, and that it had an impact on their

17   decision-making with respect to whatever the claim is that's

18   before them.

19          THE COURT:  So it's important to the decision of the

20   IRS.

21          MR. HOTALING:  Yes.  It's capable of influencing the

22   decision of the IRS.

23          THE COURT:  I'm haunted by "capable of influencing."

24          MS. MALIZIA:  Your Honor, I think the distinction is

25   something could be important to you but it may not affect your

1    decision-making.

2            THE COURT:  But "capable of" also doesn't mean that it
3    always affects their decision.

4            MS. MALIZIA:  No, but it has to have the ability to do
5    that, be material.

6            THE COURT:  I know, but that's not the same thing.

7            MS. MALIZIA:  It's not the same thing as important,
8    either.

9            THE COURT:  Pardon?

10           MS. MALIZIA:  It's not the same thing as important,
11   either.

12           THE COURT:  Okay.  So find an alternative.

13           MR. HOTALING:  I'm sorry?

14           THE COURT:  What's the alternative?

15           MS. MALIZIA:  "Capable of influencing."  It's in the
16   instruction.

17           THE COURT:  Pardon?

18           MS. MALIZIA:  "Capable of influencing."  It's in the
19   instruction.  I don't know why a jury would not be able to grasp
20   that concept.

21           THE COURT:  Well, the problem with it is that "capable
22   of influencing" doesn't mean it did influence.

23           MS. MALIZIA:  That's right.  And that is an important
24   distinction.  It doesn't actually have to influence.

25           In this case, it arguably did.

1    MR. HOTALING:  Because that's the next sentence of the

2  instruction, Judge.  It's not necessary that the false statement

3  actually have had that influence or actually have been relied on

4  by the victim, as long as it was simply capable of doing so.

5    THE COURT:  Well, so it "could influence"?

6    MR. HOTALING:  If it "could influence"?

7    THE COURT:  Wouldn't that be a little more

8  straightforward than "capable of influencing"?

9    MR. HOTALING:  So instead what we would read is:  A

10  false or fraudulent pretense, representation or promise is

11  material if it could influence the decision of the IRS.

12    Judge, it's the government's position that we would go

13  with -- it's our recommendation that we go with the instruction

14  and the definition that's included in the pattern instruction

15  manual.  That is our recommendation.  That would be our proposal.

16    If you are saying that you are insistent on changing

17  this particular language, I think that then the next best

18  alternative would be "could influence."

19    MR. FUENTES:  Your Honor, may standby counsel be heard?

20  And I'd like to explain why I'm asking to be heard now, if I may.

21    THE COURT:  Sure.

22    MR. FUENTES:  My concern, as standby counsel at this

23  point, first of all, the Court wishes me to remain through

24  closing arguments, is that correct?

25    THE COURT:  Yes.

1    MR. FUENTES:  That is because there is a possibility

2  that I could be appointed trial counsel to possibly deliver a

3  closing argument, is that correct?

4    THE COURT:  No.  I was thinking more that, although it's

5  very unlikely, I want to make sure that Mr. El Bey has the option

6  to consult you.

7    Now, so far obviously he's been quite emphatic that he

8  doesn't want to, and I'm sure he will adhere to that.  But I want

9  to leave the door open, if he should change his mind.

10    That's the only reason that I have been reluctant to

11  release you, as we stand here.

12    MR. FUENTES:  And I'm not inquiring so much trying to

13  get released at this point, but trying to project for the Court

14  the scenario:  In the event that I were trial counsel at the time

15  of closings, there are some points I would like to make about

16  these instructions.

17    And if I were trial counsel and the pattern instruction

18  wasn't given, I probably would object to that.

19    I probably would also insist that "materiality" be

20  included in the instruction number 27.  I have authority for

21  that.  It's in the committee comments to the Seventh Circuit

22  pattern book.

23    And I think the "false or fraudulent or fictitious"

24  statement that is made under the false claims statute must be

25  material.

1          The committee comments said the Seventh Circuit has not

2    yet decided that issue yet, but the weight of authority in the

3    other circuits is that where the statement was fraudulent -- so

4    they draw a distinction between fraudulent and false or

5    fictitious -- where the statement was fraudulent -- and that's

6    clearly the government's theory here -- it must be material.

7          And there is another case, a Supreme Court case that

8    says where it's material, and where the jury is not instructed on

9    materiality, it's reversible error.

10          So that issue would be in the record in my mind if the

11   Court didn't deliver the pattern instruction and didn't include

12   materiality in the modified pattern instruction.

13          THE COURT:  Okay.  So let me interrupt you for a second.

14          So what you're saying is that if you were Mr. El Bey's

15   lawyer you would want the -- you would want the government's

16   instruction, is that right?

17          MR. FUENTES:  With the addition of number five:  The

18   statement must be material.

19          THE COURT:  Well, that was in there.

20          MR. HOTALING:  It wasn't actually on 287, on our 287.

21   It's the same one that you were just referring to, Judge, where

22   we talked about number four.

23          THE COURT:  Right.  But you did have "materiality" in a

24   later paragraph.

25          MR. HOTALING:  It's materiality with reference to the

1  mail fraud statute.  In the mail fraud counts.

2         THE COURT:  Materiality.

3         MR. HOTALING:  And we did not include a materiality

4  element with respect to the 287 false claim count.

5         I understand Mr. Fuentes's point though.

6         MR. FUENTES:  I'm saying I would insist on the

7  inclusion, also include that as an instruction, and I would

8  prefer the language in the pattern instruction defining

9  "materiality" as capable of influencing the decision-maker.

10        I think "could" is softer and more speculative and more

11 easy to satisfy than "capable."

12        So I would prefer the pattern instructions with the

13 modifications I have suggested on the 287, which is instruction

14 number 27, Judge.  And my concern about that is that if I wind up

15 having to advise him and argue that it's all fair, we have this

16 discussion now rather than my injecting it later after they have

17 already done their opening closings, Judge.

18        THE COURT:  So what are you saying, Mr. Hotaling and

19 Miss Malizia?

20        MR. HOTALING:  With respect to the issue of -- I'm

21 sorry, Judge?

22        THE COURT:  The suggestion of having that materiality

23 definition in regard to the defrauding as opposed to the --

24        MR. HOTALING:  It would be on both, both offenses.

25        THE COURT:  Having a fifth paragraph.

1          MR. HOTALING:  Well, actually, Judge, I'm not sure we
2   would necessarily need to have a fifth one.  I think what you
3   could do is you could, on element number 2, which says that the
4   claim was false, fictitious or fraudulent, you could say the
5   claim was materially false, fictitious or fraudulent.  That
6   matches up with the language of the mail fraud count, which again
7   refers to the fact that the scheme to defraud involved a
8   materially false or fraudulent pretense, representation or
9   promise.

10          So getting back to that original question, we would be
11  fine with inclusion of materiality on that particular element.

12          THE COURT:  Is that -- what do you think?

13          MR. FUENTES:  That would be fine with me, Judge, were I
14  in that position.

15          THE COURT:  Okay.  All right.  Well, I think I'm going
16  to give up.

17          All right.  So we will use the government's proposed
18  instructions with this addition, paragraph 5.

19          MR. HOTALING:  And, Judge, again, on that particular
20  one, it won't be a new paragraph 5.  We will add the word
21  materially into element two.

22          THE COURT:  Right.  I understand.  So you make that
23  change.

24          And apart from that I will look at the -- so we had this
25  little change, the bracketed change.

1    (Pause.)

2         THE COURT:  Let me just speak to my law clerks for a

3    second.

4    (Pause.)

5         THE COURT:  Okay.  Could you tell the jurors that they

6    can go and have lunch, and we will give them a long lunch break.

7    They should come back at 1:30.

8         MR. HOTALING:  1:30.  Okay.  Perfect.  Perfect.

9         THE COURT:  Okay.  So --

10        LAW CLERK:  Can I have a word?

11   (Discussion off the record.)

12        MR. FUENTES:  One moment, please.

13        MR. HOTALING:  Sorry.  My apologies, Judge.

14        MR. FUENTES:  Thank you.

15        MR. HOTALING:  I'm sorry.

16        And, Judge, following our pretrial conference a couple

17   of weeks ago, there were a couple of specific things that you had

18   mentioned that you wanted to have changed.

19        For example, the removal of witness demeanor as part of

20   those factors to be considered in witness credibility.  I have

21   removed that that I will forward to your clerk.

22        Similarly, you had asked that we include an example, and

23   the example that's contained in the pattern instruction book

24   about direct versus circumstantial evidence.

25        THE COURT:  Yes.

1          MR. HOTALING:  I inserted the raining example that you

2    will see in the version that I will send.  Actually, I'm happy to

3    show Mr. El Bey right now what that language is.  And Mr. Fuentes

4    too.

5          THE COURT:  Another little change I'd like to make --

6    maybe we discussed this before -- this is in the --

7          THE DEFENDANT:  Judge, can I ask you a question though?

8          THE COURT:  Let me finish.

9          In the mail fraud, when you say the defendant knowingly

10   devised or participated in a scheme, I thought it would be better

11   to say that the defendant engaged in a scheme.

12         Would you have a problem with that?  Because I don't

13   think you are really trying to show that he devised a scheme

14   which was then executed by some accomplice, right?

15         MR. HOTALING:  No.  No.  It's certainly the government's

16   theory of the case that this was his scheme, that his --

17         THE COURT:  Right.  So could I say engaged in a scheme?

18         MR. HOTALING:  My preference again, Judge, because I'm

19   always very reluctant -- and I will be very honest, Judge -- I'm

20   very reluctant --

21         THE COURT:  Is this a pattern thing?

22         MR. HOTALING:  It is.

23         THE COURT:  Okay.  All right.

24         MR. HOTALING:  Just so you understand, I'm just very

25   hesitant to deviate from the patterns and risk the ire of your

1 colleagues upstairs.

2        THE COURT:  All right.  No, that's fine.

3        The only other thing I had just -- I mean, this is

4 trivial nitpicking, but in the very last page, in considering

5 whether the government has proven a scheme to defraud.

6        Well, it should be proved, okay?  Because proven is the

7 adjective and proved is the participle.

8        MR. HOTALING:  I'm sorry.  Which page is that?

9        THE COURT:  I think it's Page 24.

10        MR. HOTALING:  Page 24, first sentence.  Good catch,

11 Judge.

12        THE COURT:  That's minor.

13        So, Mr. El Bey, you wanted to say something?

14        THE DEFENDANT:  Yes.  I was just curious why, you know,

15 as a defendant, and I had to send everything that I did, but I

16 never got any of these.  I could have been reading this.  You

17 know, I have never got any of it.

18        MR. HOTALING:  It was filed.

19        THE DEFENDANT:  What?

20        MR. HOTALING:  These were all filed.

21        THE DEFENDANT:  Yeah, but when I filed mine I still send

22 you all a copy.

23        What I'm saying is I could have been reading on it and

24 you all --

25        THE COURT:  You didn't get a set of the proposed jury

1   instructions from the government?

2          THE DEFENDANT:  I gave you the jury instructions.  You

3   just denied them.

4          THE COURT:  Pardon?

5          THE DEFENDANT:  I did give you a copy of my jury's

6   instructions.  You just denied them.  I mean, the jury rules.

7          Say that one more time, the jury instructions?

8          THE COURT:  No, I'm sorry.  The government proposed --

9   the instructions, that's what I tell the jury, I'm instructing

10  them.

11         So the government has drafted a set of proposed

12  instructions which you could have done but you didn't do it.

13         THE DEFENDANT:  Okay.  But I did, but I'm just saying I

14  didn't even receive a copy of it.

15         THE COURT:  You didn't get the government -- the

16  government didn't give you a copy?

17         THE DEFENDANT:  I never received them.

18         MR. HOTALING:  Judge, we filed them on the docket.  They

19  are publicly filed.  They are the same materials that Mr. Bey --

20  everyone in this courtroom gets a copy of these instructions.

21         THE DEFENDANT:  Whatever I file, because that was in

22  your order when the case first started was, make sure that the

23  defendant or the plaintiff get a copy.  And I didn't get a copy

24  of anything.

25         As a matter of fact, I had nothing been answered with

1  me.  So what I'm saying is I haven't got a copy of anything.

2          MR. HOTALING:  Judge, with all due respect to Mr. El

3  Bey, we actually talked about each of these instructions at the

4  pretrial conference two weeks ago.  So he had them in front of

5  him then.

6          So whether or not he didn't want to take a copy --

7          THE DEFENDANT:  I never had --

8          MR. HOTALING:  -- he was offered a copy to him.

9          THE DEFENDANT:  I never had them.

10         MR. HOTALING:  He doesn't accept them, Judge.  That

11  doesn't mean that he doesn't have an opportunity to have access

12  to them.  If he doesn't want to take them, if he doesn't want to

13  get the information, I can't control that.

14         THE COURT:  Do you have a copy you can give him right

15  now?

16         MR. HOTALING:  He is looking at one right now, Judge,

17  because Mr. Fuentes has a binder and he is scrolling through it.

18         THE DEFENDANT:  Mr. Fuentes got it and I didn't.

19         MR. FUENTES:  And everything Mr. Fuentes said or did

20  shouldn't reflect anything in the record, any assistance provided

21  or accepted by Mr. El Bey.

22         MR. HOTALING:  And similarly, I have a copy that I have

23  at the podium that he is welcome to look on with.

24         We can make him copies.  He doesn't want to take the

25  copies that --

1          THE DEFENDANT:  But I could have been looking at them in

2   advance.   You dropped them on me, you all want me to read

3   everything in two minutes.

4          THE COURT:  No, I didn't expect you to read anything.

5          THE DEFENDANT:  And that's what I'm saying.  I'd like to

6   sit down and read and comprehend like everybody do.

7          Like I said, nothing has been fair.  And so hey, I came

8   to accept that.  I know what I'm up against now, so --

9          THE COURT:  But you have a copy now.  Okay.

10          THE DEFENDANT:  But this guy here, he decided to take it

11   and look at it.  But where am I going to read it at?  When you

12   send me to lunch?

13          THE COURT:  Well, we are going to break until 1:30.  So

14   you can read them.

15          MR. HOTALING:  And, Judge, if he would like --

16          THE COURT:  The problem is this is the instructions

17   conference.

18          THE DEFENDANT:  You see what I'm saying?  That's what

19   I'm saying to you.  And you all changing everything.

20          I don't know what you're changing.  I mean, y'all almost

21   like I'm not here, and then you doing everything like I'm not

22   here.  And I just sit here and just look at it.

23          THE COURT:  I am not -- I'm not changing anything.

24          THE DEFENDANT:  And, Judge, you know what you doing and

25   they do too.  So I can't --

 1          THE COURT:  I tried to give you every opportunity to

 2   testify, object, cross-examine, introduce.

 3          THE DEFENDANT:  Testify against what?  He hasn't proved

 4   anything.  There hasn't been nothing proved, Judge.  What would I

 5   testify for?

 6          THE COURT:  If you don't open up the documents that are

 7   sent to you what am I supposed to do?

 8          THE DEFENDANT:  Wasn't no documents sent to me though.

 9   That's it.

10          MS. MALIZIA:  Your Honor, we have provided these filings

11   and a full paper copy of the discovery in open court at the

12   pretrial conference, and he walked out and refused to take them.

13          THE DEFENDANT:  They brought a box in here.

14          You said, just like your discovery has to be on the

15   record and has to be sent to me, Judge.  Wasn't none of that

16   done.  We both know that.

17          I mean, we are sitting here arguing about it.  I'm not

18   trying to argue about that.  It is what it is now, Judge.

19          All I'm saying is if she has discovery, she can put them

20   on the record.  And she would have sent them to me like I did.  I

21   went out my pocket and mailed them.  That's all I'm saying.

22          And when she brought that box in here it was -- it was

23   past the due date.  You had -- you said January 26th was the last

24   date for all discoveries.  When we talked again it was February

25   the 9th.  And they didn't sent me a box --

 1          MS. MALIZIA:  Your Honor, we don't need to reopen this.

 2          MR. HOTALING:  We don't need to the rehash this, Judge.

 3   We have already dealt with the issues.  You have already dealt

 4   with those issues back at the pretrial conference in February.

 5          I don't see any need to go back and rehash those

 6   particular discussions.

 7          THE DEFENDANT:  Well, again, like I say, Judge, when

 8   they speak you listen.  When I speak it's nothing.  So I came to

 9   that conclusion that this is how it's going to be.  So I just got

10   to deal with it.  And I'm not going to fool myself and so --

11   okay --

12          MR. HOTALING:  Judge, I'd like the record to reflect

13   that the course of this trial completely refutes that statement,

14   that this Court has not given the defendant an opportunity to be

15   heard, an opportunity to present evidence, an opportunity to

16   present whatever arguments he feels fit.  This record on this

17   trial is clear.

18          THE DEFENDANT:  And I would like to put on the record

19   that that's absolutely wrong, and that I have not been given a

20   fair trial.

21          No discovery was answered, no real evidence -- and then

22   my only exhibit that you told me I had to let the Court see, you

23   let them take it and use it before I used it.  And they didn't

24   have it.  And you said because it was in the record now.

25          THE COURT:  They did have it.

1          THE DEFENDANT:  Okay.

2          THE COURT:  It's in the record of the case.

3          THE DEFENDANT:  Okay.  You know what, Judge, you know,

4   you the Judge.  So you know what, I'm going to -- hey, I'm gonna

5   do?  You the man, so I got to the sit here --

6          THE COURT:  I have no stake in the case.

7          THE DEFENDANT:  You know, Judge --

8          THE COURT:  Look, just understand.  I have no stake in

9   this case.

10         THE DEFENDANT:  You do.

11         THE COURT:  If you are convicted, you are acquitted,

12  it's none of my business, right?  All I'm trying to do is

13  manage -- I'm the stage manager.  I have to manage this thing.

14  Very, very difficult when one of the parties doesn't have a

15  lawyer.  Because it puts you at a big disadvantage.

16         THE DEFENDANT:  But you know what, Judge --

17         THE COURT:  This is a self-inflicted disadvantage.  And

18  you have been warned that if you don't have a lawyer and you

19  refuse to consult the standby counsel you're at a big

20  disadvantage.  Now I have tried to give you every break.  But I

21  can't just let you do anything that you want to you if it's not

22  consistent with legal rules.

23         THE DEFENDANT:  The law.  Okay.  And, Judge, and that's

24  a beautiful thing.

25         And so what I am a saying to you is this:  Is that you

418

1  haven't given me a fair chance because I'm not a lawyer, and I'm

2  not with the bar or, you know, with your group of people.  Your

3  standard of people.  So I understand that.

4  　　　　　But, you know, if we are going to follow the law, I have

5  a chance.  But if we're not going to follow the law, then no, I

6  don't have a chance.

7  　　　　　And the rules that you made you didn't hold up.  Because

8  everything that you said on the record at the beginning of the

9  case, I followed to the exact.  But they didn't.  And you allowed

10 it to happen.

11 　　　　　Nothing has happened in this case.  They haven't proven

12 anything.  Only thing they did was they showed this little stuff

13 of what I did with the money, and that's nothing.  Because they

14 haven't proved anything.

15 　　　　　So what I'm saying to you is this:  You allowing this to

16 happen.  You allowed this to get this far.  So only thing I can

17 do is accept what I got coming.

18 　　　　　THE COURT:  I don't know what I allowed to happen.

19 　　　　　They had evidence.  They had documents.  They had

20 witnesses.  You could make objections.

21 　　　　　THE DEFENDANT:  Why, Judge?  You been overruling

22 everything I did.  Whatever I did, you didn't let it go.

23 　　　　　THE COURT:  That's not true.

24 　　　　　THE DEFENDANT:  Judge, you haven't given me anything.

25 You haven't give me one thing.

1    THE COURT:  I let you testify.  I let you have exhibits.

2  I let you cross examine.

3    THE DEFENDANT:  You let me testify to what, Judge?

4    MR. HOTALING:  You had the option.

5    THE COURT:  I said to you, if you wanted to testify,

6  you'd go into the box, you would swear to tell the truth and then

7  you could testify.

8    THE DEFENDANT:  What am I going to testify for, Judge?

9    THE COURT:  That's what I said to you.  And you said you

10 didn't want to testify.

11    THE DEFENDANT:  No.

12    THE COURT:  And now don't blame me --

13    THE DEFENDANT:  Why would I use my Fifth Amendment.

14 There ain't nothing been proven.  You never allowed anything else

15 to happen, why would I get up there when they haven't proven

16 anything.

17    THE COURT:  Right.  You don't have to testify.  It's

18 your right.  If you don't testify, well, then the jury doesn't

19 hear your testimony.

20    THE DEFENDANT:  Okay.

21    THE COURT:  Okay.  That's just the way it is.

22    THE DEFENDANT:  Okay.  I don't have a problem with that.

23    THE COURT:  All right.  So why don't we take a break.

24    MR. HOTALING:  And so, Judge, as long as it's acceptable

25 to the Court, I will provide your clerk a copy of the electronic

1  version of the jury instructions that I had modified slightly

2  based upon, again --

3         THE COURT:  Right.

4         MR. HOTALING:  -- our previous conversations.  And one

5  thing --

6         THE COURT:  Well, before you do that.

7         But you'll be sure to give Mr. El Bey and Mr. Fuentes --

8         THE DEFENDANT:  What?  You want to give me something

9  now?

10         MR. HOTALING:  I'm happy to give you something.  I'm

11  happy to.  Absolutely, Judge.

12         THE DEFENDANT:  I know what you want to give me, but

13  what am I going to do.

14         MR. HOTALING:  If it's one thing it's not the other.

15         So let's deal with what we are dealing with right now.

16         THE DEFENDANT:  Is it okay if I take this?

17         MR. FUENTES:  Yes.

18         MR. HOTALING:  So getting back to the point, Judge, I

19  will tender that.  If Mr. El Bey tells me where he is and I can

20  print out a copy of what I am tendering to him, submitting to

21  your clerk, I'm happy to go print it out right now and meet you

22  and give you a copy of it.

23         THE DEFENDANT:  I'm probably going to be downstairs on

24  the second floor.

25         MR. HOTALING:  Second floor in the cafeteria?  Done.

1     And then I assume that your clerk is going to make some

2  additional modifications.

3          LAW CLERK:  Just the materiality for the false claims

4  charge that we discussed here, and then the "proven" to "proved"

5  are the two edits I had.

6          MR. HOTALING:  And there is one additional one in

7  connection with the summary chart.  I think what we will do is we

8  will actually go ahead and identify, because now it's three

9  particular exhibits have been admitted into evidence that were

10 summary charts:  Summary Charts 1, 2 and 3.

11         It probably makes sense that we be explicit that those

12 are the three that have been admitted into evidence, but I can

13 even make that change in the version that I submit to you.

14         LAW CLERK:  If you can do that that would be easier.

15         MR. HOTALING:  I'll take care of it.

16         THE COURT:  And they get all the exhibits.

17         MR. HOTALING:  I think the game plan -- and that

18 actually raises a point, Judge.

19         What we have is a box of exhibits, original exhibits

20 that we can put on a cart, will go back to the jury, the CSO can

21 take that material back to -- because there is nothing that they

22 actually have to play, there is no need to have a jury laptop, so

23 we won't send anything back other than the copies of exhibits --

24 excuse me -- a copy of the jury instructions and the copy of the

25 indictment.

1          That has been redacted to remove any references to the

2     grand jury.  Similarly, the signature blocks at the bottom.  So

3     it is a clean indictment.

4          THE DEFENDANT:  Can I ask a question though?

5          MR. HOTALING:  Sure.

6          THE DEFENDANT:  Judge, the indictment is already filed

7     on the docket.  So you going to let him change the indictment

8     now?

9          THE COURT:  It's not a change in the indictment.  It's

10    to remove references that are not -- a couple little things.

11         Well, he'll show you.

12         MR. HOTALING:  I have a copy of it right here, Judge.

13         But let me ask you a question:  That's going to change

14    the whole projectory of the indictment, and then it's going to

15    confuse the jurors because if they got the original indictment

16    then they seeing this now.  Why are we making corrections?

17         MR. HOTALING:  They don't have the original indictment.

18         THE DEFENDANT:  Okay.  But why are we making corrections

19    now, though?

20         MR. HOTALING:  This is for your benefit.  And actually

21    the point of it --

22         THE DEFENDANT:  For my benefit?

23         MR. HOTALING:  Generally speaking, the benefit of the

24    defendant.  To remove the fact that a grand jury has in fact

25    returned an indictment, and meeting in its constituted form has

1 returned an indictment based on the grand jury procedures.

2     So as a general protection for the defendant, we remove

3 the references to the grand jury.  Similarly the signature block

4 at the very end in which it indicates the foreperson of the grand

5 jury.

6     Again, that's done for the general protection of ^the

7 defendant.  If he doesn't want that, absolutely.

8     THE COURT:  What was the other thing?  A signature?

9     MR. HOTALING:  There is a signature block at the very

10 end that says the United States Attorney and then there is a

11 signature block for the foreperson of the grand jury.

12     We generally remove that so, again, no references to

13 either the grand jury or to the United States Attorney as some

14 sort of sponsor or anything like that.

15     THE DEFENDANT:  Well, who is bringing though?  When you

16 remove the signature, we need a wet-ink signature on it.

17     MR. HOTALING:  No, you -- no, you don't.  No, you don't.

18     THE COURT:  But do you want to leave the signature?

19     MR. HOTALING:  The signature blocks.  We can leave the

20 signature blocks.

21     THE DEFENDANT:  But it wasn't signed nowhere.

22     MR. HOTALING:  Okay.  Now we are going off field --

23     THE DEFENDANT:  Okay.  Okay.

24     MR. HOTALING:  -- here.  So I don't know if we are going

25 to go --

1           THE DEFENDANT:  I'm going to lunch, Judge.

2           THE COURT:  Do you want the signature?  Do you want the

3    signature left on?

4           THE DEFENDANT:  I would like a wet-ink signature on it.

5    I would like to know who is bringing the case.

6           THE COURT:  Wait, wait.  The signature can't be changed,

7    in the sense of somebody else's name put there.

8           THE DEFENDANT:  But what if it was never signed, Judge.

9    The indictment was never signed.

10          MR. HOTALING:  Judge, you actually will have to go to

11   the 20th floor Clerk's Office, to the original case file to

12   actually -- a decision was made a number of years ago by the

13   district court clerk to not file on the docket the original

14   signed -- that has the original signed signature of the

15   foreperson of the grand jury.

16          That was done for privacy reasons with respect to the

17   foreperson.

18          So when you go onto the document, you will see an

19   indictment that's been returned, and the minute entry reflects

20   that a grand jury has returned the indictment, but the signature

21   blocks are blank.

22          Now, if you actually want to see the original signed

23   indictment, you do need to go to the 20th floor to the Clerk's

24   Office of the District Court on the 20th floor, get a copy of the

25   case file, and contained within the case file is the indictment

1    that has the original signatures of both the U.S. Attorney and

2    the foreperson of the grand jury.

3           So what I am proposing is, this is one that just has

4    blank signature blocks -- which I don't think has any value to

5    Mr. El Bey -- but if that's what he wants, we'll put that in.

6           THE DEFENDANT:  It doesn't matter.  It's all good.

7           THE COURT:  I'm sorry?  Do you want it in?

8           THE DEFENDANT:  You know what, it doesn't matter.  He

9    says it's in the docket on the 20th floor.  I'm going to go up

10   and see.  But other than that, it's no big thing.  It's no big

11   thing.

12          THE COURT:  I'm sorry.  I just didn't understand.

13          MR. HOTALING:  He wants to go up to the 20th floor.

14          THE DEFENDANT:  Yeah, I'm going to go up on my lunch.

15          THE COURT:  All right.  I understand the 20th floor, but

16   I didn't understand the end of your sentence.

17          THE DEFENDANT:  All right.  No, sir.  It does not have

18   to be on there.

19          THE COURT:  It doesn't have to be.  Okay.

20          THE DEFENDANT:  I'm good with that.

21          MR. HOTALING:  And one more procedural thing, Judge.

22          THE COURT:  Yes.

23          MR. HOTALING:  Now that we are moving toward the final

24   phase, I know that you would have liked to have kind of a

25   tutorial, for lack of a better term, about the next phase of the

426

1  case.

2       And I don't know if you wanted to discuss with him about

3  the rules about closing arguments, since that seems to be the

4  next thing we are heading into.

5       THE COURT:  Right.  I should.

6       Let me just ask you, Mr. Hotaling or Ms. Malizia, how

7  long do you think your closing argument will take?

8       MR. HOTALING:  I mean 30, 35 minutes or so.  Roughly in

9  that range for the opening close.

10      Rebuttal?  10, 15.

11      THE COURT:  How many minutes ^do you think you'd like,

12 Mr. El Bey?

13      THE DEFENDANT:  It's thinking no more than 15 or 20.

14      THE COURT:  Okay.  So before I mention the -- before I

15 give you your little briefing on the next phase, I think -- so we

16 will resume at 1:30.

17      And if you take a half -- or say you take 45 minutes,

18 including rebuttal, if you decide to rebut, and Mr. El Bey, say,

19 20 minutes.  So about an hour.

20      That means that I would read the instructions to the

21 jury at about a quarter of 3:00.  And then that probably takes

22 20 minutes.

23      Do you think the jury -- do you think it would be better

24 to have the jury deliberations begin then?

25      MS. MALIZIA:  Yes, your Honor.  We would ask they

1  deliberate at least until the end of the day, 5:00 o'clock.

2  　　　　THE COURT:  Just until 5:00 though.

3  　　　　MR. HOTALING:  It's obviously up to them.

4  　　　　MS. MALIZIA:  Yes.

5  　　　　MR. HOTALING:  It's up to the jury how long they would

6  prefer to deliberate.  I mean, if they --

7  　　　　THE COURT:  Well, no, there is a problem, right, because

8  I have to stay here.  I don't want to stay here all night.

9  Right?

10  　　　　MR. HOTALING:  That has --

11  　　　　MS. MALIZIA:  There is also staff, court reporters --

12  　　　　THE COURT:  So that's why I would like to not obviously

13  tell them how long their deliberations have to last, but to tell

14  them that if they don't have a verdict by 5:00, they should go

15  home and resume tomorrow morning.

16  　　　　MR. HOTALING:  I'm sure the jury would appreciate that.

17  　　　　THE COURT:  Pardon?

18  　　　　MR. HOTALING:  I'm sure the jury would appreciate that.

19  　　　　MS. MALIZIA:  And, your Honor, we will provide our

20  cellphone numbers to your clerk.

21  　　　　THE COURT:  Okay.  I appreciate that.

22  　　　　Okay.  So Mr. El Bey, let me just say something about

23  closing arguments.

24  　　　　They are very much like opening arguments, and what each

25  side tries to do is explain to the jury how the evidence, which

consists of the testimony, and including answers given on cross-examination, and the documents that were part of the record, how those -- that evidence supports the government's case when they are giving closing argument, your case when you are giving a closing argument.

It's not testimony.  It's not evidence.  I think I mentioned that to the jury.  I will certainly emphasize it again.

It's just an attempt to summarize everything and, you know, give a good argument for why you should be acquitted.  Of course, the government wants a conviction.

That's closing argument.

After that I instruct the jury, read the instructions, and then they go and deliberate.

Now, if they return a verdict quickly, say before 5:00 o'clock, then we will all reassemble and I will ask the jury for its verdict.  And then you have a right -- I guess both sides have a right, but I think it's mainly for the defendant -- you have a right to ask me to poll the jury.

And what that means is to make sure it really is unanimous -- because it has to be a unanimous jury -- I will ask each one whether this verdict, which the foreman or foreperson of the jury will have read, I will ask each of them whether this is their verdict.  And that's the end.

If you're convicted then there is a sentencing proceeding, but that's later.  Because the government, the

1  probation service does an investigation, and it can be several

2  months.

3        THE DEFENDANT:  Can I ask you a question?  You saying

4  they came back with a verdict and they found me guilty, will you

5  still me allow me to go home?  Or are you going to hold me in

6  custody?

7        THE COURT:  That -- you're on bail.  If the government

8  asks me to cancel your bail I'd have to consider their request.

9        MR. HOTALING:  We haven't thought about that, Judge.

10        MS. MALIZIA:  No.

11        MR. HOTALING:  We have not thought about that.

12        MS. MALIZIA:  And just a remainder, there would also be

13  a forfeiture phase following deliberations on guilt or innocence.

14        THE COURT:  Thank you.  I forgot already, but I'm

15  writing it down.

16        MR. HOTALING:  We also have some proposed instructions

17  that we are also happy to forward to you and to your clerk, so

18  that everything is -- if we do get to that second stage --

19        THE COURT:  The forfeiture, have you shown the

20  forfeiture instructions to Mr. El Bey?

21        MS. MALIZIA:  I tendered him a copy this morning, your

22  Honor.

23        THE COURT:  Okay.  Well, I will --

24        THE DEFENDANT:  No.

25        MS. MALIZIA:  I handed them to you and said it on the

1  record.

2      THE DEFENDANT:  Oh, something you handed to me.

3      MS. MALIZIA:  Yes.  You have got it.

4      THE DEFENDANT:  You did hand me something.

5      MR. HOTALING:  Judge, one thing that I missed, is it

6  your preference that the foreperson actually read the verdict or

7  is it something that you intend to read?

8      THE COURT:  I thought that was the standard.

9      MR. HOTALING:  Which?

10     THE COURT:  No.  You're right.  The foreman --

11 fore-whatever --

12     MR. HOTALING:  Foreperson.

13     THE COURT:  Seems like such an awkward construction --

14     MS. MALIZIA:  Or forewoman.

15     THE COURT:  -- hands the verdict up to me and then I

16 read it.

17     MR. HOTALING:  I think that's the more traditional way

18 to handle it.

19     THE DEFENDANT:  And one more question.  You said it

20 would have to be unanimous?

21     THE COURT:  Yes.  And one of the things I will do is

22 after the jury is instructed -- I mean after -- after the jury is

23 instructed then I will release the alternate jurors.

24     But I will remind them that they still must not discuss

25 the case or anything because what sometimes happens is that in

1  the course of the jury deliberations you lose a juror.

2          And then if not too much time has passed, an alternate

3  can be recalled and the jury starts from scratch with its

4  instructions.

5          Is that the proper procedure?  Am I leaving something

6  out?

7          MR. HOTALING:  No.  If there were to be the necessary

8  need to impanel an alternate, then deliberations would begin

9  afresh with the newly constituted alternate.

10         THE COURT:  If it's a short period.

11         We had a case, where two weeks after the jury had

12  delivered its verdict, it was discovered that one or two members

13  of the jury had criminal records that hadn't been disclosed, and

14  so they were excluded.  The jury recalled two jurors.

15         I thought it was too late.  That shouldn't -- but I

16  think I was dissent.

17         But if it's just hours or a day or so, then the

18  alternates will be recalled.

19         MR. HOTALING:  And you would instruct the jury that they

20  would have to begin their deliberations anew.

21         THE COURT:  From scratch.

22         MR. HOTALING:  From scratch with the new alternate.

23         THE COURT:  So does this cover it, I think?

24         MR. HOTALING:  Nothing more from the government.

25         THE COURT:  Okay, great.  So we will reassemble at 1:30

432

1    for closing arguments.

2            MR. HOTALING:  Thank you, Judge.

3            THE DEFENDANT:  Is it okay to leave my coat in here?

4            THE COURT:  I'm sorry?

5            THE DEFENDANT:  Is it okay to leave my coat?

6            THE COURT:  Oh, sure.  You can leave anything.

7        (At 12:24 p.m. proceedings recessed to 1:30 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

433

1                IN THE UNITED STATES DISTRICT COURT
                 NORTHERN DISTRICT OF ILLINOIS

2                     EASTERN DIVISION

3  UNITED STATES OF AMERICA,       )
                        )

4               Plaintiff,   )
                        )  No. 14 CR 447

5            vs.          )  Chicago, Illinois
                        )  March 4, 2015

6  HAKEEM EL BEY,             )  1:30 p.m.
                        )

7              Defendant.   )

8

                      VOLUME 3

9             TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE RICHARD A. POSNER

10                AND A JURY

11  For the Plaintiff:       U.S. ATTORNEY'S OFFICE
                      219 South Dearborn Street

12                      Chicago, Illinois 60604
                      BY:  MR. CHRISTOPHER HOTALING

13                        MS. KATHRYN E. MALIZIA

14  The Defendant:          MR. HAKEEM EL BEY
                      439 Hoxie Avenue

15                      Calumet City, Illinois 60409

16

    Defense Standby Counsel:   JENNER & BLOCK

17                      353 North Clark Street
                      Chicago, Illinois 60654

18                      BY:  MR. GABRIEL A. FUENTES

19  Official Court Reporter:   MAELLEN E. PITTMAN, FCRR, RDR
                      219 South Dearborn Street

20                      Room 2342
                      Chicago, Illinois 60604

21                      (312) 435-5576

22

23

24

25

Hotaling - Closing Argument                434

1      (Proceedings heard in open court:)

2           THE COURT:  So is there anything we need to discuss

3  before the jury is returned for the closing arguments.

4           THE DEFENDANT:  No.  We're set.

5           THE COURT:  Okay.  You can bring them in.

6      (At 1:43 p.m. jury in.)

7           THE COURT:  Good afternoon, ladies and gentlemen.  Thank

8  you for your presence.  Welcome.

9           So we now have two stages left in the trial.

10          First we are going to hear closing arguments from the

11 government and from Mr. El Bey.  And then I will give you the

12 jury instructions and then you will begin your deliberations.

13          So is the government ready to proceed?

14          MR. HOTALING:  Yes, your Honor.

15          THE COURT:  Okay.  Mr. Hotaling.

16          CLOSING ARGUMENT ON BEHALF OF THE GOVERNMENT

17          MR. HOTALING:  May it please the Court, ladies and

18 gentlemen of the jury, good afternoon.

19          The defendant in this case, Hakeem El Bey, is a tax

20 cheat.  He figured out a way --

21          THE DEFENDANT:  Excuse me, Judge.

22          THE COURT:  No.  Please don't interrupt.

23          THE DEFENDANT:  Okay.  But, Judge --

24          THE COURT:  You'll have your chance to make your closing

25 argument.

1          MR. HOTALING:  He figured out a way to pull a fast one

2    over on the IRS when he submitted tax returns in the name of a

3    trust that he created and in which he named himself as the

4    trustee and the beneficiary.

5          As part of his -- as part of the scheme that he

6    concocted he submitted six false trust tax returns to the IRS, in

7    each of which he claimed the astonishingly high refund amount of

8    $300,000.

9          Now, ladies and gentlemen, let's put this in

10   perspective.  That's six returns, each of which he claimed had a

11   $300,000 refund, for a total amount of claimed refunds of $1.8

12   million.

13         And as you now know, because of the way that the IRS

14   works, they actually paid out on two of those refunds, two of the

15   $300,000 refunds, for a total of $600,000:  Checks that the

16   defendant accepted, checks that the defendant deposited in

17   special bank accounts that he opened in the name of his trust at

18   Wells Fargo Bank.

19         Money which he then used to go on a months' long

20   spending spree in which he purchased a new house and multiple new

21   cars.  His was a fairly simple scheme, but one that netted him a

22   very big payday, all at the expense of the United States

23   Treasury.

24         Now, ladies and gentlemen, before I begin talking about

25   the evidence that ^we have seen and heard during the course of

1  the trial I want to spend a few moments and talking about the

2  charges that the defendant is facing.

3         Now, as Judge Posner is going to instruct you, the

4  defendant has been charged in what's called an indictment.  An

5  indictment is, very simply, the way in which a person is informed

6  of the charges he is facing.

7         The indictment in this case, a copy of which you will

8  have, the defendant is charged in eight separate counts.  Counts

9  1 and 2 charge the defendant with a mail fraud scheme.

10 Essentially submitting all of those tax returns to the IRS in the

11 hope of getting all of those refunds.

12        That's Count 1 and 2, mail fraud.

13        Counts 3 through 8 charge the defendant with the crime

14 of filing a false claim with the United States, each one of those

15 six fraudulent tax returns that's been submitted to the IRS

16 claiming those refunds.

17        So -- and something else that I expect that Judge Posner

18 is going to instruct you on, that with respect to those three

19 charges -- or actually all eight charges, but two counts of mail

20 fraud and six counts of filing a false claim -- each one of those

21 offenses has what are called elements, and the government has the

22 burden of proving each one of those elements as to each of the

23 crimes that the defendant is facing beyond a reasonable doubt.

24        That's a burden that rests with the government

25 throughout this entire case.  It exists right now, it exists when

1  Mr. El Bey talks to you, it exists until you walk into that room

2  and begin your deliberations a little bit later this afternoon.

3         Proof beyond a reasonable doubt is a high burden, but

4  it's one that we, the government, have met in this case.

5         So let's start talking about the evidence that we have

6  seen and how those mesh up with the offenses that the defendant

7  has been charged.  And principally I'm going to spend the bulk of

8  my time with you today talking with Counts 1 and 2, the mail

9  fraud.  But I will also talk about the false claim counts,

10 Counts 3 through 8.

11        And as part of that, what I'd like to do is put up on

12 the screen in front of you, it's on the screens in front of you,

13 I'm going to put up what those four elements are for the offense

14 of mail fraud.

15        Now, you should have those all up on the screens in

16 front of you.

17        There are four elements to the offense of mail fraud:

18        Number one, the defendant knowingly devised or

19 participated in a scheme to defraud as described in the

20 indictment.

21        The defendant did so with the intent to defraud.

22        The scheme to defraud involved a materially false or

23 fraudulent pretense, representation or promise.

24        And that the fourth, for the purpose of carrying out the

25 scheme or attempting to do so the defendant caused the use of the

1  United States mails.

2          So those are the four elements that the government has

3  an obligation to prove beyond a reasonable doubt.

4          Now, I would like to now focus -- I want to focus now

5  and drill down a little bit more on the first two elements:  The

6  scheme to defraud and the defendant's intent to defraud.

7          And I expect that the Judge is going to give you the

8  following instruction that defines what a scheme to defraud is:

9          A scheme is a plan or course of action formed with the

10  intent to accomplish some purpose, and that a scheme to defraud

11  is a scheme that is intended to deceive or cheat another and to

12  obtain money or property or cause the potential loss of money or

13  property to another by means of materially false or fraudulent

14  pretenses, representations, misrepresentations or promises.

15          That's what a scheme to defraud is.

16          Next, what about intent to defraud?  A person acts with

17  the intent to defraud if he acts knowingly with the intent to

18  deceive or cheat the victim in order to cause a gain of money or

19  property to the defendant or another, or the potential loss of

20  money or property to another.

21          So now let's talk about what you've seen and heard

22  during the course of the trial that goes to show that the

23  government has met those two elements beyond a reasonable doubt.

24          And in doing so I'd like to refer back to -- refer you

25  back to the testimony yesterday from Agent Bodner and that flow

1  chart that he testified about that was admitted as Government

2  Exhibit Summary Chart 1.  I'm going to put it up on the easel for

3  you today.

4          Ladies and gentlemen, this is the roadmap of the

5  defendant's scheme to defraud as well as the evidence of his

6  intent to defraud.

7          So let's start talking about it.  The defendant's scheme

8  to defraud really kicked off and got into high gear in August

9  of 2009.  Because that was the days, you heard the testimony from

10 Agent Bodner, Kristy Morgan and Agent Ponzo, that the defendant

11 submitted those three form 1041 trust returns for his trust, the

12 Hakeem El Bey Trust, for tax years 2006, 2007, and 2008.

13         So what was actually, as you heard during the testimony

14 there was lots about those particular returns that were

15 suspicious on their face.  And I'd like to highlight a couple of

16 those for you ^are right now.

17         Number one, you heard the testimony from Agent Kristy

18 Morgan regarding the EIN, or the employer identification number,

19 that was assigned and written on each one of these three trust

20 returns.

21         She told you that that EIN number, or that EIN, was

22 assigned to the defendant's trust on August 10th, 2009, a mere

23 four days before the IRS received these trust returns four days

24 later.

25         Now, ladies and gentlemen, there was some sort of

1  suggestion that perhaps the EIN was associated with or that the

2  trust was established at or around the time that the defendant

3  was born.  That's -- there is no evidence to support that.

4          This trust was created four days before he submitted

5  these trust returns.  The trusts were created simply as the means

6  by which he could facilitate his fraud against the Treasury.

7  Four days before than they were received.

8          Now, what else about those trust returns were suspicious

9  on their face?  Well, again, you heard the testimony from Kristy

10 Morgan, and she told you that these three returns, IRS 3 for tax

11 year 2006, IRS 4, the 1041 return for tax year 2007, and IRS 5,

12 the 1041 for tax year 2008, they were all submitted to the IRS on

13 the same day in the same envelope.  Three trust returns for three

14 separate years, all submitted on the same date.

15         As Agent Ponzo told you and Agent Morgan told you,

16 that's very, very bizarre.  Even the 2000 -- even the 2008 return

17 which was submitted in August of 2009, if it was timely, it

18 should have been filed many months earlier in April of 2009.

19 Bizarre.

20         They were all stuffed together in one envelope, all with

21 the intent to try to get the IRS to pay out on those returns.

22         Additionally, and on top of that, you also heard the

23 testimony from Miss Morgan that at the end of October 2009, so

24 about two and a half months after the IRS received these returns,

25 they sent -- the IRS meaning -- the IRS sent the defendant

1   frivolous filer letters, and you heard -- you saw those up on the

2   screen and you heard testimony about those frivolous filer

3   letters, which told the defendant in no uncertain terms that

4   there was no basis in law for the claims that were contained in

5   his trust returns.  He was told flat out by the IRS that these

6   returns were fraudulent.

7           It said it straight on the face of documents.  He

8   received these letters directly from the IRS:  These returns are

9   fraudulent.  And because of that you had a couple different

10  options.

11          Number one, you could file amended returns for these

12  ^particular particular entities, and if you didn't file the

13  amended returns within 30 days you were subject to a $5,000

14  penalty per return.

15          Now, again, you received those returns -- he received

16  those frivolous filer notices.  Did that stop him in ^in any way?

17  Did that deter, did that turn him away from what the scheme was?

18          No.  You know that.  He kept marching right forward.

19  Because again, after he received those notices, after he mailed

20  them back in December 2009, he filed another false trust tax

21  return, in May 2010 he filed yet another false trust tax return,

22  and then in November 2010 another.

23          Now, ladies and gentlemen, I have been spending a lot of

24  time talking about these three returns.  And I just want to spend

25  just a couple minutes talking about the meat of those returns and

1  why those returns were fraudulent.

2          And I'm referring your testimony -- referring you back

3  to the testimony of Agent Ponzo, so he walked through each one of

4  those returns and he showed you exactly why those returns were

5  fraudulent.

6          And what I'm going to put up on the screen for you now

7  is, again, IRS 3, which is the 1041 trust for the Hakeem El Bey

8  Trust for tax year 2006.  Now, this return that I'm putting up

9  there is identical in every significant way to all of the other

10 tax returns that we've talked about during this trial, the

11 remaining five that are referred to up here on the board.

12         So what is it about this particular return and all

13 returns that were fake?

14         Well, number one, as you can see on the screen in front

15 of you, they all were filed in the name of the Hakeem El Bey

16 Trust with the defendant listed as the trustee, the same employer

17 identification number, the same date of creation, the same

18 reference to the fact that it's a simple trust.

19         Moving down to the next section, the income section,

20 every single one of these returns claimed the exact same amount

21 of total income:  $900,000.

22         As Agent Ponzo told you, that was very suspicious

23 because even looking at the face of the form itself, there is

24 nothing to document where that $900,000 comes from.  In fact, the

25 only thing that's on this form is a bunch of zeros:  0 plus 0

1  plus 0 doesn't equal $900,000.

2          For purposes of this return, it certainly did.

3          And as Agent Ponzo also told you, there was no

4  supporting documentation, there were no schedules that showed

5  additional income or capital gains or anything.  There was

6  nothing to substantiate that $900,000 number.  It was just pulled

7  out of thin air.

8          Moving down to the next section, the deductions section.

9          Again, on each one of these returns the defendant

10  claimed the same amount of fiduciary fee deduction:  $900,000

11  fiduciary fee deduction, a convenient number because it basically

12  zeros out all of his income:  900,000 deduction, taking away the

13  $900,000 in income.

14          Now, how else -- now, why do you know that that

15  fiduciary fee deduction number is bogus?

16          Well, as Agent Ponzo again told you, that if it was

17  legitimate, any fiduciary who received that much money had an

18  obligation to claim that money as income on the fiduciary's own

19  trust -- I mean, his own personal tax return.

20          And as Agent Ponzo told you, he went and looked at

21  Hakeem El Bey's personal return, and there is no reference

22  whatsoever to his receipt of almost $1 million in fiduciary fees.

23          It's not on there.

24          Again, it's a number that he made up.  That deduction is

25  a fiction, a fiction that ^you he needed in order to zero out

1  that income, because zeroing out is important because as you move

2  down to the exemption, the $7,950, Agent Ponzo once again told

3  you the standard exemption for a simple trust like the Hakeem El

4  Bey Trust was $300, no more, no less.

5        But the defendant jacked that exemption from $300 all

6  the way up to $7,950.  How?  Why?  There is no explanation.  It

7  wasn't proper.  It wasn't legal.  Because as Agent Ponzo told

8  you, the number is only allowed to be 300.

9        So with a $7,950 exemption we move down to the next box,

10 the tax and payment box.  And again, ladies and gentlemen, it's

11 the same numbers for every single return in this case.

12       Because he had that $7,950 exemption, and because he had

13 no tax because it was zeroed out with the $900,000 income

14 deduction, you have taxable income of a negative number.  That

15 means that the trust wasn't subject to any taxes because of the

16 way he was jimmying the numbers.

17       Moving down to the next Box 24-E, he claims $300,000 in

18 withholdings.  Where did that come from?  Withholdings from who?

19 Was there a bank that was holding it?  Was there an employer?

20       No.  There is no document.  There is no evidence to

21 support that any entity whatsoever claimed they will be holding

22 $300,000 in money for the defendant's trust.  Again, that's a

23 number that's made up.

24       And that's important because that $300,000 then

25 transfers down to the very bottom on Line 29, where he is saying

1   he was overpaid $300,000 and claims a refund in that same amount,

2   $300,000.

3           Everything, everything, everything about this document

4   is totally made up.  He knew it was made up.  He knew that that

5   was the way that he could get money, and that's why he filled out

6   the forms in the way that he did; to claim and to get his hands

7   on a refund of $300,000.

8           And again, to make sure that there is no dispute or

9   there is no question about who actually submitted these returns,

10  again, the defendant, his signature down at the bottom:  Hakeem

11  El Bey.  His signature is on the bottom of each one of these

12  returns, signed under penalties of perjury, in which he is

13  attesting and certifying to the fact that the IRS, that the

14  information in that return was true, accurate and correct.

15          But we know it wasn't true, accurate and correct.  But

16  that was the representation he made to the IRS when he signed

17  these returns in that box.

18          Now, let me reinforce the point again:  This return is

19  identical in every way, in every meaningful significant way to

20  all of the other returns in this case.

21          The defendant signed each one of these returns, he

22  claimed the same $300,000 refund in each one of these returns, he

23  did it on three occasions -- on August 4th -- 14th, 2009, when

24  the IRS received these returns, he did it again on December 8th,

25  when the IRS received yet another return in December for the 2008

1  tax year, he did it again in May of 2010 for the 2009 tax year

2  for his trust, and he did it a fourth time in November 2010 for

3  tax year 2007.

4           He submitted all of these returns with the singular goal

5  of cheating the United States Treasury out of hundreds of

6  thousands of dollars, money that he had absolutely no legal right

7  to.

8           Ladies and gentlemen, that's pretty compelling evidence

9  of both a scheme to defraud and his intent to defraud.

10          But there is more.

11          You know that the IRS did not accept this particular

12  return that was received on August 14th, 2009.  He submitted

13  those -- they sent him the fraudulent filer letters.  He returned

14  those letters back.  But nevertheless, he went another shot in

15  December where he submitted a return in December 2009 which was

16  received on December 8th.

17          Now, this time it was different.  You know it was

18  different.  Because what happened here, the IRS actually issues a

19  $300,000 refund check to the defendant's trust one month later on

20  or about January 5th, 2010.

21          And you know what he did with that money.  He

22  immediately goes and deposits it -- or shortly thereafter will

23  deposit it -- into one of his special Wells Fargo accounts, ^ann

24  account that at the time he deposited it had a negative balance,

25  and the only deposit items that were going into that account were

1  money that he was receiving from his job at the postal service.

2         As you now know, that $300,000 check that the defendant

3  received was burning a hole in his pocket.

4         So what does he do?  Even before he deposits it into his

5  account he goes to Shaffer Hyundai on January 9th and purchases a

6  brand new 2010 Hyundai Genesis for about $27,000.

7         Once the check is actually deposited into his account,

8  he buys another car, a 2011 Hyundai Sonata for around $27,000,

9  and then one month later he makes a really big purchase:  He goes

10 and negotiates the purchase of a house at 439 Hoxie Avenue in

11 Calumet City.

12        You will have those records back there.  You will have

13 those records back there with you in the jury room.  You will see

14 a copy of the cashier's check.  He went to the bank, Wells Fargo

15 Bank, and went to the title -- he went to the settlement, the

16 closing at Stewart Title, and he paid for that house in cash.  No

17 mortgage.  In cash.  $120,000.

18        Now again, ladies and gentlemen, this is proof of a

19 scheme to defraud and his intent to defraud.  If he has -- if he

20 was going to -- if he was going to cheat the United States

21 government out of hundreds of thousands of dollars, he was going

22 to make sure that he got his money's worth.  These were all big

23 ticket purchases that he made in his name, using an account in

24 the name of his trust that he had exclusive control over.

25        Now, seeing the success that he had in January -- excuse

1  me -- in December in connection with this particular check, and

2  after, and also realizing that his money was starting to

3  decrease, because in fact in the 5730 account, by the beginning

4  of April 2010, it was almost down to a thousand dollars.  He had

5  whittled the 300,000 down to a thousand.

6        In order to keep his scheme going, he tried it again.

7  He submits yet another trust return to the IRS that was received

8  by the IRS on May 24th, 2010, for tax year 2009 for his trust.

9        And again, as you know, just about a month later the IRS

10  issued a refund check in the amount of $300,000.

11        Now, I want to stop here and talk for a brief moment

12  about the IRS.  Undoubtedly many of you have some questions and

13  it was a question that Mr. El Bey raised on cross-examination:

14  How could it be that the IRS, who sent frivolous filer letters

15  and notices to the defendant in connection with these earlier

16  ones, how could it be that they turned around and allowed these

17  subsequent trust returns to go through and to actually pay

18  $300,000 in refunds to the defendant?

19        Well, you know the answer, and Kristy Morgan told you

20  what's going on here.  The IRS is a very large government agency.

21  She testified that on a yearly basis they process close to 150

22  million personal income tax returns.  They process close to 47

23  million business and trust returns.

24        That is a lot of returns.  And they don't have the

25  ability to go through every single one of those hundreds of

1  millions of returns and do a hard-scrubbing of each one of those

2  returns.

3          Instead, what they do is they rely on the good faith, on

4  the honesty of the taxpayers who submit their returns to the IRS.

5          When a taxpayer submits that return with that

6  certification under penalty of perjury that it's true, accurate

7  and correct, they rely on that.  They have to rely on it.

8          Because it's simply too many returns for them to do the

9  hard push-through and the hard top to bottom look-through that

10 would have caught this return if that was something they had the

11 opportunity to do, but they don't.

12         The sheer volume means that they must rely on the good

13 faith, honest statements and representations of taxpayers.

14         That's why they paid them out.

15         Now, it's unfortunate that they did.  There is no doubt

16 about it.  But that doesn't excuse the defendant's decision to

17 exploit that, his decision to execute this fraud, his decision to

18 go ^head and submit what he knew to be fraudulent returns

19 exploiting what he knew to be a loophole, in the way exploiting

20 that loophole in the IRS system and he took advantage of it and

21 paid them out.

22         Again, it's unfortunate but it's reality.  The way it

23 works.

24         Now, the fact that the IRS paid these things out

25 unfortunately doesn't justify though, A, the scheme that he

1    engaged in, and also all of the significant purchases that he did

2    after he received the money.  With that check burning in his

3    pocket again, he went and made a number of very, very big

4    purchases.

5            In August -- in June of 2010 he bought a 2011 Hyundai

6    Sonata for $26,000, July 9th he purchased another car, a 2010

7    Jeep Patriot for 21 thousand five-four-59, on August 13th he made

8    yet another car purchase for a 2010 Buick LaCrosse.  About two

9    months -- about two weeks later, excuse me, August 28th, 2010, he

10   purchased a 2011 Jeep Grand Cherokee for $36,000, and about a

11   month and a half later he purchased a 2010 Hyundai Genesis for

12   25,107.

13           Ladies and gentlemen, those again, those are all very

14   significant big-ticket purchases that the defendant himself made

15   in his own name.

16           And those are just the big-ticket items.

17           You also heard Agent Bodner testify about that pie chart

18   and all of those miscellaneous withdrawals and expenditures that

19   he had for things like furniture, electronics, jewelry, and any

20   number of different things, and he used all that money he

21   received on personal expenditures.

22           And again, because he was spending so much money so

23   quickly, as you know, down here at the bottom he tried it once

24   again, one last time:  He submitted an additional fraudulent 1041

25   trust return for his trust for tax year 2007.  It was received by

1  the IRS on November 29th, 2010.

2          Thankfully, as you know, the IRS caught wind of the

3  defendant's scheme.  They shut it down and didn't pay the refund.

4          So, ladies and gentlemen, this is a lot of evidence that

5  goes to the defendant's scheme to defraud as well as his intent

6  to defraud.

7          There is one more piece of evidence I want to touch on,

8  and that is, again, the statement that you heard this morning

9  from Agent Greg Howard.  And he told you about the interview that

10 he had with the defendant in December 2010.  The defendant

11 voluntarily came to the IRS office, and the agents asked and

12 confronted the defendant with the different tax returns that he

13 had submitted.

14         In the course of that interview, the defendant admitted

15 that he filed those returns, all of them, that he signed those

16 returns, all of them, that he claimed those $300,000 refunds on

17 all of them, and that he did, in fact, receive those two $300,000

18 refund checks and deposited them into his Wells Fargo account.

19 All of those were admissions.

20         And then when confronted about the particular face of

21 the return itself, you heard Agent Morgan tell you -- Agent

22 Howard tell you that the $900,000 income number was a another

23 number he basically made up as well as the fact that he never

24 received $900,000 in fiduciary fees.  Again, he made it up.

25         So when you have the defendant's statement, combined

1  with all of the evidence that you have seen and heard, what we

2  have, and so that essentially, ladies and gentlemen, establishes

3  beyond a reasonable doubt the first two elements of the offense:

4  The scheme to defraud and his intent to defraud.

5          Now, I just want to talk briefly about the last two

6  elements.

7          First, that the defendant -- the scheme to defraud

8  involved a materially false or fraudulent pretense,

9  representation, or promise.

10          Now, the misrepresentations that we are talking about

11  here is everything that's in those returns.  He used the false

12  information about the total income, the false information about

13  the fiduciary fee deductions, the false information about the

14  exemptions, the false information about the withholdings, the

15  false information about the claimed refund.

16          So that's what we are talking about, the

17  misrepresentations.

18          So the question that we want to talk about right now is,

19  were those material.  And Judge Posner is going to define for

20  you -- is going to explain to you that a false or fraudulent

21  pretense is material if it is capable of influencing the decision

22  of the IRS to whom it was addressed.

23          Well, again, I touched on this -- and let me make it

24  clear once again -- the answer to that is yes.

25          Kristy Morgan told you that the IRS relies on the good

1  faith, honest information provided by taxpayers under penalty of

2  perjury when they submit their tax returns.

3         When the defendant submitted his trust return to the

4  IRS, he certified under penalty of perjury that the information

5  was true, accurate, and correct.  We know it wasn't, but the IRS

6  was certainly entitled to and did, in fact, rely on that

7  information.

8         We know that they relied on it because, in fact, for two

9  of them, they accepted those returns and paid out $300,000 in

10 refunds or $600,000 in refunds.

11        So, ladies and gentlemen, the government established

12 those misrepresentations were material.

13        Finally, the last element for mail fraud, that for

14 purposes of carrying out the scheme, the defendant caused the use

15 of the United States mails.

16        Now, as I mentioned at the very beginning of my opening,

17 there were two counts of mail fraud.  Count 1 addresses each --

18 Count 1 addresses one particular mailing, and Count 2 addresses a

19 second.

20        Count 1 addresses the mailing on or about January 5th,

21 2010, of the Treasury check from the U.S. Treasury to the

22 defendant's trust.  So this is Count 1, this box right here,

23 Count 1.

24        Count 2 is the June 22nd, 2010, mailing of the $300,000

25 refund check to the defendant's trust.  So this green box,

1  Count 2.

2          So what proof did you hear about the mailings?  Well,

3  again, you heard testimony from Kristy Morgan and Agent Bodner

4  who told you that it was the practice of the IRS during this time

5  period to generate paper refund checks for trusts.  And you

6  actually saw copies of those paper refund checks during the

7  course of this trial.  You saw it was paper because you actually

8  saw the back of the -- the signature endorsements on the back.

9          And they also told you that those particular paper

10  checks were -- it was the practice of the IRS to mail those

11  refund checks to the intended recipients.

12          And again, you know that these checks were mailed

13  because you actually saw on the top of the check the words

14  Austin, Texas, because those checks were generated in Austin,

15  Texas, stuck in the mail in Austin, Texas, and then mailed to the

16  defendant at his residence here in Illinois.

17          That, ladies and gentlemen, is Count 4 and, ladies and

18  gentlemen, that is proof beyond a reasonable doubt as to Counts 1

19  and 2 of the indictment.

20          Now I want to talk about Counts 3 through 8, the false

21  claims counts.  A lot of the information I have already talked to

22  you goes to these same ones.  We will be able to do these fairly

23  quickly.

24          Again, there are four elements as to the false claims

25  acts for Count 3 through 8.

1          Number one, the defendant made, presented, or caused to
2    be presented a claim against the United States Department of
3    Treasury, the Internal Revenue Service, the claim as materially
4    false, fictitious, or fraudulent.  The defendant knew the claim
5    was false, fictitious, or fraudulent and, four, the defendant
6    acted with the intent to defraud.
7          With respect to element one, each one of these
8    particular six fraudulent trust returns corresponds to a
9    different count in the indictment.  So we have got a chart that
10   kind of backs that up.  You have it in front of you.
11         Count 3 is the August 14th, 2009, Form 1041 for 2006.
12   Count 4 is the second of those returns submitted on August 14th
13   for tax year 2007.  Count 5 is the third tax return received on
14   August 14th, 2009, for tax year 2008 for the defendant's trust.
15   Count 6 is the December 8th, 2009, return received by the IRS for
16   tax year 2008.  Count 7, May 24th, again.
17         And all of these -- this is Counts 1, 2 and 3, 4, 5 --
18   I'm sorry, 3, 4, 5, 6, 7 and then Count 8, the January -- excuse
19   me -- the November 29th, 2010, tax return for tax year 2007.
20         Each one of those returns, a separate count.  We have
21   established that those were submitted and submitted to the IRS.
22   That is element one.
23         Two, the claims were materially false, fictitious, or
24   fraudulent.  Again, we have already talked about that, talked
25   about it extensively.  You heard the testimony of Agent Ponzo

1  about all the information in those returns and why that

2  information was false and fraudulent.

3          It was material because, again, Agent Kristy Morgan told

4  you that the IRS relied on the information in those claims in

5  deciding whether or not to issue a refund.  Element two,

6  satisfied.

7          Three, the defendant knew the claims were false,

8  fictitious, or fraudulent.  The defendant admitted it.  He

9  admitted it to Agent Howard who told you about that this morning.

10          Also again, like I've already talked about, these

11  returns didn't make sense on their face.  They were filled with

12  fake numbers, fake information.  He knew that those claims were

13  false, fraudulent, fictitious.  Element three, satisfied.

14          And finally, that the defendant acted with the intent to

15  defraud.  Everything that I talked about earlier in connection

16  with the intent to defraud element as to the mail fraud counts

17  applies with equal force here to these particular claims.

18          The defendant knowingly submitted those returns, those

19  trust returns to the IRS, all with the singular goal of enriching

20  himself with hundreds of thousands of dollars in refunds that he

21  was simply not entitled to.

22          He did it with the intent to get himself money he should

23  never have gotten in the first place.  And, ladies and gentlemen,

24  that is proof beyond a reasonable doubt to all four elements of

25  offense as to Counts 3 through 8.

1          Ladies and gentlemen, during the course of this trial,

2     the defendant's scheme has been laid bare.  The defendant

3     submitted tax returns to the IRS claiming hundreds of thousands

4     of dollars, and he did it repeatedly over the course of over a

5     year.

6          Throughout this trial one thing has been made crystal

7     clear:  The defendant is a tax cheat, pure and simple.  And that

8     is why I am asking, we are asking, the government is asking when

9     you go into that jury room and begin your deliberations, you

10    return the verdict that is consistent with all of the evidence

11    that you have seen and heard during the course of this trial:

12    Verdicts of guilty on each and every count of the indictment.

13          Thank you.

14          THE COURT:  Mr. El Bey.

15          THE DEFENDANT:  Yes, sir.

16          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

17          THE DEFENDANT:  Good afternoon, jury.  I want to make a

18    little brief --

19          COURT REPORTER:  Mr. El Bey, I can't hear you.  I'm

20    sorry.

21          THE DEFENDANT:  Okay.  I'm sorry.

22          I'm going to make a little short statement real quick,

23    and then I will get into detail as to the truth of everything.

24          First, I want to say the government testimony of fraud

25    and mail fraud and anything unlawful hasn't been proven beyond a

1    reasonable doubt.

2           The only thing proven is I spent the funds received from

3    the trust created at birth.  So now I'm going to continue now.

4           I have worked 30 years for the government, and I think

5    you all know that if anyone submits forms constantly using the

6    same information, signing their name, they are only doing what

7    they know is legal.

8           I would never do anything fraudulent and get myself in

9    trouble.  I wouldn't ask for nothing that I know I couldn't have.

10   I wasn't hurting.  I made a good salary at the postal service.

11          So what I want to show you all is that everything that

12   they have said was a lie.  It's not true.  I never talked to this

13   officer.  When I did talk to him, I only talked to him about my

14   knee replacement, which is why I'm off work now.

15          And we only talked about, he wanted to know about

16   anybody else who knew what I was doing.  Okay?  He wanted to

17   know, did I show this to anyone else.

18          And I'm like, no, I do everything by myself.  I say I

19   study law.  That's what I do.  And everything I do is lawful.

20          And I think you all know that the Internal Revenue

21   Service would not just keep letting you do that without putting

22   you in jail.  I know we all know, we file our taxes.  I filed my

23   taxes every year.  I paid my taxes every year until I realized

24   what I could do.  And I did it.

25          And so we talk about those first, the first three tax

El Bey - Closing Argument                    459

1    years that he mentioned:  '6, '7 and '8.  When I first came into

2    knowledge and understanding that at birth a trust is created for

3    you, and so I used the trust.  I looked and I found out what I

4    could do.  And I did it.

5           And so they denied me my first three times.  And I'm

6    like, okay.  So I say, you know what, I have to know.  I want to

7    know.  I called Internal Revenue Service.  I talked with them on

8    the phone.

9           MR. HOTALING:  Judge, I'm sorry.  This assumes facts not

10   in evidence.  There is nothing --

11          THE DEFENDANT:  We said we wasn't going to interrupt,

12   Judge.  Here we go.

13          So I found out, I talked to agents over the phone.  They

14   told me certain things that I could or could not do.  So I

15   resubmitted.  And when I resubmitted, I received.

16          In the process, as the government is saying with Wells

17   Fargo, you can't get trust money and not put it in a trust.  So I

18   opened up my trust and put it in the trust in the name of the

19   trust.

20          And the name of the trust is, it was Hakeem El Bey's

21   trust.  I put it in there.  And we had to have a trustee on it to

22   disburse the money.  So I made myself the trustee, so be

23   responsible for it.

24          So because if you use money the wrong way, you are

25   responsible for it.  And as you say, the perjury on the Internal

El Bey - Closing Argument                     460

1    Revenue, we all know about that.  But as you saw, I put "ARR,"

2    all rights reserved.  That means I reserved my rights.

3            So, but anyway, so I opened the trust and I -- you know,

4    I bought the necessary vehicles to do what I was meant to do.

5    And then I needed the property to continue to do what I needed

6    do, so I bought the house.  It's all in the trust.

7            And I bought the house, again, because I'm a minister,

8    and I preach and I teach and I give service on Sundays.  So I

9    bought everything.

10           THE COURT:  Mr. El Bey, I have to interrupt you.  As I

11   said, the closing argument is not evidence.

12           THE DEFENDANT:  Okay.

13           THE COURT:  You have to confine yourself to the evidence

14   that has been introduced.

15           THE DEFENDANT:  Okay, Judge.  I'm sorry.

16           THE COURT:  There is no evidence about ministry.

17           THE DEFENDANT:  I see your point.

18           So anyway, I resubmitted again because as I talk to the

19   Internal Revenue Service agents, they told me that it was lawful.

20   I do anything that's lawful, not legal -- I mean, not legal-wise,

21   but I do everything lawful that the law permits me to do.

22           MR. HOTALING:  Judge, I'm going to have to object to

23   conversations that he had with the IRS agents that's not in

24   evidence.

25           THE DEFENDANT:  Okay.  I been limited all through the

1  trial, but anyway.

2          So anyway, I continued to file again, and I did receive

3  another check.  And so I continued to, you know, do what I do.

4  You know, I can't say certain things but, anyway, I continued to

5  do what I was born here, put here to do.

6          And so anyway, I submitted and submitted six times.  And

7  it's all lawful.  I wouldn't have done it if I wasn't instructed

8  and told it was legal by an agent.  So what I did was lawful and

9  so --

10          MR. HOTALING:  Judge, I can't --

11          THE DEFENDANT:  So I --

12          MR. HOTALING:  Judge, I'm sorry.

13          THE COURT:  Let him finish his sentence.

14          THE DEFENDANT:  So anyway, you know, I was -- okay.  I

15  can't say that because he say I can't say.  I don't want to get

16  burnt up the wrong way.

17          But anyway, what I did, after I filed -- and I talked

18  with the IRS agents.  Actually when they came to my house, he

19  left a card, and I wasn't there at the time.

20          So I called him and I said:  I see you left a card at my

21  house.

22          He said:  I did.  He said:  I just want to talk to you

23  about something.

24          I said:  That's no problem.

25          He said:  When will you be free?

1          I said:  Well, probably Friday.  I said:  I have a
2    funeral to attend but I --
3          THE COURT:  Well, Mr. El Bey, I don't think this is --
4          THE DEFENDANT:  Okay.  Okay.  I'm just trying to let
5    them know what our conversation was, me and --
6          THE COURT:  Well, I know, but that's testimony.
7          THE DEFENDANT:  Oh, okay.  I'm sorry.
8          But anyway, I went and saw him.  And when we talked, he
9    asked me about -- he only asked me about the 1099 OIDs, and I
10   told him -- he asked me this.  But anyway, I'm going to get on
11   this.
12         I passed you all a sheet here, and the sheet was, it was
13   an overpayment the IRS sent to me and told me:  Hey, so one of
14   your trusts, you made an overpayment.  So what we did, we applied
15   it to your 2009 trust.
16         And I said:  Oh, okay.  No problem.
17         So my point to you all is, if I did anything illegal,
18   why did they send this to me and tell me that I had an
19   overpayment?  If they didn't know what I was doing was legal, why
20   did they tell me this was legal?
21         IRS don't make those kind of mistakes.  And you all know
22   they don't.  It's they coming to get it or they going to shut
23   your bank account down.  They not once shut my bank account down.
24         So what I'm saying to all is, I know you're all not
25   buying this because that's not true.  Why would they send me

1  $600,000 and you think they don't know it?  That's not true.

2  They are not going to send me $60 and don't know it.

3         So my point to you all is, you know, then they tell me

4  this is mail fraud.  Mail fraud, in the way he described it, is

5  he said, I sent it through the mail.  Okay.  So whatever you send

6  through the mail, if you don't cancel it out, it's fraud.

7         But I didn't send it.  I sent it through -- I took it to

8  the mail.  The postal service stamped it.  Anytime you got a red

9  stamp and it's not cancelled out, it could be mail fraud.

10        So if they want mail fraud, they couldn't get me for it,

11 they have to go to the postmaster general because he the one that

12 did it.  The postal service supposed to know what they do.  I

13 work for them.  I know what they do.

14        They supposed to cancel out that stamp and make it

15 black.  So if they didn't do that, then it's not on you, it's on

16 the postal service.  The postal service is very powerful, and you

17 really need to look into them.

18        And so, but anyway, jury, what I'm trying to tell you

19 all is this:  I didn't do anything illegal.  I don't hurt nobody.

20 I don't have a record.

21        My thing is this.  I'm going to do everything that's

22 lawful because I'm -- you know, I done got old now.  I'm not

23 trying to hurt nobody.

24        So that's my speech.

25        THE COURT:  Okay.  Thank you, Mr. El Bey.

1          Mr. Hotaling, do you have any rebuttal?

2          MS. MALIZIA:  We have brief rebuttal, your Honor.

3          THE COURT:  Excuse me?

4          MS. MALIZIA:  We have a brief rebuttal.

5          THE COURT:  Okay.

6          REBUTTAL ARGUMENT ON BEHALF OF THE GOVERNMENT

7          MS. MALIZIA:  The defendant realized what he could do,

8    and he did it.  And what he did was defraud the IRS.

9          He made up a bunch of bogus numbers, put them on tax

10   forms six separate times, and he sent each of those forms to the

11   IRS.

12         And he knew exactly what he was doing, ladies and

13   gentlemen, because after he sent in the first three of those

14   returns, the IRS told him there was no basis in law for any of

15   his claims for a $300,000 refund.  They actually told him what he

16   had done was frivolous and false.  But he did it again.

17         And when he got that first refund check, what did he do?

18   He deposited it in his bank account knowing that what he put in

19   those forms was false.  Knowing that they had no basis in law, he

20   deposited that check in his account, and he spent it.  And then

21   he did it again and got another check, and then he did it again.

22         That's what the defendant did.  He realized what he

23   could do, he got away with it twice, he committed fraud.

24         I want to emphasize:  You have heard the Court instruct

25   you several times throughout these proceedings about what is

1  evidence.  And what the Court has told you, and what I expect the

2  Court will tell you again today, is that it's not what the

3  parties ask the witnesses.  It's not what they say in opening

4  statements or closing arguments.  It's not what I am telling you

5  now.

6          It is the testimony you heard from the witnesses, and

7  it's the documents that have been admitted into evidence.  And

8  when you are deliberating in that jury room, that is what you

9  should rely on along with your common sense.

10          Thank you.

11          THE DEFENDANT:  Your Honor, can I do one more rebuttal?

12          THE COURT:  No.  It's just a rebuttal for the person who

13  has --

14          THE DEFENDANT:  Well, there's two against one, your

15  Honor.  I should get the last word.  I should get another

16  rebuttal.  I haven't been able to get anything else.

17          THE DEFENDANT:  Your Honor, can I do one more rebuttal?

18          THE COURT:  No.  It's just a rebuttal for the person who

19  --

20          THE DEFENDANT:  There is two against one.  I should get

21  the last word.  I should get another rebuttal.  I haven't been

22  able to get anything else.

23          THE COURT:  No.  I'm sorry.  I can't.

24          I want to talk to the jury now.  So we have reached the

25  point at which your role becomes absolutely critical, and I'm

1   going to give you the instructions on the law.  You are going to

2   apply the law to the facts.

3          But I just want to say one introductory rule.

4          Now, Miss Malizia was correct when she said there is a

5   difference between evidence and what the parties argue.  The

6   argument is to try to put the evidence together and explain why

7   the evidence supports one side or the other.  And that's entirely

8   proper.

9          But the argument is not evidence.

10         Now, of course it's difficult to, sometimes to try to

11  draw these distinctions.

12         So when you think about what you've heard in these

13  closing arguments, you must distinguish between what you heard,

14  which was commentary on the evidence by both sides, and what may

15  have lapsed over into actual, you know, testimony:  saying things

16  that weren't part of the evidence that could have been presented

17  as evidence earlier, but weren't, and so they can't be

18  considered.

19         So you heard, you know, a mixture.

20         Okay.  So now I'm going to read the instructions which I

21  have discussed with the parties and taken their criticisms, and

22  revised them, and so on.

23         And just to repeat:  This is the law that you will

24  accept for purposes of your decision.

25         Now, I might make a mistake, which could be correctable

1  by a higher court, but for your purposes you will assume I am

2  telling you the straight truth about the law.

3          Now, the instructions are in two parts:  The longer part

4  is just instructing you about the legal principles.  The very end

5  of the instructions are just some procedural things about how the

6  deliberations work and a verdict form that you have to fill out.

7          So I begin with the law.

8          And by the way, you will have a copy of the instructions

9  in the jury room when you deliberate, so you don't have to try to

10 memorize or take notes of what I'm saying.

11         So you are the judges of the facts, right?  You can

12 decide who is telling the truth and what really happened, and so

13 on.  But you also apply the law to the facts, because you have to

14 do that to get an actual conclusion.  Facts won't give you a

15 bottom line.  So you'll -- I give you the law, you find what the

16 facts are, you make your decision what the facts are, and then

17 you apply the law that I have given you to the facts to derive a

18 verdict.

19         Now, remember, your role is a judicial role.  You are

20 judges, like me, but slightly different responsibilities, and we

21 try -- and you should try to, you know, be completely impartial

22 and don't let, you know, personal sympathies, likes, dislikes,

23 prejudice, public opinion influence you.  And of course, you

24 don't let a person's race, color, religion or ethnic origins, or

25 whether male or female, obviously that's completely irrelevant.

468

1        And you shouldn't think that I have expressed or taken

2   any view on this.  I respect your domain, which is to issue the

3   verdict, and I'm not trying to influence you in any way.

4        And you've heard that the defendant was indicted, which,

5   as Mr. Hotaling explained, it's a form of charging a person with

6   a crime.  And this indictment charged -- and the indictment will

7   be, you'll have access to that, if you're interested, also in the

8   jury room.

9        So the indictment charges, as Mr. Hotaling was

10  explaining, mail fraud, which relates to the two $300,000 checks

11  that Mr. El Bey received from the Internal Revenue Service, but

12  also presenting false claims which were other -- his other

13  submissions, where he asked for the 300,000 and the IRS did not

14  pay.

15       So two separate types.  Both -- they are both crimes.

16  They are slightly -- they have slightly different elements.

17       The indictment is just a charge.  It's not evidence of

18  any sort, doesn't mean the defendant is guilty.  It's just the

19  way these criminal proceedings get started.

20       And in fact, the defendant is presumed innocent of all

21  the charges, and you continue to think about that presumption

22  right through your deliberations.

23       And you can't convict him unless you decide from the

24  evidence that the presumption of innocence has been overcome,

25  that there is by proof beyond a reasonable doubt that the

1  defendant is guilty of either or both types of charge.

2          There are eight separate counts.  Your verdict will have
3  to go through count by count.  You can acquit of some, convict of
4  some, convict of all, acquit of all.

5          I emphasize that this burden of proof beyond a
6  reasonable doubt, the burden is always with the government
7  throughout the trial.

8          The defendant is not required to prove his innocence.
9  In fact, he is not required to present evidence.  He is not
10 required to say anything if he doesn't want to.  The burden is on
11 the government.

12          Now, I had said at the beginning that you should not do,
13 you know, independent research:  television, radio, the Internet,
14 talking to friends, family, and so on.  This is your judgment to
15 make.

16          And so I'll just repeat that:  that your decision should
17 be based only on what you saw and heard here in the courtroom,
18 and that included the testimony under oath of witnesses, the
19 documents -- the exhibits, we call them -- that I allowed into
20 evidence.

21          And to repeat:  The statements, arguments, objections,
22 and so on, they are not evidence.  They are part of the
23 procedure, but they are not the evidence that you weigh when you
24 decide on a verdict.

25          And similarly, the lawyers, their questions, their

objections, their opening and closing statements, that's argument, that's not evidence.

There have been occasional objections to questions that were being asked.  Objections are a permissible form of participation in litigation by the lawyers, the parties.

And if I sustain an objection, and you -- you know, you forget about it, there is no testimony that's been objected to. I mean, if I sustain an objection you don't listen to any testimony that was objected to.  It's excluded.

Now, when you are considering the evidence and trying to determine what the facts are, you're not going to have one piece of evidence, you're going to have a fair amount of evidence to consider.

You have to weigh it, decide what is believable, more believable, less believable, and in doing that you are going to have to use common sense.

You make decisions.  We make decisions many times a day. And we are doing it on a kind of weighing basis, the good versus the bad of this decision.

Should I eat another chocolate sundae?  Well, it will shorten my life a little, but it will make me happy.  Right?  So you weigh those two and you decide whether to have the chocolate sundae.

And similarly, in a much more serious setting, obviously, you will be weighing the pros and cons of the various

bits of evidence.

Now, when you hear evidence given, often, you know, you might draw an inference from it. The evidence is -- well, in my chocolate sundae example. Okay, I know what a chocolate sundae is, I know what it tastes like, I can also maybe draw an inference: If I eat this a chocolate sundae, not really good for me, right?

So drawing inferences from facts is legitimate.

And sometimes the lawyers distinguish between direct evidence and circumstantial evidence, but I'm not sure how useful that is, but there is sort of basic evidence. My example: You see the chocolate sundae, but you might draw inferences from that; from the circumstances, you might learn something more than just that it was a chocolate sundae.

You don't have to count up the witnesses and decide that if five witnesses testify on one thing and another to the opposite that the five are right. Crowds can make errors.

So you want to assess each witness individually, whether you think that person is believable.

And I said earlier, there was no burden of proof on the defendant.

So a defendant doesn't have to testify, he doesn't have to put in as much testimony as the prosecution. Of course, zero is a lot less than the prosecution presented. But the fact that there is less, fewer witnesses on one side or the other, that's

1  not a decisive consideration.

2  It's what the testimony of all the witnesses on one side

3  add up to versus what the witnesses said on the other side and

4  how that adds up.

5  You don't have to believe everything that a particular

6  witness testified.  You may think that witness is wrong about

7  something, right about something else.  Well, that's fine.  You

8  consider the right and the wrong separately.

9  When you're assessing a witness, you'll want to consider

10  such things as does this seem like an intelligent person, a

11  knowledgeable person?  Did the witness really have the ability

12  and opportunity to see, hear, know the things that he testified

13  to?  Does he seem to have had a decent memory?  Did he seem --

14  that's a plus, if he or she has a good memory.

15  But, on the other hand, did the witness give you the

16  impression maybe he had some kind of prejudice or other reason to

17  slant his or her testimony, not tell the truth?

18  And also sometimes other evidence that's been presented

19  will help you assess what a particular witness testified to:  Did

20  it hang with what other witnesses have said, or was it out in

21  left field?

22  I think you heard, or perhaps it was just simply

23  obvious, that the government's witnesses -- and it may well be

24  Mr. El Bey's witness -- that the lawyers had talked to these

25  witnesses before trial.  You know, find out what they want to

1  say, and so on.

2      That's proper.  There is no impropriety there.

3      You know, you have heard testimony from these -- from

4  one of the special agents, I guess Mr. Howard, about a

5  conversation he had with the defendant, and the agent was

6  entitled to testify about what Mr. El Bey said to him.

7      But you have to make your own decision whether you think

8  the agent was truthful in representing what Mr. El Bey had said.

9      You will remember that some charts that were summaries

10  of evidence, to try to make things a little clearer, were

11  admitted into evidence.  So they are evidence, and you can

12  consider those charts and give whatever weight you think

13  appropriate to them.

14      I know some of you have taken notes during the trial,

15  which is entirely proper.  And, you know, you can use the notes

16  in deliberations to, you know, help you remember what happened,

17  which is fine.

18      But you don't want to use them as evidence, you know.

19  Because they are just really to try to stimulate your memory.

20  You want to make sure that you are remembering accurately.

21      It's difficult to take notes, and often one writes down

22  something that doesn't quite coincide with what one implies.

23      There was a fair amount of discussion about dates, dates

24  on which forms were mailed, and so on.  And the indictment,

25  you'll see, doesn't try to specify dates, in general.  Maybe some

of them.  But it will say some crime occurred on or about a particular date.  So the exact dates are not critical.

Now, obviously the years are important and months may be important, as you think about the case.  But, you know, little mistakes may have occurred about a particular day.  And if you know you're in the general time period that the witnesses were -- that the case involves, that, you know...

It's important in most criminal cases -- and certainly this criminal case -- that anything the defendant is accused of doing, doing wrong, and so on, is something that he -- that he did knowingly.  That is, he knew what he was doing and it wasn't just ignorance, mistake, accident.

People do misspeak, and they make mistakes, and they are not ordinarily -- or not in this charge -- they are not, can't be punished for their mistakes, but only for what they do with knowledge.

Now, a mistake may be the launching pad for some deliberate falsehood.  That is, you may mistakenly think that you can lie in a courtroom, right?  That -- the fact that the mistake gave rise to your lying doesn't mean you weren't lying, and lying can be an important element of a crime.

Now, with regard to the mail fraud charge, that is, the charges relating to the $300,000 refunds that he received, you'll have to -- you'll have to decide whether the government proved each of the following elements beyond a reasonable doubt.

1          It's not enough they proved one.  They have to prove all

2    four.

3          So one is that the defendant knowingly devised or

4    participated in a scheme to defraud to get that, the $300,000

5    check; that he did so with the intent to defraud; and that the

6    scheme to defraud involved a materially false or fraudulent

7    pretense, representation, or promise.

8          That's very important, that notion of materiality.

9    Because if you -- sometimes people will lie, for example, out of

10   embarrassment.  You know, someone asks your age, you knock a

11   couple of years off, or something like that.

12         That would -- those are not -- those little white lies,

13   those are not material falsehoods.  They don't -- I mean, they

14   may embarrass you when it's discovered, but they're not -- that's

15   not wrongful conduct.

16         It's when, with specific reference to our case, if

17   you -- if you tell -- if you tell the Internal Revenue Service a

18   lie which is capable of getting them to do something which they

19   would never do if they knew the truth, namely, give you $300,000

20   to which you're not entitled, that is a material falsehood.

21   That's fraud.  And that is an element of the charges.

22         And the last thing with regard to these counts involving

23   the $300,000 is that in order to carry out the alleged scheme the

24   defendant used the mails or caused the mails to be used in the

25   way in which is described in the evidence you've heard.

1        So it doesn't mean he has to mail a letter himself, but

2   he has to, you know, get the mail service involved by his

3   application, and so on, receipt; his correspondence with the

4   Internal Revenue Service involves his use of mails.

5        So if you find that all these elements are present, that

6   they have been established beyond a reasonable doubt, then the

7   conclusion will be that he did violate the mail fraud statute and

8   therefore he is guilty.

9        But you have to be confident of each of these elements,

10  you know, beyond a reasonable doubt.

11       And if not, then he is not guilty.

12       I also I made -- I guess the indictment and I think the

13  lawyers have made reference to the term of "a scheme."  A scheme,

14  plan, it's all the same thing.  It's connected with the fact that

15  the kind of fraud that's illegal is a deliberate act.

16       So you're thinking about, you know:  How am I going to

17  get X from Y?  Something like that.

18       It's intentionally cheating to obtain money or property

19  or impose a cost, a loss on somebody else, using, you know,

20  materially false statements.

21       Now, with regard to the last six counts, there

22  the -- there no money passed to Mr. El Bey.  So, nevertheless,

23  the charge is that there was a scheme to defraud.  It didn't

24  succeed with regard to those other requests that he made for

25  refunds, but nevertheless they were attempts to obtain something

1  he wasn't entitled to.  That's the charge.

2       And what's important for you to understand about these

3  false claim charges, it's not necessary that the false claim have

4  had any effect, had any consequence.  All that's necessary is

5  that it was intended to get for the applicant, the -- for the

6  refund, something he wasn't entitled to.

7       So, in other words, you want to understand that a scheme

8  to defraud is illegal even if it's unsuccessful.

9       And each time, if you use the mail to try to defraud,

10 then each time you use the mail that's a separate violation,

11 separate offense.

12      I'll be a little more specific about the false claim.

13      You have to find -- again, beyond a reasonable doubt --

14 that the defendant didn't make, you know, present or cause to be

15 presented a claim, a claim to the Internal Revenue Service, a

16 claim that the Internal Revenue Service owed the defendant money.

17      And you have to find the claim -- again, beyond a

18 reasonable doubt -- was materially false, the way I explained, or

19 fictitious or fraudulent -- they are synonyms -- but you have to

20 find beyond a reasonable doubt that the defendant knew that and

21 knew he was making a false or fraudulent representation to get

22 money to which he wasn't entitled, and so that he was acting

23 intentionally to defraud.

24      And again, as with the four elements of the mail fraud

25 charges, if you find any one of them the government has failed to

1  prove beyond a reasonable doubt then you should acquit.

2  There have been criticisms of the Internal Revenue

3  Service for allowing this to happen.  And Mr. Hotaling noted that

4  in his closing argument.

5  The fact that maybe the Internal Revenue Service, if it

6  had more resources, more agents, what have you, it might have

7  prevented any of this from happening, well, I suppose it wouldn't

8  prevent the applications, but if maybe, as I say, they were

9  better funded, better organized, better administered the Internal

10  Revenue Service would not have given Mr. El Bey anything, that

11  doesn't bear on his guilt or innocence.

12  Because, I mean, there are a great many crimes that

13  would not occur if the victim were more cautious, right?

14  So if you go to the toughest neighborhood in Chicago and

15  decide to take a stroll at 3:00 a.m. and you're attacked by

16  someone, beaten up, you're a fool for having been there and

17  exposed yourself to this person.  But the person who attacked you

18  is guilty of a crime.

19  So you don't blame the victim for the crime, even if you

20  think the victim was careless.  And -- okay.

21  You want to be -- as you deliberate you want to be

22  clear.  So the defendant is charged with eight separate crimes,

23  and you don't want to -- you want to consider each of them

24  separately.  You don't want to say:  Well, if he is charged with

25  eight crimes, he must be guilty of one of them.  You know, you

1 don't want to think that.

2 The government could well charge someone with a whole

3 bunch of crimes and not be able to prove any of them beyond a

4 reasonable doubt.  That can happen.  So the mere number of crimes

5 makes more work for you, you have to think about all of them, but

6 it doesn't bear on his guilt or innocence.

7 Okay.  So those are the rules of law.

8 And now just a few little procedural things about your

9 deliberations.

10 So once you're in the jury room the first thing you need

11 to do is to choose a -- used to be called a foreman of the jury,

12 but now we call it foreperson since obviously it can be a man or

13 woman.  It's irrelevant.  So you choose that.

14 You know, maybe you'll agree on one person, or maybe

15 you'll elect a person, or -- but in any event, you want to choose

16 a person.  And this person is just sort of the chairman, just to

17 keep things going.  He doesn't -- he or she doesn't have an extra

18 vote or anything of that sort.

19 Just that because there are going to be 12 of you --

20 we'll have to excuse the alternates at the end of my little

21 talk -- you know, you could say you have 12, but you can't talk

22 all at once, so you want to have one person who will, as I say,

23 be the chair.  Not having any more influence or, you know, any

24 more authority than the rest.  Just a chairman.

25 And also the foreperson has one more duty, and that is

1  when you have a verdict the foreperson will write out what the

2  verdict is and hand it to me and then I read it out loud.

3          Now, when you are deliberating, when you start

4  deliberating, remember, you are just talking to each other, you

5  are not talking to anybody else.  No, you know, using your

6  cellphone to go cruising the Internet looking for interesting

7  discussions of the post office or the Internal Revenue Service or

8  anything of that sort.  So just -- just by yourselves.

9          Now, occasionally a jury gets kind of stymied, and maybe

10  it's some critical issue it doesn't feel it understands.  If you

11  feel that you really need to get an answer to some question from

12  me before you can proceed, then either the foreperson or another

13  member of the jury should write me a note and sign it and send it

14  to me, and I will respond either in writing or by calling you

15  back into the courtroom.

16          And after you send me the note, you don't have to stop

17  everything waiting for me to answer.  You can continue with your

18  deliberations.

19          So you'll have, as I said, you have the indictment.

20  You'll have the, all the exhibits.

21          Oh, there is one important thing about the -- if you do

22  send me a note asking a question or expressing a concern of some

23  sort.  You're not supposed to tell me if you've taken a vote -- a

24  tentative vote, presumably, if you have a question for me -- but

25  if you've taken a vote don't -- you're not supposed to reveal

what that tentative vote is.  That's a secret.

The only thing that -- the only thing that counts for the verdict is a -- you know, telling me that it was a unanimous determination by the jury either to acquit or to convict or on particular terms.

Now, the verdict is in a -- is a form that is filled out.  It's a very, very simple form, which you'll get.  So what it says is:

Count 1.  We, the jury, as to Count 1 of the indictment find defendant Hakeem El Bey guilty or not guilty.

So there is a little box beside "guilty" and one beside "not guilty," and you just check it.

Count 2, they are identical, just the reference to the counts.

And then it's signed by everybody.  So it's unanimous and it's dated and it's given to me.

And, okay, there are 12 of you so you have, you know, you are different people.  You will -- you should make a very serious effort, try to reach a verdict, try to agree.

You may start off with very different views, but most of the time the jurors, taking as long as they want to discuss the case, will come up with a unanimous agreement.  And, you know, it's desirable, because if it's not unanimous then this is no verdict.

So I'm just going to ask the lawyers and Mr. El Bey to

1  talk a little at sidebar so they can tell me if I've left out

2  something which I should have told you.

3          So this will just be brief.

4     (Proceedings heard at sidebar:)

5          LAW CLERK:  We can either talk to you or I can say it in

6  front of the parties.  It's up to you.

7          THE COURT:  Okay.  Secret.

8     (Pause.)

9          THE COURT:  Well, my law clerk reminded me that there

10  are six false claim charges, not four.

11          MS. MALIZIA:  That's right.

12          THE COURT:  So I was just mentioning the ones that

13  failed.  But the ones that succeeded were also false, is that

14  correct?

15          MS. MALIZIA:  That's correct.

16          THE COURT:  So I should tell them that there are eight

17  charges altogether:  two mail fraud and six false claims?

18          MR. HOTALING:  Yes.

19          THE COURT:  The two false claims that succeeded and the

20  four that failed.

21          MR. HOTALING:  And, Judge, our recommendation is that we

22  not get into which ones are alleged to have been succeeded, and

23  what -- I really worry -- just six false claims, yes.

24          THE COURT:  But I should mention -- but I do want to

25  tell them that two of those are also the mail fraud claims.  I

1 don't want them to forget about the mail fraud.

2       MR. HOTALING: Well, no, the mail fraud is the whole

3 thing. It's not just -- I mean, the two executions are the two

4 particular mailings that are in Counts 1 and 2, but the mail

5 fraud scheme encompasses everything. And so --

6       THE COURT: You mean there are six counts of mail fraud?

7       MR. HOTALING: No, there are two counts of mail fraud

8 corresponding to the two mailing executions; that the IRS mailed

9 those two checks on those two dates. That's how we charged the

10 executions.

11       THE COURT: But I don't know what you mean by whole

12 scheme?

13       MR. HOTALING: Everything. All six returns are part and

14 parcel of the scheme.

15       THE COURT: But he is not being charged with mail fraud

16 for the four that failed.

17       MS. MALIZIA: But it's part of the scheme, though, along

18 with the purchase of the vehicles and house, it's all part of the

19 scheme.

20       THE COURT: Does that make a ninth count?

21       MR. HOTALING: No.

22       MS. MALIZIA: No, it's all part of the first two counts.

23       The first count alleges the scheme itself and its goals,

24 and encompassed in that scheme is all six of the false returns.

25 But to execute that scheme he caused two mailings. The two

484

1    Treasury checks were mailed to him in furtherance of the scheme.

2            THE COURT:  I see.  So what should I say?

3            MR. HOTALING:  I think, Judge, just simply say that

4    there are six -- you have already said it -- there are two counts

5    of mail fraud and there are six counts of mailing a false claim.

6            If there is a concern that is what you might have said

7    earlier, just simply clarifying that there is six counts, and

8    just leaving it at that.

9            THE COURT:  Okay.

10           MS. MALIZIA:  I think there was an instruction on how

11   the jury should not consider any potential punishment of the

12   defendant that maybe was skipped over in your charge.

13           THE COURT:  It's not in what I have.

14           MR. HOTALING:  We didn't get a copy of the ones you were

15   reading from.

16           LAW CLERK:  It should be in there.

17           There you go, Mr. Fuentes, Mr. El Bey.

18           MR. HOTALING:  Right there.

19           LAW CLERK:  It's on Page 26, Judge.

20           MR. HOTALING:  Page 26.

21           THE COURT:  I mean, it's certainly true.  Does it get

22   them thinking about it?

23           MS. MALIZIA:  I think --

24           THE COURT:  What do you think is the psychological

25   effect?

1      MS. MALIZIA:  The psychological effect is to the extent

2  that they are concerned that he may or may not go to jail is

3  irrelevant to their determination of his guilt.  That is up to

4  you to decide.

5      THE COURT:  I know that's correct.  I'm just asking

6  whether you think it is --

7      MS. MALIZIA:  It should not enter into their

8  deliberations:

9      If we convict this guy, will he go to jail?

10     What is the potential consequences of this?

11     Should we really do it if we think they are going to

12  lock him up for 20 years?

13     That should not even enter into their deliberations.

14     THE COURT:  Okay.  Anything else?

15     MR. HOTALING:  And, Judge, I think just we would ask --

16  and it very well could be that I missed it -- but when you were

17  going over that very last instruction, that Silvern

18  instruction -- that's S-I-L-V-E-R-N -- I think you might have

19  missed the component that it was required that they come back

20  with a unanimous verdict, the very first sentence.

21     So I think my recommendation, Judge, is that perhaps we

22  could just -- this is a pretty significant instruction -- and we

23  would, I think our request would be that you read that verbatim.

24     THE COURT:  Well, I told them about making a reasonable

25  effort.

1      MR. HOTALING:  Well, no, but the fact that it has to be,

2 that their verdict must be unanimous.

3      THE COURT:  I thought I said that.  I'll say it again.

4      MR. HOTALING:  Maybe I missed it.

5      THE COURT:  I mean, I think I said it, but I'll say it

6 again.  If you missed it some of them may have missed it.  That's

7 fine.

8      MR. HOTALING:  Mr. El Bey, do you have anything else?

9      THE DEFENDANT:  No.

10      THE COURT:  Yeah.  Anything, Mr. El Bey?

11      THE DEFENDANT:  No.

12      THE COURT:  Okay.

13   (Proceedings heard in open court:)

14      THE COURT:  After discussing, after asking the

15 government lawyers and Mr. El Bey if they had any suggestions or

16 corrections in what I told you, they made some suggestions and

17 which I will add.

18      First, I made a mistake because I gave you the

19 impression that there are six charges:  two mail fraud and four

20 false claim.

21      The two mail fraud being the two $300,000 checks that

22 he, Mr. El Bey, received; and the four false claims being the

23 $300,000 refunds that he sought but that the Internal Revenue

24 Service didn't give him, so that they were attempts.

25      Now, my mistake was that the first two counts which are

1    for the two checks he received, they are also being charged as

2    false claims.  So they are mail fraud because through use of the

3    mail, you know, he got all this money, but they are also -- they

4    are also false claims.

5             So you can have a false claim that succeeds in the sense

6    that you get the money you asked for, it's still a false claim,

7    and that's a separate crime from mail fraud.

8             So when he didn't get anything he couldn't be -- when he

9    didn't get anything, that is four of the -- no, let me see.

10            Yeah, there were six false claims and there

11   were -- there were six false claims; that each effort that he

12   made to obtain the $300,000, that is charged as a false claim.

13            So we have six separate false claims.

14            But the two that succeeded where he got the $300,000,

15   they are also mail fraud counts.  So that makes a total of eight

16   charges.  And the -- although I managed to scramble it, the jury

17   verdict form that you'll be getting is perfectly clear with it's

18   eight counts.  So I apologize for that.

19            The other thing I think I said, but maybe I missed it,

20   you know, to bring -- to render a verdict, whether it's acquittal

21   or conviction, it has to be unanimous:  All 12 jurors have to

22   sign it.

23            Otherwise, it's -- you don't have a verdict.  You know,

24   you can -- if after protracted deliberations, and maybe

25   additional instructions from me, you might decide you just have

1  irrep- -- incurable disagreements, and you can't render a
2  unanimous verdict either way.
3          That happens occasionally.  It's quite rare.  It's
4  unfortunate, but it can happen.
5          So I just want you to understand that to bring back
6  either verdict, acquittal or conviction, you have to have
7  unanimity, which means everybody signing in his place.
8          So another thing that I think you are aware of
9  already -- but I'll just remind you of it -- so your duties cease
10 when you render the verdict.  The verdict is guilt or innocence.
11 It's not the punishment.
12         So if a defendant is acquitted, then of course he goes
13 free, that's the end of it.  If a defendant is convicted of a
14 crime, then there is a separate later sentencing proceeding.
15         But the sentencing proceeding is entirely conducted by
16 the judge and it's the judge who decides on the sentence.  So
17 there is no jury involvement in the punishment phase of a
18 criminal proceeding.  So you don't have to worry about that at
19 all.
20         So that I think does it.
21         The only other thing I have to do -- I'm sorry to do --
22 is to excuse the two alternate jurors, because the jury has to be
23 12, it can't be 14.
24         In excusing you -- this is Miss Chiappa and Miss
25 Shoopman -- in excusing you, though, there is an important

1    qualification, and that is suppose something happens in the next

2    day or so that -- or whatever -- or this afternoon it could

3    happen, suppose one of the 12 jurors gets ill or something

4    happens and leaves the jury with only 11 people.

5              Well, if this -- if the loss of a juror or two jurors

6    happens very shortly after the completion of the trial, then I

7    would be allowed to call back one or, if necessary, two of the

8    alternates, then the jury deliberations would start over from

9    scratch.

10             So that it would give the alternate or alternates a

11   chance for a complete -- not just:  We've decided X, what do you

12   think?  But for a complete redo of the jury decision.

13             So for that reason the alternates should continue to

14   maintain confidentiality, that is, not talk to anybody, do any

15   research or anything that would add to your knowledge or might

16   distort your knowledge of the trial.

17             So although you're dismissed as of now, you will not

18   participate in the jury deliberations, you are still a part of

19   the jury process.

20             And as soon as there is a verdict, you'll be notified

21   and then you will be free.

22             And probably there won't be any, you know, last-minute

23   loss of one of the 12 jurors, but there is this possibility, and

24   the issue has arisen occasionally in previous cases.

25             Okay.  So thank you very much.  So thank you, Miss

1 Chiappa and Miss Shoopman again.

2 And I'd like the jury to be taken to the jury room for

3 their deliberation, and they have all their documents and the

4 binders and everything.

5 Is there anything more?

6 MR. HOTALING:  No, Judge.  And obviously we will

7 facilitate getting the exhibits back to the jury through the CSO

8 as soon as they are back.

9 THE COURT:  Yes.  Is there anything else we need to

10 discuss?

11 LAW CLERK:  Here is two copies of the jury instructions,

12 if you want to add them to your cart.

13 THE CLERK:  I need a clean copy.

14 MR. HOTALING:  Just to make sure I'm clear, are all the

15 jurors getting individual copies, or are you sending one copy

16 back of the jury instructions?

17 LAW CLERK:  We are sending one.  And we can make extra

18 copies if you think that's --

19 MR. HOTALING:  I sometimes think it's nice to have

20 multiple copies in case different jurors want to flip through

21 different copies.

22 THE COURT:  I think that is a good idea.

23 MR. HOTALING:  I would suggest a half dozen, if not a

24 full dozen of the jury instructions.

25 LAW CLERK:  We will do that.

1        MR. HOTALING:  Perfect.  And we are just getting a

2   cart -- oh, the cart is here -- to take the exhibits back.

3        THE COURT:  Excuse me?

4        MR. HOTALING:  And we have a cart on which we will put

5   the exhibits --

6        THE COURT:  A cart.

7        MR. HOTALING:  -- on which we will put the exhibits to

8   send back to the members of the jury.

9        THE COURT:  And now are you -- you are going to -- and

10  you said you were going to leave me your phone numbers or

11  something?

12       MS. MALIZIA:  And to be clear, your Honor, we are

13  including the defendant's exhibit and the summary chart as well

14  in the exhibits we are sending back.

15       LAW CLERK:  And then Mr. El Bey's cell number or --

16       THE COURT:  Yes.

17       MR. FUENTES:  And, your Honor, I had a question as

18  standby counsel.

19       THE COURT:  Pardon?

20       MR. FUENTES:  I have a question as standby counsel.

21       With the jury now deliberating and the evidence now

22  closed, would the Court now entertain a request that I be

23  discharged as standby counsel?

24       THE COURT:  Well, I hate tying you up like this,

25  Mr. Fuentes, but I can imagine -- very unlikely -- but I can

1  imagine the jury -- I can imagine the jury having a question.

2          MR. FUENTES:  Understood.  I'm happy to stay.  I'm happy

3  to stay if the Court wants me to.  I just was professionally

4  obligated to ask.

5          THE COURT:  No.  I appreciate it.  We are very grateful

6  for your patience because I know it's been difficult for you.

7          MR. FUENTES:  Thank you.

8          And, of course, as standby counsel, I haven't been trial

9  counsel, there were -- I did not interpose any objections during

10  the trial --

11          THE COURT:  Of course.  No, no.

12          MR. FUENTES:  -- to any of the procedures.

13          I raised one issue with the jury instruction because I

14  thought I might have had to argue.  But I hope the Court and the

15  parties understand that I -- at no time did I view it my place to

16  object to anything that was going on.

17          THE COURT:  No, I understand.  That was fine.

18          MR. FUENTES:  Thank you.

19          THE COURT:  You know, it just occurs to me, I didn't

20  tell the jury that they should go home at 5:00 o'clock.  Did I?

21          THE MARSHAL:  I was going to ask you that.  Do you want

22  them to go home?

23          THE COURT:  What is the general practice?

24          THE MARSHAL:  Generally, judges allow them to go, based

25  on train schedules and childcare, whatever time they go to, and

493

1  if they don't return --

2          THE COURT:  Should we ask them when they'd like to break

3  and come back?

4          THE MARSHAL:  Do you want me to go ask them at 5:00

5  o'clock?

6          Do you need the two alternates, or send them home?

7          THE CLERK:  You can send them home.

8          THE COURT:  Yeah.  So say we'd like to break at 5:00 and

9  resume, say, at 9:30 tomorrow.

10          THE MARSHAL:  9:30.

11          THE COURT:  But if they feel strongly they want to stay

12  or come in earlier or later, we will.

13          THE DEFENDANT:  Judge, do we sit here until 5:00?

14          THE COURT:  I'm just waiting to hear whether the jury

15  wants -- will leave at 5:00 o'clock.

16          So, you see, the problem is you will want to be here

17  when the jury -- well, the jury might have a question, and you

18  would want to see the question, and so on.  And you would

19  want -- you should be present when the jury returns with a

20  verdict.

21          So I was thinking that if they stayed after 5:00

22  o'clock, if they have a question at 7:00 o'clock, what are we

23  supposed to do?  We are all scattered to the winds.

24          So I was hoping they would stop at 5:00 and then resume

25  at 9:30 tomorrow.  And you can't predict the length of the jury

1  deliberation, but it would be good if, assuming they will do

2  that, if you'd come back at 9:30 tomorrow.

3        THE DEFENDANT:  I'll be here tomorrow at 9:30.  That's

4  no problem.

5        So you want us to stay until 5:00, and then if they

6  don't do anything, come back tomorrow at 9:30.

7        THE COURT:  Yes.  If -- yeah, I would prefer you stay to

8  5:00 and resume tomorrow at 9:30.  I'm just waiting to see what

9  they want to do --

10        THE DEFENDANT:  Okay.

11        THE COURT:  -- because they may want to -- you know,

12  often you have a situation where the jurors are really eager to

13  end their involvement in the case.  And they might prefer to stay

14  a couple of hours more rather than having to come back tomorrow.

15        Yes?

16        THE MARSHAL:  They will let me know before 5:00 o'clock

17  how late they want to go.  That's the best I could get out of

18  them, your Honor.

19        THE COURT:  Okay.  That's great.  All right.

20        So I don't know.  So what should I do?

21        LAW CLERK:  We have the phone numbers.  So we will let

22  the parties know that they have left.  So you don't have to stay

23  in the courtroom.

24        THE DEFENDANT:  Just stay in the building?

25        LAW CLERK:  Just very close by.

495

1          THE COURT:  Could we have a conference call?  Because we

2    are not going to be talking to the jury, obviously.

3          LAW CLERK:  But if the jury comes back, you have to be

4    here to enter the verdict.

5          THE COURT:  Excuse me?

6          LAW CLERK:  If the jury comes back at 6:30 or 7:00, you

7    have to be here to enter the verdict.  So the conference call

8    wouldn't resolve...

9          THE COURT:  No, I was thinking if they had a question.

10          LAW CLERK:  Right.  But I don't know if we can leave

11    until they are done for the day because if they finish at 6:45,

12    we all have to be here to hear the verdict.

13          THE COURT:  Well, I'm not going to stay until 6:45.

14    I'll come back.

15          So if they wanted to stay beyond 5:00, would that mean

16    they would get dinner?  Does the Court provide?

17          THE MARSHAL:  Well, the cafeteria is closed.  I have

18    never had a jury go to dinner, no.

19          MS. MALIZIA:  Your Honor, if I may, you can also put

20    reasonable time limits on their deliberations tonight.

21          It's understandable that you would want for them to

22    continue.  But for them to continue, not only do we have to be

23    present but the court reporter has to be present, we need your

24    deputy here.

25          If any of those people can't make it past 5:00 or 5:30,

1  then it would probably be prudent to release the jury and tell

2  them to come back at 9:30 if they are still deliberating at that

3  time.

4           THE COURT:  Well, so as I think back to my -- I have

5  never had a criminal case, but as I think back to my civil cases,

6  I don't remember a case in which jurors wanted to stay around

7  after 5:00 clock.

8           Is it common?

9           MS. MALIZIA:  Usually if you give people the opportunity

10  to leave, if they haven't already reached a decision, they will

11  take you up on that.

12          THE COURT:  So I could prod them and say, really, you

13  know, because Mr. El Bey lives in Calumet City -- it's not that

14  close.

15          MS. MALIZIA:  That's right, your Honor.

16          Again, it's up to the Court.  Obviously, you can't

17  release them until they have reached a verdict or are deadlocked,

18  but you can certainly put reasonable limits on how late they stay

19  today.

20          THE COURT:  How about this?  How about if I will wait

21  until five of 5:00.  But why don't -- how about if we told them

22  because of where people live and other commitments and so on,

23  people involved in -- the staff and a number of people who have

24  to be here, that if they feel they are going to go beyond 5:30

25  then they ought to break off and come back.

497

1          THE MARSHAL:  I will tell them.

2          THE COURT:  Okay.  Thank you.  That's the best I can

3     think of.

4          MS. MALIZIA:  I think that's fine, Judge.

5       (Proceedings recessed at 3:38 p.m. to 4:48 p.m.)

6          THE COURT:  So shall we invite the jury back?

7          MS. MALIZIA:  Your Honor, if we could address just one

8     issue on the record before?

9          THE COURT:  Sure, so we will wait just a minute.

10         MS. MALIZIA:  Your Honor, regarding the forfeiture

11    issue, we weren't sure it was clear to the defendant whether or

12    not he had a choice to have either the jury or your Honor decide

13    the forfeiture issue, that waiving the jury didn't necessarily

14    waive forfeiture or any other right he may or may not think he

15    has, that the issue ultimately will be decided by you, you or the

16    jury.

17         And if we could get on the record his preference.

18         THE COURT:  Yes.  I thought he had said that he wanted a

19    jury.

20         THE DEFENDANT:  I did.

21         THE COURT:  I'll ask him again.

22         THE DEFENDANT:  I said I wanted the jury to do it.

23         THE COURT:  Excuse me?

24         THE DEFENDANT:  I said I wanted the jury to do it.

25         MS. MALIZIA:  We just wanted the record to be clear.

498

1     THE COURT:  Excuse me?

2     MS. MALIZIA:  We just wanted the record to be clear and
3  if that is the case.

4     Let's bring the jury in.

5     THE COURT:  Well, if it's the case and if there is a
6  guilty verdict, I'll go directly to it because I don't think it
7  will take long.

8     MR. HOTALING:  Agreed.

9     MS. MALIZIA:  Agreed.  Thank you, your Honor.

10     (Proceedings in open court at 4:50 p.m.  Jury in.)

11     THE COURT:  So welcome back, ladies and gentlemen of the
12  jury.  I understand that there is a verdict.  And assuming that's
13  correct, could the foreperson please give me the verdict?

14     Okay.  The jury has -- the jury has unanimously found
15  that Mr. El Bey is guilty on all -- on all -- on all of the eight
16  counts.

17     And I had mentioned to Mr. El Bey earlier that he has a
18  right to poll the jury, which means ask each of the individual
19  jurors whether it is indeed, as indicated by their signatures,
20  but it is indeed -- does each juror agree with this form that I
21  have been handed.

22     Would you like to do that, Mr. El Bey?

23     THE DEFENDANT:  Yes.

24     THE COURT:  Okay.  So let me ask the lawyers, is there
25  any particular form of words that I'm supposed to use?

1          MR. HOTALING:  Judge, the traditional language is:  Was
2    this and is this now your verdict.
3          THE COURT:  Okay.  I was given the form.  Thank you.
4          Okay.  So I'll say, Mr. Adams, was this and is this now
5    your verdict?
6          JUROR ADAMS:  Yes.
7          THE COURT:  Thank you.
8          Miss Chiappelli, was this and is this now your verdict?
9          JUROR CHIAPPELLI:  Yes.
10         THE COURT:  Mr. Chiappelli.  I'm sorry.  I always make
11   that error.  Okay.
12         Miss Fetty, was this and is this now your verdict?
13         JUROR FETTY:  Yes.
14         THE COURT:  Miss Fleita, was this and is this now your
15   verdict?
16         JUROR FLEITA:  Yes.
17         THE COURT:  And Mr. Shannon, was this and is this now
18   your verdict?
19         JUROR FOX:  Ms. Fox.
20         THE COURT:  I'm sorry.  Miss Fox.  It's Shannon Fox.
21   That's your first name.
22         JUROR FOX:  Shannon Fox.  Yes.
23         THE COURT:  Mr. Gibbons, was this and is this now your
24   verdict?
25         JUROR GIBBONS:  Yes.

500

1          THE COURT:  Mr. Ilagan, was this and is this now your

2   verdict?

3          JUROR ILAGAN:  Yes.

4          THE COURT:  Miss Jerele, was this and is this now your

5   verdict?

6          JUROR JERELE:  Yes.

7          THE COURT:  Mr. Jones, was this and is this now your

8   verdict?

9          JUROR JONES:  Yes.

10          THE COURT:  Mr. Mauro, was this and is this now your

11  verdict?

12          JUROR MAURO:  Yes.

13          THE COURT:  Miss Sawko, was this and is this now your

14  verdict?

15          JUROR SAWKO:  Yes.

16          THE COURT:  And Miss Smith, was this and is this now

17  your verdict?

18          JUROR SMITH:  Yes.

19          THE COURT:  And so say you all?

20          THE JURY:  Yes.

21          THE COURT:  Okay.  Thank you.  Okay.

22          Now, there are some loose ends to be noted.  There is

23  a -- there is a final issue here of forfeiture which has to

24  be -- unfortunately, it has to be treated separately.  It

25  couldn't be part of your initial determination of guilt.

1    But Mr. El Bey has exercised his right to have the jury

2 determine certain criminal forfeiture allegations in the

3 complaint because you remember that there was a good deal of

4 testimony about what Mr. El Bey did with the money that he

5 received when he applied for refunds to the Internal Revenue

6 Service.

7    And I'm going to read some very brief instructions and

8 then -- I don't like to do it to you -- but then I have to ask

9 you to consider these. You can either do it this afternoon, if

10 you want, I don't -- this is not an elaborate, complicated

11 matter -- or else you could come back in the morning. So I'm

12 sorry about that, but I'm required to do this.

13    So in a part of the indictment that wasn't discussed

14 previously, the government is asking for a forfeiture of certain

15 property that Mr. El Bey has obtained.

16    The law provides that when a defendant is convicted of

17 mail fraud, which were the first two counts, he can be required

18 to forfeit to the United States certain property obtained with

19 the proceeds. And you will have to consider whether this law is

20 applicable to the property in question.

21    So forfeiture means that, you know, you own something

22 but you forfeit it. You have lost it. You no longer have rights

23 in it because you violated a federal law. That's how you got the

24 property.

25    You're not allowed to keep it. You have to give it back

1 to the -- in this case, the government.  That's what the

2 property -- that is, the money that he got illegally was used to

3 buy certain property, right.

4        So the government, in effect, is trying to follow the

5 money that it lost through the fraud into the property that

6 was -- not all the property, some of the property that was

7 obtained with the proceeds of the fraud.

8        Again, you are required to consider the evidence.  You

9 heard evidence about what happened to the money, what it was used

10 for.  And you will deliberate together, and you will need to

11 reach a unanimous verdict, although the burden of proof is

12 different.

13        I will explain that.  You can consider all the evidence

14 you heard even though it wasn't directly focused on forfeiture.

15 The government has alleged forfeiture.  But, once again, just the

16 allegation is not evidence.  And you'll have to make a judgment

17 whether there was forfeiture because Mr. El Bey denies it.

18        The government has the burden of proof, but it's not

19 proof beyond a reasonable doubt.  All it has to prove with this

20 allegation, it has to prove a preponderance of the evidence,

21 which means when you weigh the evidence, if the evidence in favor

22 of guilt is stronger than the evidence against guilt, even if

23 it's only slightly stronger, even though it is like a 51 percent

24 more probably true allegation than false, then that's enough for

25 the government to prevail.

1        Again, the defendant does not have a burden of proof.

2   He can just be silent and say nothing.

3        But if you're satisfied the government has proved that

4   it's more likely than not that there was this -- there was a

5   forfeiture because of the conduct of the defendant, then the

6   government prevails.

7        Now, what the government is seeking forfeiture of is two

8   pieces of property.  One is the house that you heard about at

9   South Hoxie Avenue in Calumet City here, the government alleging

10  that the house was bought with money that Mr. El Bey improperly

11  obtained from the Internal Revenue Service.

12       The other is a vehicle called a Quicksilver 2010 Buick

13  LaCrosse four-door sedan.  And you heard testimony about this

14  acquisition.  So those are the two items.

15       And to find that it's subject to forfeiture, you have to

16  be satisfied that the government proved that the property indeed

17  was derived from the proceeds of the fraud that he committed

18  against the government.  There has to be a connection between

19  those properties alleged to be forfeitable and the offenses

20  charged in those first two counts, the counts about mail fraud.

21       In other words, to simplify, you have to find that the

22  property and the Buick were obtained with some part of that

23  $600,000 which he received as a result of his first two -- I

24  don't mean chronologically, first two -- but the checks he

25  received which are in Counts 1 and 2 where he actually got

1    $300,000 checks from the government.  Those are the mail fraud

2    violations.

3           So, as I said, the last point about the connection, when

4    I say there has to be a connection between the property and the

5    offense, I don't mean just some accidental connection,

6    coincidence, something like that.  It has to be -- you know, it

7    has to be significant; money actually used to obtain property,

8    money that he wasn't entitled to.

9           There is an instruction here which I don't think is

10   applicable to this case -- if I'm wrong, I will let the

11   government point it out -- that's the definition of proceeds.  I

12   think that's straightforward.

13          We're talking about money obtained from the Internal

14   Revenue Service improperly and then what the money was used for.

15   And the government's argument is it was used to buy the house and

16   the car, and so that's property that's been forfeited to the

17   federal government.

18          I think that's clear enough without the

19   particular -- there is one little -- I don't know if this has any

20   application, but you want to consider this.

21          The government would be entitled to forfeiture even if

22   the property is no longer in the defendant's possession or the

23   government can't find it.  It might be -- it might never be able

24   actually to benefit from having it forfeited if it can never find

25   the property, but if the property vanished and then later was

1  found, the government -- it would be the government's property.
2  It would have been forfeited.
3        I'll read you the special forfeiture verdict form.  It's
4  very short and really, really shouldn't cause any confusion, but
5  I will read it anyway.
6        So it says:  With regard to the forfeiture allegation in
7  the indictment, that the real property, the real estate, the
8  house located at 439 South Hoxie Avenue, Calumet City, Illinois,
9  is subject to forfeiture.  We, the jury, find that the property
10 constitutes or was derived from proceeds traceable to the offense
11 for which the defendant, Hakeem El Bey, has been convicted as
12 charged in Counts 1 and 2 of the indictment.
13       Then there are two lines.  One says yes, and one says
14 no.
15       And then 2, essentially the same:  With regard to the
16 forfeiture allegation in the indictment, that a Quicksilver 2010
17 Buick LaCrosse four-door sedan, I'll leave out the -- what is a
18 VIN?
19       MR. HOTALING:  Vehicle identification number.
20       THE COURT:  I will spare you the multidigit vehicle
21 identification number with a mixture of letters and numbers.
22       Okay.  With regard to the forfeiture allegation
23 involving the Buick, that the Buick is subject to forfeiture.
24 We, the jury, find that the vehicle, A -- and this is the same
25 language as for the house -- constituted or was derived from

506

1  proceeds traceable to the offense for which the defendant, Hakeem
2  El Bey, has been convicted as charged in Counts 1 and 2 of the
3  indictment.
4      Again, yes, no, and then a place for signatures, and
5  that's it.
6      So I say, what I will do -- I will have a brief sidebar
7  first -- but what I propose to do is to send you back to the jury
8  room with these instructions and the verdict forms.  But you will
9  decide whether you want to stay and decide the forfeiture issue
10 this afternoon or whether you'd like to come back tomorrow
11 morning at 9:30 and do it.
12     And is there anything further that I should say or you
13 should say?
14     MR. HOTALING:  Well, Judge, I think we could do this in
15 maybe about 30 seconds at sidebar.
16     THE COURT:  Oh, at sidebar.
17     MR. HOTALING:  Just really quick.
18   (Proceedings heard at sidebar:)
19     MS. MALIZIA:  Your Honor, customarily the parties are
20 entitled to argument on the forfeiture issue.  The government is
21 willing to waive their argument, but Mr. El Bey, if he wishes to
22 have an argument --
23     THE COURT:  Would you like --
24     MS. MALIZIA:  -- should have that option.
25     THE DEFENDANT:  Yes.

507

```
1            THE COURT:  -- to address the forfeiture issue?
2            THE DEFENDANT:  I would.
3            THE COURT:  Okay.
4            MR. HOTALING:  We will waive.  The government will
5    waive.
6            THE COURT:  Okay.  Fine.  Is there anything else?
7            MR. HOTALING:  That's it.
8            MS. MALIZIA:  That's it.
9            THE DEFENDANT:  You know what, I think they're going to
10   take it anyway.  It don't matter.
11           THE COURT:  I'm sorry.  Do you want to?
12           THE DEFENDANT:  No, no.  You know what --
13           MR. HOTALING:  You have a right.
14           THE DEFENDANT:  I don't have the right, so no way.  I'm
15   not going to even play with it.  It's just a waste of time.
16           THE COURT:  All right.
17      (Proceedings heard in open court:)
18           THE COURT:  Okay.  Ladies and gentlemen, you will go
19   back to the room and decide whether you want to deal with this
20   today or tomorrow, and we will wait for you.
21      (At 5:09 p.m. jury out.)
22           MR. FUENTES:  Judge, I have a repetitive request.
23           THE COURT:  Excuse me?
24           MR. FUENTES:  I have a repetitive request.
25           THE COURT:  To be released?
```

508

1          MR. FUENTES:  Well, with the verdict delivered on
2     liability at this point, I thought perhaps it may be more
3     appropriate or maybe the Court believes it would be okay to
4     release standby counsel, discharge him at this time.
5          THE COURT:  Yes.  The only thing is that I do want
6     to -- I do want to -- I do want to say something about
7     post-judgment motions.
8          And I do want to say -- and I do want to ask
9     Mr. Hotaling and Ms. Malizia about bail.
10         MS. MALIZIA:  Your Honor, the defendant is currently
11    free on a personal recognizance bond.  And we have no intention
12    of moving for its revocation.
13         THE COURT:  That's fine.  That is what I wanted to know
14    exactly.
15         MS. MALIZIA:  We can continue bail.
16         THE COURT:  All right.  But I did want to also mention
17    that if I'm right, that if Mr. El Bey wants to file post-judgment
18    motions, he can within 14 days, is that correct?
19         MS. MALIZIA:  That is correct, your Honor.
20         THE COURT:  Okay.  So, Mr. El Bey, you know, a defendant
21    can always --
22         MR. HOTALING:  Judge, I think we have a note from the
23    jury.
24         THE MARSHAL:  The jury is going to stay.
25         THE COURT:  They want to stay.

1          THE MARSHAL:  They want to stay.

2          THE COURT:  Okay.  Thank you very much.

3          THE MARSHAL:  This is the earlier note with the verdict.

4          THE COURT:  Yes.  I just wanted to mention that it is

5    permitted to a defendant to file post-judgment motions within

6    14 days.  This is separate from an appeal.

7          This would be a motion to me if you thought there were

8    irregularities, mistakes, the jury verdict was all mistaken, they

9    didn't weigh the evidence.  Whatever you wanted to do, you can

10   file that within 14 days.

11         That is specifically separate from your right to appeal.

12   But the right to appeal doesn't click in until the sentencing.

13         THE DEFENDANT:  Okay.

14         THE COURT:  So what happens after a guilty verdict is

15   that the probation service, which is a branch of the judiciary,

16   does an investigation of the defendant and trying to -- family,

17   personal history, health, criminal record or not, no criminal

18   record.  And that information is then used by the judge in

19   deciding on a sentence.

20         And with regard to representation, I would strongly urge

21   you -- but it's your choice -- to have a lawyer assist you with

22   regard to the sentencing process.

23         Because what happens is the probation service may or may

24   not make recommendations, but they will submit something to me

25   and to you called a presentence report.  And that report will

1  contain a lot of information that the service believes bears on

2  the relevant punishment.

3          So then I have to have a hearing, which you would be

4  present and the government lawyers, at which commonly the parties

5  will make recommendations for sentencing.

6          Now, this process, sentencing process is extremely

7  complicated, for which I apologize on behalf of the judiciary.

8  Because the criminal statutes tend to set forth broad ranges

9  within which a defendant can be sentenced, broad ranges for

10  prison, and broad ranges for fines.

11          There is a possibility of probation, where the defendant

12  is not actually imprisoned but is subject to various

13  restrictions.

14          So further complicating it, the U.S. Sentencing

15  Commission has set forth Guidelines, suggested sentences within

16  the statutory range.  And the sentencing judge is required to

17  consider the Guidelines, but he isn't bound by the Guidelines.

18  He is bound by the statutory range and can't go below the minimum

19  or above the maximum, but he isn't bound by the Guidelines.

20          In fact, he is required to consider whether a Guideline

21  sentence for a particular defendant would be consistent with

22  certain statutory sentencing factors having to do with the

23  gravity of the crime, the need for deterrence, special

24  characteristics of the defendant, and so on.

25          As a further complication, when a defendant is convicted

1  of a felony -- which just means a crime for which a sentence of

2  more than a year is permitted -- the judge is required to impose

3  certain what are called conditions of supervised release which

4  means that when -- if you receive a prison term, when your term

5  is completed, these conditions of supervised release kick in.

6          In other words, you are released at the end of the

7  prison term, but you are subject to continued restrictions.

8          Now, if it's a felony conviction, there are certain

9  mandatory conditions, like not being allowed to own a gun.  There

10 are only a few of those.  But in addition to that, there are an

11 indefinite number of optional restrictions.  And some are called

12 standard conditions.  Some are called special conditions.  The

13 judge can make up his own restrictions.

14         And it's very, very important that the defendant be

15 prepared to challenge particular restrictions that the government

16 might want to impose.  I mean, that's been a serious problem.  At

17 the appellate -- in the appellate court, we have reversed a

18 number of impositions of these conditions on the ground they are

19 unduly restrictive.

20         But it's very important that the defendant be able to

21 point to restrictions that the government wants or that the judge

22 may want but which are inappropriate.

23         Now, I have stressed this complexity, which is actually

24 greater than what we have faced in the trial, because I think it

25 is very, very helpful for a defendant to have a lawyer in the

1  sentencing process.

2      And it's not -- in the sentencing process, it's not --

3  it does not involve the big issues that have concerned you.  It's

4  just, the jury having spoken and so on, the judge has to make a

5  sentence.  And you want to have as lenient a sentence as

6  possible.

7      Now, it's after the sentence is imposed, whatever it is,

8  that you can appeal.  In fact, the government can appeal too if

9  they think the sentence is too light, although it's very rare for

10  the government to appeal sentences.

11      So in order to both make a good argument for a light

12  sentence and also in order to preserve a good shot at an appeal,

13  it would be very, very helpful for you to have a lawyer because

14  this sentencing stuff is so complicated that the district judges

15  frequently screw up and get reversed.  But most of the time they

16  are affirmed.

17      So we appellate judges, speaking in my appellate judge

18  capacity, we are supposed to give significant deference to a

19  district judge's judgment.

20      So I want to be sure you can -- you want to continue to

21  fight at various levels, and the next -- so you can file

22  post-judgment motions.

23      THE DEFENDANT:  Judge --

24      THE COURT:  You can also fight hard at the sentencing to

25  make sure you can make as strong a case as possible.

513

1          THE DEFENDANT:  Okay.  Do I -- with the motion, do I

2  send it to you?  Do I file it on the case or do I just --

3          THE COURT:  I'm sorry?

4          THE DEFENDANT:  With the motion for 14 days --

5          THE COURT:  Yes.

6          THE DEFENDANT:  -- do I send them to you, file them on

7  the case, or send them to you or what?

8          THE COURT:  Well, you file them in the ordinary way that

9  you filed other documents.

10          THE DEFENDANT:  Oh, just keep putting them on the case.

11          MR. HOTALING:  Yes.

12          THE DEFENDANT:  Yes.

13          THE COURT:  That's fine.

14          THE DEFENDANT:  And I have 14 days?

15          THE COURT:  I hope at least you will think about the

16  possibility of retaining a lawyer for the sentencing.  And, you

17  know, if you can't afford a lawyer, I can appoint a lawyer.  It

18  wouldn't cost you anything.

19          THE DEFENDANT:  Okay.

20          THE COURT:  And, Mr. Fuentes, I know you had some

21  initial concerns about him, but Mr. Fuentes is a very good and

22  experienced lawyer.

23          THE DEFENDANT:  And nothing personal.  He knows that,

24  though.

25          THE COURT:  What?

514

1          THE DEFENDANT:  Nothing personal.  You know that.

2          THE COURT:  If you don't want Mr. Fuentes, we can find

3     another one.

4          THE DEFENDANT:  Okay.  So what do I do now?  I mean, I

5     know --

6          THE COURT:  Well, we are just waiting to hear about the

7     forfeiture.  But after that, as Mr. Hotaling explained, you are

8     still on bail.  Your bail conditions have not been changed.

9          THE DEFENDANT:  I'm not going nowhere.  You know I'm not

10    going nowhere.

11         THE COURT:  You are not going to be arrested or

12    anything.

13         THE DEFENDANT:  But one question I do have, how long

14    would they allow me to get my stuff out the house?  How soon they

15    coming for the house, or whatever?

16         THE COURT:  The forfeiture, that's a good question.

17         MS. MALIZIA:  They haven't decided it yet.

18         MR. HOTALING:  It depends on what the jury decides.

19         THE COURT:  That's an excellent question.

20         THE DEFENDANT:  I'm just asking.

21         THE COURT:  If the jury finds that it's forfeited, how

22    long would Mr. El Bey have to --

23         THE DEFENDANT:  Get my --

24         THE COURT:  Couldn't he stay in his house even if you

25    now own it?  I mean, where is he going to live?

1          MR. HOTALING:  Judge, we are going to have -- those are

2    issues that we're not in a position to answer today.  We will

3    have to do some looking into that.  We will have to do some

4    research into that.

5          THE COURT:  Now, would that be something that -- I mean,

6    suppose --

7          THE DEFENDANT:  Yeah.  What I'm saying is, I just don't

8    want them to rush on me and just throw me in the street.

9          THE COURT:  No, no, no.  Absolutely.

10         The question I want to ask the government lawyers is

11   suppose -- I don't think you will do this, but suppose

12   you -- suppose the jury brings back a verdict of forfeiture and

13   you say:  All right.  Mr. El Bey, you're out.  You're out of your

14   house and you're out of your Buick.

15         Would he be able -- do I have authority to prevent it,

16   to regulate the implementation of the forfeiture?

17         MR. HOTALING:  Judge, as I understand it, there will be

18   a preliminary order of forfeiture that would need to be entered.

19   And then at the time of the sentencing, there would be a --

20         THE COURT:  I'm sorry.  Speak a little louder.

21         MR. HOTALING:  A preliminary order of forfeiture.  And

22   there would be a final order of forfeiture that your Honor would

23   need to consider at the time of sentencing.

24         Actually, it's a preliminary order of forfeiture at the

25   sentencing, which will -- so there's a variety of steps that need

1  to be completed before any sort of action could be moving against

2  the house.

3       THE COURT:  That's fine.

4       MR. HOTALING:  So it's not anything immediate.  The

5  preliminary -- go ahead.

6       MS. MALIZIA:  I was going to say, we will provide you a

7  copy of that order but it won't be --

8       THE COURT:  Will I be notified when -- of these

9  different stages in the forfeiture?

10       MS. MALIZIA:  Well, your Honor, after you -- assuming

11  you do ultimately enter the order of forfeiture, the government

12  will proceed on it, but I can't give you an exact timeline now.

13       I don't believe the Court is traditionally notified of

14  when that order is executed.

15       THE COURT:  I see.  So the jury's verdict is not the

16  equivalent of a --

17       MR. HOTALING:  Of an eviction notice?

18       THE COURT:  Of an eviction notice.

19       MS. MALIZIA:  Right.  But just as in the sentencing

20  phase of the defendant, you will have to enter an order, a J&C, a

21  Judgment and Conviction Order if there is prison time.  There is

22  a similar order for the forfeiture finding as well.

23       THE COURT:  So the forfeiture is not implemented until

24  the sentence is imposed?

25       MS. MALIZIA:  That's correct, your Honor.

1          THE COURT:  Okay.  So Mr. El Bey, so there is no danger

2     of your being evicted --

3          THE DEFENDANT:  Okay.

4          THE COURT:  -- in the next several months probably.

5          MR. HOTALING:  That's correct.

6          THE COURT:  How long is it likely to take for the

7     probation service?

8          MS. MALIZIA:  Your Honor, typically it's 90 days between

9     conviction and sentencing.

10          MR. HOTALING:  But that might get extended based on your

11     resolution of post-trial motions.  So any number of different

12     things can factor into when exactly you reach that sentencing

13     date.

14          THE COURT:  But certainly for several months, there will

15     be no danger of eviction.

16          MR. HOTALING:  I think that's right.

17          THE COURT:  Would you like to sit down, everybody, or

18     just wait?

19          MR. HOTALING:  Yes.  We won't go anywhere.

20          THE COURT:  Okay.

21          THE DEFENDANT:  Excuse me.

22          THE COURT:  Yes.

23          THE DEFENDANT:  Can I ask for an extension, maybe a

24     month extra on filing the 14-day report?

25          THE COURT:  Let me ask --

518

1        MS. MALIZIA:  We have no objection to that extension,
2   your Honor.
3        THE COURT:  Oh, okay.  Okay.
4        MR. HOTALING:  How much additional time do you need,
5   sir?
6        THE DEFENDANT:  Just asking for 30 days.
7        MR. HOTALING:  No objection.
8        THE DEFENDANT:  Thank you.
9        THE COURT:  I'll enter an order to that effect.
10       Okay.  I'm informed that the jury has reached a
11  unanimous decision in regards to the forfeiture count, so you can
12  bring the jury in.
13     (Proceedings in open court at 5:37 p.m.  Jury in.)
14       THE COURT:  Welcome back, ladies and gentlemen.
15       I think we have the same foreperson, is that correct?
16       THE FOREPERSON:  Yes.
17       THE COURT:  So the jury has a unanimous verdict?
18       THE FOREPERSON:  Yes.
19       THE COURT:  Could you hand me the verdict?
20       THE FOREPERSON:  Absolutely.
21       THE COURT:  Okay.  Well, thank you very much, ladies and
22  gentlemen.  I'll read the verdict.
23       So with regard to the forfeiture allegation in the
24  indictment, that the real property located at 439 South Hoxie, it
25  says:  Subject to forfeiture.  We, the jury, find that the

property constitutes or was derived from proceeds traceable to
the offense in which the defendant, Hakeem El Bey, has been
convicted as charged in Counts 1 and 2 of the indictment.

And the answer is yes, the unanimous answer is yes, it
does constitute or was derived from proceeds traceable to the
offense.

And with regard to the forfeiture allegation in the
indictment about the Buick, again, we, the jury, find that the
vehicle constitutes or was derived from proceeds traceable to the
offense for which the defendant, Hakeem El Bey, has been
convicted as charged in Counts 1 and 2 of the indictment.

And, Mr. El Bey, would you like me to poll the jury
again, the individual jurors?

THE DEFENDANT:  No, Judge.

THE COURT:  Excuse me?

THE DEFENDANT:  No, you don't have to.

THE COURT:  No.  Okay.

Well, that then, unless there is anything that the
government lawyers have to say?

MS. MALIZIA:  Nothing from the government, your Honor.

THE COURT:  Well, then that completes the proceeding.

And I want to thank the jury.  Obviously
attended very -- I mean, no drop-outs and attended to the
evidence very carefully and obviously an intelligent and alert
and conscientious jury.  And we are very grateful for your

520

1   verdicts and thank you again.

2          And you are discharged.  I don't know where you go next.

3          You will be led out.  Thanks again.

4     (Proceedings in open court at 5:40 p.m.  Jury out.)

5          THE COURT:  The only other thing I have, I just got a

6   piece of information which is that the presentence report by the

7   probation officer will be completed in April.  The earliest

8   possible sentencing date would be May 27th, approximately, a

9   little less than three months from now, but these dates may get

10  extended, delayed.

11         So unless there is further discussion to be had, I want

12  to thank the lawyers for the government for their vigorous

13  efforts on behalf of their client and Mr. El Bey for his efforts,

14  which were vigorous.  I know you had certain disadvantages

15  because not being a lawyer, but you did, I think, the best you

16  could.

17         And grateful to the witnesses as well and to the court

18  staff, my law clerks.

19         MR. HOTALING:  Thank you to you, your Honor.

20         MS. MALIZIA:  Thank you, Judge.

21         THE COURT:  So we will adjourn.

22         Mr. Fuentes?

23         MR. FUENTES:  I'm here, Judge.  Thank you.

24         THE COURT:  So thank you very much.  And you will remain

25  standby until we resolve it.

521

```
1              MR. FUENTES:  Thank you.  Understood.
2              THE COURT:  And if Mr. El Bey decides he wants you or
3    another lawyer, you will let me know.
4              MR. FUENTES:  Understood.
5              THE COURT:  Okay.
6              THE DEFENDANT:  Look, can he help me, you know?
7              MR. FUENTES:  And, Judge, we appreciate being of service
8    to the Court.  As I mentioned earlier, we respond affirmatively
9    to Court appointments.
10             THE COURT:  We are very grateful, just because I know
11   it's hard for you.
12             MR. HOTALING:  Thank you again, your Honor.
13        (At 5:49 p.m. proceedings adjourned.)
14                        C E R T I F I C A T E
15        I, Maellen E. Pittman, do hereby certify that the
16   foregoing is a complete, true, and accurate transcript of the
17   proceedings had in the above-entitled case before the Honorable
18   RICHARD A. POSNER one of the judges of said Court, at Chicago,
19   Illinois.
20
21                   /s/ Maellen E. Pittman, FCRR, RDR
22                   Official Court Reporter
23                   United States District Court
24                   Northern District of Illinois
25                   Eastern Division
```