In the

# United States Court of Appeals
### For the Seventh Circuit



CERTIFIED COPY
A True Copy
Teste:

Deputy Clerk
of the United States
Court of Appeals for the
Seventh Circuit

No. 15–3180

UNITED STATES OF AMERICA,

                        *Plaintiff-Appellee,*

*v.*

HAKEEM EL-BEY,

                        *Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 14 CR 447— **Richard A. Posner**, *Circuit Judge*.[*]

ARGUED JANUARY 5, 2017 — DECIDED OCTOBER 24, 2017

Before WOOD, *Chief Judge*, and MANION and WILLIAMS, *Circuit Judges*.

PER CURIAM. Hakeem El-Bey filed six tax returns with the Internal Revenue Service seeking $1.8 million in tax refunds to which he was not entitled. He received $600,000 from the

---

[*] Of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

2                                                          No. 15–3180

IRS as a result of two of the returns, which he used to purchase a house and numerous cars. El-Bey represented himself on charges of mail fraud and making false claims to the IRS. He advanced irrelevant arguments, interrupted the judge, and made it challenging to manage the trial. On appeal, El-Bey seeks a new trial. Although the district court was understandably frustrated by a difficult litigant, El-Bey had a right to a fair trial, and we cannot be assured that he received one. Statements by the court in the presence of the jury conveyed that El-Bey was guilty or dishonest and impaired El-Bey's credibility in the eyes of the jury. We remand the case for a new trial.

## I. BACKGROUND

In August 2009, Hakeem El-Bey, a self-described Moorish national, created an Employer Identification Number with the IRS for the Hakeem El-Bey Trust, naming himself as the trustee and fiduciary. Between August 2009 and November 2010, El-Bey filed a total of six tax returns by mail with the IRS in the name of the trust, each seeking a $300,000 refund. Each return was essentially identical: each claimed $900,000 in trust income, $900,000 in fees, $7,590 in exemptions, and $300,000 in withholding. El-Bey signed each return, identifying himself as the fiduciary of the trust, and listed his date of birth as the date of trust creation. El-Bey mailed three returns in the same envelope to the IRS in August 2009. The IRS flagged these returns as frivolously filed and mailed three letters to El-Bey informing him he would be assessed a $5,000 penalty per return if he failed to file a corrected return within twenty days.

In November 2009, El-Bey returned the three letters by mail to the IRS and included various vouchers and tax forms

No. 15–3180                                                                      3

bearing no relation to the returns. El-Bey filed the fourth identical tax return in December 2009. Based on this return, the IRS issued and mailed a $300,000 refund check to "Hakeem El Bey Trust, Hakeem El Bey Trustee." El-Bey received and deposited the check into a bank account and used the funds to cover personal expenses, to purchase two vehicles, and to buy a house. He filed the fifth identical return in May 2010. Again, the IRS issued and mailed a $300,000 refund check to the Trust. El-Bey deposited the check into a new account and used the funds for personal expenses and to purchase five vehicles. Finally, in November 2010, El-Bey filed the sixth return, but the IRS did not issue a refund to him for this return.

IRS criminal investigators interviewed El-Bey, and he admitted he signed and filed the returns, and received and deposited the checks. El-Bey did not explain how he came up with the numbers on the return and refused to answer questions regarding the $300,000 withholding amount, though he did eventually admit he had not received $900,000 each year as the Trust fiduciary. He was indicted on two counts of mail fraud, in violation of 18 U.S.C. § 1341, and six counts of making false claims to the IRS, in violation of 18 U.S.C. § 287.

### A.  Proceedings Before Trial Judge

El-Bey filed a motion to proceed without counsel and represent himself. The district court granted this motion to proceed *pro se*, and appointed standby counsel over El-Bey's objection. Gabriel A. Fuentes, El-Bey's standby counsel, appeared at every substantive proceeding in the district court until he was discharged following El-Bey's sentencing hearing. Fuentes did not act as or purport to be El-Bey's counsel, and El-Bey repeatedly and emphatically objected to Fuentes's presence.

Case: 1:14-cr-00447 Document #: 136 Filed: 01/19/18 Page 4 of 16 PageID #:2067
Case: 15-3180     Document: 00713146443     Filed: 01/19/2018     Pages: 16

4                                                              No. 15–3180

Before trial, El-Bey filed numerous motions related to admiralty law, the Uniform Commercial Code, and the Federal Rules of Civil Procedure. Although irrelevant to the criminal proceedings, the motions pertained to El-Bey's sovereign citizen beliefs. *See El v. AmeriCredit Fin. Serv., Inc.*, 710 F.3d 748, 750 (7th Cir. 2013) ("Sovereign citizens view the USG [U.S. government] as bankrupt and without tangible assets … [and] exploit this belief by filing fraudulent financial documents charging their debt to the Treasury Department." (quotation marks and citation omitted)); *see also Bey v. State*, 847 F.3d 559, 560–61 (7th Cir. 2017). The district court ruled that evidence and testimony concerning El-Bey's sovereign citizen affiliation or views were to be excluded from the jury's consideration. It advised El-Bey that non-compliance with this ruling could cause him to be excluded from court.

At trial, two IRS representatives testified for the government regarding El-Bey's tax returns and the three letters and two refund checks that the IRS sent him. During cross-examination of the government's first witness, IRS Representative Kristy Morgan, El-Bey asked whether it was her understanding that compliance with federal tax laws was voluntary. Morgan responded:

> The tax laws are based on individuals taking their information, voluntarily putting them on the tax returns, and mailing them to the IRS. However, the law states if you don't do that the IRS can come in and file for you because the law states you file and pay your income tax.

El-Bey continued, "Now, you just contradicted yourself. Because in one case you are saying that the IRS is saying filing

No. 15–3180 5

taxes is voluntary compliance?" At this point, the court interjected and the following exchange took place in the presence of the jury:

> THE COURT: Look, paying taxes is not voluntary.
>
> THE DEFENDANT: That's what it says here. I'm not saying it.
>
> THE COURT: Come on.
>
> THE DEFENDANT: Judge, I'm not saying it.
>
> THE COURT: You don't pay your tax, you go to jail.
>
> THE DEFENDANT: Judge, I'm just saying what they are saying what they have—
>
> THE COURT: Payment of taxes to the government is not voluntary.
>
> THE DEFENDANT: Okay. Judge, so you brought in from behind the law.
>
> THE COURT: Just—look, I'm going to kick you out if you keep on with this nonsense. You understand that? You can go watch the case from another room.
>
> THE DEFENDANT: Okay. I am through.
>
> THE COURT: Don't you say that tax payment is voluntary.
>
> THE DEFENDANT: I just asked a question. I didn't say it was. It's on the paper. I didn't say that, Judge. But I'm done. I'm done.

This concluded El-Bey's cross-examination of Morgan. The government had no redirect, so court recessed for the day. Once the jury had left the courtroom, the district court continued to scold El-Bey, stating:

> You don't know the law because this stuff that you have been shoving at me for the last month about the Stamp Act[,] … Foreign Sovereign Immunities Act[,] … admiralty law[,] … the Uniform Commercial Code and about the common law, this is all complete bullshit. … [Y]ou have to obey me and not keep arguing with me. And if you keep arguing, I kick you out, and I appoint Fuentes and he becomes the lawyer, and you don't get to say anything.

Before adjourning proceedings that day, the district court threatened to eject El-Bey from the trial proceedings several more times, outside of the jury's presence, if he "continue[d] disobeying [the court's] orders." The district court concluded the first day of trial by telling El-Bey, "I have been very patient with you. My patience is running out. And I want you to understand that."

The next day, before the jury entered the courtroom, the court apologized to El-Bey for its expression of frustration with him the previous day. The government expressed its concern "that some of what happened yesterday may have been potentially prejudicial to the defendant … importantly, perhaps, [it] has left a misimpression with the jury in certain respects." After the jury entered the courtroom, the court explained, "[Y]ou don't have to worry about the exchanges that Mr. El-Bey and I have had. And I don't want you to feel any

No. 15–3180 7

hostility to Mr. El-Bey just because I got annoyed occasionally." The district court then proceeded to read parts of the transcript of the previous day's exchange back to the jury, including portions of the text quoted above. It then told the jury:

> [W]hen I said: If you don't pay taxes you go to jail, what I was simply saying was you must pay taxes, and if you don't pay taxes it's criminal and you can be sent to jail. I was not talking about Mr. El-Bey, because he isn't charged with tax evasion.

The district court then polled each individual juror about their ability to be impartial in deciding the case against El-Bey. Each juror responded that he or she could and would continue to be impartial in his or her application of the law.

### B. Jury Instructions

Before trial, the government submitted its proposed jury instructions, which were based upon the Seventh Circuit's pattern instructions. El-Bey did not object to the government's instructions and submitted no instructions of his own. During the jury instruction conference before closing arguments, the government asked the district court if it anticipated any changes to the elements or definitional instructions. The district court replied that it did not, and that its changes "would be simply to try to eliminate jargon." The parties continued to closing believing that the district court planned to orally instruct the jury using the government's proposed instructions as written. However, the district court ultimately deviated from the proposed instructions in its oral instructions, including when it orally instructed the jury on materiality:

Case: 1:14-cr-00447 Document #: 136 Filed: 01/19/18 Page 8 of 16 PageID #:2071
Case: 15-3180     Document: 00713146443     Filed: 01/19/2018     Pages: 16

8                                                                          No. 15–3180

> [O]ne [element] is that … the scheme to defraud involved a materially false or fraudulent pretense, representation, or promise. That's very important, that notion of materiality. Because if you—sometimes people will lie, for example, out of embarrassment. You know, someone asks your age, you knock a couple of years off, or something like that. That would—those are not—those little white lies, those are not material falsehoods. They don't—I mean, they may embarrass you when it's discovered, but they're not—that's not wrongful conduct. It's when, with specific reference to our case, if you—if you tell—if you tell the Internal Revenue Service a lie which is capable of getting them to do something which they would never do if they knew the truth, namely, give you $300,000 to which you're not entitled, that is a material falsehood. That's fraud. And that is an element of the charges.

The jury was provided copies of the written instructions identical to those the government proposed. After deliberating for under two hours, the jury returned a guilty verdict on all counts.

## II. ANALYSIS

On appeal, El-Bey argues his conviction must be reversed for three reasons. He argues that the district court conveyed bias against him, depriving him of his Fifth Amendment right to due process and a fair trial. He also contends that the district court infringed upon his Fifth Amendment right to due

Case: 1:14-cr-00447 Document #: 136 Filed: 01/19/18 Page 9 of 16 PageID #:2072
Case: 15-3180   Document: 00713146443   Filed: 01/19/2018   Pages: 16

No. 15–3180 9

process and Sixth Amendment right to a jury trial by, he contends, partially directing a verdict on the element of materiality when it gave an ad-hoc oral instruction. Finally, he asserts that the district court indirectly commented on his failure to testify, in violation of his Fifth Amendment right to not testify, and impermissibly shifted the burden of proof from the government to him. Because it will be dispositive of this appeal, we address only El-Bey's contention that the district court conveyed bias against him that deprived him of a fair trial.

El-Bey asserts that the district court conveyed prejudicial bias against him due to: (1) inflammatory remarks made towards him at trial in the jury's presence; (2) language used throughout the jury instructions tending to presume his guilt; and (3) comparison of him to a violent street attacker during the jury instructions. He argues that these statements would be interpreted by the jury as a comment on his guilt, resulting in improper influence on the jury. Therefore, he maintains, he was deprived of his fundamental right to a fair trial. "We evaluate this claim using a two-part inquiry: (1) 'whether the judge in fact conveyed a bias regarding the defendant's dishonesty or guilt'; and (2) 'whether the complaining party has shown serious prejudice resulting from the district court's comments or questions.'" *United States v. Curry*, 538 F.3d 718, 727 (7th Cir. 2008) (quoting *United States v. McCray*, 437 F.3d 639, 643 (7th Cir. 2006)). "The ultimate inquiry is whether the defendant was deprived of a fair trial." *Curry*, 538 F.3d at 727; *see United States v. Verser*, 916 F.2d 1268, 1272–73 (7th Cir. 1990) ("Fundamental to the right to a fair trial" is that the court must not "give the impression to the jury that the judge believes one version of the evidence and disbelieves or doubts another.").

It is clear from the transcript of the trial court proceedings that El-Bey was a difficult litigant. He filed numerous irrelevant motions, disregarded court instructions, and often inappropriately interrupted the district court to express disagreement and dissatisfaction. Nonetheless, we agree with El-Bey that the district court's remarks during cross-examination of the government's first witness conveyed bias regarding his dishonesty or guilt. The district court interrupted El-Bey at the beginning of his cross-examination, stating, "Look, paying taxes is not voluntary." When El-Bey noted that he was only reading what the document stated, the district court remarked "Come on"—a statement "laced with skepticism." *United States v. Martin*, 189 F.3d 547, 554 (7th Cir. 1999). The district court continued with further remarks in the presence of the jury reflecting upon El-Bey's dishonesty or guilt, stating, "You don't pay your tax, you go to jail," and "I'm going to kick you out if you keep on with this nonsense." While the government contends that the district court's statements were merely meant to remind El-Bey that his sovereign citizen views were not permitted at trial, the purpose of the comments cannot eliminate the bias conveyed to the jury by the remarks here. The court's statements that one who does not pay taxes goes to jail and that El-Bey was acting in a nonsensical manner indicated bias about El-Bey's guilt or honesty to the jury. *Contra id*. (no bias in district court's questioning of witness where "district judge was firm, but not harsh or abusive in any way [and] [t]he questions were not laced with skepticism and they gave no indication as to the judge's thoughts about [the defendant's] honesty or dishonesty").

We also find that these comments seriously impaired El-Bey's credibility as a *pro se* defendant in the eyes of the jury. "Federal district judges are busy people and they get irritated

No. 15–3180                                                                    11

when lawyers waste their time and that of jurors, witnesses, and other lawyers. It is unfortunate, but it is inherent in an adversary system, that the cost of this irritation is likely to be borne primarily by the [defendant]." *Cooper v. Casey*, 97 F.3d 914, 919 (7th Cir. 1996). Reversible error occurs "when the judge so impairs the lawyer's credibility in the eyes of the jury as to deprive the client of a fair trial." *Id*. While a district court "must often confront courtroom behavior by attorneys which is deserving of censure, … the judge's role in the exchange [here] went far beyond the correction of an alleged misstatement." *United States v. Spears*, 558 F.2d 1296, 1298 (7th Cir. 1977). The district court's admonishments of El-Bey and threat to eject him from court occurred in the presence of the jury and "so discredited him in the eyes of the jury that he could not have remained an effective spokesman for hi[mself.]" *Id*. (finding reversible error where district court admonished defense counsel by stating counsel's statements during closing were "absurd and bordering upon a lie" and threatening to fine counsel for contempt in the presence of the jury). This harm was exacerbated by the fact that the admonishment was not directed toward defense counsel and indirectly imparted upon the defendant, but, instead, was aimed directly at the defendant while he was exercising his constitutional right to defend himself.

Next, we agree with El-Bey's contention that the comments were prejudicial. We note that although the government argues on appeal that no prejudice occurred, it expressed concern to the district court during trial that the comments "may have been potentially prejudicial to the defendant." We evaluate the district court's comments "in the context of the course of the trial." *Curry*, 538 F.3d at 728. Here, the district court's comments at the beginning of trial were not

"inadvertent, isolated and ambiguous." *Id*. Instead, the jury heard several remarks, at different parts of the trial, that conveyed that El-Bey was guilty or dishonest. As detailed above, the court made comments in the presence of the jury during cross-examination of the first government witness which conveyed that El-Bey had committed a crime. The threat to kick El-Bey out of court also seriously impacted his credibility in the eyes of the jury. The jury was present throughout the entire exchange, and the district court's remarks were "of a sort most likely to remain firmly lodged in the memory of the jury and to excite a prejudice which would preclude a fair and dispassionate consideration of the evidence." *Quercia v. United States*, 289 U.S. 466, 472 (1933) (finding prejudicial error in district court's remarks to the jury that defendant's hand wiping during his testimony "is almost always an indication of lying"). The jury's service that day ended with the court's threats to eject El-Bey from the courtroom fresh on the jurors' minds, as it was the last exchange of the day. (We do not intend to imply that reprimanding El-Bey for inappropriately introducing his sovereign citizen defense was unwarranted. "However, any such reprimand or censure should have been made outside the presence of the jury." *Spears*, 558 F.2d at 1298.)

In addition to the remarks made during cross-examination of the first government witness, El-Bey's guilt was again conveyed during the oral jury instructions to the jury at end of trial. At the end of its oral jury instructions, in the course of explaining that there were six false claims charged and two mail fraud charges, the district court stated to the jury:

> The two mail fraud[s] being the two $300,000 checks that he, Mr. El Bey, received; and the four

Case: 1:14-cr-00447 Document #: 136 Filed: 01/19/18 Page 13 of 16 PageID #:2076
Case: 15-3180    Document: 00713146443    Filed: 01/19/2018    Pages: 16

No. 15–3180                                                             13

> false claims being the $300,000 refunds that he sought but that the Internal Revenue Service didn't give him, so that they were attempts. Now, my mistake was that the first two counts which are for the two checks he received, they are also being charged as false claims. So they *are* mail fraud because through use of the mail, you know, he got all this money, but they are also—they *are* also false claims. (emphasis added).

But rather than clarifying what El-Bey was charged with, the language conveyed to the jury that El-Bey was guilty by concluding that El-Bey's receipt of the checks and money made him guilty of mail fraud and making false claims.

El-Bey also points to another oral jury instruction, when the court sought to explain to the jury that the IRS was an innocent victim:

> [I]f maybe, as I say, they were better funded, better organized, better administered the Internal Revenue Service would not have given Mr. El Bey anything, that doesn't bear on his guilt or innocence. Because, I mean, there are a great many crimes that would not occur if the victim were more cautious, right? So if you go to the toughest neighborhood in Chicago and decide to take a stroll at 3:00 a.m. and you're attacked by someone, beaten up, you're a fool for having been there and exposed yourself to this person. But the person who attacked you is guilty of a crime. So you don't blame the victim for the crime, even if you think the victim was careless.

Case: 1:14-cr-00447 Document #: 136 Filed: 01/19/18 Page 14 of 16 PageID #:2077
Case: 15-3180     Document: 00713146443     Filed: 01/19/2018     Pages: 16

We agree with El-Bey that comparing the fraud crimes El-Bey was charged with to a violent attack on an individual could be seen as an insinuation to the jury that El-Bey's actions were as reprehensible as those of a violent and brutal criminal.

"Judicial comments in the presence of the jury are subject to special scrutiny because of the recognized fact that 'the influence of the trial judge on the jury is necessarily and properly of great weight, and that his lightest word or intimation is received with deference, and may prove controlling.'" *United States v. Dellinger*, 472 F.2d 340, 386 (7th Cir. 1972) (quoting *Quercia*, 289 U.S. at 472). Here, the district court's "deprecatory and often antagonistic attitude toward the defen[dant] is evident in the record from the very beginning. It appears both in the presence and absence of the jury." *Dellinger*, 472 U.S. at 386.[1] "Most significant, however, were remarks in the presence of the jury, deprecatory of [El-Bey] and [his] case." *Id*. at 387. These statements implied that El-Bey "was inept, bumptious, or untrustworthy, or that his case lacked merit." *Id*. Cumulatively, the comments "telegraphed to the jury the judge's contempt for the defen[dant,]" *id.*, and seriously prejudiced El-Bey. *See also Spears*, 558 F.2d at 1298 ("[W]e think the trial judge 'lost his cool,' departed from the equanimity of spirit required of him, and seriously prejudiced the defense.").

But the government continues, arguing that even if the court's remarks were prejudicial, its curative instruction at the

---

[1] In addition to the remarks made in the presence of the jury, outside of the jury's presence, the district court threatened to eject El-Bey from trial proceedings several times, made several comments conveying his dissatisfaction with El-Bey's self-representation, and repeatedly remarked that El-Bey did not know what he was doing and did not know law.

No. 15–3180                                                   15

beginning of the second day of trial and at the beginning of its oral instructions to the jury resolved any prejudice. As the government notes, "jurors are presumed to follow limiting and curative instructions[,]" *United States v. Smith*, 308 F.3d 726, 739 (7th Cir. 2002), and we have previously found such instructions reduce the risk of any prejudice the court may have conveyed. *See United Sates v. McCray*, 437 F.3d 639, 644 (7th Cir. 2006). Here, the district court explained to the jury on the second day that it shouldn't "worry about the exchanges" and shouldn't "feel any hostility to Mr. El Bey just because I got annoyed occasionally." However, during this instruction, the court read portions of the previous day's exchange back to the jury, reminding the jury, for example, of the court's comment that "If you don't pay taxes you go to jail." While we understand the attempt to mitigate the effect of the previous day's comments and to clarify that El-Bey was not charged with tax evasion, reading the transcript back to the jury meant the jury now heard the comments from the judge a second time.

In its final instructions, the court gave the following instruction: "[Y]ou shouldn't think that I have expressed or taken any view on this. I respect your domain, which is to issue the verdict, and I'm not trying to influence you in any way." But it followed this remark by comparing El-Bey to a violent assailant, and a "definite and concrete assertion of fact, which [it] had made with all the persuasiveness of judicial utterance[,]" *Quercia*, 289 U.S. at 472, that El-Bey's actions constituted mail fraud and false claims. This assertion of the district court's view that El-Bey was guilty of the charges was made shortly before the jury began its deliberations. *Cf. United States v. Donato*, 99 F.3d 426, 435 (D.C. Cir. 1996) (per curiam) (citation omitted) (negative comments by judge revealed

"such a high degree of … antagonism as to make fair judgment impossible").

Although there is more than enough evidence of El-Bey's guilt, "we must … conclude that the unfairness in the trial requires reversal. Any other holding would constitute the adoption of the principle that a defendant the court thinks is obviously guilty is not entitled to a fair trial." *Spears*, 558 F.2d at 1297.

### III. CONCLUSION

El-Bey's conviction is VACATED, and we REMAND the case for a new trial.